UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

COREY FORD,

                                        Plaintiff,
                                                              9:16-CV-01001
v.
                                                              (MAD/TWD)
RICHARD DEACON, et al.,

                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

COREY FORD
95-A-8605
Plaintiff pro se
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. BARBARA UNDERWOOD             KYLE W. STURGESS, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        The claims remaining in *pro se* Plaintiff Corey Ford's civil rights action, brought under

42 U.S.C. § 1983, are: (1) First Amendment retaliation claims against Defendants Richard

Deacon ("Deacon"), formerly a Lieutenant with the Department of Corrections and Community

Supervision ("DOCCS"), working at Shawangunk Correctional Facility ("Shawangunk"), and

Tracy Phillips ("Phillips"), a DOCCS Correction Officer ("C.O."), also at Shawangunk; (2) First

Amendment retaliation claims against Deacon, Christopher Miller ("Superintendent Miller"), Superintendent at Great Meadow Correctional Facility ("Great Meadow"); Rodney Eastman ("Eastman"), First Deputy Superintendent at Great Meadow; and Colin Fraser ("Fraser"), a Captain at Great Meadow, for acts that occurred at Great Meadow; (3) Eighth Amendment conditions of confinement claims against Defendants Superintendent Miller, Eastman, and Fraser occurring at Great Meadow; (4) Fourteenth Amendment due process claims against Defendants Superintendent Miller and Eastman at Great Meadow; and (5) First Amendment retaliation and access to court claims against Defendant C.O. Daniel McClenning ("McClenning") at Great Meadow.  (*See generally* Dkt. Nos. 1 and 9.)  Defendants now move for summary judgment pursuant to Rule 56.  (Dkt. No. 64.)  Plaintiff has filed papers in opposition to Defendants' motion, and Defendants have filed a reply.  (Dkt. Nos. 69, 70.)

For reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted in its entirety.

## II.   FACTUAL BACKGROUND

### A.   Incident at Green Haven Correctional Facility

On April 14, 2004, while Plaintiff was being housed in Green Haven Correctional Facility ("Green Haven"), Plaintiff assaulted C.O. Matt Miller by burning him with a hot oily substance and stabbing him multiple times.  (Dkt. Nos. 64-1 at ¶¶ 5-6; 69-2 at ¶¶ 5-6.[1])  Defendant McClenning was involved in subduing Plaintiff and testified against him in the trial on criminal

---

[1] Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

charges resulting from the assault.  (Dkt. No. 69-3 at 74, 77-89.[2])

In 2005, Plaintiff commenced a civil action against a number of corrections personnel,

including McClenning, alleging, *inter alia*, excessive force as he was escorted to the special

housing unit ("SHU") following the April 14, 2004, incident.  (Dkt. No. 64-2 at 81-83.)  *See*

*Ford v. Phillips, et al.*, No. 1:05-cv-06646-NRB (S.D.N.Y. 2005), Dkt. No. 2.  The action was

settled after it had been dismissed against McClenning based upon a determination that

McClenning had not acted improperly in subduing Plaintiff.  *See* No. 1:05-cv-06646-NRB

(S.D.N.Y. 2005), Dkt. No. 74.

**B.**  **Shawangunk**

1.  Deacon

Subsequent to the April 14, 2004, assault, Plaintiff was transferred to Shawangunk where

he remained in the special housing unit ("SHU") until on or about May 28, 2014.  (Dkt. Nos. 64-

1 at ¶ 8; 69-2 at ¶ 8.)  Defendant Deacon, who had been assigned to Green Haven at the time of

the April 14, 2004, attack on Miller, was the A & B Housing Unit Sergeant and was responsible

for overseeing SHU on the 3pm to 11pm shift at Shawangunk from approximately 2012 through

late 2013.  (Dkt. No. 64-3 at ¶¶ 7-8.)

Deacon was assigned to Green Haven at the time of Plaintiff's April 2004 attack on

Miller and was moved to Shawangunk in 2012.  (Dkt. No. 64-3 at ¶¶ 1, 4.)  Plaintiff was not

familiar with Deacon prior to Deacon's arrival at Shawangunk.  (Dkt. No. 64-2 at 69-70.)

Plaintiff claims that beginning in or about August or September of 2012, Deacon engaged in a

---

[2]  Page references to documents identified by docket number are to the numbers assigned by
the CM/ECF docketing system maintained by the Clerk's Office.

3

course of harassment against him by: (1) in August or September 2012 telling Plaintiff he would do everything in this power to ensure Plaintiff was never released from SHU into general population because of what Plaintiff had done to Matt Miller, one of Deacon's closest friends, Dkt. No. 64-2 at 74-75); (2) generally harassing Plaintiff by doing such things as yelling into his cell in an attempt to bait him into engaging in misconduct that would result in a misbehavior report (Dkt. Nos. 1 at ¶ 14; 64-2 at 109-111); (3) giving Plaintiff smaller portions of food (Dkt. No. 64-2 at 114); and (4) playing a role in the search of Plaintiff's cell and the confiscation and destruction of a Bible that had been in Plaintiff's possession for eighteen years.[3] (Dkt. Nos. 1 at ¶¶ 39-40; 64-2 at 132-36, 147; 64-2 at 98, 115-17, 161-62, 210-12.)  Plaintiff claims that Deacon's harassing actions at Shawangunk were done in retaliation for Plaintiff's April 2004 attack on Miller at Green Haven.  (Dkt. No. 1 at ¶ 117.)

Deacon has denied Plaintiff's allegations including: (1) being friends with Matt Miller or knowing of any lawsuits Plaintiff brought against Miller or McClenning; (2) threatening Plaintiff or engaging in any harassing behavior against him; (3) involvement in the destruction of Plaintiff's Bible; and (4) involvement in Plaintiff being placed in administrative segregation ("Ad Seg") at Great Meadow.  (*See generally* Dkt. No. 64-3.)

    2.   <u>Phillips</u>

In his complaint, Plaintiff has alleged that Defendant Phillips, along with Deacon, destroyed his Bible.  (Dkt. No. 1 at ¶ 40.)   Phillips is a C.O. who has worked at Shawangunk

---

[3] In his response to Item 27 of Defendants' Statement of Material Facts, Plaintiff denies ever accusing Deacon of engineering the confiscation of his Bible, only the destruction.  (Dkt. No. 69-2 at ¶ 27.)  In response to Item 29, Plaintiff explains that the search was not ordered or directed by Deacon, whose responsibilities at the time did not involve cell searches in SHU.  *Id.* at ¶ 29.

during most of his time with DOCCS.  (Dkt. No. 64-4 at ¶ 4.)  Phillips knew of the April 2004

incident at Green Haven but has never worked at Green Haven and never knew or worked with

Matt Miller.  *Id*.  Phillips was unaware that Plaintiff had sued Green Haven corrections personnel

after the incident.  *Id*.  From approximately 2010 through 2015, Phillips worked in the

Shawangunk disciplinary office, and while he knew who Deacon was, they did not work in the

same area except when one of them picked up overtime outside of their normal positions, and

Phillips was not supervised by Deacon.  *Id*. at ¶ 5.

Phillips acknowledges having participated in several cell searches in SHU, including

Plaintiff's cell, in April 2014, at the direction of Lieutenant Gardner, but does not recall whether

he or anyone else confiscated Plaintiff's Bible.  *Id*. at ¶ 6.  Phillips, however, denies having been

ordered to destroy Plaintiff's Bible by Deacon or being involved in the destruction of Plaintiff's

Bible.  *Id*. at ¶ 8.  While Plaintiff continues to believe Phillips destroyed his Bible, *see* Dkt. 69-2

at ¶ 32, Plaintiff testified at his deposition that, except for the Bible, Phillips had "always been a

sweetheart" and was being used as a pawn by Deacon in destroying the Bible.  (Dkt. No. 64-2 at

148-49.)  When asked whether he thought Phillips was following orders in destroying the Bible

or retaliating against Plaintiff, Plaintiff responded that he believed Phillips was following

Deacon's orders.  *Id*. at 150.

### C.   Great Meadow

#### 1.   Placement in Ad Seg

##### a.   Fraser's Recommendation

Plaintiff was transferred to Great Meadow on or about May 28, 2014, and placed in

keeplock for what he believed to be fifteen days.  (Dkt. Nos. 1 at ¶ 44; 64-6 at 10.)  Shortly

before Plaintiff's arrival at Great Meadow, Defendant Fraser, who was a member of the facility's Crisis Intervention Unit ("CIU"), which dealt with the assessment and development of strategies for dealing with certain types of security and safety issues at the facility, received an email from Deacon informing him that Plaintiff was an active member of the Bloods street gang and claimed to be a "two star" general in the organization.  (Dkt. No. 64-5 at ¶¶ 5, 10 and pp. 11-12.)  Upon receipt of the email from Deacon, Fraser decided to take a closer look at Plaintiff's background and contacted the DOCCS Central Office, which tracks gang information to verify that Plaintiff was associated with the Bloods.  *Id.* At ¶ 11.  Fraser also asked Deacon about Plaintiff's conduct and reviewed Plaintiff's disciplinary history, which he found to be extensive.  *Id.*  Plaintiff's disciplinary history included, *inter alia*, the attack on Matt Miller and assaults on other inmates. *Id.*; Dkt. No. 64-2 at 251-56.

Based upon the information he collected, on May 28, 2014, Fraser recommended that Plaintiff be considered for Ad Seg status.  (Dkt. No. 64-5 at ¶ 12 and p. 13.)  Superintendent Miller approved Fraser's recommendation that Plaintiff be placed in Ad Seg, which triggered Plaintiff's right to an Ad Seg hearing.  (Dkt. Nos. 64-6 at 15; 64-7 at ¶ 10.)

Plaintiff claims he has never been a member of the Bloods street gang, and that Deacon gave Fraser false information in retaliation for Plaintiff's attack on Matt Miller ten years earlier and the filing of grievances against Deacon at Shawangunk.  (Dkt. Nos. 1 at ¶¶ 117, 126-27; 64-2 at 116; 161; 64-6 at 18.)  Plaintiff testified at his deposition that Fraser had written the recommendation for Ad Seg because Fraser had worked closely with Matt Miller at Green Haven, and before the Ad Seg hearing, Fraser told Plaintiff that Plaintiff had hurt Fraser's friend Matt Miller. (Dkt. No. 64-2 at 195-96.)  Plaintiff believed there could be no other reason for

6

Fraser making the recommendation than the incident in which Plaintiff assaulted Matt Miller. (Dkt. No. 64-2 at 197.)

In his declaration, Fraser has stated that the recommendation was not based primarily on gang affiliation or Plaintiff's rank in the organization, but on the cumulative effect of Plaintiff's affiliations and history, in particular his assaults on staff and inmates, coupled with his threatening demeanor, al of which made Plaintiff a security risk in general population. (Dkt. No. 64-5 at ¶ 13.) Although not reflected in his Ad Seg recommendation or hearing testimony, in his declaration, Fraser has stated he was also concerned that Plaintiff's history and high profile might make him a target of other inmates. *Id.* at ¶ 14; Dkt. Nos. 64-5 at 13; 64-6 at 20-23.

b.    Ad Seg Hearing

Plaintiff was served with the formal charges on May 29, 2014, and met with his chosen assistant the following day. (Dkt. No. 64-6 at 9-10, 12.) Plaintiff refused to sign the statement agreeing the assistant had "interviewed witnesses, assisted as required, and reported the results to the inmate charged." *Id*. at 12. The statement did not identify any documents or witnesses requested by Plaintiff. *Id*. at 12.

According to Superintendent Miller, Great Meadow's hearing officers, including full time hearing officers and several members of the facility administration who handle hearings in addition to their regular duties, operate on a "wheel" or rotation, and Miller's assignment of Eastman as hearing officer was based on the rotational schedule. (Dkt. No. 64-7 at ¶ 10.) Plaintiff testified at his deposition that when he told Superintendent Miller prior to the hearing that Plaintiff had been sent to Great Meadow to be killed, hurt very badly, or paralyzed, Miller told Plaintiff that Eastman would be his Ad Seg hearing officer, and Plaintiff would be found

guilty. (Dkt. No. 64-2 at 199-200.) Miller denies ever having a conversation with Plaintiff in which he told Plaintiff his placement in Ad Seg was retaliatory. (Dkt. No. 64-7 at ¶ 17.)

Plaintiff's hearing was held before Eastman on June 5 and 6, 2014. (Dkt. No. 64-6 at 15-24.) Plaintiff claims that there was an off the record discussion before Eastman commenced the proceedings on June 6, 2014, in which Eastman and Fraser told Plaintiff "'that he better not object to anything that may take place during the proceedings.' 'They bolster that plaintiff was lucky they do not release the 700 officers to kill him.' 'Because plaintiff hurt a very close friend of defendant Fraser,' and suit his other friend, defendant McClenning and grieved his pal, defendant Deacon." (Dkt. No. 1 at ¶ 56) (unaltered text). Plaintiff contends that the threats were real and severe, and once they were over, Plaintiff had no choice but to agree not to object on the record. *Id*. at ¶¶ 56-57. Fraser has denied making any off the record comments or threats at the hearing or observing Eastman doing so. (Dkt. No. 64-5 at ¶ 15.)

Plaintiff's assistant was not present at the hearing, and Plaintiff informed Eastman that although the assistant's statement did not list any additional information or supporting documentation requested by Plaintiff, Plaintiff had, in fact, requested "any and all information they were using saying that I am part of some gang now all of a sudden after all these years." (Dkt. No. 64-6 at 15-16.) According to Plaintiff, he was told by his assistant that he would have to receive the information at the hearing. *Id*. at 16. Eastman confirmed that Plaintiff had already received the Ad Seg report and told Plaintiff he would receive copies of supporting documentation entered into the record at the hearing. *Id*. Eastman also noted that Plaintiff had not requested any witnesses, and Plaintiff responded he did not know who to call. *Id*. Plaintiff told Eastman he did not like it being said that Plaintiff was a part of something and putting a

8

target on him so when he was ready to go to another facility he was already targeted by the officers because he was said to be part of a gang. (Dkt. No. 64-6 at 20.) Eastman noted on the record that Plaintiff believed the Ad Seg hearing was being conducted, in part, because of the assault on Matt Miller in 2004. *Id*. at 20.

Fraser was the sole witness at Plaintiff's hearing. *Id*. at 20-22. By way of background, Fraser testified that he had numerous trainings on gang intelligence and gang awareness as a member of the CIU. *Id*. at 21. Eastman asked Fraser how he confirmed Plaintiff was part of a gang, to which Fraser responded that after receiving the email from Shawangunk that Plaintiff was a member of the Bloods and held the position of General, Fraser confirmed it through DOCCS Central Office. *Id*. at 20. Fraser testified that "[b]ased on [Plaintiff's] affiliation with Bloods and the seriousness of the assault that occurred in Green Haven Correctional Facility, um, I believe his presence in our population presents a danger to both general population, staff, and the facility itself." *Id*. at 21.

Eastman gave Plaintiff an opportunity to present questions for Eastman to ask Fraser on Plaintiff's behalf. *Id*. In response to those questions Fraser testified that Deacon was the individual at Shawangunk who had stated Plaintiff was a gang member. *Id*. When asked the identity of the individual with whom Fraser had communicated at Central Office regarding Plaintiff's alleged gang involvement, Fraser responded he was not 100% sure and could look at the email, but that typically it would be Senior Investigator Demo ("Demo"). *Id*. at 21-22. Fraser was unable to respond to Plaintiff's question regarding the approximate date on which Plaintiff was identified as a member of the Bloods and to which particular set of the Bloods he belonged. *Id*. at 22.

9

At the end of Fraser's testimony, Eastman noted that on the previous day, Plaintiff had told Eastman he had no witnesses to present, and Eastman then stated he would call Plaintiff back later to read his decision in the record.  (Dkt. No. 64-6 at 22.)  Eastman subsequently read his disposition affirming the Ad Seg order and identifying the evidence upon which he relied as Fraser's recommendation identifying Plaintiff as a high ranking individual of the blood gang; Plaintiff's disciplinary record reflecting the assault on Matt Miller in 2004; and Fraser's testimony which Eastman found creditable.  *Id*. at 22.  Eastman stated further that "[t]he reason for my determination is based on the evidence presented to me.  It is clearly your presence in general population here in Great Meadow Correctional Facility to represent a considerable threat to the safety and security of the facility."  *Id*.; Dkt. No. 64-6 at 26.  (unaltered transcript).

Eastman had told Plaintiff he would receive copies of documents entered into the record at the hearing.  (Dkt. No. 64-6 at 16.)  Plaintiff testified at his deposition that he asked Fraser to let him see the emails about which Fraser had testified at the hearing, and Fraser had told Plaintiff he would see them if they were introduced and relied upon at the hearing.  (Dkt. No. 64-2 at 198-99.)  However, no new documents, including the emails between Fraser and Deacon and Fraser and Demo regarding Plaintiff's gang involvement, which Fraser testified had been relied upon by him in making his recommendation, were entered into the record or provided to Plaintiff.  (Dkt. No. 64-6 at ¶ 15.)

Superintendent Miller reviewed and approved Eastman's determination for the reasons set forth in Eastman's determination on the record.  (Dkt. No. 64-7 at 4.)

### c.    Administrative Appeal

Plaintiff submitted an administrative appeal to SHU Commissioner Albert Prack ("Prack") on or about June 9, 2014.  (Dkt. Nos. 1 at ¶ 62; 69-3 at 133-41.)  The grounds raised on appeal by Plaintiff were lack of meaningful assistance; failure to produce documentary evidence that would substantiate Fraser's testimony regarding information received from Shawangunk and the Central Office regarding Plaintiff's alleged membership in the Bloods gang and provide sufficient proof to support administrative segregation; and failure to provide an impartial hearing officer.  (Dkt. No. 69-3 at 133-41.)  Prack reviewed and summarily affirmed the determination in the Ad Seg hearing on August 5, 2014.  *Id*. at 142.

### d.    Article 78

Plaintiff commenced an Article 78 proceeding in New York State Court challenging the placement in Ad Seg in or about October of 2014, following the affirmance by Prack.  (Dkt. No. 64-2 at 273-313.)  Plaintiff challenged the Ad Seg determination as arbitrary and capricious and in violation of Plaintiff's substantive, regulatory, and procedural due process rights; based on a false misbehavior report; overly vague with regard to Plaintiff's alleged gang membership and emails from Deacon and Demo to Fraser supporting the gang membership allegation against Plaintiff; and failure to present evidence of the emails allegedly relied upon by Fraser.  *Id*. at 303-04, 308.  Plaintiff also raised the alleged threats by Eastman and Fraser prior to the hearing and claimed he was denied meaningful employee assistance in connection with the hearing.  *Id*. at 307-08.

The Article 78 was sent to the Appellate Division Third Department on a substantial

evidence question after the Attorney General responded. (Dkt. No. 69-3 at 291.) Plaintiff claims

he was unable to file a brief in the Article 78 as directed by the Third Department because his

legal papers for the proceeding had been lost or destroyed when he was moved from Great

Meadow to Five Points Correctional Facility ("Five Points"), and Plaintiff did not have $39.00 to

obtain a copy of his Article 78 petition from the Court. (Dkt. Nos. 1 at ¶¶ 108, 110, 122; 69-3 at

297.)

<p style="text-align:center">e.    <u>Ad Seg Periodic Reviews</u></p>

The first of Plaintiff's two Ad Seg reviews was completed by the facility three-member

committee on September 9, 2014, and signed off on by Superintendent Miller on September 10,

2014. (Dkt. No. 69-3 at 168.) Information provided by the committee regarding Plaintiff's

behavior and attitude while in Ad Seg was that "[s]ubject's attitude and behavior appear to be

appropriate. He has had no issue adhering to unit protocol or following staff direction. He has

not received any subsequent misbehavior reports." *Id*. The committee nonetheless found that

Plaintiff's having shown "a propensity for violence" favored retaining him in Ad Seg. *Id*.

Superintendent Miller decided that Plaintiff should remain in Ad Seg, writing "[a]s stated by

committee It is clear that your assignment to G.P. would pose a threat to your safety and the

safety of other I/M's as well as the safety of staff. Admin. Seg. is therefore appropriate at this

time." *Id*. (unaltered text).

Plaintiff submitted a written statement in response to the review and Superintendent

Miller's determination on September 15, 2014. *Id*. at 176. Plaintiff reiterated that no emails or

other evidence had been produced at his Ad Seg hearing to support the allegations relied upon in

placing him in administrative segregation. (Dkt. No. 69-3 at 176.) Plaintiff claimed he had been

sent to Great Meadow to be killed for what he had done to Matt Miller, and that Fraser, who

authored the Ad Seg recommendation, had been a close friend of Matt Miller's.  *Id.* at 176-77.

Plaintiff also raised that he had been threatened with retaliation by Deacon for attacking Miller,

and Deacon was the one who sent the email identifying Plaintiff as a member of the Bloods.  *Id*.

at 178.

Plaintiff's second periodic review was completed by the committee on November 12,

2014, and signed off on by Superintendent Miller on November 17, 2014.  *Id*. at 192.  The review

was essentially the same as the September, 9, 2014, review, and Superintendent Miller's rationale

for keeping Plaintiff in Ad Seg was "As stated above."  *Id*.

Plaintiff wrote a written response on November 19, 2014, in which he claimed that

Fraser, Eastman, and Superintendent Miller were aware he had never been a gang member.  *Id*. at

193.  Plaintiff again expressed his belief that his placement in Ad Seg was all part of a conspiracy

by Deacon, Fraser, Eastman, and Superintendent Miller to retaliate against him because of Matt

Miller.  *Id*.

According to Plaintiff, on or about November 19, 2014, when Offender Rehabilitation

Coordinator Arena ("Arena"), one of the members of the Ad Seg review committee, was making

rounds in SHU, Plaintiff asked her what evidence was considered in the decision to keep him in

administrative segregation.  (Dkt. No. 1 at ¶ 82.)  According to Plaintiff, she responded that no

further investigation was done, and the decision to keep Plaintiff in Ad Seg was based on the Ad

Seg hearing packet.  *Id*.; *see also* Dkt. No. 64-2 at 220.

2.      Conditions of Confinement at Great Meadow

According to Plaintiff, shortly after his arrival at Great Meadow, he was placed in SHU cell F-1 29, which smelled unclean and of another human being.  (Dkt. No. 1 at ¶ 46.)  Plaintiff saw and smelled feces and months of dried urine on the cell bars and gate mesh, plexiglass, and feed-up slot.  *Id.*  The cell floors were caked with dirty buggers and other unknown stains, and the sink and toilet were extremely filthy with months upon months of dirt, food, and waste.  *Id.*  Plaintiff's request for cleaning supplies was denied, and he was deprived of cell clean up for eleven days.  *Id.*  Plaintiff remained in cell F-1 29 for around a month to a month and a half before being moved to F-1 15.  (Dkt. No. 64-2 at 175-77.)

Plaintiff claims that while in cell F-1 29, he was surrounded by mental patients who banged on their plexiglass and metal walls with their feet, hands, and gallon buckets day and night.  *Id.* at ¶ 61.  Plaintiff contends that the area in which he was placed was an area for torture designated for inmates for retaliatory reasons.  *Id.*  At his deposition, Plaintiff testified that everyone knows cell F-1 29 is a punishment cell.  (Dkt. No. 64-2 at 170.)

Plaintiff has submitted the affidavit of inmate, Angel Ordonez ("Ordonez"), dated June 9, 2014, whom Plaintiff has described as a depressed mental patient who had attempted suicide on numerous occasions, regarding Plaintiff's placement in cell F-1 29 and the condition of the cell.[4] (Dkt. Nos. 1 at ¶ 61; 69-3.)  According to Ordonez, he had resided in the cell until May 28, 2014,

---

[4] Aside from his statements regarding the condition of cell F-1 29 while he was housed there and of observing an unidentified individual deny Plaintiff cleaning supplies, Ordonez's affidavit is largely inadmissible hearsay that cannot properly be considered in opposition to Defendants' summary judgment motion.  *See Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) ("hearsay assertion that would not be admissible if testified to at trial is not competent for a Rule 56 affidavit").

when he was moved to cell F-1 27 shortly before Plaintiff was moved into cell F-1 29.  (Dkt. No. 69-3 at ¶ 1.)  Ordonez corroborated to some degree Plaintiff's description of the condition of the cell, and Ordonez explained that he had not been allowed to clean the cell because he had a mental health disorder.  *Id*. at ¶ 4.  Ordonez claimed the cell had not been cleaned for 120 days.  *Id*. at ¶ 5.  Ordonez stated in his affidavit that he saw Plaintiff being denied cleaning supplies.  *Id*. at ¶ 18.

In or about June or July 2014, Plaintiff wrote a grievance complaining the F Block ventilation system was off.  (Dkt. No. 64-7 at 10.)  Superintendent Miller noted in his decision on the grievance that the system was off but reset as soon as possible, and that the system occasionally kicked off and maintenance was doing everything in its power to resolve the situation.  (Dkt. No. 64-7 at 10.)  Plaintiff wrote a number of grievances on conditions of confinement after being moved to cell F-1 15.[5]  A September 15, 2014, grievance complained of broken windows from cell F-1 17 down to F-1 cell 29.  (Dkt. No. 69-3 at 180.)  The grievance was denied through Plaintiff's appeal to the Central Office Review Committee ("CORC") on the grounds that the windows had been inspected and found to be free from deficiencies.  (Dkt. No. 69-3 at 181-84.)

Plaintiff also wrote a grievance complaining of the showers being cold with very low water pressure for the previous month, and cold air coming into the showers on the bottom of the yard doors, dropping the temperature in the shower room to freezing at night.  (Dkt. No. 69-3 at 186.)  The Superintendent granted Plaintiff's grievance to the extent of having the maintenance

---

[5]  In his complaint, Plaintiff alleges he was moved to cell F-2 15.  (Dkt. No. 1 at ¶ 131.) At his deposition, Plaintiff corrected it to cell F-1 15.  (Dkt. No. 64-2 at 189.)

department contacted to inspect the water pressure and temperature.  (Dkt. No. 69-3 at 188.)

On October 27, 2014, Plaintiff wrote another grievance complaining that the vents were inoperable.  *Id*. at 190.  According to Plaintiff, he had written numerous grievances complaining of the ventilation system.  *Id*.  On December 7, 2014, Plaintiff wrote a grievance complaining that the exhaust fan in front of his cell was constantly being turned on as a collective punishment for all of the inmates, raising the noise level, causing a drop in temperature, resulting in yelling and banging on the cell walls with buckets by the mentally ill and other inmates.  (Dkt. Nos. 69 at ¶ 49; 69-3 at 258, 273.)  Plaintiff also wrote to Superintendent Miller complaining of the use of the exhaustion fan as a collective punishment for the inmates.  *Id*. at 258.

On or about December 14, 2014, Plaintiff was moved to cell 24 on the even side of F-Block.  (Dkt. No. 1 at ¶ 87.)  The even side was considered the quiet side without extremely loud inmates or mental patients.  *Id*.  According to Plaintiff, the cell was filthy with a barely workable sink, and his request for cell clean-up was denied.  *Id*.  Plaintiff requested that a work order be put in for sink repair but nothing happened.  *Id*.

### 3.    Loss or Destruction of  Legal Documents

On or about February 5, 2015, Plaintiff was advised by the area supervisor ("Sergeant") he was being packed up and drafted out of Great Meadow.  (Dkt. No. 1 at ¶ 90.)  Plaintiff asked the Sergeant who would pack his property, and the Sergeant responded they were not taking any bags.  *Id*.  Plaintiff's cell bag, which had all of his active legal work in it, including the Article 78 he was pursuing at the time, was in the draft officer's possession when Plaintiff left Great Meadow, although according to Plaintiff, all of his bags should have accompanied him when he left.  (Dkt. No. 64-2 at 92-93.)  When Plaintiff arrived in the draft room, all of his personal

16

property was there except for his cell bag.  (Dkt. No. 69-3 at 264.)

In the draft room, Plaintiff saw Defendant McClenning, who had been involved in stopping the assault on Matt Miller in 2004, testified against Plaintiff at the criminal trial on the assault, and was initially a defendant in Plaintiff's civil action.  *Id*.  McClenning had Plaintiff sign additional I-64 forms.  *Id*. at ¶ 91.  When Plaintiff asked him why, McClenning told him to shut up.  *Id*.  According to Plaintiff, McClenning told Plaintiff he had been waiting to "get your ass for 10 years.  You hurt my friend Miller. . . .  Deacon ensured to keep track of you and sent us work to get your ass, mother fucker. . . . You filed a lawsuit against me, and wrote grievances against my friend Sgt. Deacon, you know we always win, and keep track of you mother fucker." *Id*. at ¶ 91.

McClenning drove Plaintiff to Washington Correctional Facility ("Washington").  (Dkt. No. 64-2 at 91.)  From there, Plaintiff was driven to Downstate Correctional Facility ("Downstate").  *Id*.  Plaintiff's personal belongings should have been on the bus to Washington and then transferred to Downstate with Plaintiff.  *Id*. at 93.  However, when Plaintiff finally arrived at Five Points Correctional Facility ("Five Points"), on February 9, 2015, he was informed he had no property.  (Dkt. No. 69 at ¶ 53.)  Plaintiff did not get his cell bag back until February 12 or 13, 2015.  (Dkt. No. 64-2 at 95.)  The cell bag had a big hole in the bottom that looked like it had been made with a knife, and Plaintiff's active legal papers were gone.  Plaintiff claims that McClenning was responsible for damaging the cell bag and destroying Plaintiff's legal papers.  *Id*. at 99.  Plaintiff testified at his deposition that he thought McClenning had acted in retaliation for Plaintiff filing a lawsuit against him in 2004 and probably writing up Deacon, and not for the assault on Matt Miller.  (Dkt. No. 64-2 at 95-96.)

17

In his declaration, McClenning states he never directly handled Plaintiff's property or had it in his direct possession.  (Dkt. No. 64-8 at ¶ 8.)  According to McClenning, his sole responsibility was transporting Plaintiff's person to Washington.  *Id*. at ¶ 10.  McClenning denies destroying or misplacing any of Plaintiff's property or throwing away legal material from Plaintiff's active litigation.  *Id*.  Moreover, McClenning denies having had any knowledge regarding Plaintiff's active litigation.  *Id*.

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[6] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball*

---

[6] The Court finds that Plaintiff's complaint is properly verified. (Dkt. No. 1 at 34.)

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[7] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record supporting those instances where he disputes a statement included in Defendants' statement of undisputed facts.[8] (See Dkt. No. 69-2.)

Where a party has failed to respond to the movant's statement of material facts in the

_____

[7] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

manner required under N.D.N.Y.  L.R. 7.1(a)(3), the facts in the movant's statement to which

Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported

by evidence in the record,[9] and (2) the nonmovant, if proceeding *pro se*, has been specifically

advised of the possible consequences of failing to respond to the motion.[10]  *See Champion v.*

*Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Because Plaintiff's responses to the items in Defendants'

statement of material facts that are disputed by him do not cite supporting admissible evidence

and do not themselves constitute admissible evidence, the Court will not consider the responses

in opposition to Defendants' motion.  *See Spiegel,* 604 F.3d at 81 (court may rely only on

admissible evidence in determining whether summary judgment is appropriate).  However, in

deference to Plaintiff's *pro se* status, the Court, in the exercise of its discretion, has opted to

conduct an assiduous review of the entire summary judgment record despite Plaintiff's failure to

comply with the local rule.  *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001).

## V.    LEGAL STANDARDS FOR  PLAINTIFF'S CLAIMS

### A.    First Amendment Retaliation

Plaintiff has asserted First Amendment retaliation claims against Defendants Deacon,

Phillips, Miller, Eastman, Fraser, and McClenning.  (Dkt. No. 64-9 at 3-10, 16-19, 22-23.)   To

---

[9] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy  Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[10] The Clerk's Office provided Plaintiff with the requisite notice of the consequences of his failure to respond to Defendants' summary judgment motion.  (Dkt. No. 65 at 2.)

prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)).  "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.  Otherwise, the retaliatory act is simply *de minimis* and outside the scope of constitutional protection.  *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 492-93).  The adverse action inquiry is a contextual one.  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) *(*citing  *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 493 (quoting *Thaddeus X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)).

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the

alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a

hearing on the matter; and (iv) statements by the defendant concerning his motivation.

*Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873).

"The causal connection must be sufficient to support an inference that the protected conduct

played a substantial part in the adverse action." *Id.*  A showing of temporal proximity, without

more, has generally been found insufficient to survive summary judgment.  *See Roseboro,* 791 F.

Supp. 2d at 370 (citations omitted).

Because of the relative ease with which claims of retaliation can be incanted, courts have

scrutinized retaliation claims with particular care.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d

Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. at 506.  As the Second Circuit

has noted,

> [t]his is true for several reasons.  First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve
> questions of intent and are therefore easily fabricated.  Second,
> prisoners' claims of retaliation pose a substantial risk of
> unwarranted judicial intrusion into matters of general prison
> administration.  This is so because virtually any adverse action
> taken against a prisoner by a prison official--even those otherwise
> not rising to the level of a constitutional violation--can be
> characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491.  Accordingly, claims of retaliation must be supported by specific facts;

conclusory statements are not sufficient.  *Flaherty*, 713 F.2d at 13; *see also Houston v. Goord*,

No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at *11 (N.D.N.Y. Mar. 31, 2009) ("Analysis

of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning

the protected activity in which the inmate Plaintiff has engaged and the adverse action taken

against him or her, as well as the evidence tending to link the two.  When such claims, which

ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (defendant may be entitled to summary judgment upon showing that the alleged retaliatory action would have taken even without the improper motivation).

### B.    Eighth Amendment Conditions of Confinement

Plaintiff has alleged Eighth Amendment conditions of confinement claims against Defendants Fraser, Eastman, and Superintendent Miller with regard to his living conditions at Great Meadow.  (Dkt. No. 1 at ¶¶ 128-133.)   The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The prohibition extends to prison conditions.  *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998).  "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and internal quotation marks omitted).  "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to support a claim for unconstitutional conditions of confinement.  *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must satisfy both an objective and a subjective element.  *Farmer*, 511 U.S. at 834, 837. To satisfy the objective element, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of harm."  *Id*. at 834.  To satisfy the subjective element, a plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Id*.  Health includes the risk of serious damage to "physical and mental soundness."  *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions."  *Walker,* 717 F.3d at 125 (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights.  *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).  "The conditions themselves must be evaluated in light of contemporary standards of decency."  *Jabbar,* 683 F.3d at 57 (citation and internal quotation marks omitted)*.*

When the challenged prison conditions include exposure to unsanitary conditions, the Second Circuit has been unwilling "to set a minimum duration and minimum severity of an exposure for it to reach the level of a constitutional violation."  *Willey v. Kirkpatrick*, 801 F.3d

51, 68 (2d Cir. 2015). There is no "bright-line durational requirement for a viable unsanitary

conditions claim. Nor is there some minimal level of grotesquerie required . . . ." *Id*. Courts

must "evaluate the product of these two components [on a case-by-case basis and] whether

exposure to human waste is cruel and unusual depends on both the duration and severity of

exposure." *Id*. "The severity of an exposure may be less quantifiable than its duration, but its

qualitative offence to a prisoner's dignity should be given due consideration." *Id*.

To constitute deliberate indifference under the subjective element, "[t]he prison official

must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at

57; *see also Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the

subjective element in cases involving prison conditions is "deliberate indifference to inmate

health or safety."). "The official must be both aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837. Mere negligence is not enough. *Id.* at 835.

### C.    Fourteenth Amendment Due Process

A prisoner asserting a procedural due process claim "must establish (1) that he possessed

a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of

insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*,

515 U.S. 472, 484 (1995), the Supreme Court held that an inmate's liberty interest is implicated

by prison discipline only if the discipline "imposes [an] atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life." In *Arce v. Walker*, 139 F.3d 329, 334

(2d Cir. 1998), the Second Circuit found that the liberty interest standard articulated in *Sandin*

applies to Fourteenth Amendment procedural due process challenges to placement in Ad Seg.

Procedural due process does not permit a court to review the substance of a defendant's decision to confine an inmate in Ad Seg. *Proctor v. LeClaire*. 846 F.3d 597, 608 (2d Cir. 2017). "The Due Process Clause permits only an evaluation of whether Defendants' method for coming to their Ad Seg determinations is sufficient." *Id*. The Second Circuit noted in *Proctor* that in making that determination that ". . . we are mindful of the context in which this case arises and the deference we owe prison officials in carrying out their daily tasks. (citation omitted). '[O]ne cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation . . . in a state prison.' *Wolff v. McDonnell*, 418 U.S. 539 547-48 (1974)." *Id.*

Citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), *abrogated in part on other grounds by Sandlin*, 515 U.S. 472, the Court explained in *Proctor* the process due from prison officials making Ad Seg determinations as follows:

> The [Supreme] Court made it clear that Ad Seg is appropriate when necessary to incapacitate an inmate who "represents a security threat" or to "complet[e] ...an investigation into misconduct charges." *Id*. at 476 [ ]. So long as prison officials seek to achieve one or both of these goals, they have wide latitude in the procedures they deploy. Before confining an inmate in Ad Seg. prison officials must provide "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad Seg]," although not necessarily a full hearing. *Id.*; *accord Taylor v. Rodriguez*, 238 F. 3d 188, 192 (2d Cir. 2001). Once that has occurred, prison officials need only conduct "an informal, non-adversary evidentiary review" of whether the confinement is justified. *Hewitt*, 459 U.S. at 476 [ ]. Their final Ad Seg decision may "turn largely on purely subjective evaluations and on predictions of future behavior." *Id*. at 474 [ ] (internal quotation marks omitted).

"The standard for sufficiency of evidence in the prison administrative or disciplinary

context is 'some' or a 'modicum' of evidence to support the hearing officer's decision."

*Zimmerman v. Seyfert*, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *14 (N.D.N.Y. July 19,

2007) (citations omitted).  The state law standard requiring that a hearing officer's determination

be supported by "substantial evidence" is not applicable to federal due process claims.  *Id*.; *see*

*also Proctor v. Kelly*, No. 05-CV-0692 (GTS/GJD), 2008 WL 5243925, at *13 (N.D.N.Y. Dec.

16, 2008) (substantial evidence standard used by New York in prison disciplinary and

administrative segregation proceedings is not applicable to federal due process claims); *Cabassa*

*v. Gummerson*, No. 9:01-CV-1039 (DNH), 2008 WL 4416411, at *12 (N.D.N.Y. Sept. 24, 2008)

(violation of a DOCCS directive regarding review of administrative segregation determinations

does not amount to constitutional violation).

   In addition to the requirement that an inmate be given notice and an opportunity to be

heard before being placed in Ad Seg, inmates confined to Ad Seg must be given some sort of

periodic review of their confinement to verify that the inmate remains a security risk throughout

his term so that Ad Seg is not used as a pretext for indefinite confinement of the inmate.  *Hewitt*,

459 U.S. at 477 n.9; *Proctor*, 846 F.3d at 609-10.  The Second Circuit explained in *Proctor* that

"[p]eriodic Ad Seg reviews are also flexible and may be based on 'a wide range of

considerations,' including but not limited to observations of the inmate in Ad Seg, 'general

knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any

ongoing investigations.  [*Hewitt*, 459 U.S. at 477 n.9]."  *Id.* at 609.

   In *Proctor*, the Second Circuit recognized the counterbalancing interests of the prison

administration in adopting and executing policies and practices that in their judgment are needed

"to preserve internal order and discipline and to maintain institutional security," and the private

28

interest of inmates implicated by a long stay in Ad Seg. 846 F.3d at 610 (quoting *Bell v. Wolfish*, 441 U.S. 520. 546-47 )1979). The following three criteria were provided by the Court for analysis in determining whether the review process employed related to continued Ad Seg confinement violates due process.

> First, the reviewing officials must actually evaluate whether the inmate's continued Ad Seg confinement is justified. . . . It is not enough for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows. Review with a preordained outcome is tantamount to no review at all. *Id*. at 610.

> Second, the reviewing officials must evaluate whether the justification for Ad Seg exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available. . . . Ad seg reviews may not be frozen in time. . . . Rather, reviews must take into account prison conditions and inmate behavior as they change over time; those changes may modify the calculus of whether the inmate presents a current threat to the safety of the facility. The periodic Ad Seg review test announced by the *Hewitt* Court is not whether the confined inmate *was* a threat to the facility when he was confined initially; it is whether the inmate "*remains* a security risk" on the date of periodic review. . . (emphasis added). This is not to say that prison officials are barred from according significant weight to events that occurred in the past. Neither do we suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred long ago. We conclude merely that prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement.

> Third . . ., the reviewing officials must maintain institutional safety and security (or other valid administrative justification) as their guiding principles throughout an inmate's Ad Seg term. SHU confinement that began for proper Ad Seg purposes may not morph into confinement that persists for improper purposes. The state is entitled to the procedural flexibility that *Hewitt* allows because of its manifest interest in maintaining safe detention facilities and

> other similar administrative concerns; "the *Mathews* balancing test
> tips in favor of the inmate's liberty interest" when a state seeks to
> impose discipline. . . . The state may not use Ad Seg as a charade
> in the name of prison security to mask indefinite punishment for
> past transgressions.

*Proctor*, 846 F.3d at 610-11 (citing *Hewitt v. Helms*, 459 U.S. 460 (1983)

9other citations omitted)).

### D.    Access to Courts

It is well-settled that inmates have a constitutional right to "meaningful" access to the

courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977). This right is implicated when prison

officials "actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]"

*Lewis v. Casey*, 518 U.S. 343, 351, 353 (1977) (citations omitted). Confiscation of an inmate's

legal papers may constitute a denial of access to the courts. *Hiney v. Wilson*, 520 F.2d 589, 591

(2d Cir. 1975); *see also Lewis,* 518 U.S. at 350 (recognizing right of access to the courts is

protected by prohibiting prison officials from actively interfering with the preparation of legal

documents). "Mere 'delay in being able to work on one's legal action or communicate with the

courts does not rise to the level of a constitutional violation.'" *Davis*, 320 F.3d at 352 (citing

*Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)). In addition, "to establish a

constitutional violation based on a denial of access to the courts, a plaintiff must show that the

defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in

actual injury to the plaintiff." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). In

order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to

pursue a legal claim." *Lewis*, 518 U.S. at 351 (1996). Thus, an inmate must show more than a

refusal to provide legal materials. *Id*. To demonstrate "actual injury" the inmate must

demonstrate "that a nonfrivolous legal claim had been frustrated or was being impeded" due to the action or inaction of prison officials. *Id*. at 353.

The right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "The injury requirement reflects the facts that 'the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong.'" *Cunningham v. District Attorney's Office for Escambia Cnty.*, 592 F.3d 1237, 1271 (11th Cir. 2010) (quoting *Christopher*, 536 U.S. at 414-15). "Actual injury" may be defined as "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a claim." *Id*. at 348.

### E.    Supervisory Liability

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.") "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state

31

commissioner of corrections . . . in a § 1983 claim") (citing *Ayers v. Coughlin*, 780 F.2d 205, 210

(2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of

a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state

a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

the defendant was grossly negligent in supervising subordinates who committed the wrongful

acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[11]

"Fundamentally, for a supervisor to be liable under Section 1983, there must 'of course'

have 'been an underlying constitutional deprivation' by a subordinate, *Blyden,* 186 F.3d at 265,

and a 'causal link' between the supervisor's conduct and the violation of the plaintiff's civil

rights." *Nicholson v. Fischer*, No. 13-CV-6072-FPG-MWP, 2018 WL 2009432, at *5

(W.D.N.Y. April 28, 2018) (citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002)).

## VI.    ANALYSIS OF PLAINTIFF'S CLAIMS

### A.    Retaliation Claim Against Deacon Regarding Keeping Plaintiff in SHU

Plaintiff alleged in his complaint and subsequently testified at his deposition that in

August or September 2012, while Plaintiff was in SHU at Shawangunk, Deacon told him that he

---

[11] The Second Circuit has thus far not determined whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

and Matt Miller were friends, and Deacon would do everything in his power to ensure Plaintiff never got out of SHU.  (Dkt. Nos. 1 at ¶ 14; 64-2 at 115-117.)  Plaintiff testified at his deposition that Deacon made the threat on only one occasion.  (Dkt. No. 64-2 at 113, 116.)  Plaintiff contends that Deacon made good on the threat to keep him in SHU by initially laying the groundwork for a claim that Plaintiff was a member of the Blood gang through the confiscation of a card from a former girlfriend of Plaintiff's that had the word "beloved" on it during a cell search on December 18, 2013.  (Dkt. Nos. 1 at ¶ 20; 69 at ¶¶ 9-10.)  According to Plaintiff, after the card was confiscated, Counselor Kober informed Plaintiff that he and Deacon believed the word "beloved" was gang language, and at that point Plaintiff realized that "Deacon's entire angle was revenge by way of retaliation was to label plaintiff a "Blood gang member.'"  (Dkt. No. 69 at ¶ 10.)[12]  (unaltered text).

On May 27, 2014, when Plaintiff was being transferred to Great Meadow, Deacon emailed Fraser informing him "[y]ou are getting a crook being dropped from our box Corey Ford Aka C-Murder He is an active member of the bloods and claims in his correspondence to hold the rank of 2 star General."  (Dkt. No. 69-3 at 119-20.)  (unaltered text).  Fraser relied upon the information from Deacon on Plaintiff's alleged gang membership in recommending that Plaintiff be placed in Ad Seg and testified about it at Plaintiff's hearing.  (Dkt. Nos. 64-2 at 13; 64-6 at 20.)

Plaintiff has identified three reasons for Deacon's alleged retaliatory actions to keep Plaintiff in SHU.  In his complaint, and again at his deposition, Plaintiff claimed that Deacon

---

[12]  The paragraph numbers on Plaintiff's affidavit go from 10 to 12.  (Dkt. No. 69 at 3.)  It appears the paragraph in which the above-quoted language appears was intended to be paragraph 11.

threatened to do everything in his power to keep Plaintiff in SHU because Plaintiff had hurt one

of his friends and sued another one.  (Dkt. Nos. 1 at ¶ 14; 64-2 at 75.)   At another point in his

complaint, Plaintiff alleges that "Deacon began his retaliation against Plaintiff for the assault that

took place in 2004 at Green Haven" involving Matt Miller.  (Dkt. No. 1 at ¶ 117.)  Plaintiff also

alleged in his complaint that "[b]efore plaintiff left Shawangunk Corr. Facility SHU, defendant

Deacon made good on his promise to keep plaintiff confined to SHU, for assaulting ex-C.O.

Miller, and writing grievances and complaints about his threats to retaliate."  *Id*. at ¶ 126.  In his

affidavit in opposition to Defendants' summary judgment motion, Plaintiff states he filed

Grievance No. 28197/13 "for threats, of retaliation, revenge, to keep plaintiff in SHU for alleged

assault on his co-worker and close friend C.O. M. Miller."  (Dkt. No. 69 at ¶ 5.)

　　　In analyzing Plaintiff's retaliation claim, the Court must first consider whether Plaintiff's

speech or conduct was protected.  *Holland*, 758 F.3d at 225.  An inmate's assault on a

corrections officer does not constitute protected activity for purposes of a retaliation claim.  *See*

*Jackson v. Dzurenda*, No. 3:11-CV-1668 (RNC), 2012 WL 5448330, at *2 (D. Conn. Nov. 7,

2012) ("An inmate's assault on an officer plainly does not constitute protected activity" for

purposes of a retaliation claim); *Ford v. Fischer,* No. 09-CV-723 (DNH/ATB), 2011 WL

856416, at *11 n.16 (N.D.N.Y. Jan. 31, 2011) ("Participation in an assault is not a protected

activity that can form the basis of a retaliation claim"); *Reeder v. Artus*, No. 09-CV-575

(DNH/DRH), 2010 WL 3636138, at *6 (N.D.N.Y. July 27, 2010) (assaulting a corrections officer

is not the sort of thing protected by the constitution).  Therefore, Plaintiff's assault on Matt

Miller in 2004 was not protected conduct and cannot support a retaliation claim against Deacon.

　　　Filing lawsuits and grievances can be protected conduct for purposes of a retaliation

claim.  *See Baskerville,* 224 F. Supp. 2d at 732 (filing a lawsuit is a constitutionally protected

activity for purposes of a retaliation claim) (citing *Bounds,* 430 U.S. at 821-32; *Flynn v. Ward*,

No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *8 (N.D.N.Y. June 7, 2018) ("It is well-

settled that the filing of a grievance constitutes protected speech under the First Amendment" for

purposes of a retaliation claim) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).

However, even assuming Deacon's alleged threat to use his power to keep Plaintiff in SHU and

alleged scheme to falsely identify Plaintiff as a member of the Bloods gang as a vehicle for doing

so constituted adverse action, the Court finds that no reasonable jury would conclude that there

was an adequate causal connection between Plaintiff's 2005 lawsuit against McClenning and the

grievances filed against Deacon by Plaintiff, and Deacon's alleged adverse action.

There is no evidence in the summary judgment record that Deacon was personally

involved in Plaintiff's 2005 lawsuit against McClenning and others for excessive force following

Plaintiff's assault on Matt Miller.  "Generally, alleged retaliation motivated by an action the

prisoner took which did not personally involve the prison officials is insufficient for a retaliation

claim." *Ortiz v. Russo*, No 13 CIV. 5317, 2015 WL 1427247, at *11 (S.D.N.Y. Mar. 27, 2015)

(citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a

corrections officer when the alleged basis for retaliation was a complaint about an incident

involving another corrections officer)); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014

WL 4365274, at *18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's

retaliation for complaints against another defendant").

Moreover, the approximately nine years between Plaintiff's 2005 lawsuit against

McClenning and Deacon's alleged threat and subsequent action to keep Plaintiff in SHU in 2014

is too great a time gap to support an inference of causation.  *See Moore v. Kwan*, No. 12-CV-4120, 2016 WL 9022575, at *15 *S.D.N.Y. Mar. 30, 2016), *aff'd* 683 F. App'x 24 (2d Cir. 2017) ("Courts have found causation based upon temporal proximity where the lapse between the protected act and the adverse actions consisted of a few months, not years."); *Baskerville*, 224 F. Supp. 2d at 732 (no temporal proximity where a prior lawsuit was filed three years prior to the retaliatory act).

The Court also rejects Plaintiff's claim that Deacon's threat to keep Plaintiff in SHU was made in retaliation for a series of grievances Plaintiff filed against Deacon at Shawangunk subsequent to the threat.  Plaintiff himself claims that Deacon made the threat he was going to use all his power to keep Plaintiff in only one time, and that it was in August or September 2012. (Dkt. Nos. 1 at ¶ 14; 64-2 at 75.)  Grievances filed after the allegedly retaliatory action, cannot be a substantial factor in the alleged retaliation.  *See Diaz v. Fischer*, No. 08-CV-1208 (LEK/DRH), 2010 WL 1132772, at *9  (N.D.N.Y. Feb. 23, 2010).

Based on the foregoing, the Court recommends that Defendant Deacon be granted summary judgment on Plaintiff's First Amendment retaliation claim regarding the threat made and actions allegedly taken by Deacon to keep Plaintiff in SHU.

### B.    Retaliation Claim for Harassment by Deacon

Plaintiff has alleged that Deacon engaged in a course of harassing conduct against him while he was in the Shawangunk SHU.  (Dkt. No. 1 at ¶ 18.)  Plaintiff testified at his deposition that after August or September 2014, Deacon harassed him every chance he got doing such things as yelling at the top of his lungs, "where is Ford . . . I don't see him," and coming by and kicking the gate and telling people to give him smaller portions of food.  (Dkt. Nos. 1 at ¶ 18; 64-

36

2 at 108-11.)

"It is well-settled that 'verbal harassment, or even threats, are generally held not to rise to

the level of adverse action that will support a First Amendment retaliation claim.'" *Thomas v.*

*Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 9:17-CV-0377 (GTS/ATB), 2017 WL 3913018, at *4

(N.D.N.Y. Sept. 6, 2017) (quoting *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y.

2010)); *see also Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM), 2013 WL 5441503, at *6

(N.D.N.Y. Sept. 27, 2013) ("it is well-established, however, that verbal harassment and

derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise

to a level of constitutional significance, and therefore cannot constitute adverse action sufficient

to support a retaliation cause of action.").

Therefore, the Court recommends that Deacon also be granted summary judgment on

Plaintiff's First Amendment retaliation claim regarding Deacon's alleged harassment.

## C.     Retaliation Claim Against Deacon and Phillips Regarding the Alleged Destruction of Plaintiff's Bible

Plaintiff has alleged in his complaint that Deacon destroyed a Bible that had been in

Plaintiff's possession for eighteen years until it was confiscated during a search of his cell on or

about April 14, 2014.  (Dkt. No. 1 at ¶¶ 39-40.)  Plaintiff further alleged that Deacon "destroyed

the Bible in retaliation because he believed he had failed his leader and mentor C.O. M. Miller,

to keep his promise that he would assure plaintiff stay in SHU."  *Id*. at ¶ 40.  (unaltered text).  At

his deposition, Plaintiff testified that while no one had told him Deacon had ordered the search of

his cell when the Bible was taken, he believed Deacon was involved and the search was

undertaken in retaliation for Matt Miller.  (Dkt. No. 64-2 at 136.)  Plaintiff also testified that he

believed Deacon had taken the Bible and told Defendant Phillips to get rid of it. (Dkt. No. 64-2 at 132.) Plaintiff conceded "I could be wrong but I know Deacon." *Id.* at 148.

Deacon has denied playing any role in the search of Plaintiff's cell in April 2014 and at that time had been the relief Charts Sergeant for several months and would have had no involvement with cell searches in SHU, nor any reason to order them. (Dkt. No. 64-3 at ¶ 13.) Deacon does not recall ever directing a search of Plaintiff's cell. *Id.* Deacon denies ever having possession or control over Plaintiff's Bible, and denies Plaintiff's claim that Deacon destroyed the Bible or ordered it destroyed is untrue. *Id.* at ¶¶ 13-14.

Phillips has also submitted a declaration in which he has stated that he recalls participating in a search of several cells, including Plaintiff's, in April 2014 at the direction of Lieutenant Gardner. (Dkt. No. 64-4 at ¶ 6.) According to Phillips, if he or another officer had confiscated Plaintiff's Bible because it had for some reason been designated as suspected contraband, it would have been secured in a contraband locker in the disciplinary office and subject to a strict set of policies governing the documentation, securing, and treatment of suspected contraband. *Id.* at ¶¶ 6-7. Phillips has stated in his declaration that Deacon, as Charts Sergeant, would not have been involved in dealing with contraband and never ordered Phillips to destroy Plaintiff's Bible. *Id.* at ¶ 8. Phillips denies destroying Plaintiff's Bible. *Id.*

Plaintiff testified at his deposition that he had known Phillips for years and never had a problem with him, and that Phillips was a "sweetheart." (Dkt. No. 64-2 at 148-49.) Plaintiff also testified that he believed that Phillips was used as a pawn by Deacon in connection with the destruction of the Bible. *Id.* at 148. When asked if he believed Phillips had been acting in retaliation or following orders, Plaintiff testified he believed Phillips was following Deacon's

38

orders. *Id*. at 150.

The Court finds no evidence in the summary judgment record supporting Plaintiff's belief that Deacon and Phillips were involved in the destruction of his Bible. Conjecture and speculation are insufficient to create a genuine issue of fact. *Kerzer*, 156 F.3d at 396. Therefore, the Court finds that no reasonable jury could conclude that either Deacon or Phillips engaged in adverse action with regard to Plaintiff's Bible as required for a First Amendment retaliation claim, *Holland*, 758 F.3d at 225, and recommends that Deacon and Phillips be granted summary judgment on Plaintiff's First Amendment retaliation claim regarding the destruction of his Bible.

### D.     Retaliation Claims Against Fraser, Eastman, and Superintendent Miller Regarding Plaintiff's Transfer to Great Meadow and Placement in Ad Seg

Plaintiff has alleged in his complaint that when he learned that he was being transferred to Great Meadow, he realized immediately he was being retaliated against because McClenning, who had been involved in the incident with Matt Miller, testified against Plaintiff at the criminal trial, was a defendant in Plaintiff's excessive force action, and was a friend/mentor of Matt Miller at Great Meadow. (Dkt. No. 1 at ¶ 43.) According to Plaintiff, the day after he arrived at Great Meadow, when his cell was opened for him to take a shower, he saw numerous white officers with batons waiting to attack him with deadly physical force in retaliation presumably for the Matt Miller assault. *Id*. at ¶ 45. Plaintiff went back into his cell to avoid the confrontation. *Id.* Plaintiff testified at his deposition that he told Superintendent Miller he had been sent to Great Meadow to be murdered or badly hurt. (Dkt. No. 64-2 at 200-01.) However, Plaintiff has conceded he was never assaulted by staff or inmates while housed at Great Meadow. *Id*. at 155-56.

At his deposition, Plaintiff testified that someone in the Inspector General's Office was

responsible for his transfer to Great Meadow. (Dkt. No. 64-2 at 157.) Moreover, in his responses to items 38 and 39 of Defendants' statement of material facts, Plaintiff has admitted that Fraser, Eastman, and Miller did not organize or direct his transfer to Great Meadow and did not have the power or authority to do so. (Dkt. No. 69-2 at 15.) Plaintiff has, however, asserted a claim against Fraser, Eastman, and Miller that they placed him in Ad Seg at Great Meadow in retaliation for his assault on Matt Miller. (Dkt. Nos. 69 at ¶¶ 21-22; 69-3 at 152.)

According to Plaintiff, Fraser had worked closely with Matt Miller at Green Haven and wrote the Ad Seg recommendation out of retaliation for his close friend. (Dkt. Nos. 1 at ¶ 47; 64-2 at 195-96.) Plaintiff testified at his deposition that there could be no reason other than the incident with Matt Miller that Fraser wrote the Ad Seg recommendation. (Dkt. No. 64-2 at 197.) Plaintiff has alleged in his complaint that on June 6, 2014, Superintendent Miller told Plaintiff that Eastman would be his hearing officer on the Ad Seg hearing, that Plaintiff would be found guilty, and he should not have fought Matt Miller, sued Miller and McClenning, or filed grievances against Deacon. (Dkt. No. 1 at ¶ 54.)

Fraser has denied that his Ad Seg recommendation was in retaliation for an assault that had occurred ten years ago at another facility or a lawsuit he knew nothing about, but rather that it was based on his understanding of Plaintiff's history and profile. (Dkt. No. 64-5 at ¶ 18.) Eastman has denied that the Ad Seg process or his determination were retaliatory since he had no reason to retaliate against Plaintiff in that Plaintiff had filed no grievances or lawsuits against him at the time and Eastman was unaware of any filed against his colleagues. (Dkt. No. 64-5.) According to Eastman, his determination was based upon Plaintiff's gang membership and Plaintiff's lengthy and disturbing disciplinary record highlighted by the 2004 attack but also

40

including assaults on other inmates, which suggested that Plaintiff's presence in general population would create a dangerous risk of disturbances. *Id*. at ¶ 9.

Superintendent Miller has denied selecting Eastman as hearing officer and has also denied telling Plaintiff that he was being placed in Ad Seg out of retaliation. (Dkt. No. 64-7 at ¶¶ 10-17.) According to Superintendent Miller, Plaintiff's claim that everything that occurred at Great Meadow with which Plaintiff disagreed or he disliked was based on an attack that he occurred ten years ago was "simply speculative and wrong." *Id*. at ¶ 18.

The Court finds that Defendants Fraser, Eastman, and Superintendent Miller are all entitled to summary judgment on Plaintiff's retaliation claims related to his being moved to Great Meadow and his placement in Ad Seg. As already explained, an inmate's attack on a corrections officer does not constitute protected activity for purposes of a retaliation claims. *See Jackson*, 2012 WL 5448339, at *2. Moreover, no reasonable jury would find an adequate causal connection between Plaintiff's 2005 lawsuit against McClenning or grievances he filed against Deacon at Shawangunk and Fraser, Eastman, and Superintendent Miller's involvement in Plaintiff's placement in Ad Seg. *See Ortiz*, 2015 WL 1427247, at *11 (alleged retaliation motived by action prisoner took that did not personally involve prison officials is generally insufficient for retaliation claim); *Baskerville*, 224 F. Supp. 2d at 732 (no temporal proximity where lawsuit filed three years prior to alleged retaliation).

In addition, the Court has found no evidence in the summary judgment record sufficient for a reasonable jury to conclude that Fraser, Eastman, and the Superintendent's actions in connection with Plaintiff's placement in Ad Seg were retaliatory. Plaintiff's conclusory assertions, conjecture, and speculation as to the Defendants' motivation is not enough to avoid

summary judgment. *See Kerzer*, 156 F.3d at 400.

In light of the foregoing, the Court recommends that Fraser, Eastman, and Superintendent Miller be granted summary judgment on Plaintiff's retaliation claim related to Plaintiff's transfer to Great Meadow and placement in Ad Seg.

### E. Conditions of Confinement Claims Against Fraser, Eastman, and Superintendent Miller Regarding Housing Conditions at Great Meadow

#### 1. Plaintiff's Claims Regarding the Conditions of his Confinement

Plaintiff has asserted an Eighth Amendment conditions of confinement claim against Defendants Fraser, Eastman, and Superintendent Miller in connection with his living conditions while at Great Meadow. (Dkt. No. 1 at ¶¶ 128-133.) Plaintiff has claimed that SHU cell F-1 29, where he was housed for approximately a month and a half, was filthy and unsanitary, and he was denied cleaning supplies for eleven days. (Dkt. Nos. 1 at ¶ 46; 64-2 at 175-77.) According to Plaintiff, everyone knew that SHU cell F-1 29, which was surrounded by mental patients who banged the plexiglass and metal walls, was a punishment cell. (Dkt. Nos. 1 at ¶ 61; 64-2 at 170, 175-76.)

Plaintiff has alleged in his complaint that Fraser, Eastman, and Superintendent Miller "strategically housed plaintiff in F-2 29 cell to be tortured next Mental Health Patients whose untreated illnesses were severe and beyond just yelling at the top of their lungs, but by banging on plaintiff's thin metal walls and their plexiglass partitions with their 3 ½ gallon buckets." (Dkt. No. 1 at ¶ 129.) (unaltered text). Plaintiff suggests that he was placed in that cell because his admission to SHU was actually punitive and not administrative as was claimed. (Dkt. No. 64-2 at 173.) He theorized at his deposition that Eastman and Superintendent Miller were

responsible for his placement there and were the ones who said Plaintiff should be taken to SHU cell F-1 29.  *Id*. at 173-74.  Plaintiff also testified that because Miller was Superintendent whatever he said goes.  *Id*. at 184.  When Plaintiff was asked if he had complained about the conditions of cell F-1 29 to Superintendent Miller in addition to writing grievances, Plaintiff testified he had not because it was Miller's prison, and Miller already knew what cell F-1 29 was used for and knew what the back cells were used for, that they were filthy, that the inmates do not get cleaning supplies, and the porters do not come and clean out the cells when the inmates leave.  (Dkt. No. 64-2 at 185-86.)

Plaintiff also filed grievances claiming that the ventilation system did not function properly; windows were broken; the showers were cold with little water pressure; cold air was coming into the showers through the bottom of the yard doors creating freezing conditions at night; and a large exhaust fan outside Plaintiff's cells was turned on as a punitive measure.  (Dkt. No. 64-7 at 10; 69 at ¶ 49; 69-3 180-86, 190, 258, 273.)

>        2.    Defendants' Evidence Relevant to Plaintiff's Conditions of Confinement Claim

Fraser denies having any responsibility for cell maintenance, conditions, or repair and has stated in his declaration that he was never involved in processing or responding to any grievances Plaintiff may have filed concerning his housing.  (Dkt. No. 64-5 at ¶ 16.)  The Court has found no evidence in the summary judgment record to the contrary.

Eastman has stated in his declaration that Plaintiff's claims that Eastman bears responsibility for the alleged condition of the various SHU F-Block cells in which Plaintiff was housed while in Ad Seg are baseless.  (Dkt. No. 64-6 at ¶ 12.)  According to Eastman, cells are

assigned on an as-available basis, and he had no role in Plaintiff's initial assignment in cell F-1 at 29, nor has he ever been told it is designated as a punishment cell. *Id*. Eastman has also explained in his declaration that as Deputy Superintendent of Security, he had no role in responding to complaints about cell conditions, cleaning supplies, or fixing sinks. *Id*. at ¶ 13. Eastman claims to have had no responsibility for the correction of any maintenance or hygiene concerns with regard to Plaintiff's cell. *Id*. Moreover, Eastman has stated in his declaration that Plaintiff never complained to him directly regarding his cell conditions, although Plaintiff frequently spoke to him when he made his rounds. *Id*. at ¶ 14. The Court has found no evidence in the summary judgment record to the contrary.

Superintendent Miller has stated in his declaration that he did not direct Plaintiff's placement in any particular cell, and that to the best of his knowledge, assignment would be made on an as-available basis by the staff in SHU. (Dkt. No. 64-7 at ¶ 13.) Superintendent Miller does not typically involve himself in the issue of cell placement and did not do so in this case. *Id*. at ¶ 14. Miller denies conducting any kind of inquiry or review of decisions made regarding Plaintiff's cell placement except to the extent of reviewing grievances addressed by the Inmate Grievance Resolution Committee ("IGRC") and affirming grievance determinations having to so with his living conditions, and did not direct Plaintiff's movement between cells. *Id*.; Dkt. No. 64-7 at pp. 10-11, 13-6.

In addition, Superintendent Miller has stated he plays no personal role in overseeing cell maintenance and correcting cell defects, and that those duties fall to the officers and Sergeants responsible for the housing units where maintenance or repair problems have been discovered or reported by inmates. *Id*. at ¶ 15. Miller had a number of conversations with Plaintiff during his

rounds of SHU and does not recall Plaintiff ever making complaints directly to him about the conditions of his cell. *Id*. at ¶ 16. The Court has found no evidence in the summary judgment record to the contrary.

        3.    <u>Analysis</u>

        Personal involvement in the alleged deprivation of constitutional rights is a prerequisite to an award of damages under § 1983. *McKinnon*, 568 F.2d at 934. There is no vicarious liability under § 1983. *Iqbal*, 556 U.S. at 676. Therefore, Fraser, Eastman, and Superintendent Miller may only be held liable if they were personally involved in the violation of Plaintiff's Eighth Amendment right to humane living conditions.

        The Court finds that aside from Plaintiff's conclusory assertions and speculation, there is no evidence in the summary judgment record showing that, other than Superintendent Miller's decisions on Plaintiff's grievances regarding his living condition, Fraser, Eastman, and Miller had any personal involvement in determining the cells in which Plaintiff would be housed and no knowledge of or involvement with respect to the conditions about which Plaintiff has complained. Under the *Colon* criteria for personal involvement set forth above, writing letters and grievances to a supervisory official is insufficient to establish notice of a constitutional violation and personal involvement. *See Flynn*, 2018 WL 3195095, at *13 (citing *Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); *Thompson v. Pallito*, 949 F. Supp. 2d 558, 575-76 (D. Vt. 2013) (if merely writing an unanswered letter to a prison official were sufficient to establish personal involvement, it would "contravene the black-letter principle that § 1983 does not allow for respondeat superior

liability.")

Moreover, even if the Court were to assume solely for purposes of this summary judgment motion that Plaintiff had raised an issue of fact with regard to the objective prong of a conditions of confinement claim, and that one or more of the Defendants may have had some personal involvement, Plaintiff's claim fails on the subjective component of his claim because there is absolutely no evidence in the summary judgment record upon which a reasonable jury could find that any of the three Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety. *See Jabbar*, 683 F. 3d at 57. There is nothing in the record that shows Fraser, Eastman, or Superintendent Miller were "both aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed], and [they drew] the inference." *Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Defendants Fraser, Eastman, and Superintendent Miller be granted summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim.

### F.    Procedural Due Process Claim Against Eastman and Superintendent Miller Regarding his Ad Seg Hearing and Periodic Reviews

Defendants Eastman and Superintendent Miller appear to have conceded for purposes of their summary judgment motion that Plaintiff possessed a liberty interest on his Fourteenth Amendment procedural due process claim and to rely solely on their claim that Plaintiff received all of the process that was due him in connection with his placement and retention in Ad Seg. (Dkt. No. 64-9 at 16-19.)

Plaintiff claims that his procedural due process rights were violated by Eastman's denial of his request for copies of the emails between Deacon and Fraser and Fraser and Demo upon

which Fraser had relied in concluding that Plaintiff was a member of the Bloods gang.   (Dkt.

Nos. 1 at ¶ 136; 69 at ¶¶ 30-31.)   According to Plaintiff, the denial prevented him from properly

presenting and preparing his defense that Deacon and Fraser conspired to have him placed in Ad

Seg in retaliation for the assault on Miller.   *Id*.   Plaintiff claims that Eastman and Superintendent

Miller further violated his due process rights by failing to have adequate periodic review of his

Ad Seg status.   (Dkt. No. 69 at ¶¶ 39-41.)

       1.    <u>Ad Seg Hearing</u>

      Plaintiff has relied largely upon the rights regarding placement in Ad Seg granted inmates

under the New York regulations at N.Y. Comp. Codes R. & Regs,  tit. 7, §§ 254, 301.4 in

support of his Fourteenth Amendment procedural due process claim against Eastman and

Superintendent Miller.   (Dkt. No. 1 at ¶ 135.)   However, "[a]n alleged violation of a prison

policy, directive, or regulation, in and of itself, does not give rise to a federal claim, because

federal constitutional standards rather than state law define the requirements of procedural due

process."   *Holland v. City of New York*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016) (internal

quotation marks omitted) (quoting *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990));

*Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not

establish federal constitutional rights"); *O'Diah v. Artus*, 887 F. Supp. 2d 497, 501 (W.D.N.Y.

2012) (violation of state regulations by prison officials "does not in itself give rise to a due

process claim.").

      Under *Hewitt*, 459 U.S. at 476, due process requires that prior to an inmate's placement

in Ad Seg, he "must merely receive some notice of the charges against him and an opportunity to

present his views [either orally or in writing] to the prison official charged with deciding whether

to transfer him to administrative segregation." Plaintiff was served with formal charges

recommending that he be placed in Ad Seg on May 29, 2014. (Dkt. No. 64-6 at 13.) The

recommendation placed Plaintiff on notice that his membership in the Bloods gang, the 2004

assault on Matt Miller, and Plaintiff's disciplinary history were the reasons for the Ad Seg

recommendation. (Dkt. No. 69-3 at 71.) Plaintiff was asked if he wanted to present witnesses

and answered in the negative. (Dkt. No. 64-6 at 16, 22.) Plaintiff presented his views regarding

the Ad Seg recommendation at a hearing before Eastman, including his denial that he was a

member of the Bloods, his assessment of most of his disciplinary history as "garbage," and his

explanation of the assault against Matt Miller, despite his claim that he did not defend against Ad

Seg placement because of threats by Eastman and Fraser. *Id*. at 17-19. Plaintiff was present for

Fraser's testimony and was allowed to question Fraser and thereby learned that the individual

from Shawangunk who had identified Plaintiff as a member of the Bloods was Deacon, and that

it was likely Demo with whom Fraser communicated at Central Office concerning Plaintiff's

alleged gang membership. *Id*. at 21-22.

   Plaintiff was not, as he pointed out, provided with copies of the Deacon and Demo emails

regarding his alleged membership in the Bloods, nor were the emails produced at the hearing to

confirm Fraser's claim. (Dkt. No. 1 at ¶¶ 57-58.) Courts, however, have drawn a distinction

between disciplinary and administrative segregation and concluded that prisoners who are

segregated for administrative reasons are entitled to fewer protections than those segregated for

disciplinary reasons. *See Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir. 1988). In *Hewitt*, the

Supreme Court found that only minimal process was due. *Hewitt*, 459 U.S. at 472. The Court

finds that despite not being given the emails prior to or at the hearing, Plaintiff was clearly placed

on notice that the Ad Seg recommendation was based, in part, on his membership in the Bloods; he knew based on Fraser's testimony that Deacon was his accuser; and he clearly denied membership in the Bloods at the hearing.

Based upon the foregoing the Court concludes that failure to give Plaintiff copies of the emails did not deprive him of the ability to prepare a defense to the clear charges in the Ad Seg recommendation, *see Taylor v. Rodriguez*, 238 F.3d 188, 192-93 (2d Cir. 2001); he was afforded his due process right to the opportunity to be heard at a meaningful time and in a meaningful manner, *Doe v. Simon*, 221 F.3d 137, 139 (1979); and Plaintiff was provided with all of the process due him under *Hewitt*.

### 2.    Periodic Reviews

Plaintiff was in Ad Seg at Great Meadow from on or about May 28, 2014, through on or about February 6, 2015.  (Dkt. No. 69 at ¶¶ 21, 52.)  During that eight month period, two periodic Ad Seg reviews, the first on September 9, 2014, and the second on November 17, 2014, were undertaken by facility three-member committees who recommended keeping Plaintiff in Ad Seg.  (Dkt. No. 69-3 at 175, 192.)  Superintendent Miller found that keeping Plaintiff in Ad Seg was appropriate at the time of the reviews because it was clear that placing Plaintiff in general population would pose a threat to Plaintiff's safety and the safety of other inmates and staff.  *Id.*

Plaintiff filed written statements objecting to both determinations keeping him in Ad Seg. *Id.* at 176, 193.  Plaintiff claims that Eastman and Miller violated his right to procedural due process by providing inadequate substantive, meaningful review in his two periodic reviews. (Dkt. No. 1 at ¶¶ 80, 140.)  "Once an inmate has been confined in Ad Seg, *Hewitt* mandates that prison officials 'engage in some sort of periodic review of the confinement' to verify that the

inmate 'remains a security risk' throughout his term." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 477 n.9).

The Second Circuit recognized in *Proctor* the state's substantial interest in maintaining institutional security and the need to accord prison administrators wide ranging deference in adopting and executing flexible Ad Seg review policies. *Id*. at 610.  The Court also noted that "the private interest implicated by an extended and indefinite stay in Ad Seg is also weighty" and recognized that the interest of the plaintiff in *Proctor*, who had spent thirteen years in Ad Seg with no release in sight, in avoiding an indefinite Ad Seg term was surely more substantial that the interest of the plaintiff in *Helms*, who was in Ad Seg for less than two months. *Id.*  Thus, the Court found that "an inmate who has spent an extended period of time in Ad Seg and whose term is 'potentially limitless' has a 'more significant liberty interest for due process analysis than that attributed to [Helms].'" (quoting *Mims v. Shapp*, 744 F.2d 946, 951-52 (3d Cir. 1984)).

Plaintiff had been in Ad Seg only a little over three months when he had his first periodic review.  He had been in Ad Seg for approximately five and a half months at the time of his second.  (Dkt. No. 69-3 at 175, 192.)  The reviews reveal that Plaintiff's behavior and attitude over the period of time covered by the review had been evaluated by the committee and found appropriate.  However, in light of the reasons for Plaintiff's Ad Seg placement and the relatively short amount of time he had been in Ad Seg, it does not seem unreasonable that the officials would conclude, based upon Plaintiff's behavior over a short period of time, that he was no longer a threat to the safety or security of the facility, or that releasing him into the general population would not constitute a risk to Plaintiff's own safety.  *Id.* at 175.

In *Proctor*, there was testimonial evidence that those involved in the periodic review of

the plaintiff's Ad Seg placement had reached a pre-review conclusion that the plaintiff would remain in Ad Seg over a thirteen year period and beyond, regardless of the existence of evidence supporting his release. *Proctor*, 846 F. 3d at 605-07. There is no such evidence in this case, and despite Arena's alleged comment that her only involvement was in signing the review, there is no evidence that the decisions reached on Plaintiff's two reviews were guided by anything other than concern for institutional safety.

Based on the foregoing, the Court finds that the periodic reviews of Plaintiff's Ad Seg placement satisfied the three criteria for review set forth in *Proctor*, and that there was no violation of Plaintiff's procedural due process rights by Eastman and Superintendent Miller.

### 3. Conclusion

The Court finds that Defendants Eastman and Superintendent Miller did not violate Plaintiff's Fourteenth Amendment procedural due process rights in either his placement in Ad Seg or the periodic reviews, and recommends that the Defendants be granted summary judgment on the claim.

### G. Access to Court and Retaliation Claims Against McClenning Regarding the Loss or Destruction of Plaintiff's Materials from Plaintiff's Active Legal Files

Plaintiff claims that McClenning made a hole in Plaintiff's cell bag and took all of his active legal material when Plaintiff was moved from Great Meadow to Five Points in February 2015, thereby preventing him, *inter alia*, from pursuing an Article 78 proceeding brought with regard to his placement in Ad Seg. (Dkt. No. 64-2 at 95-99.) Plaintiff testified at his deposition that he thought McClenning had acted in retaliation for the lawsuit Plaintiff had filed against him in 2005 and probably for writing up Deacon, but not for the assault on Matt Miller. (Dkt. No. 64-2 at 95-96.)

51

In his declaration, McClenning acknowledged being involved in restraining Plaintiff following his attack on Matt Miller and testifying against Plaintiff at his criminal trial. (Dkt. No. 64-8 at ¶ 4.) McClenning was transferred from Green Haven to Great Meadow in 2004. *Id.* While aware that Plaintiff had been transferred to Great Meadow, because of his position in the draft office at Great Meadow, McClenning denies any interaction with Plaintiff until Plaintiff transferred out of Great Meadow. *Id*. at ¶¶ 5, 8. According to McClenning, he had no involvement in the packing or loading of Plaintiff's belongings, and his only direct interaction with Plaintiff was as the van driver who transported him to Washington, which was less than a mile from Great Meadow. *Id*. at ¶ 8.

McClenning denies ever directly handling Plaintiff's property or having it in his direct possession. *Id*. McClenning further denies making the comments alleged by Plaintiff in his complaint. *Id*. at ¶ 9; *see also* Dkt. No. 1 at ¶ 91. McClenning also denies throwing away or destroying material from Plaintiff's active legal cases, or having any knowledge of the cases Plaintiff was pursuing. *Id*. at ¶ 10.

Plaintiff, for his part, has produced no evidence whatsoever establishing that McClenning was involved in the loss of materials in Plaintiff's active legal cases. Plaintiff's belief that McClenning was involved appears to be based solely on the happenstance of McClenning's presence in the draft room and role as driver of the van; the comments Plaintiff claims McClenning made regarding waiting to get Plaintiff's ass for ten years because of what he had done to his friend Matt Miller; and McClenning having Plaintiff sign two additional I-64 forms. (Dkt. Nos. Dkt. No. 1 at ¶ 91; 64-2 at 89-96.)

One of the elements of a First Amendment access to courts claim is that a prison official

be personally involved in interfering with or hindering a plaintiff's pursuit of a nonfrivolous legal claim, resulting in actual injury to Plaintiff. *Davis*, 320 F.3 at 351; *Taylor v. Santana*, 2007 WL 737485, at *6-7 (S.D.N.Y. 2007). A First Amendment retaliation claim requires that a defendant have personally engaged in adverse action against a plaintiff. *Holland*, 758 F.3d at 225. Plaintiff has failed to submit evidence sufficient to raise a question of fact on the issue of whether McClenning took any action whatsoever with regard to Plaintiff's active legal papers, let alone that he did so deliberately and maliciously. *See Collins*, 877 F. Supp. 2d at 871. Plaintiff's conjecture and speculation that McClenning was responsible for the loss or destruction of his legal papers is inadequate to avoid summary judgment in McClenning's favor. *See Kerzer*, 156 F.3d at 400. Therefore, the Court recommends that McClenning be granted summary judgment on Plaintiff's First Amendment access to court and retaliation claims.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED** in its entirety; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[13] Such objections shall be filed with the Clerk of the

---

[13] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  August 27, 2018
        Syracuse, New York

                                                    Therese Wiley Dancks
                                                    United States Magistrate Judge

---

is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Matthews v. Thomas, N.D.N.Y., November 6, 2017

2008 WL 4416411
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Samuel CABASSA, Plaintiff,

v.

Craig GUMMERSON, Corrections Captain,
Auburn Correctional Facility; Donald Selsky,
Assistant Deputy Commissioner, Director of
Special Housing/Disciplinary Program; Anthony
Graceffo, Chief Medical Officer, Auburn Correctional
Facility; Glenn S. Goord; Hans Walker; Gary
Hodges; D.W. Seitz; Terry Halcott; Christine
Coyne Nancy O'Connor; Ann Driscoll; John
McClellen; John Rourke, Captain, Security Services
at Auburn Correctional Facility; Koors, Head
Pharmacist at Auburn Correctional Facility;
Robrt Mitchell, Correctional Counselor at Auburn
Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.

No. 9:01–CV–1039.
|
Sept. 24, 2008.

**Attorneys and Law Firms**

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, David L. Fruchter, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

*1 Plaintiff, Samuel Cabassa, brought this civil
rights action pursuant to 42 U.S.C. § 1983. In a
Report Recommendation dated June 30, 2008, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' second motion
for summary judgment (Docket No. 81) be granted

in part and denied in part. Objections to the Report
Recommendation have been filed by the parties.

Based upon a de novo review of the portions of the
Report–Recommendation to which the parties have
objected, the Report–Recommendation is accepted and
adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part
and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in
its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to
the extent that it asserts:

(a) Any Fourteenth Amendment procedural due
process claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against
defendant Hans Walker;

2. Defendants' second motion for summary judgment is
otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts
claim against defendants D.W. Seitz and Craig
Gummerson asserted in the Fourth Amended
Complaint's Fifth Cause of Action; and

(b) Plaintiffs First Amendment retaliation claim against
defendants D.W. Seitz and Craig Gummerson also
asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.)[1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[4] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[5] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se*.[7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[11] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[12]

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement. [13] In one of those actions, he was awarded $1,000 following a jury trial. [14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience. [15]

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded, [16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of

Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4–8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6–8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8–10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

**\*4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1–2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move

2008 WL 4416411

around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4–5.)

### 1. Continuing Violation Doctrine

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[17] I will assume, for purposes of this Report–Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[19]

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4–5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response,

admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16–17 [Ex. B to Plf.'s Decl.].)

**\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].)[20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24–28 [Ex. E to Plf.'s Decl.].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation]," since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].)[21]

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1

Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf* . Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

*6 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40–41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6–8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5–21 [Plf.'s Decl.].) [22]

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false. [23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983. [24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36–37 [Ex. H to Plf.'s Decl.].) [25]

2008 WL 4416411

**\*7**  Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [26]

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23–38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6–8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8–12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23–31 [Exs. E–F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21–22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [27]

**\*8**  The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it, [28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 61 of 299
Cabassa v. Gummerson, Not Reported in F.Supp.2d (2008)
2008 WL 4416411

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03–CV–0959, 2004 WL 2202501, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]–6[17], 6[19], 6 [23], 6[30]–6[34], 6[36], 6[38], 6[41]–6[50], 6[52]–6[58], 6[61]–6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5–7, 9–10, 13–17, 19–22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's

actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

### 2. Protected–Liberty–Interest Requirement

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn

C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23–25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161–day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161–day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided

"good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS. [29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population. [30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population, [31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility, [32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be). [33]

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.) [34]

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998. [35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

**\*12** As explained above in Part II.A.1. of this Report–Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate

DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

### B. Plaintiff's Fifth Cause of Action

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]–6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4–8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day

2008 WL 4416411

deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10–11, 13–14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4–day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10–13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) [36] The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [37]

**\*13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2–3.)

### 1. Procedural Due Process Claim Under the Fourteenth Amendment

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379–80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483–84 (1995).

Furthermore, I have found no cases suggesting that *Sandin*'s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158–59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07–CV–0102, 2007 WL 4287840, at \*3–5 (E.D.Ark. Dec. 7, 2007) (finding

that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations—arising from same placement in segregated housing—*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05–CV–0198, 2007 WL 2479467, at *4–5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

 *14  As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin*' s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report–Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4–8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation. [38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

## 2. Claims Under the First Amendment

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11–13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2–3.)

### a. Access–to–Courts Claim

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*—at least against Defendants Seitz and Gummerson. [39]

 *15  Plaintiff's "Fifth Cause of Action" alleges as follows:

> The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13–15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States

Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]–6 [15].)

Indeed, in my Report–Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5–8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1–3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor.

(Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report–Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [40]

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of

grievances." [42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act. [45]

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but

final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90–CV–1731, 1997 WL 431065, at *6–7, 1997 U.S. Dist. LEXIS 11025, at *21–22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85–CV–5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted]. [46]

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18**  A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin* [*v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at \*6, 1997 U.S. Dist. LEXIS 11025, at \*19–20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at \*9, 1991 U.S. Dist. LEXIS 8763, at \*26–27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted]. [47]

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]–6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [48]  The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998—approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

**\*19**  Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308–09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06–CV–0669, 2007 WL 1030304, at \*4–5, 2007 U.S. Dist. LEXIS 24261, at \*11–12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b][6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368–70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments). [49]  In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20,

Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 69 of 299
Cabassa v. Gummerson, Not Reported in F.Supp.2d (2008)
2008 WL 4416411

1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]–6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. [50] This initial burden, while modest, is not without substance. [51]

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14–18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40–41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then. [52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry [53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely—in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay). [55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

### b. Retaliation Claim

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

2008 WL 4416411

**\*21** In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of* ] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]–6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [56]

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004),

*Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997).

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [58] in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986–87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810–11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ...."). [59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because*

Case 9:16-cv-01001-MAD-TWD   Document 73   Filed 08/27/18   Page 71 of 299
Cabassa v. Gummerson, Not Reported in F.Supp.2d (2008)

2008 WL 4416411

Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. [60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him). [61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that

Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them). [62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary. [63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground. [64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be *GRANTED* in part and *DENIED* in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be *DISMISSED* in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be *DISMISSED* to the extent that it asserts (a) any Fourteenth Amendment

procedural due process claim whatsoever, (b) a First Amendment accesstocourts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise *DENIED*** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24 ANY OBJECTIONS to this Report– Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–**

**Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [65]

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roland v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of H.H.S., 892 F.2d 15 [2d Cir.1989]* ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4416411

**Footnotes**

1    By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

2    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).*

3    *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997)* [citation omitted]; *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990)* [citation omitted].

4    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).*

5    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita, 475 U.S. at 585– 86; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).*

6    *Ross v. McGinnis, 00–CV–0275, 2004 WL 1125177, at \*8 (W.D.N . Y. Mar. 29, 2004)* [internal quotations omitted; emphasis added].

7    *See Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir.2002)* ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso, No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), aff'g, 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at \*12–13 (N.D.N .Y. Feb. 10, 2004)* (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak, 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at \*1– 4 (N.D.N.Y. Feb. 16, 2006)* (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003)* (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan, 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003)* (Hurd, J.).

8    *See Patterson v. County of Oneida, 375 F.3d 206, 219 (2d. Cir.2004)* ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson, 251 F.3d 345, 361 (2d Cir.2001)* (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied, 536 U.S. 922 (2002); Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1993)* ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

9    (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

10    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

11    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West–Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

12    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03–CV–3789, 2006 WL 357824, at *3–4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

13    *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92–CV–6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96–CV–6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

14    *See Cabassa v. Rufat,* 96–CV–6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

15    "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06–CV–0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report–Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97–CV–0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report–Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97–CV–1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report–Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

16   Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

17   (*See* Dkt. No. 81, Part 5, at 5–8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1–5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report–Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

18   *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94–CV–0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97–CV–0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

19   The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05–CV–9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04–CV–8135, 2007 WL 924464, at *6–7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

20   Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21–22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

21   Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3–4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report–Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report–Recommendation.

22   I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]–6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

23   *See Ciaprazi v. Goord,* 02–CV–0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743–44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

24   A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS

Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

25    Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36–37 [Ex. H to Plf.'s Decl.].)

26    It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87–88 (W.D.N.Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

27    *See Brown v. Goord,* 04–CV–0785, 2007 WL 607396, at *6 (N.D .N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02–CV–3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

28    It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39–45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

29    *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360–day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1–304.14).

30    *See, e.g., Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04

(W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

31    *See, e.g., Husbands,* 990 F.Supp. 218–19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354–55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

32    *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60–119 days; 127 had SHU sentences of 120–179 days; 545 had SHU sentences of 180–365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU—for periods as long as or longer than [the plaintiff's 180–day] stay—is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

33    *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

34    *See Goros v. Pearlman,* 03–CV–1303, 2006 U.S. Dist. LEXIS 19661, at *22–24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

35    "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

36    I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

37    For example, he cites Paragraph 6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11–12.)

38    (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

39    *See Carroll v. Callanan,* 05–CV–1427, 2007 WL 965435, at *5–6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising

under First Amendment) [citing cases]; *Stokes v. Goord,* 03–CV–1402, 2007 WL 995624, at *5–6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez–Cifuentes v. Torres,* 04–CV–1470, 2007 WL 499620, at *4–6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01–CV–1396, 2006 WL 383513, at *1, 6–7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381–82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

40    I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

41    "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

42    *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

43    *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

44    *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

45    *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03–CV–1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

46    *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

47    *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00–CV–1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010–11 (S.D.W.Va.1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

48    Without burdening this already lengthy Report–Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

49    *Cf. Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199–1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

50    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

2008 WL 4416411

If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].”); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986).

51    *See* *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) (“[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.”) [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (“Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.”) [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that “the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown,” *only where the motion has been “properly filed” and “the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein.”* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

52    *See* *Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) (“We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.”) [citations omitted]; *cf. Wright v. Rivera,* 06–CV–1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that “the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court”).

53    (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching “Notice of Entry of Order,” dated June 18, 1998, stating that Judge Corning's judgment had been “duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998”].)

54    N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, “Time to Appeal or Move for Leave, In General,” C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

55    *See* *Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf.* *Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

56    Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) (“A statement in a pleading may be adopted by reference elsewhere in the same pleading ....”)

57    It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they “plausibly” suggest. *See* 408 F.3d at 130 (“It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....”) [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965–74 (2007) (rather than turn on the “conceivab[ility]” of an actionable claim,” the Rule 8 standard turns on the “plausibility” of an actionable claim in that his “[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]”); *see also Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (“*Twombly* requires ... that the complaint's ‘[f]actual allegations be enough to raise a right to relief above the speculative level ....’ ”) [internal citation omitted].

58    *See Trask v. Rios,* 95–CV–2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (“ ‘Harass,’ ‘discriminate,’ and ‘retaliate’ are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.”) [citations omitted].

59    This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05–CV–6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) (“Varela's grievance does not use the

2008 WL 4416411

word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03–CV–3789, 2007 U.S. Dist. LEXIS 31700, at *18–19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04–CV–2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

60    To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

61    (*See* Dkt. No. 85, Part 3, at 10–11 [Plf.'s Memo. of Law].)

62    (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

63    (Dkt. No. 16, ¶¶ 6[11]–6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning.]") [internal quotation marks omitted].) As explained earlier in this Report–Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report–Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

64    (*See generally* Dkt. No. 81, Part 5, at 5–8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1–5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

65    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th

2008 WL 4416411

Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1132772
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick DIAZ, Plaintiff,

v.

Brian FISCHER, Commissioner, Department of
Corrections; Harold D. Graham, Superintendent,
Auburn Correctional Facility; Steven Byrne,
Lieutenant; Timothy Quinn, Lieutenant; Gregory
Redmond, Lieutenant, Auburn Correctional
Facility; James Cady, Correctional Officer,
Auburn Correctional Facility; Robert Burdick,
Correctional Officer, Auburn Correctional
Facility; and Joseph Merville, Correctional
Officer, Auburn Correctional Facility, Defendants.

No. 08−CV−1208 (LEK/DRH).
|
Feb. 23, 2010.

## Attorneys and Law Firms

Frederick Diaz, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## REPORT–RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Frederick Diaz ("Diaz"), an inmate
in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
the DOCS Commissioner and seven DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Compl. (Dkt. No. 1).
Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 25. [2] Diaz
opposes the motion. Dkt. No. 27. For the following
reasons, it is recommended that defendants' motion be
granted.

## I. Background

The facts are related herein in the light most favorable to
Diaz as the non-moving party. *See* subsection II(A) *infra.*

### A. Work Placement

On April 3, 2006, Diaz was transferred to Auburn
Correctional Facility ("Auburn"). Compl. ¶ 14. Upon
arrival at Auburn, Diaz was immediately verbally
harassed by defendant Redmond, a Lieutenant. *Id.* ¶ 15. [3]
Shortly after his arrival, Diaz sought an employment
placement. *Id.* ¶ 16. Diaz claims that he was not offered
an appointment "commensurate with his education and
skills, despite the fact that all the other inmates were
being given programs of [their] choosing." *Id.* When Diaz
protested, his privileges were limited. *Id.*

While on limited privileges, Diaz was repeatedly denied
access to recreation, showers, and the law library, ordered
to double bunk with another inmate, and placed in
keeplock [4] when he refused the double bunking order.
Compl. ¶ 17. During this time, Diaz continued to attempt
to secure an employment position in the Shop Gate. *Id.* ¶
21. Diaz was told that he was not permitted to join such a
program, which he later learned was untrue, so he wrote
multiple letters and grievances to defendant Graham, the
Auburn Superintendent. *Id.* Graham responded that Diaz
would still not be assigned to the Shop Gate program,
regardless of whether it was permitted pursuant to internal
policies and regulations. *Id.* As Diaz was continually
offered nothing other than a porter position, he decided
to run for a membership spot in the Inmate Grievance
Resolution Committee (IGRC). [5] *Id.* ¶ 20.

The day after Diaz won the IGRC election, Graham
approached him and offered a deal. Compl. ¶ 22. If Diaz
resigned from his position on the IGRC, he would be given
an employment placement in the law library and could join
the Inmate Liason Committee. *Id.* Diaz accepted the offer
and resigned. *Id.* [6]

Diaz commenced working in the law library under the
supervision of defendants Burdick and Merville, both
corrections officers. Compl. ¶ 23. Burdick and Merville
attempted to incite the other inmate library clerks into

an altercation with Diaz, telling the other inmates that Diaz was a "snitch," and promoting Diaz to a coveted position over other inmate clerks who had been employed longer. *Id.* Shortly after Diaz refused the promotion, on December 27, 2006, Burdick issued a retaliatory misbehavior report against Diaz for his failure to report to work. *Id.* ¶ 24. According to Diaz, the schedule was changed without his knowledge and he was not scheduled to work that shift. *Id.*

**\*2** At the subsequent disciplinary hearing, Diaz was found guilty for failing to attend work, sentenced to ten days keeplock [7], and referred back to the Program Committee for a new job assignment. Compl. ¶ 25. Diaz claims that Burdick and Merville tolerated known homosexual activity and drug use among the other inmate clerks, allowing them to retain their employment in the law library despite being adjudged guilty of more serious disciplinary infractions which led to longer disciplinary sentence dispositions. *Id.* ¶ 28. However, due to Diaz's propensity to file grievances, he was terminated from his position in the law library despite his minor disciplinary infraction. *Id.* ¶¶ 28, 30. Diaz was again offered the porter position by the Program Committee, which he accepted, despite the fact that it was given to him with "absolutely no consideration of [his] education and skills ...." *Id.* ¶ 30.

### B. Misbehavior Report for May 21, 2007 and Subsequent Disciplinary Hearing

On May 21, 2007, defendant Quinn, a Lieutenant, was sent to interview Diaz and investigate the claims alleged in Diaz's grievance against Sgt. Cox, a non-party here. [8] Compl. ¶ 37. Quinn called Diaz into an interview room, but was not concerned with investigating Diaz's concerns, as instead he "began to berate [Diaz] about his grievances." *Id.* ¶ 38. During the interview, Quinn asked to see Diaz's identification ("ID") card. *Id.* ¶ 39. Diaz produced the ID card, which did not have a program sticker on it. *Id.* Quinn threatened to place Diaz in keeplock for having improper documentation, but Diaz stated that his card had recently been lost during transport and the replacement did not have a sticker. *Id.* Quinn then asked Diaz why he had not reported to his assigned work program as a porter, and Diaz responded that he was not called out to work that day. *Id.* ¶ 40. At this point, Quinn exited the interview room and ordered Diaz to report to work. *Id.* Upon exiting the room, Diaz

told Quinn not to contact him again. *Id.* ¶ 41. Quinn ordered Diaz onto the wall, Diaz was "roughly" pat frisked, and threatened again by Quinn who stated that the policies and procedures of Auburn did not apply to the corrections officers there. *Id.* Before being returned to his cell, Diaz was informed that he was being sent to the Special Housing Unit ("SHU") [9] for not reporting to work that day. *Id.* ¶ 43.

Quinn charged Diaz with "refusing a direct order and refusing to accept a program assignment by the Program Committee." Compl. ¶ 45. On May 26, 2007, defendant Redmond. a Lieutenant, presided over the disciplinary hearing for the aforementioned misbehavior report. *Id.* ¶ 46. Diaz contends that the misbehavior report was false because (1) he never told Quinn he removed his program sticker, (2) Diaz did accept the porter assignment from the Program Committee or else he would have been on limited privileges, and (3) he did not fail to refuse a direct order as he had never been called for his employment on May 21. *Id.* Diaz could not develop his defense during the hearing because Redmond failed to let him ask Quinn any questions. *Id.* While Diaz was waiting for the verdict of the hearing, he was placed in a holding room. Compl. ¶ 47. While in that room, Diaz observed Quinn and Redmond conversing. *Id.* Then, Quinn came over to the door of the holding room and began to curse at and berate Diaz. *Id.* Ultimately Redmond found Diaz guilty and sentenced him to 120 days in SHU. *Id.* ¶ 47.

**\*3** Diaz wrote letters of complaint and grievances about Quinn and Redmond during the disciplinary hearing. Compl. ¶¶ 47, 49. Diaz also requested to see the videotape of the hearing, [10] as well as asking Graham and Fischer to view the tape. *Id.* ¶¶ 48–49, 51–52. On June 1, 2007, Graham modified Diaz's disciplinary disposition to fourteen days in SHU and forty-six days in keeplock, as well as 120 days loss of privileges. *Id.* ¶ 48. Graham's modification was affirmed on administrative appeal on July 18, 2007, and the grievances Diaz lodged in connection with this misbehavior report and disciplinary hearing were denied. *Id.* ¶ 51.

### C. Conditions of Confinement

For the forty-six days in which Diaz was housed in keeplock, he was deliberately placed in a filthy cell in retaliation for the grievances which he had previously filed

2010 WL 1132772

against defendants. Compl. ¶ 56. Diaz's cell (1) contained a urine-stained mattress; (2) had filthy walls and a dirty sink; (3) had a sink in need of repair; (4) required a new mattress and light bulbs; and (5) lacked a desk and foot locker. *Id.* ¶¶ 56–57. Additionally, while in keeplock, guards placed a note on Diaz's cell labeling him "total whiner," until it was subsequently removed by "a decent guard." *Id.* ¶ 57. Diaz was also denied showers for two days. *Id.* ¶ 58. In response, Diaz submitted a grievance against the staff. *Id.*

### D. Disciplinary Hearing on June 26, 2007 and Subsequent Misbehavior Report and Disciplinary Hearing

On June 26, 2007, Byrne presided over one of Diaz's disciplinary hearings. Compl. ¶ 60. [11] During the hearing, Diaz interrupted Byrne when he began to read the misbehavior report out of context. *Id.* ¶ 62. Byrne strenuously advised Diaz not to interrupt him further. *Id.* This escalated into a verbal altercation, whereupon Diaz got up to leave the hearing and Byrne ordered him to stop. *Id.* ¶¶ 62–63. Defendant Cady, a corrections officer who was also present at the disciplinary hearing, prevented Diaz from leaving the room. *Id.* ¶ 63. Diaz was then assaulted by both Byrne and Cady. *Id.* ¶¶ 63–64. Additional officers responded to the altercation and also began to batter Diaz alongside Byrne and Cady. *Id.* ¶ 64. Throughout the entire assault, an audiotape was running, which was supposed to be recording the disciplinary hearing. *Id.* ¶¶ 62–64. Byrne ultimately found Diaz guilty of the disciplinary infraction, sentenced him to thirty days keeplock, and also issued Diaz a misbehavior report for assaulting an officer. *Id.* ¶¶ 69–70. Diaz's disciplinary disposition was upheld by Graham, despite the fact that he listened to the audiotape of the disciplinary hearing. *Id.* ¶ 68. However, on August 1, 2007, the misbehavior report was "expunged from [Diaz's] record per Supt. Graham," overturning the thirty day disciplinary disposition. *Id.* ¶ 69.

**\*4** On July 2, 2007, a disciplinary hearing was held for the misbehavior report for the altercation on June 26. Compl. ¶ 71. During the hearing, the audiotape from June 26 was played, which was allegedly altered. *Id.* ¶ 72. When Byrne was questioned about the tape's authenticity, he explained he paused the tape player during the hearing in order to converse privately with Diaz. *Id.* ¶ 73. On July 9, 2007, Diaz was found guilty of assaulting Byrne and Cady and sentenced to eight months in SHU. *Id .*

¶ 74. Graham affirmed the disciplinary disposition. *Id.* On September 13, 2007, the conviction and sentence were report was reversed on administrative appeal due to the altered audiotape. *Id.* ¶ 75.

### E. Destroyed Property

Diaz also claims that when he was sent to SHU or keeplock, the retaliation against him was exacerbated and perpetuated by defendants throwing away and damaging his personal property. Compl. ¶¶ 53, 77. Diaz wrote letters to Graham complaining about the destruction of his property, but no investigation was ever commenced. *Id.* ¶ 53.

### II. Discussion

In his complaint, Diaz alleges that his First Amendment rights were violated when defendants continually authored false misbehavior reports against him for filing grievances. Additionally, liberally reading the complaint, Diaz contends that his Eighth Amendment rights were violated when he was subjected to (1) unconstitutional conditions of confinement during his forty-six days in keeplock and (2) excessive force by defendants Byrne and Cady during his disciplinary hearing. Lastly, Diaz asserts that his Fourteenth Amendment rights were violated when he was subjected to (1) multiple false misbehavior reports, (2) faulty procedural due process during disciplinary hearings, (3) damaged personal property, [12] and (4) an Equal Protection violation as Diaz was terminated from his job position in the library when other similarly situated inmates were allowed to continue with their employment placement. Defendants assert that (1) Diaz has failed to demonstrate the personal involvement of defendants Fischer, Quinn, and Graham; (2) there is no merit to Diaz's due process, retaliation, or equal protection claims; (3) the Eleventh Amendment bars suit of defendants in their official capacities; [13] and (4) defendants are entitled to qualified immunity.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to

dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*5** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a

party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Conditions of Confinement

To the extent that, liberally reading Diaz's complaint, such a claim is raised, it is without merit. First, Diaz fails to identify the individuals responsible for his placement and care in keeplock." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Second, "[t]he Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson v. Smith,* No. 9:03CV1050 (FJS/DEP), 2006 WL 1843292, at \*9 (N.D.N.Y. June 29, 2006) (Scullin, J.) (citations omitted).

**\*6** The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

Diaz claims that while in keeplock, he had a stained mattress, dirty walls and sink, and lacked a desk and foot locker. However, Diaz has failed to show how these conditions rose to the level of substantial risk of serious harm or denial of an identifiable human need. *See Davidson,* 371 F.Supp.2d at 370. Diaz makes no contention of how a dirty wall and sink and stained mattress inhibited his ability to eat, sleep, or remain at an adequate temperature. Additionally, there are no claims for illness or injury. At best, these are conclusory allegations that are wholly insufficient to state an Eighth Amendment violation. Moreover, Diaz's claims that he was not offered a shower for two days are also insufficient to state an Eighth Amendment violation. *See Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N.D.N.Y.2001) (citations omitted) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); *see also Cosby v. Purkett,* 782 F.Supp. 1324, 1329 (E.D.Mo.1992) (holding that access to showers every seventy-two hours is not a violation under the Eighth Amendment). Accordingly, Diaz has failed to establish the objective element of the analysis.

Lastly, as discussed *supra,* verbal harassment alone is insufficient to allege a constitutional violation. Accordingly, defendants' motion as to any such claim should be granted.

### C. Personal Involvement

Defendants contend that Diaz has failed to allege the personal involvement of Fisher, Quinn, and Graham. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950

F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

*7 (1)[T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.3d 319, 323–24 (2d Cir.1986)).

### 1. Fischer

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright,* 21 F.3d at 501. Thus, Fisher cannot be held liable solely because he, as Commissioner, held a supervisory position. The gravamen of Diaz's Complaints against Fischer is that he was continually written to, and failed to respond. Compl. ¶¶ 29, 3, 52, 76. However, failure to respond to a grievance is insufficient to allege personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Additionally, there were no allegations, nor does the record support any contentions, that Fischer was directly involved in any of the alleged violations, that Fischer failed to remedy a wrong of which he was informed, that he was grossly negligent in supervising subordinates, or that he was deliberately indifferent to the health and safety of Diaz.

Accordingly, defendants' motion should be granted and Fischer should be dismissed from the present action.

## 2. Quinn

Diaz has unequivocally alleged that Quinn was directly responsible for writing a false misbehavior report on May 21, 2007, and also influenced Redmond's decision at his subsequent disciplinary hearing on May 26, 2007. Compl. ¶¶ 45, 47. As such, Diaz has plausibly contended that Quinn was responsible for his alleged constitutional violations. Whether there is any substantive merit to said violations is a separate issue and discussed *infra*. Accordingly, defendants' motion on this ground as to Quinn should be denied.

## 3. Graham

As previously discussed, holding a supervisory position, without more, is insufficient to allege personal involvement. *Wright,* 21 F.3d at 501. Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Defendants argue that Diaz's contentions center around Graham's lack of response to his complaints. However, Diaz alleges that Graham personally investigated and acted on Diaz's complaints. For example, Graham allegedly listened to the audiotape of the June 26, 2007 disciplinary hearing before affirming both disciplinary dispositions. Compl. ¶ 74.

**\*8** Additionally, Diaz contends that after the May 26, 2007 disciplinary hearing, he asked Graham to review the videotape of the hearing, thus providing Graham with notice of a constitutional violation which was allegedly ongoing with his continued segregation. Graham refused to review the tape prior to affirming the disciplinary disposition.

> It has been held that "an appropriate guiding principle" for determining personal responsibility

is where a grievance alleges an "ongoing" constitutional violation, the supervisory official who reviews the grievance is "personally involved" if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.

*Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (internal citations omitted). Thus, Graham's knowledge was not that of a "violation ... that has already occurred and is not ongoing," it was continuous and his failure to remedy the situation is sufficient to allege personal involvement. *Id.*

Accordingly, defendants' motion on this ground as to Graham should be denied.

## D. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).)).

First, as discussed *infra* section II(E)(2), Diaz's misbehavior reports were written for a proper purpose. Additionally, Diaz has failed to allege or prove facts to support a retaliation claim against Merville and Burdick. The misbehavior report which Burdick authored, and Merville endorsed, occurred shortly after Diaz refused to accept a promotion. Compl. ¶¶ 23–24. Diaz's

employment status does not represent a constitutionally protected activity. *See supra* note 4. Thus, this cannot provide a basis by which to assert a retaliation claim. Instead, Diaz appears to rely upon his grievances as his constitutionally protected conduct. Compl. ¶¶ 28, 30. While filing grievances is an activity protected by the First Amendment, Diaz fails to identify a time when he filed grievances against Merville and Burdick prior to the issuance of the allegedly false misbehavior report. Thus, defendants' adverse actions of filing the misbehavior report could not be a substantial factor in the alleged retaliation because the grievances against them were filed *after* the misbehavior report, not before. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

**\*9** Similarly, Diaz has failed to allege or prove facts to support a retaliation claim against Quinn. Quinn investigated a grievance which Diaz filed against an unnamed corrections officer. Throughout the interview, Diaz and Quinn exchanged words, Quinn ordered Diaz to report to work, Diaz left the interview and failed to report to work, and was given a misbehavior report for failing to follow a direct order and participate in his programming. Compl. ¶¶ 38–45. Diaz filed a grievance against Quinn after the disciplinary hearing took place. *Id.* ¶ 47, 49. As previously discussed, this constitutionally protected activity occurred *after* the adverse action of the misbehavior report, and not before. Thus, the grievances could not serve as a substantial cause for the report. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

The same is true, with regard to the misbehavior reports and disciplinary hearing occurring prior to June 2007, for Graham. Graham's actions in affirming the hearing decisions were allegedly in retaliation for Diaz's filing of grievances against the other defendants. These conclusory allegations are insufficient to plausibly state a retaliation claim.

Accordingly, defendants' motion on this ground should be granted.

### E. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### 1. Preclusion

Diaz alleges due process violations occurring during his disciplinary hearing in connection with the December 27 misbehavior report and the hearing on May 26, 2007 in connection with the May 21 disciplinary report. However, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule apples to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).

**\*10** There is no evidence that Diaz's disciplinary determinations were ever vacated with regard to these two proceedings. [14] While Diaz's sentence was modified with respect to the May 26 hearing, it was never overturned or expunged. Thus, the *Heck* rule still applies and any

procedural challenges are barred. Therefore, because Diaz's recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction, the based on that hearing is barred.

Accordingly, defendants' motion should be granted as to these claims.

### 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

As discussed *supra,* Diaz has failed to establish facts sufficient to allege a retaliation claim. Thus, the present claim must also fail. Moreover, as discussed *supra,* such a finding of a false misbehavior report runs afoul of *Heck* and its progeny. Finally, as established by the record, Diaz's misbehavior reports were supported by sufficient evidence.

In the first case, Diaz does not dispute that the schedule indicated that he needed to be at work and he was not there. Compl. ¶ 24. The factual issues of when the schedule was changed and what it actually indicated were determined at the hearing, which concluded with a finding of guilt and has not been overturned. Similarly, the second misbehavior report cited Diaz's failure to follow a direct order and participate in his employment. Quinn's order to Diaz to report to work, whether or not he was previously called out, was a direct order with which Diaz failed to comply. *Id.* ¶¶ 40, 43, 45. Any other factual issues were necessarily addressed during the disciplinary hearing which resulted in a finding of guilt which was never expunged or overturned. Accordingly, in both cases, Diaz was found guilty of the offense charged. Such findings were also consistent with the allegations in the complaint. While there are some disputed facts as to why the schedule was incorrect or whether Diaz was actually called for

work, those facts were determined in the disciplinary hearings.

Accordingly, defendants' motion should be granted as to these claims.

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> **\*11** [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted). In the prison setting, inmate treatment is evaluated pursuant to a rational basis standard. *Phillips,* 408 F.3d at 129 (citing *Shaw v. Murphy,* 532 U.S. 223, 229–230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)). Thus, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

If an inmate cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotations and citations omitted). Similarly, to succeed, plaintiffs must show "that they were intentionally treated differently from other similarly-

situated individuals without any rational basis." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 158–59 (2d Cir.2006). Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves ...." *Neilson,* 409 F.3d at 104.

Here, Diaz contends first that he was not given the preferential employment treatment he deserved when he made a deal with Graham. Compl. ¶ 22. As the Equal Protection Clause bars deprivations and unequal treatment, such claims for preferential treatment are not within its bounds. Moreover, Diaz fails to allege facts sufficient to conclude that others who made similar deals with Graham were treated differently.

Additionally, Diaz claims that the sanction of losing his employment was more severe than that received by other inmates who had been adjudged guilty of more serious disciplinary infractions and sentenced to more severe dispositions. Such general claims fail to identify which individuals intentionally treated him different. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ( "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable ... class."). The named defendants did not appear to have any involvement in Diaz's employment placement. At Diaz's hearing, he was referred back to the Inmate Program Committee for assignment. Compl. ¶ 25. This committee, the members of which are not named in the present action, appears to have the authority to place inmates in a job assignment. The moving defendants are neither on the Program Committee nor vested with the authority to provide Diaz with employment options. Reliance on Fischer or Graham for such power is neither alleged nor inferable from the record. Additionally, none of the other moving defendants acted as hearing officers or imposed Diaz's sentences. Thus, no evidence has been proffered that any moving defendant purposefully discriminated against Diaz.

**\*12** Accordingly, defendants' motion should be granted as to the equal protection claim.

### F. Qualified Immunity

Defendants claim that they are entitled to qualified immunity. Qualified immunity generally protects

governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning Diaz's claims because, as discussed *supra,* accepting all of Diaz's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, in the alternative, defendants' motion should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all respects and that the complaint be **DISMISSED** as to defendants Fischer, Graham, Quinn, Redmond, Burdick, and Merville as to all claims against them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS**

WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1132772

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The motion is filed on behalf of all defendants except Byrne and Cady. Dkt. No. 25 at 2. Byrne and Cady have both filed answers. Dkt. Nos. 26, 39.

3    Allegations of verbal harassment alone are not actionable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ( "The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly d ism issed.").Therefore, even when the allegations of the complaint are liberally construed, the allegations here afford no basis for a claim under § 1983 and will not be further addressed.

4    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

5    "DOCS maintains an Inmate Grievance Program (IGP)at all facilities. The first step requires an inmate to file a grievance with the IGRC. If such informal resolution fails, the inmate may then appeal to the facility superintendent and thereafter to the Central Office Review Committee. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

6    To the extent that, liberally reading the complaint, Diaz contends that he should have received, or continued to occupy, a specific employment placement, such contentions are without merit. Prisoners do not have a constitutionally protected property interest in a certain employment or in continued employment. *See Johnson v. Rowley,* 569 F.3d 40, 43–44 (2d Cir.2009); *see also Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995) (finding that termination and reassignment to a different job within the prison setting is neither atypical nor significant in relation to ordinary prison life); *Newsom v. Norris,* 888 F.2d 371, 374 (6th Cir.1989) (holding that "the Constitution does not create a property or liberty interest in prison employment and that any such interest must be created by state law by language of an unmistakably mandatory character.") (citations and quotation marks omitted); *Karacsonyi v. Radloff,* 885 F.Supp. 368, 370 (N.D.N.Y.1995) ("Prison officials, however, have broad discretion in denying federal inmates the opportunity to [work].") (citations omitted). Additionally, the Second Circuit has held that a "New York [state] ... prisoner has no protected liberty interest in a particular job assignment." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted) (holding that inmates "ha[ve] no constitutional right to any particular position of employment."). Accordingly, as a matter of law, Diaz has no liberty interest in his initial, or continued, employment, or any choice in which employment he should be assigned.

7    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (2007).

8    On May 15, 2007, Sgt. Cox presided over one of Diaz's disciplinary hearings. Compl. ¶ 35. During the hearing, Cox threatened Diaz, insisting that unless Diaz stopped filing grievances he would be subjected to "man law" by having fabricated charges brought against him, being assaulted by staff, and being sent to solitary confinement. *Id.*

9    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

10    Diaz viewed the tape on June 27 It allegedly showed Diaz in the holding room, Quinn entering the room and conversing with Redmond, Quinn moving to the door of Diaz's room and exchanging words, and then Quinn returning to speak with Redmond. Compl. ¶ 50.

11    It is unclear what the disciplinary infraction was for which Diaz was being tried. However, Diaz and Byrne had previously met as Byrne interviewed Diaz about previous grievances he had submitted. Compl. ¶ 61. Prior to the hearing, Diaz inquired about the status of his grievance investigation and Byrne was very agitated by Diaz's questions. *Id.*

12    An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,*

468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "New York courts provide such a remedy ... [through the] initiat[ion of] an Article 78 proceeding in New York Supreme Court ....." *Gabis v. New York City Taxi & Limousine Comm'n,* No. 05–CV–8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct.12, 2005); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2). In this case, Diaz contends that there were unconstitutional deprivations when his property was destroyed by corrections officers. Compl. ¶¶ 53, 77. First, the Article 78 procedure exists. Second, because Diaz is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court. Accordingly, defendants' motion should be granted as to this claim.

13    Diaz has clarified, in his opposition papers, that he "is suing the defendants in their individual capacities [and] ... refer[ed] to the official title .. for reference purposes only ....." Dkt. No. 27. Accordingly, since Diaz clearly sues the defendants only in their individual capacities, the Eleventh Amendment bar to suits against state officials in their official capacities is inapplicable.

14    Diaz's claims concerning the June 26, and July 2, 2007 disciplinary hearings are not raised in the present motion.

---

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,
v.
Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*1 Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at *7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

## A. Facts

**\*2** The facts are related herein in the light most favorable to Flynn as the nonmoving party. See subsection III(A) infra. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). See generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. Id. at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word" and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted. [7] Id. at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. Id. at 3.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3** On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed. [8] Id. at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. Id. at 9.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. Id. Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. Id.

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances. [9] Id. at 22-23. Flynn appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. Id. at 18.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent denied the grievances.[10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483.[11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance.[12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

**\*4** On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking.[13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id.

Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16. The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

**\*5** In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status, Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. First Amendment

#### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

**\*7** Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he

could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped—sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal work sent to me. Then they lost a box of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions.

See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

### 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)) (explaining that "claim[s] supported by specific and detailed factual allegations ...

ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 Fed.Appx. 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, —— Fed.Appx. ——, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other

circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing of a grievance constitutes protected speech under the First Amendment. See Graham, 89 F.3d at 80; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

### a. Assault

**\*9** Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See Rivera v. Goord, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not chill a person of ordinary

firmness from continuing to engage in First Amendment activity."); Sloane v. Mazzuca, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. Williams v. Hesse, No. 9:16-CV-01343 (GTS/TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See Williams, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

**b. Access to Courts**

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See Shariff v. Poole, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under § 1983 even if the act when taken for different reasons would have been proper.' " Id. (quoting Franco, 854 F.2d at 588); see Nei v. Dooley, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See Guillory v. Haywood, No. 9:13-CV-01564

(MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

**\*10** However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015,

Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library. Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 Fed.Appx. 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de

minimis and do not constitute adverse action for purposes of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70. Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior was in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3

at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

**\*12** Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70.

Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied. [18]

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

**\*13** Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally, Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

**\*14** A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

**D. Exhaustion**

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*15** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent

within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4 at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted. [20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3rd time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> **\*16** On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am

> afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02 Civ.4477, 2004 WL 766433, at *8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [22]

**All Citations**

Slip Copy, 2018 WL 3195095

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

3   Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4   Local Rule 7.1(a)(3) states:
    Summary Judgment Motions
    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
    The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
    Local Rule 7.1(a)(3).

5   Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:
    3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.
    a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.

c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

Dkt. No. 20-1 at 17.

6    DOCCS Directive #4833 provided, in pertinent part:

Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

Dkt. No. 20-1 at 5.

7    The signature of the Superintendent is illegible.

8    See Footnote 8, supra.

9    See Footnote 7, supra.

10   See Footnote 7, supra.

11   See Footnote 7, supra.

12   See Footnote 7, supra.

13   The misbehavior report is not part of the record.

14   All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

15   In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

16   See Footnote 17, supra.

17   Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

18   See Footnote 15, supra.

19   See Footnote 17, supra.

20   Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting of all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

21   Section 701.6(b) provides:

Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.

N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

22   If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

End of Document                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 856416
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Corey FORD, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 9:09–CV–723 (DNH/ATB).
|
Jan. 31, 2011.

**Attorneys and Law Firms**

Corey Ford, pro se.

Brian J. O'Donnell, Asst. Attorney General for
Defendant.

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to me for Report and
Recommendation on March 8, 2010 by U.S. District
Judge David N. Hurd, pursuant to 28 U .S.C. § 636(b)
and Local Rules N.D.N.Y. 72.3(c). Plaintiff's second
amended complaint ("AC," Dkt. No. 28) seeks monetary
damages, under 42 U.S.C. § 1983, for various alleged
violations of his constitutional rights arising from his
confinement by the New York State Department of
Correctional Services ("DOCS") at the Shawangunk
Correctional Facility ("Shawangunk") in 2008 and 2009.
Presently before this court is defendants' motion to
dismiss the second amended complaint for failure to
state a claim, pursuant to FED. R. CIV. P. 12(b)(6),
which was supported by several substantive affidavits
and substantial documentary evidence. (Dkt. No. 32).
Plaintiff has filed a lengthy declaration and voluminous
documentary exhibits in opposition to the defendants'
motion. (Dkt. No. 35). For the reasons set forth below,
this court recommends granting in part and denying in
part defendants' motion.

## DISCUSSION

### I. *Facts*

On or about April 14, 2004, plaintiff was transferred to the
Special Housing Unit ("SHU") at Shawangunk, following
his violent assault on a correction officer at Green Haven
Correctional Facility ("Green Haven"). [1] Plaintiff alleges,
and defendants admit, that plaintiff was the subject of a
"mail watch" at Shawangunk, from the time of his transfer
in April 2004, through at least late 2009. (AC, Facts ¶
9; Defs.' Memo. of Law at 6, Dkt. No. 32–24). Plaintiff
claims that the screening of his incoming and outgoing
mail at Shawangunk included some privileged legal mail,
and resulted in delays of many days in delivery of his mail.
(AC ¶¶ 11–15, 22). Shawangunk Superintendent Joseph
T. Smith admittedly approved the initial mail watch, and
renewed the approval every 60 days thereafter. (AC, Facts
¶ 9; Defs.' Memo. of Law at 6). Plaintiff alleges that
John Maly, Deputy Superintendent for Security, and Ms.
Parisi, a mail clerk, were involved in executing the mail
watch. (AC ¶¶ 11–15, 22–23).

On or about March 22, 2009, plaintiff was charged in an
Inmate Misbehavior Report based on two of his letters
which were reviewed and confiscated by defendant Maly
pursuant to the continuing mail watch. In one letter,
plaintiff allegedly asks an unincarcerated individual to
harass and threaten plaintiff's "fiancee." In the other
letter, which plaintiff sent to another inmate through a
person outside the facility (a prohibited process known
as "kiting"), plaintiff allegedly asks one inmate to assault
another inmate. (AC ¶ 25). Plaintiff claims that, in
connection with the disciplinary hearing conducted by
defendant Eric Gutwein, he was deprived of proper
assistance, in that he was denied documents he deemed
critical to his defense. Plaintiff also claims that Hearing
Officer Gutwein improperly refused to allow certain
witnesses, requested by plaintiff, to testify. Plaintiff was
found guilty of the disciplinary charges and sentenced to
an additional 18 months in the SHU and 18 months loss
of good time. (AC ¶ 29). [2]

**\*2** Plaintiff requested permission to marry his fiancee on
or about April 1, 2008, while he was still confined in the
SHU at Shawangunk. Defendant Smith refused plaintiff's
request based on his long-term SHU status. (AC ¶¶ 16–18;
4/24/08 Smith Ltr., Dkt. No. 35–3 at 58). In April 2009,
Supt. Smith indefinitely revoked the visiting privileges
of plaintiff's fiancee because of her alleged involvement
in smuggling a note from another inmate to plaintiff in

the visiting room, and because of purported concerns for her safety based on the intercepted letter in which plaintiff allegedly asked another individual to harass and threaten her. (AC ¶¶ 24, 30–32, 34). Plaintiff claims that Supt. Smith and Dep. Supt. Maly pursued "an anti-family agenda against plaintiff, all in retaliation" for plaintiff's assault of a correction officer at Green Haven in April 2004, and his filing of grievances and lawsuits against certain defendants. (AC ¶¶ 17, 33–34). Plaintiff alleges that he formally appealed the revocation of his fiancee's visitation rights to defendant Brian Fischer, the DOCS Commissioner, but did not receive any reply. (AC ¶ 35).

Plaintiff alleges that his cell was searched three times in one week in July 2009, purportedly in retaliation for his initiation of this lawsuit and his filing of grievances and other court actions. Plaintiff claims that several correction officers informed him that "higher ups," including defendants Smith and Maly, had ordered them to destroy plaintiff's cell and take his legal magazines and books. (AC ¶¶ 36–39).

## II. Contentions and Summary of Recommendations

Plaintiff purports to sue DOCS Commissioner Fischer, Shawangunk Supt. Smith, Dep. Supt. Maly, Mail Clerk Parisi, and Hearing Officer Gutwein in their individual and official capacities. [3] The second amended complaint states five causes of action based on particular constitutional rights that plaintiff alleges were violated in various ways. However, it will be easier to address plaintiff's claims if they are considered by reference to the nature of the defendants' alleged underlying conduct.

Plaintiff alleges that the repeated extensions of the "mail watch" directed at him were not supported by current information establishing reasonable cause, and were motivated by a desire to retaliate against him for pursuing protected activity. Plaintiff claims that the mail watch violated applicable DOCS Directives, his due process rights, and his First Amendment rights—by interfering with the "free flow" of his incoming and outgoing mail, and by improperly denying him access to courts. Relying on affidavits that go beyond the allegations in the complaint or the documents reasonably associated with it, defendants argue that there was sufficient cause for the ongoing mail watch to pass constitutional muster. However, on the basis of the information properly considered in the context of a motion to dismiss, this

court finds that plaintiff has stated a plausible claim that, by continuing the mail watch through all of 2008 and 2009, defendants Smith and Maly violated plaintiff's First Amendment rights. Plaintiff's claim that the mail watch denied him access to the courts should be dismissed because he fails to make plausible allegations that he was prejudiced in connection with any litigation.

**\*3** The second amended complaint suggests that the disciplinary charges against plaintiff violated his constitutional rights because they were predicated on his letters, which were improperly reviewed and confiscated pursuant to the ongoing mail watch. However, because inmates are not constitutionally entitled to the suppression of illegally obtained evidence in the context of a disciplinary hearing, this cause of action would fail even if the ongoing mail watch were ultimately determined to violate the First Amendment. Plaintiff also alleges that he was deprived of due process at his disciplinary hearing because he was denied certain documents and because the hearing officer refused to call two witnesses, without adequate supporting reasons. Plaintiff's motion papers attach extensive documentary evidence, including the hearing transcript, in which defendant Gutwein articulates rational reasons for not allowing the particular documents and witnesses. In any event, none of the excluded evidence would have effected the outcome of the hearing, and so any procedural errors were harmless. Based on plaintiff's allegations and submissions, without reference to the hearing officer's affidavit, the plaintiff's due process claims relating to the disciplinary hearing should be dismissed under Rule 12(b)(6).

Plaintiff claims that defendant Smith denied his request to marry, based on retaliatory motives and without reasonable penological justification, in violation of plaintiff's First and Eighth Amendment rights. Relying on affidavits beyond the proper scope of a motion to dismiss, the defendants attempt to document and defend Supt. Smith's reasons for denying plaintiff's request. This court concludes that, based on the information properly considered under Rule 12, plaintiff establishes a plausible claim that, in preventing plaintiff from marrying, perhaps for the entire duration of his long-term SHU confinement, defendant Smith violated plaintiff's First Amendment rights.

Plaintiff asserts that the revocation of his fiancee's visitation rights were retaliatory and a violation of

his due process, and Eighth Amendment rights. This court concludes that plaintiff's conclusory allegations of retaliation fail to state a viable claim. The denial of visitation cannot be the basis of an Eighth Amendment or due process claim by a inmate. Plaintiff's complaint will be liberally construed to also include a claim under the First Amendment; however, the admitted reasons stated for the denial of visitation clearly constitute a rational penological justification. Because DOCS Commissioner Fisher's alleged role in the violations alleged in the second amended complaint seems to be limited to his failure to respond to plaintiff's appeals or complaints involving visitation and, perhaps, other issues, he was not personally involved to the extent necessary to establish his liability under Section 1983.

Finally, plaintiff alleges that the cell searches in July 2009 were in retaliation for his involvement in grievances and law suits against DOCS officials. However, even if plaintiff's sparse allegations suggested a retaliatory motive, cell searches in the prison setting are not the type of "adverse action" that will support a civil rights claim. [4]

## III. *Motion to Dismiss*

**\*4** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v.. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). No exhibits are attached to the second amended complaint, although it does reference a number of specific documents. The defendants have submitted three affidavits and a number of documents that go beyond what should properly be considered in connection with their motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67–68 (2d Cir.2004) (because the district court did not exclude, from its consideration, a document not incorporated by reference in or integral to the complaint, the district court should have converted the motion to dismiss into one for summary judgment).

The plaintiff responded in kind to the defendants' motion and its supporting affidavits and exhibits, filing a 78–page declaration and a substantial number of supporting documents. At least to the extent the additional factual information submitted by plaintiff is consistent with the allegations in the complaint, it may be considered in connection with the motion to dismiss, as a *de facto* amendment of the complaint. See, e.g., *Benitez v. Ham,* 9:04–CV–1159 (NAM/GHL), 2009 WL 3486379, at \*8 & n. 21 (N.D.N.Y. Oct. 21, 2009) (citing, *inter alia, Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss). There is some authority for the proposition that, when "it is clear from the record" that the party responding to a motion to dismiss knew that additional factual submissions "were being considered and, in fact, responded with its own evidentiary submissions," a court may consider factual allegations outside the complaint in deciding the motion. *See, e.g., Reliance Ins. Co. v. Polyvision Corp.,* 474 F .3d 54, 57 (2d Cir.2007) (under those circumstances, it was harmless error for the court to fail to give explicit notice that it was converting the Rule 12 motion to a Rule 56 motion). However, because this *pro se* plaintiff has not been given any notice that the defendants' motion to dismiss would or could be converted to one for

2011 WL 856416

summary judgment, this court finds it inappropriate to consider defendants' factual affidavits and most of the supporting documents against the *pro se* plaintiff in resolving the current motion.[5] Plaintiff has asserted two facially plausible claims that are better resolved by a properly noticed and documented motion for summary judgment.

## IV. Mail Watch and Related Conduct

### A. Mail Watch

### 1. Legal Standards

**\*5** Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at \*6 (N.D.N.Y.2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)).[6] That right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities, in which case no constitutional violation has occurred. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F .3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

### 2. Application

Although the second amended complaint alleges that the mail watch relating to plaintiff was unlawful from its inception in April 2004 (AC, Facts ¶ 9), this lawsuit focuses on the claim that the mail watch was continued through 2008 and 2009, without any new or current factual information to establish good cause or penological justification. (AC ¶¶ 40, 52–53). Plaintiff would likely be foreclosed from challenging the validity of the initial mail watch based on his prior litigation of this issue. In *Ford v. Phillips,* et al., 05 Civ. 6646, 2007 WL 946703, at \* 14–15 (S.D.N.Y. Mar. 27, 2007), a district judge in the Southern District of New York rejected this plaintiff's prior civil rights challenge to the mail watch at Shawangunk, for the period from April 2004 through the date of filing of the complaint in that action in 2005. The judge concluded that DOCS officials had ample good cause to monitor plaintiff's mail, including the need (1) to investigate his April 2004 assault on a correction officer at Green Haven, (2) to prevent Ford from instigating further violence following the assault, and (3) to monitor efforts by Ford to improperly influence witnesses in connection with his impending criminal trial. *Id.* at \* 14.[7] If plaintiff were attempting to relitigate the legality of the initial mail watch in this action, he would be barred by claim preclusion. *Ford v. Krusen,* 9:06–CV–890 (GTS/DEP), 2009 WL 959534, at \*7 (Apr. 6, 2009) (Corey Ford's prior, unsuccessful, due process challenge to the disciplinary hearing leading to his prolonged SHU confinement in the Southern District of New York barred him from pursuing that claim further in a subsequent action in the Northern District of New York).

**\*6** Plaintiff focuses on the fact that the continuation of the mail watch for approximately five years, violated the internal guidelines of DOCS Directive 4422.[8] However, a violation of this DOCS Directive does not state a claim for a constitutional violation under Section 1983. *See, e.g., Dillhunt v. Theriault,* 2009 WL 4985477, at \*11 (collecting cases).

Liberally construing the second amended complaint, plaintiff also alleges that his constitutional rights were violated because successive 60–day renewals of the mail watch were "rubber stamp[ed]" by Supt. Smith through 2008 and 2009 without any "new underlying facts" establishing good cause to continue the mail watch. (AC

¶¶ 40, 52–53). The allegations of the complaint and the related documents which are arguably incorporated by reference in the complaint, or were submitted by plaintiff in his motion papers, identify two abuses of the prison mail system by plaintiff in March 2009 that would certainly appear to justify a mail watch for some period of time thereafter. [9] DOCS reviewed and confiscated two sets of letters from plaintiff at that time—one which allegedly reflected an effort by plaintiff to harass or threaten his fiancee through others outside the institution over some disputed money, and another, which was improperly "kited" through someone outside the facility, and which purportedly sought to induce one inmate to threaten or do harm to another inmate at plaintiff's behest. (AC ¶ 25). [10]

The affidavits of defendants Smith and Maly, which this court is **not** using against the plaintiff in connection with this motion to dismiss, provide no factual information relating to any misconduct of plaintiff that would provide current justification for the mail watch after 2005 or 2006 (as described in the prior case from the Southern District of New York, *Ford v. Phillips,* 2007 WL 946703, at * 14–15), but before March 2009, when plaintiff was accused of several instances of mail-related misconduct. (Smith Aff ., Dkt. No. 32–1; Maly Aff., Dkt. No. 32–7). [11] Moreover, the 33 memoranda by which Supt. Smith repeatedly renewed plaintiff's mail watch between June 2004 and August 2009 (Dkt. No. 32–2 at 6–38) do not set forth any justification for continuing the mail watch. The Second Circuit has suggested that, although prison officials are entitled to considerable deference in ordering a mail watch for security reasons, justification for a mail watch should be relatively current, and the duration of the screening of mail should be reasonably limited based on the perceived threat. *Duamutef v. Hollins,* 297 F.3d at 113 (mail-related disciplinary charge in 1994, following a history of involvement in prohibited organizational activities, was not too remote to justify a "temporary" (30–day) watch on plaintiff's mail in 1995). Given that the legitimacy of the penological justification for a mail watch is difficult to validate, in the context of a Rule 12(b)(6) motion, [12] this court finds, that plaintiff's First Amendment cause of action against defendants Smith and Malay should not be dismissed at this stage of the proceedings.

### 2. Personal Involvement of Defendant Parisi

**\*7** Mail Clerk Doreen Parisi was clearly involved in the implementation of the mail watch authorized by Supt. Smith. (AC ¶ 55). However, she lacked the authority to decline the directions of Supt. Smith and Dep. Supt. Maly to intercept plaintiff's mail and provide it defendant Maly for his review. Unlike defendants Smith and Maly, Ms. Parisi had no personal involvement in the acts which allegedly violated plaintiff's constitutional rights—the authorization of the mail watch without adequate and current penological justification. Under these circumstances, defendant Parisi should not be liable, under Section 1983, for her clerical role in carrying out the mail watch at the direction of her superiors. See, e.g., *Webster v. Fischer,* 694 F.Supp.2d 163, 181 (N.D.N.Y. Mar. 9, 2010) (dismissing claim of senior mail clerk that she initiated and participated in a mail watch, which only the Superintendent of the facility had the authority to institute); *Davidson v. Goord,* 99–CV–555S, 2000 WL 33174399, at \*9 (W.D.N.Y. Sept. 27, 2000) (plaintiff's allegations regarding delays in legal mail were not sufficient to state a constitutional claims against DOCS personnel who merely handled inmate mail consistently with applicable DOCS policies). *See also Smith v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at \*9 (N.D.N.Y. Mar. 20, 2008) (dismissing medical indifference claim against social worker and psychologist in prison who had no authority to override the decision of the treating psychiatrist). Thus, the amended complaint may be dismissed in its entirety as to defendant Parisi.

### B. Access to Courts

Plaintiff has also alleged that the mail watch resulted in delays of his legal correspondence. The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52 (1996). In this case, plaintiff has not alleged that any delays in his mail resulted in prejudice to him in any legal proceeding, and thus he fails to state a claim for denial of access to courts. *See, e.g, Zimmerman v. Seyfert,* 9:03–CV–1389 (TJM), 2007 WL 2080517, at \*31 (N.D.N.Y. July 19, 2007) (plaintiff's First Amendment claim of denial

of access to courts based upon the mail watch must be dismissed because he cites no case that was hindered or lost because of the mail watch); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (a mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation). [13] Thus, this court recommends that plaintiff's access-to-courts claim be dismissed as to all defendants.

### C. Retaliation and Due Process

**\*8** The second amended complaint suggests that the mail watch was instituted in retaliation for plaintiff's participation in protected activity and violated his due process rights. Conclusory allegations of retaliation, like those in plaintiff's complaint, are insufficient to support a viable claim of retaliation. *See, e.g., Douglas v. Smith,* 2008 WL 434605, at \*15 (conclusory allegation that defendants' actions, including initiation of a mail watch, were motivated by plaintiff's filing of grievances, failed to state an actionable claim). Moreover, mere delays in the transfer of plaintiff's legal papers, even if motivated by retaliation, is not the type of "adverse action" required to support a retaliation claim. *See, e.g., Rivera v. Pataki,* No. 04 Civ. 1286, 2005 WL 407710, at \*19 (S.D.N.Y. Feb. 7, 2005) (several temporary incidents of actively preventing plaintiff from mailing his legal documents were not sufficiently serious to constitute "adverse action"). With respect to the due process claim, the Second Circuit has held that the DOCS policies regarding discretionary restrictions on mail in prisons do not create a liberty interest protected by the due process clause. *Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.,* 42 F.3d 719, 724–25 (2d Cir.1994) (in *Purnell,* we rejected plaintiff's argument that a liberty interest relating to inmate mail was created by DOCS Directive 4422) (citing *Purnell v. Lord,* 952 F.2d 679, 685 (2d Cir.1992).

## V. Due Process Claims Relating to Plaintiff's Disciplinary Hearing

### A. Legal Standards

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making

his determination. *Sira v. Morton,* 380 F.3d at 69 (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" or "a modicum" of "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F .3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

**\*9** An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is, *e.g.,* confined in SHU, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able. *Id. See also Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 9:08–CV–909, 2010 WL 1489897, at \*6 (N.D.N.Y. Apr. 13, 2010) (Singleton, J.) (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist, were confidential, or were not relevant to the defense).

Although due process includes a right to call witnesses, this right is also not unfettered. *Alicia v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,*

2011 WL 856416

471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497. The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of his position. *Id.* at 499; *Kingsley v. Bureau of Prisons,* 937 F.2d at 30–31.

**B. Application**

Plaintiff appears to claim that he was deprived of due process in connection with the disciplinary charges leveled against him in March 2009 because they were based on letters confiscated pursuant to an illegal mail watch. However, even if the mail watch was contrary to DOCS Directives or unconstitutional, plaintiff's letters would not be subject to suppression, and could be considered in the context of a prison disciplinary hearing. *See, e.g., Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at *15 (N.D.N.Y. Dec. 15, 2009) (the "fruit of the poisonous tree doctrine," which applies to evidence that is unconstitutionally obtained during a criminal investigation, has no applicability to prison disciplinary hearings) (citing *Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at *7 (N.D.N.Y. Apr. 24, 1998) (Pooler, J .). *See also United States v. Green,* No. 92–CR–159C, 1994 WL 178139, at *5–6 (W.D.N.Y. Feb. 10, 1994) (Curtin, J.) (in the context of a criminal case, evidence from a mail watch may be introduced even though it was implemented in violation of DOCS Directive 4422).

***10** In the second amended complaint and the declaration in opposition to defendants' motion, the plaintiff specifies how he believes his due process rights were violated in connection with his disciplinary hearing. First, plaintiff claims that he was denied adequate assistance in preparing for the hearing because he was not provided with two types of documents—the records authorizing and stating the justification for the ongoing monitoring of his mail and his prior grievances, in response to which DOCS officials allegedly denied that the mail watch was in place. (AC ¶¶ 29, 56; Pltf.'s Decl., Dkt. No. 35 at 24, 53–57).[14] Plaintiff objects, in passing, that

the hearing officer relied on information that "was never read into the record," (AC ¶ 56), presumably referring to *ex parte* testimony that the hearing officer received out of the presence of the plaintiff, because of security concerns. Plaintiff also alleges that he was improperly denied the right to call two witnesses at the hearing: (1) Supt. Smith, to testify about the circumstances relating to the approval of the ongoing mail watch, and (2) Lt. Barone, who plaintiff wanted to explain a perceived inconsistency in testimony about who the "reviewing officer" was for the inmate misbehavior report filed against plaintiff by Lt. Gardner. (Pltf.'s Decl., Dkt. No. 35 at 25–26, 59–62).

According to the hearing transcript submitted by plaintiff, he was denied requested documents regarding the authorization of his prior mail watch because the underlying facts were deemed confidential. (Dkt. No. 35–4 at 27–29, 57). Plaintiff was given some of his prior grievances, but requested all of his other grievances for the prior five years which, he stated during the hearing, would show that officials at Shawangunk previously denied he was being subjected to a mail watch. (Dkt. No. 35–4 at 30, 33–35). Defendant Gutwein denied plaintiff the additional grievances, finding they would be "redundant." (Dkt. No. 35–4 at 57). Based on the authority cited above, the Hearing Officer's stated reasons for refusing plaintiff the additional documents appear, on their face, to be rationally related to penological goals of maintaining institutional security and avoiding repetitive and irrelevant evidence at the hearing. In any event, even if these documents were not properly denied, the procedural error would have had no impact on the outcome of plaintiff's disciplinary hearing and thus, would be harmless. Plaintiff was clearly attempting to use these documents to establish that the correspondence used against him at the hearing were seized pursuant to an illegal mail watch. However, as noted above, because there is no suppression remedy for illegally seized evidence in the context of a disciplinary hearing, plaintiff would not have altered the outcome of the hearing even if he were able to introduce additional evidence regarding the propriety of the mail watch.

At the conclusion of the hearing, defendant Gutwein notified plaintiff that he was relying, in part, on confidential testimony that he received from two witnesses when plaintiff was not present. (Dkt. No. 35–4 at 55–56). Taking testimony from witnesses out of plaintiff's presence does not violate due process requirements.

2011 WL 856416

*Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing, and the hearing officer may rely upon evidence not presented at the hearing). The witnesses called at plaintiff's disciplinary hearing included Lt. Gardner, who issued the misbehavior report against plaintiff; the two inmates who were implicated in the correspondence by which plaintiff allegedly tried to induce one to assault the other; Sgt. Kimler, who testified about the assistance she provided plaintiff in connection with the hearing; and Dep. Supt. Maly who testified, *inter alia,* about the mail watch which resulted in the discovery to the correspondence which was the basis of the charges against the plaintiff. (Dkt. No. 35–4 at 58). Plaintiff Ford also wanted to call Supt. Smith regarding the reasons for the authorization of the mail watch. Defendant Gutwein denied this request, finding that Supt. Smith's testimony would be redundant given that Dep. Supt. Maly had already testified about the mail watch. (Dkt. No. 35–4 at 56). The Hearing Officer's stated reason for not calling Supt. Smith was rationally related to the penological goal of avoiding duplicative evidence at the hearing. In any event, plaintiff's attempt to call Supt. Smith was clearly part of his effort to prove the illegality of the mail watch. Again, because the seized correspondence would not have been subject to suppression even if plaintiff had proven that the mail watch was illegal, any procedural error relating to not calling Supt. Smith would not have effected the outcome of the hearing, and would be harmless.

*11 Plaintiff also asked to call a "Lt. Barone" to clarify an alleged inconsistency between Lt. Gardner and Sgt. Kimler about who was the "reviewing" officer on Lt. Gardner's misbehavior report against plaintiff. Defendant Gutwein denied the request for this further testimony as being irrelevant and redundant. (Dkt. No. 35–4 at 57). Despite the plaintiff's extensive efforts to articulate why this testimony was relevant to his hearing (Pltf.'s Decl., Dkt. No. 35 at 24–26, 59–63), this court does not find that further evidence regarding this minor procedural issue would have been relevant or would have any impact on the outcome of the hearing. Based on the submissions of plaintiff, this court concludes that the second amended complaint fails to state a plausible due process claim relating to the disciplinary hearing.

**VI. Denial of Plaintiff's Request to Marry**

The Supreme Court has recognized that prisoners have a fundamental constitutional right to marry. *Turner v. Safely,* 482 U.S. at 95, 96 (citing *Zablocki v. Redhail,* 434 U.S. 374 (1978) and *Loving v. Virginia,* 388 U.S. 1, 12 (1967)). However, the right to marry, like many other rights is subject to substantial restrictions as a result of incarceration. *Turner,* 482 U.S. at 95. In determining whether a prison regulation that infringes on a fundamental right is reasonable, a court must decide: (1) whether there is a "valid rational connection" between the regulation and a legitimate and neutral governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, on an inmates' liberty, and on the allocation of limited prison resources; and (4) whether the regulation is reasonable, or whether it represents an "exaggerated response" to prison concerns. *Turner,* 482 U.S. at 89–90.[15]

Plaintiff alleges that defendant Smith denied his request to marry based on his long-term SHU status, pursuant to DOCS Directive 4201, which grants the Superintendent of a DOCS facility the discretion to deny a marriage request for an inmate confined in disciplinary housing. (AC ¶¶ 16–17, 20).[16] At the time he made his request, plaintiff faced approximately four more years in SHU confinement.

In *Turner,* the Supreme Court invalidated a Missouri regulation which prohibited inmates from marrying other inmates or civilians unless the prison superintendent determined that were compelling reasons for the marriage, finding that this "almost complete ban on the decision to marry" was not reasonably related to any legitimate penological objective. *Turner v. Safely,* 482 U.S. at 94–99). There is some case law which suggests that temporary delays in allowing an inmate to marry for disciplinary reasons would pass muster under the *Turner* standards, but that indefinite or prolonged refusals might not. *See, e.g., Castellanos v. Gomez,* C–93–0503, 1994 WL 519465, at *6 (N.D.Cal. Sept. 21, 1994) (although defendants' initial statement to plaintiff that there were no procedures in place for SHU inmate marriages approaches the blanket denial of marriage held unconstitutional in *Turner,* defendants moved expeditiously to put procedures in place to allow the marriage; plaintiff's Section 1983 claims based on the defendants' 12–month delay in allowing his marriage dismissed under Rule 56); *Martin v. Snyder,* 329 F.3d 919, 921–22 (7th Cir.2003) (because

**Ford v. Fischer, Not Reported in F.Supp.2d (2011)**
Case 9:16-cv-01001-MAD-TWD Document 73 Filed 08/27/18 Page 120 of 299

2011 WL 856416

warden postponed, but did not preclude inmate's marriage based on a disciplinary charge and temporary denial of visitation of plaintiff's girlfriend, constitutional claim based on 12–month delay in marriage was properly dismissed).

**\*12** Because prison officials have some burden to demonstrate a penological justification for restricting an inmate's right to marry, and to satisfy the other elements of the *Turner* test, such claims are not conducive to resolution in the context of a Rule 12(b)(6) motion to dismiss. [17] *See, e.g., Martin v. Snyder,* 329 F.3d 921, 922 (a legitimate penological justification for refusing to allow an inmate's marriage is a defense that cannot be adjudicated under Rule 12(b)(6)); *Engel v. Ricci,* 07–5354, 2008 WL 2167994, at \*5–6 (D.N.J. May 22, 2008) (denying a Rule 12(b)(6) motion to dismiss a claim based on a 19–month delay in approval of an inmate's marriage). As discussed above, defendant Smith has presented and defended his reasons for denying plaintiff's request to marry in an affidavit and supporting documents that are not fairly considered against the plaintiff in the context of this motion to dismiss. Based on the facts properly before this court in addressing the pending motion, it is unclear whether Supt. Smith refused plaintiff's right to marry for the four years or more he remained in the SHU, or whether he would reconsider approval while plaintiff was still confined in a disciplinary setting. This court concludes that the second amended complaint states a facially valid First Amendment claim against defendant Smith relating to his denial of the marriage request. Supt. Smith is, of course, not precluded from establishing, in the context of a properly noticed summary judgment motion, that his decision passes muster under the *Turner* standards.

## VII. Visitation

### A. Imputed First Amendment Claim
In *Overton v. Bazzetta,* the Supreme Court considered the nature and scope of visitation rights of prisoners:

> Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration.... And, as our cases have established, freedom of association is among the rights least compatible with incarceration.... Some curtailment of that freedom must be expected in the prison context.

> We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners.

*Overton v. Bazzetta,* 529 U.S. 126, 131 (2003). The Court concluded that it did not need to explore and define, at length, the associational rights of inmates under the First Amendment, because the restrictions in question, including an indefinite ban [18] on the visitation rights of prisoners with two substance abuse violations, bore "a rational relation to legitimate penological interests" under the standards of *Turner v. Safely. Id.* at 132, 134–36.

"[I]nmates who claim that restrictions on their visitation privileges violated their First Amendment right to association ... must allege facts sufficient to support a finding that the challenged restrictions bear no 'rational relation to legitimate penological interests.' " *Calderon v. Conn. Dep't of Corrs.,* Civ. 04–1562, 2006 WL 3085716, at \*9 (D.Conn. Sept. 1, 2006) (quoting *Overton v. Bazzetta,* 539 U.S. at 131–32). Plaintiff does not explicitly raise a First Amendment challenge to the visitation restrictions imposed on him, although this court will liberally construe his complaint to raise such a claim. Plaintiff acknowledges that the visiting privileges of his fiancee were indefinitely suspended in April 2009 because of her alleged involvement in smuggling a note from another inmate to plaintiff in the visiting room, and because of concerns for her safety based on the intercepted letter in which plaintiff allegedly asked another individual to harass and threaten her. (AC ¶¶ 24, 30–32, 34). These are clearly legitimate penological interests that justified Supt. Smith's suspension of plaintiff's fiancee's visiting privileges under the *Turner* standards. *See, e.g., Calderon v. Conn. Dep't of Corrs.,* 2006 WL 3085716, at \*9, 11 (denial of visitation for disciplinary reasons would likely constitute a legitimate penological interest under Rule 12(b)(6) standards; only the claim that visitation was denied because of plaintiff's ethnicity was not dismissed); *Phillips v. Girdich,* 9:03–CV–1019 (DNH/DHR), 2007 WL 3046744, at \*2–4 (N.D.N.Y. Oct. 17, 2007) (indefinite suspension of visitation privileges, lasting about three years, imposed due to improper conduct during a visit and an ensuing positive drug test, advanced legitimate penological goals and otherwise satisfied the *Turner* criteria); *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 227–28 (W.D.N.Y.2003) (revocation of inmate's visitation rights, which lasted roughly three years, served

a legitimate purpose—deterring visit-related misconduct and promoting internal security).

### B. Due Process Claim

**\*13** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Following the Supreme Court's decision in *Sandin v. Connor,* "in a majority (if not the entirety) of the circuits—including the Second Circuit—prisoners have no protected liberty interest in contact visits." *Zimmerman v. Burge,* 06–CV–0176 (GLS–GHL), 2008 WL 850677, at *2–3, 12 & n. 53 (N.D.N.Y. Mar. 28, 2008) (collecting cases) (restrictions on the conditions in which inmates may visit with non-inmates would appear to be a hardship that is rather typical and necessary in relation to the ordinary incidents of prison life, and thus does not implicate a protected liberty interest).[19]

Although plaintiff alleges that his complaints to the DOCS Commissioner about the denial of his fiancée's visitation rights were not answered (AC ¶¶ 35, 51 (p. 30)), he attaches to his opposition papers several grievances regarding the visitation issue that were considered and denied by DOCS. (Dkt. 35–6 at 3–6). Even if restrictions on visitation implicated some limited liberty interest, the grievance process would provide adequate due process under the circumstances. *Id.* at * 13.

### C. Eighth Amendment Claim

To the extent plaintiff is alleging that the restriction on his visitation rights violated the Eighth Amendment, he fails to state a claim upon which relief may be granted. Under Supreme Court and Second Circuit authority, the challenged denial of visitation "does not amount to the infliction of pain at all, and that, even

it did, it does not amount to the sort of wanton (and penologically unjustified) infliction of pain prohibited by the Eighth Amendment." *Id.* at *3, 14 & n. 63 (citing, *inter alia, Overton v. Bazzetta,* 539 U.S. at 136–137 (prison regulation that subjected inmates with two substance-abuse violations to ban of at least two years on all visitation privileges did not create inhumane prison conditions, or deprive the inmate of basic necessities, under Eighth Amendment).

### D. Retaliation Claim

The second amended complaint makes completely unsupported claims that certain defendants restricted his visitation rights in retaliation for his filing of grievances and lawsuits. (AC ¶¶ 30, 46). Based on the authority cited below, such conclusory allegations are insufficient to state a plausible claim of retaliation.

### VIII. Personal Involvement of Defendant Fischer

**\*14** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 129 S.Ct. 1937 (U.S.2009).

DOCS Commissioner Fischer is mentioned as a defendant in a number of the causes of action in the second amended complaint. However, plaintiff's allegation that

defendant Fischer failed to respond to written appeals/complaints regarding the denial of his fiancee's visitation rights (AC ¶¶ 35, 51), is the sole basis for the claim that Commissioner Fischer was involved in any of the purported constitutional violations. As noted above, defendant also filed grievances with regard to the restrictions on his visitation, which were addressed by DOCS. Defendant Fischer's receipt of, and/or failure to respond to, plaintiff's letters of complaint is not a sufficient basis to render him liable under Section 1983, and he should be dismissed from this action. *See, e.g., Sealely v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision); *Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .") (collecting cases).

## IX. Retaliation—Cell Searches

### A. Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

**\*15** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if the plaintiff makes the

appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977))

### B. Application

As noted above, plaintiff makes conclusory allegations that, in carrying out most of the conduct described in the second amended complaint, the defendants were retaliating against him for filing grievances and lawsuits against DOCS officials. The only instance in which plaintiff provides any supporting facts relates to the three cell searches conducted at Shawangunk in July 2009. Plaintiff claims that, just after the first search, he had received correspondence from the court relating to this lawsuit, and he was doing legal research in this case and in connection with a post-conviction proceeding in his criminal case. (AC ¶¶ 37–38). During the second search, on July 16th, two correction officers purportedly told plaintiff that they were directed by "higher ups," including defendants Smith and Maly, to destroy his cell because plaintiff "pissed them off." He was also allegedly told that the officers were directed to take his legal magazines and books. (*Id.*). However, even if these allegations, accepted as true, were sufficient to support a plausible claim of a connection between his protected activities involving litigation and the searches of his cell, plaintiff cannot state a viable cause of action for retaliation. Numerous cases in this circuit have held a prison cell search is not the type of "adverse action" that can support a viable claim of retaliation. *See, e.g, Lebron v. Selsky,* 9:05–CV–172 (GTS/DRH), 2010 WL 1235593, at *5 & n. 8 (N.D.N .Y. Mar. 21, 2010) (collecting cases) (cell searches, even if conducted because of retaliatory motives, are not actionable under Section 1983).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 32) be denied with respect to the First Amendment claim against defendants Maly and Smith relating to the continuation of the mail watch against plaintiff in 2008 and 2009, and the First Amendment claim against defendant Smith relating to his refusal to permit plaintiff to marry; and it is further

Ford v. Fischer, Not Reported in F.Supp.2d (2011)
Case 9:16-cv-01001-MAD-TWD   Document 73   Filed 08/27/18   Page 123 of 299
2011 WL 856416

**\*16 RECOMMENDED,** that defendants' motion be granted and plaintiff's second amended complaint be dismissed with respect to all other defendants and claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 856416

### Footnotes

1    Plaintiff threw hot oil in the face of the correction officer at Green Haven and then stabbed him three times. *Ford v. Smith,* 23 A.D.3d 874, 875, 803 N.Y.S.2d 821 (3d Dept.2005), *lv. app. den.,* 6 N.Y. 708, 813 N.Y.S.2d 44 (N.Y.2006). Plaintiff was found guilty of various disciplinary charges at Green Haven and sentenced to serve eight years in the SHU, which disposition was upheld in an Article 78 proceeding and affirmed on appeal. *Id.* Plaintiff was also convicted on related criminal charges in Dutchess County, New York, for which he was sentenced, on June 11, 2008, to a consecutive prison term of 22 years to life. (AC ¶ 27; 6/11/08 Transcript of Sentencing at 1, 13–14, Dkt. No. 35–2 at 7, 19–20).

2    The disciplinary proceeding resulted in sanctions affecting both the conditions and duration of plaintiff's confinement. In order to be allowed to proceed with this Section 1983 action seeking money damages for alleged constitutional violations in connection with the disciplinary hearing, without first pursuing a habeas action to attack the sanctions affecting the term of imprisonment, plaintiff states that he forever abandoned any claim of challenging the loss of good time. (AC at p. 36, citing *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), *cert. denied sub nom. Jones v. Peralta,* 551 U.S. 1145 (2007)).

3    It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87–88 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment. *Huang v. Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

4    The "fourth cause of action" in the second amended complaint, which purports to state claims under the Eighth Amendment, makes a passing reference to conditions of confinement at Shawangunk. (AC at p. 27). The vague allegations about un-shoveled snow and bird droppings in the exercise areas, occasional discoloration in the water, and late Ramadan meals are insufficient to state a plausible claim that the defendants were personally responsible for, or deliberately indifferent to, conditions of confinement that imposed an excessive risk to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994).

5    The court will not consider, against the plaintiff, the affidavits of defendants Smith (Dkt. No. 32–1), Maly (Dkt. No. 32–7), and Gutwein (Dkt. No. 32–16) or, except to the extent discussed below, the supporting documents.

6    This discussion of the applicable legal standards draws heavily on Magistrate Judge Peebles' report-recommendation in *Dillhunt v. Theriault,* 9:07–CV–0412 (GTS/DEP), 2009 WL 4985477, at \*9 (N.D.N.Y. Dec. 15, 2009), which was adopted by District Judge Suddaby.

7    The district judge in the Southern District noted that, during the mail watch, DOCS officials found, in or before 2006, at least one letter that was relevant to the prison's investigation of the assault, and one letter through which Ford attempted to influence a witness in his trial. *Id.* The second amended complaint points out that the state court judge who presided over plaintiff's criminal trial for the April 2004 assault, suppressed a letter seized pursuant to the mail watch in late 2004. (AC ¶ 10). Transcripts of the state court proceedings submitted by plaintiff in opposition to defendants' motion, makes clear that the state court judge found that repeated 60–day renewals of the mail watch, without any factual statements of justification, violated "due process" because DOCS did not follow its own rules and regulations, in DOCS Directive 4422. (Dkt. No. 35–2 at 1–4; AC ¶ 10). It is not clear whether the state judge purported to apply New York state or federal due process standards. However, as discussed below, a violation of DOCS directives in connection with the mail watch would not constitute a federal constitutional violation cognizable under Section 1983. Hence, the state judge's suppression ruling would not undermine the preclusive effect of the federal judge's adverse ruling in the Southern District

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 856416

of New York on plaintiff's federal constitutional claim relating to the mail watch during the period from April 2004 through the date plaintiff filed the prior action in 2005.

8    Mail watches are governed by DOCS Directive # 4422, which provides, in relevant part, as follows:

III.B.[9.] Outgoing correspondence [ ... ] shall not be opened, inspected, or read without express written authorization from the facility Superintendent.

a. The Superintendent shall not authorize the opening or inspection of such outgoing mail unless there is a reason to believe that the provisions of this or any directive or inmate rule or regulation have been violated, that any applicable state or federal law has been violated, or that such mail threatens the safety, security, or good order of a facility or the safety or well being of any person. Such written authorization by the Superintendent shall set forth specific facts forming the basis for the action.

b. If after inspecting the contents of outgoing mail it is determined that the provisions of a directive, rule or regulation, or state or federal law have been violated, or that such correspondence threatens the safety, security or good order of the facility or the safety or well being of any person, then the correspondence may be confiscated. The inmate must be informed in writing unless doing so would interfere with an ongoing investigation.

Where the inmate has been so notified, he or she may appeal the action to the Superintendent. * * *

III.G.5. Incoming general correspondence, other than inmate-to-inmate letters and inmate business mail, will not be read unless there is evidence that the correspondence may contain one or more of the following:

a. Plans for sending contraband in or out of the facility;

b. Plans for criminal activity including escape; and

c. Information which, if communicated, would create a clear and present danger to the safety of persons and/or the security and good order of the facility.

III.G.6. Written authorization from the facility Superintendent to read incoming mail must be placed in the inmate's file specifying the reasons such action is considered necessary and whether all mail or certain correspondence shall be read. Such authorization shall be for a 60 day period subject to renewal by the Superintendent. The Superintendent shall request documentation from the person recommending inspection to determine that there are sufficient grounds for reading the mail, that the reasons for reading the mail are related to the legitimate interests of safety, security, and order, and that the reading is no more extensive than necessary to further these interests.

Jackson v. Portuondo, 9:01–CV–0379 (GLS/DEP), 2007 WL 607342, at *5 n. 7 (N.D.N.Y. Feb. 20, 2007).

9    See, e.g., Jackson v. Portuondo, 2007 WL 607342, at *6–7, 13 (granting summary judgment on claim challenging mail watch, which was supported by evidence that inmate was "kiting" mail in an effort to harm another inmate and smuggle contraband) (citing, inter alia, United States v. Felipe, 148 F.3d 101, 107–108 (2d Cir.1998) (knowledge that plaintiff had violated prison regulations related to mail, and had written about the commission of illegal acts constituted reasonable cause to intercept the inmate's correspondence).

10    While not validating the DOCS interpretations of this correspondence, plaintiff refers to it with some specificity in the second amended complaint. (AC ¶ 25). Thus, the copies of the letters attached to defendant Maly's affidavit (Dkt. No. 32–11 & 32–12) are properly considered here. Sira v. Morton, 380 F.3d at 67 (where the complaint explicitly refers to and relies upon documents, they are properly considered in the context of a Rule 12(b)(6) motion). In any event, plaintiff attaches, to his motion papers, the transcript from his March 2009 disciplinary hearing where the letters are discussed in detail and, often at the behest of plaintiff, read into the record. (See, e.g., Dkt. No. 35–4 at 14, 20, 39, 40). Notwithstanding plaintiff's dispute about the import of these letters, the text clearly implicated the safety and security concerns of the facility. Hence, the confiscation of this particular mail would clearly be supported by good cause and would not support a Section 1983 claim. See Ford v. Phillips, 2007 WL 946703, at * 14 (confiscation of letters admitting to assault and attempting to properly influence witnesses "did not go beyond what was necessary to protect the prison's legitimate penological interests").

11    The Smith affidavit (¶ 7) and the Maly affidavit (¶ 9) vaguely suggest that plaintiff engaged in some other instances of mail kiting, but provide no dates or other specific information.

12    See, e.g., Knight v. Keane, 247 F.Supp.2d 379, 384–85 (S . D.N.Y.2002) (in the context of a Rule 12(b)(6) motion, the record is insufficient to establish that inspection of plaintiff's mail was based on good cause, distinguishing Duamutef, 297 F.3d 108 (upon an application for summary judgment, finding that "a rational jury" could not find that the watch on plaintiff's mail was not reasonably related to legitimate penological interests); LeBron v. Swaitek, 2007 WL 3254373, at *7 (it may be the case that the confiscation of LeBron's outgoing mail was justified by legitimate governmental interests; however, it would be inappropriate to dismiss LeBron's claim at this time under Rule 12(b)(6) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986) (reversing the district court's dismissal of claims relating to interference with plaintiff's outgoing and incoming mail under Rule 12(b)(6)).

13   The fact that the Dutchess County District Attorney attempted to introduce a letter intercepted by the mail watch in late 2004 at plaintiff's criminal trial does not support a claim of prejudice for the purpose of an access-to-courts claim in this action, which is focused on the legality of the mail watch in 2008 to 2009. In any event, the state court criminal judge did not allow the letter to be used against Ford, so he was not prejudiced, in any event. *See Douglas v. Smith,* 9:05–CV–1000 (LEK/DRH), 2008 WL 434605, at *13 (N.D.N.Y. Feb. 14, 2008) (fact that letter seized by prison authorities and offered at plaintiff's criminal trial was suppressed by the state court judge negated any impact on him).

14   Because of the inconsistent page numbering of plaintiff's declaration, references will be to the page numbers in the CM–ECF header.

15   The *Turner* court did not decide whether an inmate's right to marry should be reviewed under a more stringent standard than the "reasonable relationship" test because it also implicates the rights of marriage partners who are not prisoners. *Turner v. Safely,* 482 U.S. 97. However, two years thereafter, the Supreme Court was made clear that to apply a heightened level of scrutiny to cases involving prison regulations affecting the rights of both prisoners and outsiders would unreasonably constrain the corrections system. *See Thornburgh v. Abbott,* 490 U.S. 401, 410 n. 9 (1989) (any attempt to forge separate standards for cases implicating the First Amendment rights of outsiders and inmates is out of step with Supreme Court case law).

16   Plaintiff also makes conclusory allegations that Supt. Smith denied plaintiff's request to marry in retaliation for his filing of grievances and lawsuits. (AC ¶ 46). The only factual support for the claim of retaliation is an allegation that Supt. Smith told plaintiff that he would not allow him to marry because of his involvement in the assault of a correction officer at Green Haven. (AC ¶ 18). Participation in an assault is not a protected activity that can form the basis for a retaliation claim. Based on the authority set forth below, plaintiff's unsupported allegations fail to state a plausible claim of retaliation relating to the denial of his marriage request. Plaintiff also asserts that the refusal of his marriage request violated his Eighth Amendment rights, but the court finds no authority to suggest that the inability to marry is the type of cruel and unusual deprivation required to support such a claim. *See Johnson v. Rockefeller,* 365 F.Supp. 377, 381 (S.D.N.Y.1973) (the prohibition against participating in the marriage ceremony does not subject a life-term prisoner to a "fate forbidden by the principle of civilized treatment guaranteed by the Eighth Amendment," nor is it "barbarous" or "shocking to the conscience"), *aff'd without opinion sub nom. Butler v. Wilson,* 415 U.S. 953 (1974). *Johnson v. Rockefeller* was distinguished, but not repudiated in *Turner v.. Safely,* 482 U.S. at 97, leading this court to conclude that the denial of plaintiff's marriage request should be evaluated under the *Turner* standards, not the Eighth Amendment.

17   *See Salahuddin v. Goord,* 467 F.3d 263, 275 (2d Cir.2006) (under *Turner,* the defendants bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational).

18   The visitation ban had a term of at least two years; reinstatement at the end of that period was not automatic, but could be granted the discretion of the warden. *Id.* at 130, 134.

19   To the extent plaintiff predicates his due process claim regarding visitation on alleged violations of DOCS directives or state regulations (AC ¶ 31), that alone does not support a viable constitutional claim under Section 1983. *Id.* at *11 & n. 48; *Holcomb v. Lykens,* 337 F.3d 217, 224–25 (2d Cir.2003) (state corrections officials did not violate inmate's due process rights when they revoked inmate's extended furlough without following procedures outlined in department of corrections manual).

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT**

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

2012 WL 651919

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

**A. Governing Legal Standard**

**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3**  As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 129 of 299

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation when the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency' that mark the progress of a maturing society." " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

Groves v. Davis, Not Reported in F.Supp.2d (2012)

2012 WL 651919

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

 **\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

may not incorporate by reference any portion of the original Complaint. *See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

2012 WL 651919

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

 **\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case,

> the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis,

Sill and Nicolette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

Footnotes

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).

2012 WL 651919

The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4      *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5      *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6      It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7      *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8      Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9      Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10     The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not

2012 WL 651919

an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
|
Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol, Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

*1 Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on May 31, 2011. See Dkt. No. 1. The remaining claims are that Defendants violated Plaintiff's constitutional rights under the First Amendment's Free Exercise Clause, as well as his rights under the Religious Land Use and Institutionalized Person's Act ("RLUIPA"), and subsequently retaliated against him for attempting to exercise these rights by destroying Plaintiff's mail and thus denying him access to the courts. See Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July 23, 2014, Magistrate Judge Baxter recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. See Dkt. No. 210. Specifically, Magistrate Judge Baxter first found that in relation to the December 7, 2010 incident, Defendant Ready acted within the bounds of his employment and according to the documentation before

him and thus, his inadvertent denial that caused Plaintiff to miss one religious service did not substantially burden Plaintiff's free exercise of his religion. See id. at 14. With regards to the March 20, 2011 incident, Magistrate Judge Baxter found that Defendant Ellis was not responsible for the shortened duration of the Purim celebration, and that while the delay may have been an inconvenience, Plaintiff was still able to participate in the service, thus satisfying the requirements of the First Amendment and RLUIPA. See id. at 19–20. Magistrate Judge Baxter also found that neither Defendant Ellis, nor Defendant Ready engaged in the conduct mentioned above as a way to retaliate against Plaintiff for any grievances that he had previously filed either against them or any other correctional officer. See id. at 39–40. Moreover, Magistrate Judge Baxter found that Defendant Kupiec did not interfere with Plaintiff's mail as a means to either retaliate against him or to deny him access to the courts. See id. 35–36. Finally, Magistrate Judge Baxter found that Plaintiff failed to establish that he suffered an adverse action as a result of Defendant Kupiec's alleged conduct. On August 4, 2014, the Court received objections to the Report–Recommendation from Plaintiff. See Dkt. No. 211.

### II. DISCUSSION

**A. Plaintiff's objections**
In his objection to Magistrate Judge Baxter's Report–Recommendation, Plaintiff states that he objects to the Report in its entirety. See id. Plaintiff relays his astonishment at Magistrate Judge Baxter's choice to "excuse Def [endant] Kupiec's conduct" and at his finding that Plaintiff's position is "unfounded." See id. Plaintiff further objects to Magistrate Judge Baxter's Report on the grounds that he looked outside the pleadings and "only to the Defendants Affidavits" when making his determination to grant Defendants' motion for summary judgment. See id.

**B. Standard of review**
*2 A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

## C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment

was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response

to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

 **\*5**  On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

#### 1. First Amendment

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis*

adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

#### 2. Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id .* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non*

2014 WL 4365274

*curat lex'* " ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

### B. Application

**1. December 7, 2010 Incident:**
Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings. [2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name

is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly

appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[5] and he would not even

have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[6]

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *a Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[7] and the fact that the building in which the religious services were actually held had the call-out,[8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[9]

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at \* 15 (S.D.N.Y. Oct. 15, 1999)). In granting **summary judgment,** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason." Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial

did not substantially burden the plaintiff's free exercise of his religion. In denying the plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service. [10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

**2. The March 20, 2011 Incident**

**\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (Id.) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization. (Id. ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (Id. ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (Id. ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (Id.) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (Id.)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that

plaintiff did not have any trouble that day. (Id. ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (Id.)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (Id. ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (Id. ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (Id. ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (Id.)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (Id. ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (Id. ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (Id. ¶¶ 18–20).

Defendants have also submitted the declaration of Rabbi Theodore Max,[13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then

asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived— plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that *he* was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

## V. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail
Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow

of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To

establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest an ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

### 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial

of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

### 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/ GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

### B. Application

### 1. Defendant Kupiec

### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/ or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the

2014 WL 4365274

plaintiff) files a grievance against the defendant's [sic] —retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18]   (*Id.*)

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant

Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21]   She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

### b. Discussion

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec

does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-

serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than

Guillory v. Ellis, Not Reported in F.Supp.3d (2014)
Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 149 of 299
2014 WL 4365274

the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law,[30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room.[31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights.[32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

### b. Access to Courts

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action.[33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then

stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" *would have* stricken his "motion"[34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

### 2. Defendants Ready and Ellis

**\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston.[35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken."[36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident.[37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights.[38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates.[39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

## VII. *Personal Involvement*

### A. Legal Standards

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

### B. Application

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants.

(*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id.* at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit to not include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

> The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

2014 WL 4365274

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who had advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took

no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4365274

---

Footnotes

1  Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

2  Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the

pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

3    Father Weber is not a defendant in this action.

4    Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

5    Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–3). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

6    Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

7    (Ready Decl. ¶¶ 5).

8    This court makes no such finding.

9    Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

10    To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLUIPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

11    Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

12    The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

13    Rabbi Max is not a defendant in this action.

14    In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this

grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

15    Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

16    The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

17    The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II) (A)(2) (citing 7 NYCRR § 721.2).

18    The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

19    A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13– 16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

20    A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

21  A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

22  The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

23  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

24  Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

25  To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

26  Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

27  (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

28  It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and defendant Ready is non-existent.

29  Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

30  *Gill, supra.*

31  Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was *not* a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

2014 WL 4365274

**32**  Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

**33**  Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

**34**  It is not clear what "motion" would have been stricken.

**35**  CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

**36**  The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

**37**  In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

**38**  In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

**39**  During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

**40**  Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

**41**  Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

**42**  The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.

No. 9:03–CV–1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Stephen M. Kerwin, Esq., Assistant Attorney General, of Counsel, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil rights action are Defendants' motion for summary judgment (Dkt. No. 80), and United States Magistrate Judge David E. Peebles's Report–Recommendation recommending that Defendants' motion be granted and Plaintiff's Complaint be dismissed in its entirety (Dkt. No. 85). Plaintiff has timely filed Objections to the Report–Recommendation. (Dkt. No. 86.) For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety, Defendants' motion is granted and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against twenty-two (22) individuals currently and/or formerly employed by the New York State Department of Correctional Services, at various correctional facilities. Generally, in his Complaint, Plaintiff alleges that his rights under the First and Eighth Amendments were violated when (1) certain Defendants had him transferred in retaliation for grievances that he had filed, (2) certain Defendants issued false misbehavior reports against him in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to engage in outdoor exercise on two separate occasions. (*See generally* Dkt. No. 1.) [1]

On September 29, 2006, District Judge Lawrence E. Kahn issued a Memorandum Decision and Order dismissing (1) Plaintiff's claims for equitable relief due to Plaintiff's release from incarceration, which mooted this claim, and (2) Plaintiff's claims against the CORC and all of the individual defendants in their official capacities on Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion for summary judgment seeking dismissal of all of Plaintiff's claims against them. (Dkt. No. 80.) Generally, Defendants' motion is premised on the following three grounds: (1) certain of Plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims (2) no reasonable factfinder could conclude that the issuance of misbehavior reports or the transfer to different facilities were *caused* by Plaintiff's filing of grievances; and (3) no reasonable factfinder could conclude that Plaintiff was subjected to cruel and unusual punishment based on being denied certain exercise opportunities. (*Id.*) On February 1, 2008, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles issued a Report–Recommendation recommending that Defendants' motion be granted, because (1) certain of Plaintiff's claims were not properly exhausted, and (2) no reasonable factfinder could rule in Plaintiff's favor on any of his claims. (Dkt. No. 85.) Familiarity with the grounds of the Report–Recommendation is assumed in this Decision and Order. On March 20, 2009, Plaintiff filed his Objections to the Report–Recommendation. (Dkt. No. 86.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review on Objection from Report–Recommendation

**\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)

(C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7]—even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

### III. ANALYSIS

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report–Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report–Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact

that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

**\*4** Furthermore, as explained in Magistrate Judge Peebles' Report–Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34–35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report–Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report–

Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

**\*5** Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01–CV–0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report–Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report–Recommendation (Dkt. No. 85) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED* in its entirety.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or

cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

### I. *BACKGROUND* [1]

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid–State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid–2003. [2]

### II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the

"CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*

391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Failure to Exhaust Remedies*
**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and "to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914–15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91–92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. [5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697–98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. [6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46

and pp. 109–111.[7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, see Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, see Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis.[8]

### C. Retaliation

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See Franco v. Kelly, 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." Dawes v. Walker, 239 F .3d 489, 491 (2d Cir.2001) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir.2007); Dawes, 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. Flaherty, 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

### 1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he

difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13–29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
|---|---|---|---|
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor". [9] | Dismissed (no hearing held) |
| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist | Acquitted on all counts |

| | | behavior" (neither dates nor specifics provided) | |
|---|---|---|---|
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |
| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/Inmate Disciplinary Program |

F N9. While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19–21, 24–25, 59–61 and 116–18.

F N10. While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20–21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

F N11. Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at \*1 (2d Cir.1999); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, \*7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80–8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation. [12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

2. *Prison Transfer Claim*

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons. [13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7–10, 32–46; Knapp–David Aff. (Dkt. No. 80–22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge

a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim of unlawful retaliation under the First Amendment is established. *Meriwhether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492–93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp–David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35–42, 45 and pp. 18–19, 79–81, 88–89, 91–92, 94–95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp–David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp–David Decl. (Dkt. No. 80–22) ¶¶ 2–7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp–David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions." [14] *Id.* ¶ 3. In that declaration defendant Knapp–David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp–David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could

determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted. [15]

### D. *Cruel and Unusual Punishment*

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S–Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47–48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 2323–2324 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971) (en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

 **\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

### 1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47–48; Prack Aff. (Dkt. No. 80–30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80–30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson, 757 F.2d at 35)* (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise—with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993)* (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876–877 (M.D.Pa.1976)* (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*

The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson, 757 F.2d at 35.* The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128–131 (S.D.N.Y.1997)* (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630–31(2d Cir.1996)* (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80–26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996)* (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).*

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

Footnotes

1   On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2   On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3   *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

4   *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at *12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment; *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at *1–4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

5   *Krug v. County of Rennselaer,* 04–CV–0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; *see also* Jessica Case, *"Pro Se* Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6   *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural

and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8    *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2–3; *Singleton v. Caron,* 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96–CV–1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96–CV–1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9    The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report–Recommendation. (Dkt. No. 85, at 8–14.) Accordingly, the Court will not repeat this thorough analysis.

10    *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96–2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11    *See also Sostre v. McGinnis,* 442 F.2d 178, 187–92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12    In addition, in his Objections to the Report–Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13    "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04–CV–0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14    "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

Houston v. Goord, Not Reported in F.Supp.2d (2009)
Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 171 of 299
2009 WL 890658

15    *See, e.g., Carini v. Austin,* 06–CV–5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16    To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings." *Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1    In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2    Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5    In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7    In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80–8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8    In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11–12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 54 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendents of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6–7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

it appears that these decisions have *not* been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05–CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

12    No explanation is offered for the failure to include an affidavit for that defendant.

13    It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03–CV–6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80–8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp–David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based

2009 WL 890658

upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552–53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| *Date of Transfer* | *Transferee Facility* |
| --- | --- |
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

14    In her declaration, Knapp–David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp–David Decl. (Dkt. No. 80–22) ¶ 9. Knapp–David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp–David Decl. (Dkt. No. 80–22) ¶ 9 and Exh. B.

15    In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80–8) ¶¶ 5, 9–11.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5448330
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Raashon JACKSON, Plaintiff,
v.
James E. DZURENDA, et al., Defendants.

No. 3:11–CV–1668 (RNC).
|
Nov. 7, 2012.

**Attorneys and Law Firms**

Raashon Jackson, Somers, CT, pro se.

PRISONER

*INITIAL REVIEW ORDER*

ROBERT N. CHATIGNY, District Judge.

**\*1** Plaintiff, incarcerated at Northern Correctional Institution ("Northern"), has filed a complaint *pro se* under 42 U.S.C. § 1983, against Deputy Commissioner of Corrections James E. Dzurenda, Director of Population and Management Lynn Millings, District Administrator Michael P. Lajoie, Lieutenant Pensavalle and Correctional Officers Davis, Velasquez and Doe. Pursuant to 28 U.S.C. § 1915, the Court must review the complaint and dismiss any part of it that fails to state a claim upon which relief may be granted. A prisoner's complaint under § 1983 adequately alleges a claim on which relief may be granted if the allegations, accepted as true, allow the court to draw a reasonable inference that the defendant is liable for violating the prisoner's constitutional rights. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

*Plaintiff's Allegations*

The complaint alleges the following. On July 7, 2011, Officer Davis issued a disciplinary report to the plaintiff falsely accusing him of assaulting him. On the same date, Officer Davis punched the plaintiff in the chest, knocking the wind out of him and causing him pain, and denied him medical and mental health treatment. The next day, July 8, 2011, Deputy Commissioner Dzurenda and Director Millings transferred the plaintiff to Northern without holding a hearing. Correctional Officer John Doe discarded some of the plaintiff's personal property while packing the plaintiff's things in connection with the transfer to Northern. Officer Doe discarded the items in retaliation for the plaintiff's assault on Officer Davis. On July 20, 2011, Officer Velasquez issued a disciplinary report to the plaintiff falsely accusing him of being a gang member. Defendants Dzurenda and Millings approved the plaintiff's placement in administrative segregation at Northern due to his receipt of the false disciplinary reports. Hearings were held on the disciplinary charges contained in the reports and the plaintiff participated in the hearings. Lieutenant Pensavalle, acting as the hearing officer, found the plaintiff guilty based on the false statements of defendants Davis and Velasquez. District Administrator Lajoie upheld the guilty findings on appeal.

*Discussion*

*Deprivation of Property and Retaliation Claims*

The plaintiff claims that Officer Doe deprived him of his property without due process of law in violation of the Fourteenth Amendment. A due process claim is not available to an inmate whose property is taken or destroyed by a prison guard if the state provides an adequate remedy for the deprivation of property. *See Hudson v. Palmer,* 468 U.S. 517, 531–34 (1984). The State of Connecticut provides such a remedy. *See Conn. Gen.Stat. § 4–141 et seq.* (claims for payment or refund of money by the state may be presented to the Office of the Claims Commissioner). The deprivation of property claim against Officer Doe is therefore dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

**\*2** The plaintiff claims that Officer Doe discarded the plaintiff's property in retaliation for the plaintiff's assault on Officer Davis. To state a claim for retaliation, the plaintiff must allege that he engaged in speech or conduct protected by the First Amendment, the defendant took adverse action against him, and there was a causal connection between the protected speech or conduct and the adverse action. *See Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir .2009). The plaintiff has not alleged that he engaged in speech or conduct protected by the First Amendment before Officer Doe discarded the property. And he affirmatively alleges that Officer Doe discarded the property in retaliation for the plaintiff's alleged assault on Officer Davis. An inmate's assault on an officer plainly

does not constitute protected activity. Accordingly, the retaliation claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

*False Accusation Claims*

The plaintiff claims that Officers Davis and Velasquez violated his constitutional rights by issuing disciplinary reports falsely accusing him of assault and gang membership. An inmate has no general constitutional right to be free from being falsely accused of misconduct in a disciplinary report. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). An inmate's protection against false accusations lies in the procedural due process requirements to be applied by prison officials who conduct the disciplinary hearing. *See Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994)(fair hearing conforming to due process standards will cure constitutional violation otherwise resulting from false accusation). These requirements, established in *Wolff v. McDonnell,* 418 U.S. 539, 564–66 (1974), entitle the inmate to "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and the reasons for the action taken." *Luna v. Pico,* 356 F.3d 481 (2d Cir.2004).

The complaint asserts that the plaintiff did not receive due process with regard to the false accusations against him. However, the complaint does not allege facts supporting a plausible claim that he was denied any of the procedural protections required by *Wolff.* Accordingly, the claims against Officers Davis and Velasquez based on their filing of false disciplinary reports are dismissed without prejudice.

*Transfer to Northern*

The plaintiff claims that he was transferred to Northern by defendants Millings and Dzurenda without a prior hearing in violation due process. As a general rule, inmates have no constitutional right to be housed in or remain at any particular correctional facility. *See Olim v. Wakinekona,* 461 U.S. 238, 248 (1983) ("[P]rison transfer ... does not deprive an inmate of any liberty interest."); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.1988)(generally, a prisoner is not entitled to a hearing or any other safeguards before being transferred from one prison to another); *Meachum v. Fano,* 427 U.S. 215,

225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even when conditions in one prison are "more disagreeable" or the prison has "more severe rules"). To state a due process claim based on the transfer to Northern, the plaintiff must allege that a state regulation guaranteed him a hearing prior to the transfer, and that the transfer subjected him to atypical and significant hardship compared to the ordinary incidents of prison life. *See Sandin v. Conner,* 515 U.S. 472, 479–84 (1995). The complaint does not contain these allegations. The due process claim against defendants Millings and Dzurenda based on the transfer is therefore dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

*Placement in Administrative Segregation*

**\*3** The plaintiff claims that defendants Dzurenda and Millings approved of his placement in administrative segregation at Northern in violation of his right to due process. To state a due process claim based on the placement in administrative segregation at Northern, plaintiff must allege that a state regulation guaranteed that he would not be placed in administrative segregation without certain procedures, that the requisite procedures were not followed, and that the placement resulted in atypical and significant hardship. *See Sandin,* 515 U.S. at 479–84. The complaint does not include these allegations. The due process claim against defendants Dzurenda and Millings based on the placement in administrative segregation is accordingly dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

*Excessive Force Claim*

The court concludes that the allegations of the complaint, accepted as true and liberally construed, could conceivably support plausible claims against Officer Davis for excessive force and deliberate indifference to a serious medical need in violation of the Eighth Amendment.

Accordingly, it is hereby ordered:

(1) The claims against Officer John Doe are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

(2) The claims against defendants Davis, Velasquez, Pensavalle, Lajoie, Millings and Dzurenda are dismissed without prejudice based on the deficiencies discussed above. If the plaintiff wishes to replead some or all of

2012 WL 5448330

these claims in an attempt to overcome the deficiencies identified by the court, he may do so by filing an amended complaint within thirty days of the date of this order. Any amended complaint should also include the claims against Officer Davis for excessive force and deliberate indifference to a serious medical need.

(3) If the plaintiff does not file an amended complaint within thirty days, the case will proceed only with regard to the claims of excessive force and deliberate indifference to a serious medical need against Officer Davis in her individual and official capacities.

(4) The Pro Se Prisoner Litigation Office shall send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit and a copy of the Order to the plaintiff.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5448330

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 9022575
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Taurice MOORE, Plaintiff,
v.
PA KWAN, in her official and individual
capacity, Sgt. Romaine, in his official and
individual capacity, and CO Cajigos, in his
individual and official capacity, Defendants.

12-CV-4120 (VSB)
|
Signed 03/30/2016

**Attorneys and Law Firms**

Taurice Moore, Ossining, New York, Pro Se Plaintiff.

Jeb Harben, Assistant Attorney General, Office of the Attorney General, New York, New York, Counsel for Defendants.

**MEMORANDUM & ORDER**

VERNON S. BRODERICK, United States District Judge:

**\*1** Pro se plaintiff Taurice Moore ("Plaintiff" or "Moore"), a prisoner at Sing Sing Correctional Facility, commenced this civil rights action pursuant to Title 42 U.S.C. § 1983 ("Section 1983") against defendants Physician Assistant ("PA") Pokum Kwan, Correction Officer ("CO") Daniel Cajigas,[1] and Sergeant Richard Romaine ("Sergeant Romaine") (collectively "Defendants"), alleging violation of his rights under the First and Eighth Amendments. Before me is Defendants' motion for summary judgment and dismissal of all claims against them. (Doc. 53.)

Defendants' motion for summary judgment is granted against the defendants in their individual capacities because (1) Moore failed to demonstrate that Defendants PA Kwan or CO Cajigas acted with deliberate indifference to his health or safety, (2) many of the alleged retaliatory acts of Defendant Cajigas did not constitute adverse actions, and (3) the only sufficient adverse actions

Moore alleges Defendant Cajigas took were not causally connected to Moore's protected speech or conduct. PA Kwan, CO Cajigas, and Sergeant Romaine are also entitled to dismissal of the claims against them in their official capacities because they are immune from suit in federal court under the Eleventh Amendment. Finally, since no constitutional claims remain, Moore cannot state a claim against Sergeant Romaine for supervisory liability under Section 1983. To the extent that Moore's allegations could be read to allege State law causes of action, I decline to exercise jurisdiction over those claims. Accordingly, for the reasons stated below, Defendants' Motion for Summary Judgment, (Doc. 53), is GRANTED in its entirety.

**I. Background**[2]

Moore is an inmate incarcerated at Sing Sing Correctional Facility ("Sing Sing") in New York. (Defs.' 56.1 Stmt. ¶ 1, 3.)[3] Moore arrived at Sing Sing on January 25, 2010. (Id. ¶ 3.) That same day Moore met with New York State Department of Corrections and Community Supervision ("DOCCS") Nurse Hamaway at approximately 12:00 p.m. (Id. ¶ 18.) DOCCS Medical Director Genovese made a notation to Moore's Ambulatory Health Record at 1:15 p.m. (Id. ¶ 19.)

Moore claims that he met with PA Kwan on January 25, 2010, the day that he arrived at Sing Sing, and told her that he suffers from seizures and asthma attacks. (Am. Compl. 3, 5 ¶ 2.)[4] He also claims that he warned PA Kwan that, per DOCCS policy, he could not be assigned to a top bunk because he takes seizure medication. (Id.) Moore claims that "[d]espite the information [in his] medical records, and brief conversation—health care provider (Kwan) was irresponsible and failed to have plaintiff assigned to a bottom bunk." (Am. Compl. 5 ¶ 6.) There are no records in Moore's file indicating that he met with PA Kwan on January 25, 2010, and had such a meeting occurred "it would have been documented in plaintiff's medical chart as is required by DOCCS' rules and standard practice." (Defs.' 56.1 Stmt. ¶ 16.) PA Kwan does not recall meeting with Moore until January 28, 2010. (Id. ¶ 15.)

**\*2** According to Moore, he was assigned to the top bunk by Sing Sing security staff. (Am. Compl. 5 ¶ 6; 4/1/14 Harben Decl. Ex. C, at 79-80.)[5] On January 28, 2010, Moore fell from the top bunk due to a seizure. (Am. Compl. 6 ¶¶ 7, 10.) Prior to his fall, Moore was

provided with, and was taking, seizure medication. (Defs.' 56.1 Stmt. ¶ 21.) On the day of Moore fell out of bed, DOCCS Nurse Rick and PA Kwan examined Moore, and he was placed under observation for four days. (Defs.' 56.1 Stmt. ¶¶ 22-24.) As part of her examination, PA Kwan noted that Moore complained of tenderness and a mildly reduced range of motion, but he was alert and oriented. (Kwan Decl. ¶ 12.) [6] Moore received x-rays of his skull, back, and knee on January 28, 2010, which also did not reveal any abnormalities or injuries. (Defs.' 56.1 Stmt. ¶¶ 25-26; Kwan Decl. ¶ 10.) Based upon her review of Plaintiff's treatment records, including her own observations, PA Kwan determined that Plaintiff had not suffered any serious injuries. (Kwan Decl. ¶¶ 9-12.)

Moore filed two grievances related to this fall in February and March 2010, and he did not mention improper conduct on the part of PA Kwan in either grievance. (4/1/13 Hale Decl. Ex. B, at 17-18, 25.) [7] On August 11, 2010, the Central Office Review Committee ("CORC") adopted the April 1, 2010 report and recommendation of the superintendent of the facility (the "Superintendent"), which concluded that Moore "should have been placed on the bottom bunk." (Id. at 7, 10.)

In or about March 2010, Moore was assigned to begin working as a porter in the Sing Sing barbershop (the "Barbershop"). (Cajigas Decl. Ex. A; Am. Compl. 6 ¶ 11.) [8] CO Cajigas has supervised the Barbershop since 2008. (Cajigas Decl. ¶ 4.) Moore claimed that he was denied access to his assigned program—the Barbershop—by a CO without a valid reason. (See 4/1/14 Harben Decl. Ex. A at 22.) Although assigned to work in the Barbershop, Moore did not get paid during the period of time that he was denied access to the Barbershop. (Id. at 20.) On May 24, 2010, Moore filed a grievance relating to his program assignment. (Id. at 22.) The Superintendent denied this grievance on June 22, 2010, and Moore did not appeal. (Id.) According to the decision of the Superintendent, the CO who denied Moore access to the Barbershop "had more inmates than he needed assigned to the barber shop and it was becoming a security concern." (Id.) The Superintendent indicated that Moore was told to have the Program Committee reassign him, but that he would be kept on the Barbershop payroll until he was reassigned. (Id.) Moore alleges that as a result of his filing of this grievance, CO Cajigas became upset and

retaliated against him in various ways. (See Am. Compl. 6 ¶ 14.)

**\*3** At some point after Moore filed his grievance he was directed to report to the "O.I.C. (officer in charge)," when he encountered CO Cajigas who purportedly said "[s]o you want to work in the Barbershop, well I have more than enough work for you." (Id.) When CO Cajigas and Moore reached the Barbershop, CO Cajigas made Moore sweep the floor. (Id.) A few days later CO Cajigas suggested that Moore change his program; in other words, find a job other than working at the Barbershop. (Id. 7 ¶ 15.) When Moore asked why, CO Cajigas purportedly said "I don't like you." (Id.) Moore also asserts that CO Cajigas began calling him names, including, among others, "headbanger," "rugface," and "bushface." (Id. ¶ 16.)

At any given time, 15 to 18 inmates were assigned to work in the Barbershop. (Defs.' 56.1 Stmt. ¶ 31.) However, the Barbershop had only 13 barber chairs so not every inmate working on any given day could be assigned to cut hair. (Id. ¶¶ 31, 34.) The Barbershop operated on the basis of seniority; inmates with the most seniority working in the Barbershop were given priority to work as barbers, rather than as maintenance workers or porters. (Id. ¶¶ 34, 35.)

From November 8, 2010 through February 19, 2012, Moore held the title of "Porter II" in the Barbershop. (Id. ¶ 36.) According to Moore, in late 2010 two barbers had positive urine tests and one barber was placed in the Special Housing Unit resulting in a shortage of barbers. (Am. Compl. 7 ¶ 17.) It was around this time that Moore claims that CO Cajigas let him work as a barber. (Id.) Moore continued at times to cut hair into 2011, and he claims CO Cajigas continued to mistreat him. (Id. 7-8 ¶¶ 18, 19.) For example, at one point CO Cajigas is alleged to have said "why don't you shave that stupid rug of [sic] your stupid face." (Id. 8 ¶ 19.) And after Moore would finish cutting hair, CO Cajigas "would make [him] sweep, and clean all the Barbers ['] chairs, floors and mop, and also clean the sinks." (Id.) Moore claimed that he was ordered to do these "extra tasks" by CO Cajigas even though he already had to "clean the sinks twice a day, sweep the floor numerous times during the day," and despite the fact that he was a barber and there were other porters around. (Id.)

In October and November 2011, Moore was confined to his cell for twenty-five days for an unrelated incident.

(Am. Compl. 8 ¶ 20.) When Moore returned to work, CO Cajigas directed him to find a new assignment or CO Cajigas would write-up a misbehavior report about him. (4/1/14 Harben Decl. Ex. A at 21.) On January 23, 2012, Moore filed a grievance relating to these incidents requesting back-pay and reassignment of CO Cajigas. (*Id.* at 20-21.) The Superintendent denied Moore's grievance on February 10, 2012; he appealed, and his appeal was received by the CORC on March 6, 2012. (4/1/13 Hale Decl. Ex. C at 32, 36, 40.) On July 18, 2012, the CORC adopted the report and recommendation of the Superintendent denying Moore's grievance. (*Id.* at 31.)

Moore failed to appear for work at the Barbershop on February 6, 2012. (Defs.' 56.1 Stmt. ¶ 51.) Upon investigating Moore's absence from work, CO Cajigas discovered that rather than go to work at the Barbershop Moore had requested permission to go to the gym. (*Id.* ¶ 52.) CO Cajigas issued Moore a misbehavior report for missing work on February 6. (*Id.* ¶¶ 51-52.)

Inmates assigned porter responsibilities are required to use a five- to seven-foot tall ladder [9] to properly clean certain areas of the Barbershop. (Defs.' 56.1 Stmt. ¶¶ 37-39.) Moore performed cleaning tasks using a ladder in his capacity as a porter on a number of occasions. (*Id.* ¶ 43.) According to Moore he attempted to explain his health problems to CO Cajigas, but CO Cajigas stated that he was giving Moore a direct order. (4/1/13 Hale Decl. Ex. D at 9.) Ordinarily an inmate who is impaired in such a way that it inhibits his ability to work is expected to get a "permit from the Sing Sing medical department outlining any such work restrictions." (Cajigas Decl. ¶ 12.) CO Cajigas was not aware that Moore had such a permit, (*id.*), and there was no evidence in the record that Moore had such a permit. Moore also states that he spoke to Sergeant R. Romaine, CO Cajias's supervisor, regarding his health problems. (4/1/13 Hale Decl. Ex. D at 9.) According to Moore, Sergeant Romaine directed Moore to speak to his physician and obtain a permit outlining his medical restrictions. (*Id.*; Defs.' 56.1 Stmt. ¶ 60.) Moore claims to have spoken to PA Kwan regarding a medical permit but she did not grant him one. (4/1/13 Hale Decl. Ex. D at 9.)

**\*4** On February 9, 2012, Moore fell from a ladder while performing his duties as a porter. (*Id.*) Moore alleges that Sergeant Romaine saw him on the ladder, (*id.*); however, Sergeant Romaine states that he did not witness Moore's fall or recall observing him on a ladder that day.

(Romaine Decl. ¶ 13.) [10] PA Kwan treated Moore for his injuries shortly after his fall. (Kwan Decl. ¶ 14.) PA Kwan's examination "did not reveal any serious injuries or evidence of serious trauma" and she also did "not observe any abrasions or contusions or palpable tenderness on [Moore's] part." (*Id.* ¶ 15.) As a result, Moore was given a cane. (4/1/13 Hale Dec. Ex. E, at 30.) [11] Due to Moore's fall and his history of seizures, PA Kwan advised that Moore should not work on ladders, with machinery, or in the Barbershop in the future. (Kwan Decl. ¶ 17.)

On February 17, 2012, Moore filed a grievance against CO Cajigas and Sergeant Romaine relating to his fall off of the ladder. (4/1/13 Hale Decl. Ex. D, at 9.) On April 20, 2012, the Superintendent granted Moore's request for a program change but denied his request to reprimand CO Cajigas. (*Id.* at 11.) Moore appealed the Superintendent's decision and his grievance was received by the CORC on May 11, 2012. (*Id.* at 5.) On September 12, 2012, the CORC noted that Moore did not have any program limitations and upheld the Superintendent's determination, declining to reprimand CO Cajigas because it "ha[d] not been presented with sufficient evidence to substantiate any malfeasance by staff." (*Id.* Ex. D, at 4, 11.)

When Moore was released from the infirmary on February 12, 2012, he claims that CO Cajigas ordered him to return to work. (*Id.* Ex. E, at 30.) Moore attempted to explain that he could not work due to his injuries. (*Id.*) CO Cajigas reviewed the paperwork Moore had received from the medical department that indicated that he had right to use a cane, have a bus pass, and that he could take showers on the cell block. (*Id.*) This paperwork, however, did not appear to restrict Moore's work. (*Id.*) CO Cajigas therefore ordered Moore to return to work or receive a reprimand. (*Id.*) According to Moore, CO Cajigas directed him to clean the walls, mirrors, sinks, and to sweep the floor using his free hand. (*Id.*)

Moore also filed a grievance on February 24, 2012 relating to the February 12 incident when CO Cajigas ordered him to work, claiming that he was not treated fairly. (*Id.*) On April 20, 2012, the Superintendent accepted the grievance to the extent that Moore's program was changed, and instructed Moore to get a medical limitation pass if he felt that he could not perform the job of his new program. (*See id.* 24.) Moore appealed, and his grievance was received by the CORC on May 7, 2012. (*Id.* at 19, 24.) The CORC denied Moore's grievance on October 17, 2012, noting that

Moore was reassigned to another program on February 20, 2012 and that prior to that "he did not have a medical order for limited duties." (*Id.* at 17.)

## II. Procedural History

Moore initiated this action by filing a complaint on May 23, 2012, (Doc. 2), which he amended on June 13, 2013, (Doc. 34). [12] Defendants filed a motion to dismiss on April 1, 2013, (Docs. 26-30), Moore opposed, [13] and Defendants filed their reply on May 15, 2013, (Doc. 32). On August 20, 2013, Judge Pauley granted in part and denied in part Defendants' motion to dismiss. Judge Pauley dismissed (1) Moore's claims against CO Tameka Hill because Moore failed to exhaust his administrative remedies, (2) Moore's Eighth Amendment claims against Medical Director Genovese because Moore failed to allege Genovese had any personal involvement in the alleged constitutional violations, and (3) Moore's Eighth Amendment claim that PA Kwan failed to adequately treat his injuries by not ordering an MRI. (Doc. 37 at 6-7, 8-9.) Judge Pauley also dismissed Moore's First Amendment religious discrimination claims against CO Cajigos and Sergeant Romaine. (*Id.* at 9.) However, Judge Pauley did not dismiss Moore's Eighth Amendment claim that PA Kwan failed to consider his medical needs related to his sleeping arrangements, or Moore's First Amendment retaliation claims and Eighth Amendment claims for unconstitutional conditions of confinement against CO Cajigas and Sergeant Romaine. (*Id.* at 9-11.)

**\*5** Defendants CO Cajigas, Sergeant Romaine, and PA Kwan answered Moore's Amended Complaint on September 3, 2013. (Doc. 38.) Defendants filed their summary judgment papers seeking dismissal of the remaining claims brought against them on April 1, 2014. (Docs. 53, 55-61.) Moore opposed Defendants' motion on June 12, 2014, (Doc. 66), and Defendants submitted their reply papers on July 3, 2014, (Docs. 69-70).

## III. Legal Standards

### A. *Summary Judgment*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan,* 287

F.3d 96, 103 (2d Cir. 2002); *see Fed. R. Civ. P.* 56(a). "[T]he dispute about a material fact is 'genuine[ ]' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3); Local Civil Rule 56.1(c).

In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita,* 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non moving party," summary judgment must be not be granted. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir. 2002).

"A *pro se* party's supporting papers are to be construed liberally and held to less stringent standards than pleadings submitted by attorneys." *Muse v. N.Y.C. Dep't of Housing Preservation & Dev't*, No. 96-CV-6221, 2000 WL 1209427, at *3 (E.D.N.Y. Aug. 22, 2000) (citing *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972) (per curiam)). Nevertheless, proceeding pro se "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983) (internal quotation marks omitted). "[A]t some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case, even where a party proceeds *pro se.*" *S.E.C. v. Mattera*, No. 11-CV-8323, 2013 WL 6485949, at *6 (S.D.N.Y. Dec. 9, 2013) (quoting *Salahuddin v. Coughlin*, 781 F.2d 24, 29 (2d Cir. 1986) (internal quotation marks omitted)).

## B. *Section 1983—Eighth Amendment Violations*

**\*6** "*Section 1983* provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *See Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). *Section 1983* does not establish substantive rights, but it provides a means of redress for the deprivation of rights established elsewhere. *Id.* "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [*Section*] 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted); *accord Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001).

Under the Eighth Amendment "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. "Forbidden punishments include those that involve the unnecessary and wanton infliction of pain." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks omitted). "The infliction of pain is unnecessary and wanton, for instance, when it is totally without penological justification." *Id.* (internal quotation marks omitted). "In making this determination in the context of prison conditions, we must ascertain whether the officials involved acted with 'deliberate indifference'

to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 737-38 (2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

### 1. Medical Treatment

To prove a Eighth Amendment claim under Section 1983 based on inadequate medical care, a prisoner must demonstrate "deliberate indifference to [his] serious medical needs...." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The standard for deliberate indifference includes both an objective and subjective component. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

The objective component requires that "the alleged deprivation ... be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). Whether a deprivation is an objectively serious deprivation involves a two-part inquiry. First, a court must determine whether the prisoner was actually deprived of adequate medical care. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). Where prison officials act reasonably in relation to an inmates' medical care, they cannot be liable for violation of the Eighth Amendment. *Id.* at 279-80. Second, after determining a prisoner did not receive adequate care, a court must assess whether the inadequacy in medical care was sufficiently serious. *Id.* at 280. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.*

The subjective component requires that the charged official "must act with a sufficiently culpable state of mind." *Id.* In cases involving medical treatment in a non-emergency situation it is sufficient for a plaintiff to show the prison officials were deliberately indifferent to the inmate's health. *Id.* "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law," which means that "the charged official [must] act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* This prong will generally not be met by allegations of medical malpractice, *Estelle*, 429 U.S. at 105-06, or "mere negligence[.]" *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). Similarly,

"mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

### 2. Conditions of Confinement

**\*7** "To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety.' " *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)). "To meet the objective element [of an unconstitutional conditions of confinement claim], the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* Although, "there is no static test to determine whether a deprivation is sufficiently serious[,] the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (internal quotation marks omitted). Therefore, inmates may not be deprived of their " 'basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety' "—and they may not be exposed "to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps*, 308 F.3d at 185 (quoting *Helling v. McKinney*, 509 U.S. 25, 32, 35 (1993)). However, claims for injuries relating to 'garden variety torts' are not sufficiently serious to meet the objective prong of the deliberate indifference examination. *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("[T]he Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."); *see, e.g.*, *Martin v. City of New York*, No. 11-CV-600, 2012 WL 1392648, at \*9 (S.D.N.Y. Apr. 20, 2012) ("Courts in this Circuit agree that bodily injuries sustained from a slip-and-fall on a wet floor simply do not rise to the level of a constitutional violation."); *Shariff v. Coombe*, 655 F. Supp. 2d 274, 300-01 (S.D.N.Y. 2009) (finding that a potholed recreation yard, although it resulted in injuries to inmates in wheelchairs, is not a constitutional violation); *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*15 (S.D.N.Y. Aug. 2, 2013) (finding that the failure to install handrails in limited portions of a prison walkway does not amount to a constitutional violation).

With regard to subjective part of the test, deliberate indifference requires "more than mere negligence." *Farmer*, 511 U.S. at 835. The prison official must know of, and disregard, an excessive risk to inmate health or safety. *Id.* at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not ... [cannot] be condemned as the infliction of punishment." *Id.* at 838.

### C. *Section 1983—First Amendment Violations*

To prove a First Amendment retaliation claim under Section 1983, a prisoner must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). The First Amendment protects inmates from retaliation for filing prison grievances. *See Gill*, 389 F.3d at 384 ("[The plaintiff] has sufficiently alleged (1) participation in protected activity: the use of the prison grievance system....") "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action...." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). Courts "approach prisoner retaliation claims 'with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Dorsey v. Fisher*, 468 Fed.Appx. 25, 27 (2d Cir. 2012) (summary order) (quoting *Davis*, 320 F.3d at 352). And "because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted).

"[N]ot ... every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker*, 239 F.3d 489, 492-93 (2d Cir. 2001)

overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). "Insulting or disrespectful comments directed at an inmate generally do not rise to this level." *Davis*, 320 F.3d at 353. Verbal threats, depending on the specificity and context, can constitute an adverse action. *Compare Ford v. Palmer*, 539 Fed.Appx. 5, 7 (2d Cir. 2013) (summary order) (claim that officer threatened to poison inmate at some unspecified future date alleged adverse action), *with Dorsey*, 468 Fed.Appx. at 27 (allegation of verbal abuse without threat of physical harm was not an adverse action and without specificity did not constitute an adverse action). However, retaliatory acts that would not inhibit a similarly situated inmate from exercising his or her constitutional rights are de minimis and therefore outside the ambit of constitutional protection. *See, e.g., Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (per curiam).

### IV. Discussion

### A. Eighth Amendment Claims

**\*8** Moore asserts that Defendants PA Kwan and CO Cajigas violated his Eighth Amendment rights because (1) PA Kwan was deliberately indifferent to his medical needs when she failed to inform Sing Sing security that he suffers from a "seizure disorder" and was not " 'cleared' to be placed within a double bunk cell, let alone on the top bunk of the cell," (Am. Compl. 3), and (2) CO Cajigas subjected him to unconstitutional conditions of confinement when CO Cajigas mistreated him and required him to do various tasks related to the Barbershop, including making him use a five- to seven-foot tall ladder to clean areas of the Barbershop despite knowing that Plaintiff suffers from seizures, (*see id.* 1-2, 8-9 ¶¶ 19-24).

### 1. PA Kwan

I first consider whether PA Kwan's alleged failure to provide Moore with adequate medical treatment was sufficiently serious to state an Eighth Amendment claim. The gravamen of Moore's claim is that PA Kwan did not do enough to prevent him from being placed in a top bunk from which he fell and sustained injuries. I find that Moore has failed to meet his burden of establishing that there are issues of fact related to this claim.

As an initial matter, the facts do not support a finding that there is an issue of fact concerning PA Kwan's involvement in Moore being given a top bunk assignment when he arrived at Sing Sing on January 25, 2010. (*See* Defs.' 56.1 Stmt. ¶ 3.) Moore claims that he met with PA Kwan on January 25, 2010, told her that he suffers from seizures and asthma attacks, and warned her that, per DOCCS policy, he could not be assigned to a top bunk because he takes seizure medication. (Am. Compl. 5 ¶ 2.) Moore claims that "[d]espite the information [in his] medical records, and brief conversation—health care provider (Kwan) was irresponsible and failed to have plaintiff assigned to a bottom bunk." (Am. Compl. 5 ¶ 6.) However, other than Moore's own assertions, there is no support for his claim that he met with PA Kwan on January 25, 2010, or that she had any involvement with Moore being assigned a top bunk. In fact, the evidence is to the contrary. Instead of meeting with PA Kwan on January 25, 2010, Moore's medical records demonstrate that he met with Nurse Hamaway at approximately 12:00 p.m. on that day, and later that day he either met with or had his medial file reviewed by Medical Director Genovese, who made a notation in Moore's medical record at 1:15 p.m. (Defs.' 56.1 Stmt. ¶¶ 18, 19; Kwan Decl. ¶ 6.) There is no record, notation, or indication in Moore's medical record that he met with PA Kwan on January 25, 2010, (*see* Defs.' 56.1 Stmt. ¶¶ 14, 17; Kwan Decl. ¶ 4, 6), and, had such a meeting occurred "it would have been documented in [Moore's] medical chart as is required by DOCCS' rules and standard medical practice," (Kwan Decl. ¶ 5). Moore's medical record is consistent with PA Kwan's recollection, who does not recall meeting with Moore until January 28, 2010. (*Id.*) In fact, PA Kwan unequivocally states that "[b]ased on my lack of recollection of any meeting between me and plaintiff prior to January 28, 2010, in addition to the complete lack of documentation concerning any meeting between me and plaintiff prior to January 28, 2010, it is clear that no such meeting did, in fact, occur." (*Id.*)

Having met with Nurse Hamaway and either met with or had his medical record reviewed by Medical Director Genovese, it seems unlikely and makes no sense that Moore would have been seen by a third healthcare professional—such as PA Kwan—on his first day at Sing Sing. Because (1) Moore's statements/assertions amount to the only evidence supporting Moore's claim that he met with PA Kwan on January 25, 2010, (2) the documentary and testimonial evidence presented

by Defendants squarely contradicts Moore's version of events, and (3) the implausibility of the notion that Moore met with three healthcare professionals on his first day at Sing Sing, and that one of those meetings was not documented pursuant to DOCCS' rules, I reject Moore's assertion that he met with PA Kwan on January 25, 2010, and I find that a juror could not reasonably find in Moore's favor on this issue. *See Rojas v. Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011) (per curiam) (finding that where the testimony of plaintiff was contradictory and implausible, summary judgment in favor of defendants is proper). Therefore, PA Kwan was not personally involved in the alleged constitutional deprivation. This bars an award of damages under Section 1983. *Farrell* 449 F.3d at 484.

**\*9** Even if I were to accept Moore's claim that he met with PA Kwan on January 25, 2010, told her about his history of seizures and warned her that according to DOCCS policy he could not be assigned to a top bunk because he has a history of seizures and takes seizure medication, the medical treatment Moore received prior to his fall from his top bunk was more than adequate. Prior to his fall, Moore confirmed that he was provided with, and was taking, seizure medication. (Defs.' 56.1 Stmt. ¶ 21.) He was also examined by Nurse Hamaway and either saw or had his medical record reviewed by Medical Director Genovese on his first day at Sing Sing. Moreover, as Moore concedes, it was a security staff member who made the determination to assign Moore a top bunk, not PA Kwan or some other member of the Sing Sing medical staff. (*See* 4/1/14 Harben Decl. Ex. C, at 79:25-80:3.) Based on these facts, I find that the medical treatment Moore received prior to falling out his bunk on January 28 was more than adequate, and any alleged depravation was not serious. *See Hathaway*, 99 F.3d at 553 (noting that the objective component of depraved indifference requires that the alleged depravation "be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists") (internal quotation marks omitted).

Having made the determination that Moore received adequate medical care, I need not assess (1) to what degree the alleged medical care was inadequate, or (2) the harm the alleged medical care caused or will cause in the future. However, even were I to assume that PA Kwan failed to provide Moore with a bottom bunk pass and/ or failed to notify Sing Sing security staff that Moore

had a history of seizures and was on seizure medication, the harm that resulted from this alleged inadequacy was not sufficiently serious to support a claim of deliberate indifference. *See Salahuddin*, 467 F.3d at 280 (the second part of the objective depraved indifference test requires assessment of seriousness of inadequacy and "what harm, if any, the inadequacy has caused or will likely cause the prisoner.") Shortly after his fall, Moore was examined by Nurse Rick and PA Kwan. (Defs.' 56.1 Stmt. ¶¶ 22-24.) PA Kwan noted that Moore complained of tenderness and a mildly reduced range of motion, but he was alert and oriented. (Kwan Decl. ¶ 12.) She therefore determined that he had not suffered any serious injuries. (*Id.*) In addition, Moore received x-rays of his skull, back, and knee on January 28, 2010, which did not reveal any abnormalities or injuries. (Defs.' 56.1 Stmt. ¶¶ 25-26.) In fact, Moore testified during his deposition that he did not recall whether he was in pain or suffered any bruises after his fall. (4/1/14 Harben Decl. Ex. C, at 76:18, 82:15-22, 83:8-10.) Therefore, any harm Moore suffered or is likely to suffer in the future is not serious. *Cf. Cole v. Fischer*, 416 Fed.Appx. 111, 113 (2d Cir. 2011) (summary order) (finding prisoner failed to state claim for deliberate indifference where prison official used makeshift hot-pack to treat prisoner's chronic back pain, inadvertently resulting in a small second-degree burn, because deprivation was not sufficiently serious); *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (finding state inmate's alleged eczema, back pain, stomach disorders, allergies, and asthma did not constitute a "serious medical need" on which to premise an Eighth Amendment claim of deliberate medical indifference against correctional facility physician).

Even assuming, *arguendo*, that Moore's allegations were sufficient to meet the requirements of the objective component for deliberate indifference, Moore has failed to demonstrate that PA Kwan had the requisite state of mind to meet the subjective component of deliberate indifference. *See Salahuddin*, 467 F.3d at 280 (holding that deliberate indifference requires a mental state equivalent to subjective recklessness in criminal law and "the charged official [must] act or fail to act while actually aware of a substantial risk that serious inmate harm will result"). Even assuming that PA Kwan met with and interacted with Moore on January 25, it was Sing Sing security who assigned Moore the top bunk. (*See* 4/1/14 Harben Decl. Ex. C, at 79:25-80:3.) There is no evidence that PA Kwan knew that by not providing Moore with a bottom

bunk pass and/or failing to notify Sing Sing security that Moore had a history of seizures and was taking seizure medication he would be assigned a top bunk by Sing Sing security and that such an assignment would place Moore at substantial risk. Stated differently, PA Kwan's action in not issuing a bottom bunk pass to Moore and/or failing to notify Sing Sing security that Moore had a history of seizures and was taking seizure medication does not meet the state of mind requirement for an Eighth Amendment violation in that it cannot be characterized as (1) "repugnant to the conscience of mankind" or (2) incompatible with the "evolving standards of decency that mark the progress of a maturing society," *Estelle*, 429 U.S. at 102, 105 (internal quotation marks omitted), nor is there any evidence that PA Kwan "deliberately delayed care as a form of punishment" or "ignored a life threatening and fast-degenerating condition," *Demata v. N.Y.S. Corr. Dep't of Health Servs.*, 1999 WL 753142, at \*2, 198 F.3d 233 (2d Cir. Sept. 17, 1999) (summary order) (citations omitted) (internal quotation marks omitted).

**\*10** At most, PA Kwan's alleged failure to issue a bottom bunk pass and/or failure to notify Sing Sing security that Moore had a history of seizures and was taking seizure medication was negligent. In fact, Moore described PA Kwan's failure to give him a bottom bunk pass as "negligent[ ]" when recounted his alleged interactions with her in a grievance complaining about various issues in April 2012, (*see* 4/1/14 Harben Decl. Ex. A, 19), and described her conduct as "irresponsible" in his Amended Complaint, (Am. Compl. 5 ¶ 6). The law is clear that acts done negligently do not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.") Therefore, Moore has failed to demonstrate that PA Kwan acted with a sufficiently culpable state of mind in violation of the Eighth Amendment.

Finally, during his deposition Moore was asked why he was suing PA Kwan and his response does not connote a view that he believed she was reckless. Moore testified that

> The reason I'm suing her is because she's too manipulative. She doesn't take the time, and she doesn't take the insight to look over a person's medical history nor take the time to let you voice your opinion or

give you the insight to listen to your problem, or does she care to know your problem, you know. I can safely say that because, if she would have listened to my problems most of the time when I was voicing my opinions and some of my options, dealing on my own opinions and my own scenarios, I really got hurt dealing with my double bunk. These issues I would have never got hurt dealing with the ladder incident, I would have never got hurt any of those times or I would have never been in the situations when I was dealing with and none, like, because she didn't listen, she didn't take the time to listen to what I was saying, you know.

(4/1/14 Harben Decl. Exh. C, at 76:7-25.) There does not appear to be any place in the record where Moore referred to PA Kwan's alleged acts on or about January 25, 2010 as "reckless." Instead, during his deposition he focused on his view that PA Kwan did not listen to his "opinions" or consider his "options" or his "own scenarios." At core, Moore's complaints amount to his disagreement about the medical treatment he received from PA Kwan, including his belief that she did not listen to his views and opinions. Moore's disagreement about his treatment, his dissatisfaction with the way PA Kwan did her job, or the fact that he might prefer a different treatment does not give rise to an Eighth Amendment violation. *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

### 2. CO Cajigas

Moore claims that CO Cajigas subjected him to unconstitutional conditions of confinement by mistreating him and requiring him to do various extra cleaning tasks at the Barbershop, and making him use a five- to seven-foot tall ladder to clean areas of the Barbershop despite allegedly knowing that Plaintiff suffers from seizures. (*See* Am. Compl. 1-2, 8-9 ¶¶ 19-24.) These conditions do not come close to the level of

deprivation required to sustain an Eighth Amendment claim for unconstitutional conditions of confinement.

As an initial matter, Moore was assigned to work in the Barbershop when he arrived at Sing Sing in January 2010 and he continued to work there until February 19, 2012. Because he was a new inmate at Sing Sing, Moore was assigned to be a porter in the Barbershop and was responsible for cleaning various areas of the Barbershop, including, when necessary, using a ladder to clean. Moore's responsibilities as an inmate recently assigned to work in the Barbershop were entirely consistent the Barbershop's seniority system: inmates with the most seniority were given priority to work as barbers, while those less senior worked as maintenance workers or porters. (Defs.' 56.1 Stmt. ¶¶ 34, 35.) Moore does not claim that he was asked to do tasks that other inmates were not also asked to do. Rather, Moore essentially claims that he was given more work or "extra tasks" even on days when he worked as a barber. The fact that CO Cajigas allegedly required Moore to do more work than other inmates does not constitute an unconstitutional condition of confinement because Moore has failed to demonstrate that such conditions "either alone or in combination, pose[d] an unreasonable risk of serious damage to [Moore's] health." *Walker v. Schult*, 717 F.3d at 125.

 **\*11** With regard to the ladder incident, Moore asserts that CO Cajigas violated his Eighth Amendment rights because, even though Moore claims he told CO Cajigas about his "documented medical conditions," CO Cajigas ordered Moore to use a ladder to perform his porter duties. (Am. Compl. 2.) On February 9, 2012, Moore fell from the ladder, allegedly resulting in a back injury and headaches. (Moore Dep. 57:23-58:3; Am. Compl. 9 ¶ 24.) [14] However, there is nothing in the record to support an inference that Moore's use of the ladder to clean the Barbershop posed an unreasonable risk of serious damage to his health or that CO Cajigas' directive that Moore clean using the ladder offends contemporary standards of decency.

As an initial matter the use of a ladder to clean areas of the Barbershop was routine. Moore worked as a porter in the Barbershop from January 2010 until February 19, 2012. As part of his duties he was required at times to use a ladder to clean certain areas of the Barbershop. In fact, Moore testified during his deposition that CO

Cajigas ordered him to use the ladder to clean every day. (4/1/14 Harben Decl. Ex. C, at 42:22-24 ("But he used to make me use the ladder on many occasions. He used to order me to do it on numerous occasions every day, every day.")) Other inmates who worked as porters would also use a ladder at times to clean certain areas of the Barbershop. (Defs.' 56.1 Stmt. ¶¶ 37, 39, 40, 42, 43, 45, 76, 79.) Other than Moore, PO Cajigas was not aware of any other inmate during the six years he has supervised inmates in the Barbershop who claimed to have fallen off of a ladder while cleaning in the Barbershop. (*See* Cajigas Decl. ¶ 13.) Therefore, there is nothing in the record to suggest that the mere use of a ladder to clean areas of the Barbershop posed an unreasonable risk to Plaintiff's health or safety.

In addition, Moore's alleged fall from a ladder on February 9, 2012 simply did not result in the type of serious injuries necessary to support a constitutional claim. Moore claimed during his deposition that he has back pain; explaining that the discs in his lower spine are now compressed as a result of his fall. (*See* Moore Dep. at 57:23-58:3, 58:20-59:2.) However, Moore also testified that PA Kwan explained to him that his compressed discs are normal wear and tear that occurs as people age. (*Id.* at 58:5-19.) In addition, at the time of his deposition, Moore was not taking any pain medication or using any medical device for his purported back injury. (*Id.* at 59:3-9.) Moreover, the spinal x-rays taken of Moore on the day that he allegedly fell off of the ladder did not reveal evidence of fracture, malalignment or significant degenerative change. (Kwan Decl. ¶ 16.) PA Kwan's examination on the day Moore fell also "did not reveal any serious injuries or evidence of serious trauma," and she also did "not observe any abrasions or contusions or palpable tenderness on [Moore's] part." (*Id.* ¶ 15.) There is no evidence in the record to support an assertion that any injury to Moore's back as a result of his fall from a ladder while cleaning in the Barbershop was a serious injury.

Similarly, Moore's headaches do not qualify as the type of serious injury necessary to support a constitutional claim. Moore testified that he has frequent headaches as a result of his fall. (*See* Moore Dep. at 57:23-58:3.) He claims that his headaches "started to really get out of hand" after his February 9 fall. (*Id.* at 27:17.) As an initial matter, Moore's comment suggests that his headaches were a preexisting condition and therefore not the product of his February 9 fall from a ladder. In

any event, PA Kwan noted that she examined Moore on the day that he fell from the ladder and did not observe any abrasions, contusions, or palpable tenderness on Moore's part. (Kwan Decl. ¶ 15.) Headaches ordinarily are not sufficiently serious to satisfy the objective element of a deliberate indifference claim. *Compare Renelique v. Doe*, No. 99-CV-10425, 2003 WL 23023771, at *13 (S.D.N.Y. Dec. 29, 2003) (collecting cases), *with De Jesus v. Albright*, No. 08-CV-5804, 2011 WL 814838, at *9 (S.D.N.Y. Mar. 9, 2011) ("[C]hronic migraine headaches are often found to be 'sufficiently serious' to warrant constitutional protection."), *and Moriarty v. Neubould*, No. 02-CV-1662, 2004 WL 288807, at *2 n.2 (D. Conn. Feb. 10, 2004) (finding migraine headaches are sufficiently serious because they can be "extremely painful and debilitating"). Nothing in the record demonstrates that Moore's alleged headaches give "rise to a sufficient level of disabling pain so as to constitute a serious condition." *See Renelique*, 2003 WL 23023771, at *13 (internal quotation marks omitted). He does not, for example, "allege that the headaches rendered him unable to function, that they result in chronic insomnia or that they otherwise impaired his activities of daily living." *Id.*

**\*12** The Eighth Amendment also protects against future harm "that is sure or very likely to cause serious illness and needless suffering...." *Helling*, 509 U.S. at 33; *accord Baze v. Rees*, 553 U.S. 35, 49-50 (2008); *Salahuddin v. Goord*, 467 F.3d at 280. Because Moore is no longer working in the Barbershop, (4/1/13 Hale Decl. Ex. D at 4, 11), I do not need to consider whether or not conditions of confinement he identified related to his work at the Barbershop pose a likelihood of future serious illness and needless suffering.

Moore's Eighth Amendment claim also fails because he does not allege specific facts to show that CO Cajigas knew of and disregarded an excessive risk to his health by assigning Moore's work duties. Initially, I note that whether or not CO Cajigas knew that Moore suffered from seizures and/or was on seizure medication is a disputed issue. (*Compare* Cajigas Decl. ¶ 11 ("I was not aware ... [of] whether [Moore] had any physical impairments") *with* 4/1/13 Hale Decl. Ex. D at 9 (grievance where Moore claims he attempted to explain his health problems to CO Cajigas, but CO Cajigas stated that he was giving Moore a direct order), and Pl.'s Opp. [15] 5-7 (Moore's claim that CO Cajigas knew that Moore's doctor instructed him not to climb ladders)). However, even if CO Cajigas knew that Moore suffered from seizures, Moore

has not provided evidence that CO Cajigas was aware of Moore's limitations because he suffered from seizures, and disregarded an excessive risk to Moore's health and safety by requiring Moore to perform his work duties, including using a ladder to clean certain areas of the Barbershop. In fact, the evidence in the record supports the notion that CO Cajigas had no reason to believe Moore was at risk while using a ladder to clean in the Barbershop.

Moore worked in the Barbershop beginning in January 2010 and he continued to work there until February 19, 2012, and CO Cajigas was the supervisor of the Barbershop throughout that time period. While Moore worked at the Barbershop he was a porter responsible for, among other things, cleaning various areas of the Barbershop; this included, when necessary, using a ladder to clean. There is no evidence in the record that prior to February 9, 2012 Moore had fallen off a ladder while cleaning or that he had any problems working on a ladder because of his health issues. Indeed, according to CO Cajigas, Moore had used a ladder to clean areas of the Barbershop "numerous times before he claims he fell off the ladder on February 9, 2012," and CO Cajigas "had no reason to believe that [Moore] was any more likely to fall off a ladder while working than any other inmate porter" working in the Barbershop at the time. (Cajigas Decl. ¶ 9.) Moreover, CO Cajigas had discovered that—a few days prior to his alleged fall on February 9—Moore had requested permission to go to the gym rather than go to his scheduled work at the Barbershop. As a result, CO Cajigas issued Moore a misbehavior report for missing work on February 6. (Defs.' 56.1 Stmt. ¶¶ 51-52.) According to CO Cajigas, it therefore would "not have occurred to [him] that an inmate who is physically fit enough to go to the gym cannot perform light cleaning tasks on a short folding ladder." (Cajigas Decl. ¶ 10.)

**\*13** Typically an inmate who is impaired in such a way that it inhibits his ability to work is expected to get a "permit from the Sing Sing medical department outlining any such work restrictions." (*Id.* ¶ 12.) As of February 9, 2012, CO Cajigas was not aware Moore had such a permit. (*Id.*) Indeed, according to Moore, he discussed obtaining such a permit with PA Kwan prior to his February 9 fall, but PA Kwan did not grant him one, (4/1/13 Hale Decl. Ex. D, at 9; Defs.' 56.1 Stmt. ¶ 62). [16]

Consequently, I find that Moore has not established that CO Cajigas knew of, and disregarded, an excessive risk

in assigning Moore his work assignments, including using a ladder to clean areas of the Barbershop. Therefore, Plaintiff's Eighth Amendment claim against CO Cajigas must be dismissed.

### B. *First Amendment Claims*

Moore submits that, in retaliation for his filing of one or more grievances against CO Cajigas, CO Cajigas (1) mistreated him, (2) assigned him extra work, (3) threatened to file a misbehavior report and not pay Moore his wages, and (4) directed him to use a ladder to clean the Barbershop.

### 1. Protected Conduct

Moore does not identify the specific grievance that forms the basis for the retaliation he allegedly suffered. However, his Amended Complaint and attached grievances make clear that Moore filed numerous grievances. Among these were (1) a May 2010 grievance complaining that he was denied access to his assigned program by his escort officer without a valid reason, (4/1/14 Harben Decl. Ex. A, 22); (2) a January 23, 2012 grievance relating to CO Cajigas's alleged threats that, if Moore did not find a new job assignment, CO Cajigas would write up a misbehavior report about him, complaining about Moore's failure to receive back pay, and requesting back-pay and reassignment of CO Cajigas, (4/1/14 Hale Decl. Ex. G, 23-24); and (3) a February 14, 2012 grievance relating to CO Cajigas directing Moore to do certain tasks at the Barbershop after he was released from the infirmary after his fall on February 9, 2012, (4/1/14 Hale Decl. Ex. E, 17-18).

### 2. Adverse Action

Defendants argue that Moore failed to establish an adverse action sufficient to establish a First Amendment retaliation claim. (Defs.' Mem. 18-20.) [17] I disagree as to at least some of CO Cajigas's actions.

Moore testified that sometime after his May 2010 grievance, CO Cajigas (1) purportedly said "[s]o you want to work in the Barbershop, well I have more than

enough work for you" and then directed him to do various cleaning tasks at the Barbershop, (Am. Compl. 6 ¶ 14); (2) a few days later CO Cajigas allegedly suggested that Moore change jobs and when he was asked why purportedly said " 'I don't like you,' " (*id.* at 7 ¶ 15); and (3) CO Cajigas began calling Moore names including, among others, "headbanger," "rugface," and "bushface," (*id.* ¶ 16).

**\*14** On or about October or November 2011, Moore was placed in keeplock status for 25 days for an unrelated incident. [18] (Am. Compl. 8 ¶ 20.) After he was released, Moore claims that CO Cajigas told him to change his program or CO Cajigas would make sure Moore did not get paid for the program. (Am. Compl. 8-9 ¶¶ 20-22.) A few days later, according to Moore, CO Cajigas again directed Moore to change his program or he would write Moore a misbehavior report. (*Id.* ¶ 22.) On February 9, 2012, Moore alleges that (1) CO Cajigas directed him to use the ladder to clean certain areas of the Barbershop, (2) CO Cajigas threatened to place Moore on keeplock status if Moore refused, and (3) Moore fell off of the ladder while cleaning. (*Id.* at 9 ¶ 24.) [19]

I find that CO Cajigas's delegation of work assignments, name calling, and threat to issue a misbehavior report do not qualify as adverse actions. The work that CO Cajigas asked Moore to do after his May 2010 grievance was not unique and involved cleaning tasks performed by other inmates who were porters. It would defy common sense for work that is routinely done by all inmates who are porters, and which Moore had been asked to do in the past, to morph into an adverse action merely because Moore filed his grievance. Not surprisingly that is not the law and such work cannot be an adverse action. *See Quezada v. Ercole*, No. 09-CV-2832, 2011 WL 3251811, at *5 (S.D.N.Y. July 29, 2011) (defendants' actions contrary to prison policy were not adverse where plaintiff failed to show that defendants treated plaintiff differently than other inmates); *Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (noting that treating plaintiff the same before and after grievance suggests lack of both adverse action and causal connection). The law also does not recognize insulting or disrespectful comments as adverse actions. See *Davis*, 320 F.3d at 353 ("Insulting or disrespectful comments directed at an inmate generally do not rise to this level."); *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (per curiam) ("Th[e] [adverse action] test is not

satisfied by Morales' allegation that Mentneck called him a stoolie in front of other inmates."), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002), *as recognized in Berry v. Kerik*, 366 U.S. 85, 87-88 (2d Cir. 2003). Finally, I also find that any alleged threats by CO Cajigas to issue Moore a misbehavior report or place Moore in keeplock status is de minimis, and would be unlikely to deter a similarly situated inmate of ordinary firmness from exercising his First Amendment rights. *See Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (finding that threats of misbehavior reports and special housing unit confinement do not meet the adverse action standard).

However, I cannot conclude in the context of the facts here that—as a matter of law—CO Cajigas's threat in October or November 2011 to make sure Moore was not paid his wages would not discourage a reasonable inmate from exercising his constitutional right. Moore testified that prior to May 2010, CO Cajigas was not "putting [him] through on the payroll," and he therefore was not getting paid. (Moore Tr. 34:10-17.) Numerous courts in this district have held that the decision not to pay an inmate could sustain a reasonable inference of retaliation sufficient to defeat summary judgment. *See Baker v. Zlochowon*, 741 F. Supp. 436, 439-40 (S.D.N.Y. June 29, 1990) (decision not to pay plaintiff for work absences after filing an Article 78 proceeding challenging prison officials' actions could sustain reasonable inference of retaliation); *see also Van Pelt v. Finn*, 92-CV-2977, 1993 WL 465297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying defendants' summary judgment motion since plaintiff's "transfer from porter to clerk to recreational supervisor, and his corresponding decreases in pay," was sufficient to sustain a reasonable inference of retaliation). Given the context here—where prior to May 2010 CO Cajigas had allegedly prevented Moore from getting paid—a reasonable fact finder could determine that CO Cajigas's threat in October and November 2011 not to pay Moore was alleged with specificity and related to a harm sufficient to constitute an adverse action.

**\*15** With regard to the alleged acts taken by CO Cajigas after grievances filed by Moore on January 23, February 17, and February 24, 2012, I find that none qualify as adverse actions. Those actions include (1) the misbehavior report issued by CO Cajigas to Moore for missing work at the Barbershop on February 6, (2) the directive by CO Cajigas to Moore to use a ladder to clean certain areas of

the Barbershop on February 9, 2012, and (3) the directive by CO Cajigas to Moore to clean the walls, mirrors, sinks, and sweep using his free hand after he was released from the infirmary on February 12, 2012. With regard to the misbehavior report, there is no dispute that Moore did not show up for work on February 6. CO Cajigas' filing of the report was thus justified and not an adverse action. With regard to the directive to use the ladder and to clean the Barbershop, each of the tasks were tasks that Moore had done repeatedly prior to his filing of grievances, and were tasks routinely done by other inmates who worked as porters in the Barbershop. As discussed above, these types of tasks do not qualify as adverse actions.

### 3. Causal Connection

I next consider whether there is a causal connection between the May 24, 2010 grievance and CO Cajigas's alleged threat to make sure Moore was not paid his wages. I find no such causal connection.

"To sufficiently allege a causal connection, [a plaintiff's] allegations must support an inference that the protected conduct was 'a substantial or motivating factor for the adverse actions taken by prison officials.' " *Dorsey*, 468 Fed.Appx. at 27 (quoting *Bennett*, 343 F.3d at 137). A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling,' and may show a causal connection by demonstrating that the protected activity was close in time to the adverse action." *Kotler v. Donelli*, 382 Fed.Appx. 56, 57-58 (2d Cir. 2010) (summary order) (quoting *Bennett*, 343 F.3d at 139). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). A court must therefore "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal*, 558 F.3d at 129.

The only evidence of a causal nexus between Moore's May 2010 grievance and CO Cajigas's threat is timing. CO Cajigas's threat occurred on some unspecified date after October or November 2011, approximately a year and six months after Moore filed his May 24, 2010 grievance. (*See* Am. Compl. ¶¶ 20-21; 4/14/14 Harben

Decl. Ex. A, at 22.) Courts have found causation based upon temporal proximity where the lapse between the protected act and the adverse action consisted of a few months, not years. *Compare Espinal*, 558 F.3d at 129 (six month gap sufficient), *with Kasiem v. Rivera*, No. 09-CV-9665, 2011 WL 166929, at *7 (S.D.N.Y. Jan. 18, 2011) (twenty months insufficient). Accordingly, I find that any connection based upon timing is too attenuated to establish causation. Defendants' motion for summary judgment on Moore's retaliation claim is granted.

### C. *Sergeant Romaine*

Moore submits that Sergeant Romaine is liable under Section 1983 pursuant to a theory of supervisor liability. (Am. Compl. 10 ¶¶ 28-30.) "Because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Personal involvement of a supervisory defendant may be demonstrated by showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*16** *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[20] But "[i]n the absence of an underlying constitutional violation, a plaintiff cannot state a claim for supervisory liability" under Section 1983. *Dilworth v. Goldberg*, No. 10-CV-2224, 2014 WL 3798631, at *11 (S.D.N.Y. Aug. 1,

2014); *accord Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("[B]ecause Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability."). Given that none of Moore's underlying constitutional claims survive, I dismiss Moore's claims of supervisor liability against Sergeant Romaine.

### D. *Claims for Damages Against Defendants in Their Official Capacity*

While the Amended Complaint does not clearly identify the remedy that Moore seeks, his initial Complaint seeks damages against PA Kwan, CO Cajigas, and Sergeant Romaine, in their official and individual capacities. (Doc. 2.) The Amended Complaint continues to name the Defendants in both their official and personal capacities. (Am. Compl. 1.)

It is an open issue in this Circuit whether sovereign immunity is a jurisdictional defense under Rule 12(b)(1) or an affirmative defense under Rule 12(b)(6). *See Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit."). While this issue was not raised by the Defendants on summary judgment, I believe my consideration of it here is appropriate, particularly given that, based on the facts present, it is clear that PA Kwan, CO Cajigas, and Sergeant Romaine are entitled to dismissal of the claims against them in their official capacity. *See McGinty v. New York*, 251 F.3d 84, 101 (2d Cir. 2001) (affirming district court's sua sponte dismissal of State of New York as a defendant based on Eleventh Amendment sovereign immunity); *Jones v. N.Y.S. Div. of Military & Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999) (sovereign immunity bars claims brought pursuant to § 1983 against State defendants); *Bravo v. Bexar Cty., TX*, No. 12-CV-4009, 2014 WL 1155302, at *1 (E.D.N.Y. Mar. 21, 2014) (adopting magistrate judge's report and recommendation sua sponte dismissing the state of Texas as a defendant).

It is black-letter law, that states—as well as state agencies and state officials, in their official capacities—are immune from suit in federal court under the Eleventh Amendment.

*See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of claims against individual defendants in their official capacities, among other defendants). It is equally well settled that Section 1983 does not abrogate sovereign immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989); *Quern v. Jordan*, 440 U.S. 332, 341 (1979). New York State has not consented to this suit, and as a general matter has only waived sovereign immunity for damages actions brought in the New York Court of Claims. *See, e.g.*, *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Spavone v. Fischer*, No. 10-CV-9427, 2012 WL 360289, at *2 (S.D.N.Y. Feb. 3, 2012). Moore's claims against Defendants in their official capacities are barred by the Eleventh Amendment and are dismissed. *Alsaifullah v. Furco*, 2013 WL 3972514, at *5 (citing *Jean-Laurent v. Lawrence*, No. 12-CV-1502, 2013 WL 1129813, at *4 (S.D.N.Y. Mar. 19, 2013)).

### E. *Qualified Immunity*

**\*17** Defendants also argue that Moore's claims should be dismissed under the doctrine of qualified immunity. (Defs.' Mem. 21-25.) The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would have known. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotation marks omitted). In determining whether an official is entitled to qualified immunity, courts consider whether (1) the official's conduct violated a constitutional right; and (2) the right was clearly established at the time of the incident. *See Ross v. Breslin*, 693 F.3d 300, 304 (2d Cir. 2012). "To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks and alteration omitted). "So long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (internal quotation marks omitted). Where, as here, "the facts, viewed in light most favorable to the plaintiff, do not demonstrate that an officer's conduct violated a constitutional right, [I] need

not further pursue the qualified immunity inquiry, and the [Defendants are] entitled to summary judgment." *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009) (internal quotation marks omitted).

### F. *Failure to Exhaust*

Defendants further claim that Moore failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and his claims against CO Cajigas and Sergeant Romaine should therefore be dismissed. (Defs.' Mem. 5.) However, Judge Pauley already determined that—aside from Moore's grievance relating to claims against CO Tamika Hill—Moore fully exhausted his remaining six grievances to the CORC. (Doc. 37 at 6-7.) Defendants do not request that I reconsider Judge Pauley's prior decision, and the time for a motion for reconsideration expired long ago. (*See* Local Civil Rule 6.3.) As such, I do not address Defendants' arguments regarding exhaustion under the PLRA.

### G. *State Law Claims* [21]

Although not specifically pled as such, Moore's Amended Complaint could arguably be read to fairly assert causes of action for medical malpractice under New York state law. Here, however, my exercise of jurisdiction over any New York state claims would be supplemental, and all claims over which I have original jurisdiction have been dismissed. A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Indeed, "[w]hen federal claims are dismissed early in the litigation—*for example, before trial on a summary judgment motion*—dismissal of state law claim[s] ... is appropriate." *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *3 (S.D.N.Y. July 15, 2002) (emphasis added) (quoting *Cobbs v. CBS Broad.*

*Inc.*, No. 97-CV-8284, 1999 WL 244099, at *8 (S.D.N.Y. Apr. 26, 1999)).

**\*18** I have dismissed all claims over which I had original jurisdiction. Accordingly, to the extent Plaintiff's Amended Complaint can be read to allege New York state medical malpractice claims against any Defendants, I decline to exercise jurisdiction over those claims.

**V. Conclusion**

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED in its entirety,

and Plaintiff's claims are hereby DISMISSED WITH PREJUDICE. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 53), to close this case, and to mail a copy of this Memorandum and Order to the pro se plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 9022575

**Footnotes**

1    Plaintiff incorrectly spelled CO Cajigas's name as "Cajigos" when initially filing this case, (Doc. 1), and his name remains misspelled in the caption to this matter. I will use the correct spelling of his name, Cajigas, throughout this Memorandum & Order.

2    The following material facts, drawn from Defendants' Local Civil Rule 56.1 Statements, Plaintiff's amended complaint, declarations and evidentiary submissions, are undisputed unless otherwise noted.

3    "Defs.' 56.1 Stmt." refers to Defendants' Local Rule 56.1 Statement. (Doc. 61.)

4    "Am. Compl." refers to Plaintiff's amended complaint entitled "C [o]mplaint under the civil rights act 42 U.S.C. § 1983 Prisoner Complaint." (Doc. 34.) Citations to the amended complaint will reference the page numbers generated by the Electronic Case Filing system ("ECF") and paragraph numbers where appropriate.

5    "4/1/14 Harben Decl." refers to the Declaration of Jeb Harben filed on April 1, 2014. (Doc. 56.) The citation to page numbers on the exhibits attached to the 4/1/14 Harben Decl. correspond with the page numbers designated on ECF, except for references to Moore's deposition transcript, which is independently paginated and of which portions were attached to this declaration as Exhibit C.

6    "Kwan Decl." refers to the Declaration of Physician Assistant Pokum Kwan. (Doc. 57.)

7    "4/1/13 Hale Decl." refers to the Declaration of Jeffery Hale filed on April 1, 2013, submitted in support of defendants motion to dismiss. (Doc. 30.) The citation to page numbers on the exhibits attached to the 4/1/13 Hale Decl. correspond with the page numbers designated on ECF. While this declaration was not filed with Defendants' motion for summary judgment, I still have the discretion to consider it here and I choose to exercise that discretion. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials [on a motion for summary judgment], but it may consider other materials in the record."); *see also Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 841 (11th Cir. 1988) ("[T]he choice of materials to be considered in conjunction with a summary judgment motion is within the discretion of the trial judge. It is our view that the case management powers accorded to federal trial judges ... are controlling in this regard.") (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 494 F. Supp. 1161, 1168 (E.D. Penn. 1980)). *See generally* Charles Alan Wright, et al., 10A Fed. Prac. & Proc. Civ. § 2721 (3d ed.) ("The court and the parties have great flexibility with regard to the evidence that may be used on a Rule 56 proceeding.").

8    "Cajigas Decl." refers to the Declaration of Correction Officer Daniel Cajigas filed on April 1, 2014. (Doc. 59.)

9    The parties dispute whether the ladder was five feet, or six to seven feet, tall. (Defs.' 56.1 Stmt. ¶ 42.) This distinction is immaterial to my analysis.

10   "Romaine Decl." refers to the Declaration of Sergeant Richard Romaine. (Doc. 60.)

11   The citations to Hale Decl. Ex. E correspond with the page numbers designated on ECF.

12   This case was initially assigned to Chief Judge Loretta A. Preska, reassigned to District Court Judge William H. Pauley III on June 5, 2012, and reassigned to me on January 27, 2014.

13   Moore's opposition is not on the docket, but it is clear from Defendants' reply, (Doc. 32), that Moore served his opposition on Defendants.

14   "Moore Dep." refers to the deposition of Plaintiff Taurice Moore taken on July 9, 2013. As noted in footnote 5, portions of this deposition were attached to the Declaration of Jeb Harben filed on April 1, 2014, (Doc. 56). The entire, unredacted

2016 WL 9022575

deposition was provided on a compact disc. I will use "Moore Dep." when referring to those portions of the deposition not included in Exhibit C to the Harben Declaration.

15    "Pl.'s Opp." refers to Plaintiff's Response to Defendant's Motion for Summary Judgment. (Doc. 66.) While Moore appears to raise this factual claim for the first time in his opposition brief, I will still consider it given his pro se status. *See Chavis v. Chappius*, 618 F.3d 162, 170-71 (2d Cir. 2010) (reversing district court's denial of pro se plaintiff's motion to amend because—in evaluating his motion—district court should have considered facts that were included in plaintiff's order to show cause since " 'a party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation,' and hence 'courts are, for example, to construe a *pro se* litigant's pleadings and motions liberally' ") (quoting *In re Sims*, 534 F.3d 117, 133 (2d Cir. 2008)). However, despite my lenient reading of Plaintiff's papers, I have been unable to locate any support for this assertion anywhere else in the record.

16    The lack of a medical permit may be, by itself, strong evidence that CO Cajigas was unaware of Moore's limitations. *See Goodwin v. Hungerford*, No. 12-CV-00362, 2014 WL 1219050, at *6-7 (W.D.N.Y. Mar. 24, 2014) (finding plaintiff did not allege facts that defendants were aware of, yet disregarded, plaintiff's medical limitations where plaintiff did not obtain a medical restriction permit); *cf. Briel v. Fields*, No. 12-CV-2868, 2013 WL 1833248, at *3 (E.D.N.Y. May 1, 2013) (finding subjective prong satisfied where plaintiff alleged that defendants were aware of a nurse's recommendation that the plaintiff be assigned to a bottom bunk and assigned plaintiff to a top bunk anyway).

17    "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment. (Doc. 55.)

18    "Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Holland v. Goord*, 758 F.3d 215, 218 n.2 (2d Cir. 2014) (citation and internal quotation marks omitted).

19    Moore's Amended Complaint alleges that his fall occurred on February 6, but all of the evidence and testimony on the record suggests it occurred on February 9.

20    There is disagreement in this District as to whether all the *Colon* categories survive the Supreme Court's decision in *Ashcroft*, and the Second Circuit has yet to address this issue. *See Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012). However, I need not resolve this dispute at this stage.

21    Defendants argue that "Plaintiff has not pleaded any state law tort claims and Judge Pauley's August 20, 2013 decision should be read as only allowing the specific constitutional claims enumerated therein to proceed...." (Defs.' Mem. 55 n.10.) While I agree that Plaintiff has not specifically pled any state law tort claims, Plaintiff is a pro se party and therefore I must read his pleadings "to raise the strongest arguments that they suggest." *Kevilly v. New York*, 410 Fed.Appx. 371, 374 (2d Cir. 2010) (summary order) (internal quotation marks omitted). I therefore choose to consider any possible state law tort claims which Plaintiff's pleadings could be read to assert. Defendants further argue that, if I choose to read any state law claims into Plaintiff's pleadings, I should decline to exercise jurisdiction over them if I dismiss all of Plaintiff's federal claims. (Defs.' Mem. 55 n.10.) For the reasons stated herein, I agree.

---

**End of Document**                                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2009432
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kenneth NICHOLSON, Plaintiff,

v.

Brian FISCHER, et al., Defendant.

Case # 13-CV-6072-FPG-MWP
|
Signed 04/27/2018
|
Filed 04/30/2018

**Attorneys and Law Firms**

David M. Knapp, Eric J. Ward, Jessica N. Clemente, Ward Greenberg Heller & Reidy LLP, Rochester, NY, for Plaintiff.

Bernard F. Sheehan, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendant.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1** Plaintiff Kenneth Nicholson ("Plaintiff") brings this Eighth Amendment action pursuant to 42 U.S.C. § 1983 ("Section 1983") against three employees of Wende Correctional Facility: Corrections Officer James Johnson ("Johnson"), Corrections Officer Jason Barrett ("Barrett"), and Deputy Superintendent of Security Thomas J. Sticht ("Sticht"). ECF No. 38. [1] On January 5, 2018, Defendants Sticht and Barrett moved for summary judgment. ECF No. 95. For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

**BACKGROUND** [2]

In October 2012, Plaintiff, then an inmate at Sing Sing Correctional Facility, had a physical fight with two inmates belonging to the Bloods gang. The inmates

slashed Plaintiff across the face with a sharp object. Plaintiff told prison officials that the men assaulted him because he dropped out of the Bloods. ECF No. 102-1 at 14. To separate him from his attackers, Sing Sing officials placed Plaintiff in involuntary protective custody and decided to transfer him to Wende Correctional Facility in January 2013. The New York State Department of Corrections and Community Supervision's ("DOCCS") Office of Classification and Movement in Albany, New York, which is responsible for transferring and classifying roughly 50,000 inmates among more than 50 different correctional facilities, determined that Plaintiff's transfer to Wende was appropriate and that Plaintiff was eligible to share a cell with another inmate at Wende—a practice DOCCS refers to as "double bunking."

According to Defendant Sticht, who was responsible for overseeing all aspects of security at Wende, once Plaintiff "was transferred, he was no longer in protective custody" and his "involuntary protective custody status ... did not follow him to Wende Correctional Facility." ECF No. 95-1 at 3. Plaintiff, on the other hand, stated that his protective custody status followed him to Wende and that he was supposed to be isolated so that authorities could interview him and determine if he had any enemies before placing him in a double bunk cell with another inmate. ECF No. 102-1 at 25. In any event, no one interviewed Plaintiff immediately upon his arrival at Wende; rather, he was placed into a double-bunk cell with another inmate, Michael Williams. According to Sticht, "[p]lacement of incoming inmates in cells at Wende CF is made by random selection of available cells. Both inmates were deemed eligible for double bunking and randomly selected for the cell." *Id.* at 21.

Williams had a history with the Bloods. Specifically, a form documenting his initial interview at Wende, dated January 7, 2013, states that he had a disciplinary history of gangs and violence, and his security assessment form, dated January 1, 2013, states that he was a member of the Bloods. *See id.* at 8. Furthermore, one month before Williams was placed in a cell with Plaintiff, officials placed him in the Special Housing Unit ("SHU") for four months because of gang activity. *Id.* Plaintiff also had a documented history of gang involvement: paperwork from his guidance file, which was accessible to Wende officials, indicated that Plaintiff was a former Bloods member and had enemies and prior gang-related charges. *Id.* Plaintiff's guidance file also revealed that Plaintiff

previously transferred from Great Meadow Correctional Facility in 2011 because prison staff "believed that a portion of [the] inmate population [knew] that [Plaintiff] had provided confidential information to prison security regarding Bloods activity." *Id.* at 10.

**\*2** On January 16, 2013, Williams returned to his cell after lunch and threatened to "blow [Plaintiff's] face off" unless Plaintiff asked a corrections officer to move him to a different cell. ECF No. 38 at 15. According to Plaintiff, he immediately left the cell and told Defendant Barrett, who was performing rounds in Plaintiff's cellblock, about Williams's threat. According to Barrett, however, Plaintiff told him that he could no longer live in his cell but refused to tell him why. In any case, all parties agree that Barrett then locked Plaintiff in the shower to secure him and notified his supervisor, Defendant Johnson, of the situation with Williams so that Johnson could investigate. Johnson asked Williams what would happen if he did not move Plaintiff to a new cell, to which Williams responded: "it will be what it is going to be" and that he "would handle his business." ECF No. 102-1 at 9. Johnson moved Williams into a different cell, but Plaintiff heard Johnson joke to Barrett that they should have put Plaintiff back in the cell with Williams and let them "beat the shit out of each other and the best man keeps the cell." *Id.* Neither Barrett nor Johnson made any written notation of the incident. Plaintiff did not ask anyone at Wende to place him in protective custody and nobody offered him protective custody.

According to Wende counselor Robert Skubis, new inmates are supposed to be housed separately from other inmates until a sergeant or higher ranked official conducts a security interview to determine if the new inmate is suitable for general population housing. ECF No. 102-13. According to Defendant Johnson, [3] that initial interview should occur within the first three days of an inmate's arrival. ECF No. 102-1 at 10. No one interviewed Plaintiff until January 20, 2013—five days after he arrived at Wende and several days after his altercation with Williams. Plaintiff's paperwork from that interview indicates that he was involved in gang activity but did not identify any known enemies. *Id.* at 6. The next day, Counselor Skubis interviewed Plaintiff, who alleges that he told Skubis "about his prior altercation with Williams in his cell" and that Williams was in the same prison orientation class with him. *Id.* at 11. Skubis's paperwork documenting that interview indicates

that Plaintiff had enemies, but does not mention Williams. ECF No. 95-5 at 4. The form, which Plaintiff signed, reveals that Plaintiff had no concerns for his personal safety. *Id.*

On January 23, 2013, Plaintiff, Williams, and 19 other inmates attended an orientation session in an unsupervised classroom. According to Defendant Sticht, because the orientation program is a "peer run program" that is run by a fellow inmate and not a staff instructor, it "is common to have the inmates in the room without an officer physically present in the room." ECF No. 103-1. During the orientation, Williams and another inmate named Martinez began stabbing Plaintiff with a homemade knife. Williams and Martinez stabbed Plaintiff at least nine times over the course of five to seven minutes, and Plaintiff suffered puncture wounds on both of his hands, his right shoulder, and the back of his head. Plaintiff eventually escaped and alerted a corrections officer, who was posted more than 25 feet away. Officials took Plaintiff to Erie County Medical Center for treatment.

On February 12, 2013, after Plaintiff refused to voluntarily enter protective custody, Wende officials held a hearing to determine if Plaintiff should be placed in involuntary protective custody. During the hearing, Defendant Sticht acknowledged that Plaintiff's "previous record shows prior [involuntary protective custody] placements and gangs," and decided to place Plaintiff in involuntary protective custody.

## DISCUSSION

### I. Legal Standard
Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.* The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Id.* at 249. The court resolves all ambiguities and draws all factual inferences in the nonmovant's favor, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

**\*3** To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998).

## II. Direct Liability Under the Eighth Amendment

Plaintiff argues that Defendants Barrett and Sticht violated the Eighth Amendment by failing to protect him from Williams and Martinez's attack. The Eighth Amendment protects prisoners from cruel and unusual punishment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). It also imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Officials are not liable for "every injury suffered by one prisoner at the hands of another." *Id.* at 834; *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (explaining that Eighth Amendment liability "entails something more than mere negligence").

Instead, to prove that an official violated the Eighth Amendment, the injured inmate must show that 1) "he is incarcerated under conditions posing a substantial risk of serious harm," and 2) the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834. An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The U.S. Supreme Court set forth a subjective, as opposed to objective, standard for deliberate indifference because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment" under the Eighth Amendment. *Id.* at 838.

The Court need not determine if Plaintiff satisfied the first part of the Eighth Amendment's two-part test—whether he was incarcerated under conditions posing a substantial risk of serious harm—because he has not adduced any evidence to establish that Defendants Barrett or Sticht were deliberately indifferent to his health or safety.

### i. Defendant Barrett

Barrett denies that he was deliberately indifferent to Plaintiff's safety because Plaintiff never told him about Williams's threat and, "more important[ly]," Barrett's actions on the day of the verbal altercation between Williams and Plaintiff would have been the same regardless of whether he knew that Williams threatened Plaintiff. Plaintiff argues that Barrett knew about Williams's threat, and that Barrett's failure to document the verbal dispute between them or to ensure that Plaintiff received protective custody after the incident amounted to deliberate indifference.

Plaintiff's arguments fail for multiple reasons. First, Barrett did not have "authority to conduct investigations" or to "offer an inmate protective custody." ECF No. 95-2. After locking Plaintiff in the shower when he refused to return to his cell with Williams, Barrett did what he was "supposed to" do by notifying his supervisor, Defendant Johnson, "of the situation so that he could investigate." ECF No. 95-2. Plaintiff emphasizes the fact that Barrett "simply ... called his supervisor and left the scene, rather than logging the incident, as required by DOCCS Directive." ECF No. 102-1 at 5. DOCCS rules, however, did not require Barrett to log the incident. Rather, DOCCS Directive Number 4091 provides that officers should log "fights" or other "unusual incidents." *Id.* at 27. Using his discretion, which DOCCS rules allow corrections officers to do, Barrett decided that a verbal disagreement between inmates was not an "unusual incident" that merited documentation.

**\*4** Secondly, Plaintiff unduly focuses on the fact that Barrett did not record the incident in the logbook. After refraining from documenting the incident between Williams and Plaintiff, Barrett did not simply abandon the scene or otherwise fail to act. Far from disregarding any risk to Plaintiff's safety, Barrett secured Plaintiff in a

location that was outside of Williams's reach and notified Defendant Johnson of the situation. Johnson, unlike Barrett, had authority to investigate the altercation and take corrective action, which he did by moving Williams to a new cell. Whether Johnson's actions were sufficient to protect Plaintiff is not currently before the Court on this motion. The record indicates that Barrett's reliance on his supervisor was fully reasonable, and Plaintiff has not rebutted that conclusion. Plaintiff clearly disagrees with Barrett's decision, but he cannot explain how it was deliberately indifferent or even negligent. Summary Judgment is therefore GRANTED as to Defendant Barrett.

### ii. Defendant Sticht

Plaintiff argues that, because Defendant Sticht was "responsible for overseeing all aspects of security at" Wende and had access to documents establishing Plaintiff's history with the Bloods, even a "cursory review of documents available to Sticht would have revealed that [Plaintiff] had a history of being attacked by members of the Bloods gang and should not have been placed in general population with Williams." *Id.* at 22. But the Eighth Amendment is only concerned with what Sticht actually knew—not what he *should* have known. Sticht repeatedly avers in sworn statements that he did not know anything about Plaintiff, Williams, or their respective histories with the Bloods before the orientation session attack. *See, e.g.*, ECF No. 103-1 at 2. Although Sticht could access documents describing Plaintiff's history with the Bloods, he had no reason to read them because the DOCCS Office of Movement and Classification was responsible for placing inmates and conducting risk assessments. Sticht testified that he did not learn of Plaintiff's background or his January 16, 2013 verbal altercation with Williams until after the January 23, 2013 attack at the orientation session, at which point Sticht decided to place Plaintiff in protective custody. *Id.* at 12. Nothing in the record rebuts or discredits Sticht's averments. Because it would be impossible for Sticht to disregard a risk that he did not know existed, no reasonable jury could conclude that Sticht was directly liable for an Eighth Amendment violation. Summary Judgment is therefore GRANTED as to Defendant Sticht.

### III. Supervisory Liability

Plaintiff argues that, even if Sticht is not directly liable under Section 1983, he is liable under the statute as a supervisor. Section 1983 imposes liability for conduct that subjects a plaintiff or "causes" him "to be subjected to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) ). There is no *respondeat superior* liability under Section 1983. *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 324 (W.D.N.Y. 1999). Instead, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages" under Section 1983. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d. Cir. 1977). A supervisor is "personally involved" in the deprivation of a plaintiff's Eighth Amendment rights and therefore liable under Section 1983 if he or she (1) participated directly in the alleged constitutional violation, (2) after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). [4]

**\*5** Fundamentally, for a supervisor to be liable under Section 1983, there must "of course" have "been an underlying constitutional deprivation" by a subordinate, *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), and a "causal link" between the supervisor's conduct and the violation of the plaintiff's civil rights. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). When a Plaintiff raises an allegation under the third *Colon* factor—that the defendant supervisor maintained a custom or policy under which unconstitutional practices occurred—that policy must be the "moving force" behind a constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985). Absent an "affirmative link" between the policy and the "particular constitutional violation" alleged, a policy is too "nebulous" and far "removed from the constitutional violation" to establish supervisory liability. *See id.* at 822. Furthermore, a "single incident" of illegality ... especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993).

Plaintiff argues that Sticht is liable under the third *Colon* factor of creating or continuing a policy under which unconstitutional practices occurred. Specifically, Sticht's policy "was to impermissibly defer to the determinations of unidentified people in Albany as to whether an inmate was eligible for double-cell housing, and then randomly assign inmates together." ECF No. 102-1 at 6. According to Plaintiff, state regulations required Sticht himself to determine whether Plaintiff was suitable for double-cell housing, but Sticht instead improperly relied on DOCCS Office of Classification and Movement. *Id.* at 19.

Sticht correctly argues that state regulations expressly allow him or his "designee" to make that determination. *Id.* (citing 7 N.Y.C.R.R. § 1701.5(a) ("The deputy superintendent of security or designee shall conduct a risk assessment ...") ). As there "are thousands of violent gang members who are incarcerated throughout NYS DOCCS" and "literally hundreds, and even thousands, of pages of records related to each inmate in DOCCS," it would be extraordinarily difficult for Sticht himself to determine inmates' suitability for double-cell housing. ECF No. 103-1 at 3. DOCCS's Classification and Movement Office exists so Sticht and deputy superintendents of security at other prisons can "help assess, to the extent possible, the risks associated with moving inmates among the various DOCCS facilities." *Id.* at 4. There is evidence that Classification and Movement could have more thoroughly vetted Plaintiff for double-bunk housing, [5] but that does not mean that Sticht's reliance on the office was misplaced. Plaintiff also argues that Sticht's policy [6] of "randomly select[ing] inmates to bunk together" once they were cleared for double-cell housing violated state regulations requiring him to "assess the suitability of double-cell inmates to be placed together in the same cell." ECF No. 102-1 at 21. Additionally, Plaintiff argues that he did not timely receive an intake interview. *Id.* at 10.

Even assuming that Sticht maintained deficient policies for pairing cellmates together, his policies are too disconnected from the underlying alleged unconstitutional conduct to render him liable as a supervisor under Section 1983. The alleged underlying constitutional violation in this case is Defendant Johnson's failure to document the verbal altercation between Williams and Plaintiff, but the policies leading to Williams and Plaintiff's pairing as cellmates are several "steps removed from" Johnson's own conduct and can hardly be described as the "moving force" behind Johnson's deliberate indifference. *See Tuttle*, 471 U.S. at 819.

**\*6** To illustrate the notable disconnect between Sticht's policies and the alleged Eighth Amendment violation, the Court deduces Plaintiff's line of reasoning as follows: because Sticht had improper policies for matching cellmates, Williams and Plaintiff were unwisely double bunked, which led to their verbal altercation in which Defendant Johnson intervened but failed to document, which resulted in Plaintiff and Williams attending the same orientation session, which resulted in Williams attacking Plaintiff. It is evident from this strained line of reasoning that the relationship between Sticht's cellmate pairing policies and the alleged underlying constitutional violation—Johnson's deliberate indifference to Plaintiff's safety—is attenuated at best, and a far cry from the "affirmative link" that the Supreme Court demanded in *Tuttle*. Johnson's actions are entirely unrelated to any alleged policies that Sticht had for double bunking cellmates. Moreover, a policy cannot "ordinarily be inferred from a single incident of illegality," and a single incident is all that Plaintiff has alleged. *See Dwares*, 985 F.2d at 100. Summary judgement is therefore GRANTED as to Defendant Sticht.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 95) is GRANTED and Defendants Barrett and Sticht are dismissed from this case. The Clerk of Court is directed to update the caption accordingly.

Defendant Johnson is the sole remaining defendant in this case. The parties are directed to appear on May 25, 2018 at 10 AM to set a date for trial.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 2009432

Footnotes

1    Plaintiff's Second Amended Complaint ("SAC") is the operative complaint. The SAC listed additional defendants who have since been dismissed from this case. *See* ECF No. 66 at 1.

2    The following facts are undisputed and are taken from each party's Statement of Material Facts. ECF Nos. 95-1, 102-2.

3    Defendant Johnson has not moved for summary judgment.

4    The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), called the doctrine of supervisory liability into question. The Second Circuit has "not yet determined the contours of the supervisory liability test" in the wake of *Iqbal. See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014). However, courts within the Second Circuit have reached the consensus that the relevant *Coughlin* category here—whether the supervisor created a policy or custom under which unconstitutional practices occurred—is still sound law. *See, e.g., Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. Jun. 26, 2009); *Joseph v. Fischer*, No. 08 Civ. 2824 (PKC) (AJP), 2009 WL 3321011, at *14 (S.D.N.Y. Aug. 10, 2010).

5    For instance, DOCCS should not have deemed Plaintiff eligible for double bunking in the first place because regulations prohibit individuals weighing over 299 pounds from double cell assignment, and Plaintiff weighed more than 300 pounds when he transferred to Wende. ECF No. 102-1 at 22. Additionally, it appears that DOCCS did not fill out the requisite information sheet documenting its evaluation of Plaintiff for double bunking. *See id.*

6    It is unclear, but ultimately immaterial, whether DOCCS or Sticht randomly selected inmates to bunk together.

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1427247
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Enrique ORTIZ, Plaintiff,

v.

Anthony RUSSO, C.O. Gibb, C.O. D.
Parkhurst, Correction Officer Prindle,
Dir. D. Venettozzi, Defendants.

No. 13 CIV. 5317(ER).
|
Signed March 27, 2015.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*1** *Pro se* plaintiff Enrique Ortiz brings this suit pursuant to 42 U.S.C. § 1983 alleging that he was issued a misbehavior report ("Misbehavior Report") and held in the Segregated Housing Unit ("SHU") for ninety days while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in violation of his constitutional rights. Defendants Russo, Gibb, Parkhurst, Prindle, and Venettozzi (collectively, "Defendants") bring the instant motion to dismiss Plaintiff's Amended Complaint ("Am.Compl.") under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on the ground that Plaintiff has failed to state any plausible claims of entitlement to relief. Def.'s Mem. L. Support. Mot. Dismiss, Doc. 33. For the reasons set forth below, Defendants' motion is GRANTED.

**I. Background**

**A. Factual Background**

The Court accepts the following allegations as true for purposes of this motion. [1]

On May 21, 2010, Plaintiff was an inmate at the Eastern Correctional Facility when Corrections Officer ("C.O.") Prindle approached him in the prison yard and informed him that Sgt. Parkhurst wanted to see him in his office. Am. Compl., Doc. 28, ¶¶ 8–9. As C.O. Prindle escorted Plaintiff across the yard, he said to Plaintiff, "take a

good look at this yard because it will be the last time you ever see it, or this facility, ever again ... because we don't allow gang members in our facility." *Id* . at ¶¶ 11–12. Plaintiff was escorted into an office occupied by Sergeant ("Sgt.") Parkhurst and Lieutenant ("Lt.") John Doe, who questioned Plaintiff regarding a departmental disbursement form he had used to access his inmate account. *Id.* at ¶ 14. On the disbursement form at issue, Plaintiff had written "33%" beside his signature. *Id.* The officers told Plaintiff that that the 33% symbol is a known "marking" of the Trinitarios Gang. *Id.* at ¶ 19. Plaintiff explained that there had been a "rash of identity theft" from other inmates' institutional accounts, and the 33% symbol was simply his way of protecting his account from theft. *Id.* at ¶ 15.

While Plaintiff was being detained by Sgt. Parkhurst and Lt. John Doe, C.O.s Prindle and Gibb searched his cell. *Id.* at ¶ 24–25. The search resulted in the discovery of "months and years" worth of Plaintiff's old processed disbursement receipts, all of which included the same "33%" symbol next to his signature. *Id.* at ¶ 26. The officers also recovered a newspaper article about the Jheri Curl gang. [2] *Id.* at ¶ 29.

Two days later, on May 23, 2010, Sgt. Parkhurst wrote and issued Plaintiff a Misbehavior Report for violating Rule 105.13 of the Standards of Inmate Behavior for New York. *Id.* at ¶¶ 33, 36. Rule 105.13 provides, "[a]n inmate shall not engage in or encourage others to engage in gang activities or meetings, or display, wear, possess, distribute or use gang insignia or materials including, but not limited to, printed or handwritten ... gang related material." N.Y. Comp.Codes R. & Regs. Tit. 7, § 270.2(B) (6)(iv) (May 28, 2008). The Misbehavior Report found that Plaintiff (1) used the 33% symbol next to his signature to signify gang involvement, and (2) possessed a prohibited newspaper article. Am. Compl. ¶¶ 21, 38.

**\*2** Plaintiff alleges that the Misbehavior Report was false and that Sgt. Parkhurst and Lt. John Doe issued it with the specific goal of harassing Plaintiff and depriving him of his liberty. *Id.* at ¶ 21. Specifically, Plaintiff alleges that all of the previous disbursement receipts had been approved, and no one had ever expressed to him the concern that the 33% symbol next to his signature was gang-related. *Id.* at ¶ 27. He also claims that he informed prison officials that a member of his family had sent him the article, which in turn was reviewed and provided to him by "the facility's Media Review." Compl., Doc. 2–1, at ¶ 9.

Plaintiff claims Sgt. Parkhurst was retaliating against him for the dismissal of a prior misbehavior report issued to him three years earlier by Sgt. Parkhurst, on May 18, 2007. Am. Compl. ¶ 28. Immediately after the Misbehavior Report was served on Plaintiff, he was removed from the general population and placed in the Special Housing Unit ("SHU"). *Id.* at ¶ 37.

On May 28, 2010, Captain ("Cpt.") Russo conducted a Tier III hearing regarding the allegations in the Misbehavior Report and found Plaintiff guilty of both charges. *Id.* at ¶ 39. Cpt. Russo explained that Plaintiff provided no documentary evidence that Media Review had permitted him to possess the article at issue, Doc. 2–1 at 18, [3] and that Plaintiff's explanation that he was using the 33% symbol to prevent forgery was "unreasonable." *Id.* Cpt. Russo imposed a penalty of ninety days in solitary confinement in the SHU and six months loss of good time. Am. Compl. ¶ 39. Plaintiff claims that Cpt. Russo prevented him from defending himself at the hearing by denying him a reasonable amount of time to review documents and preventing him from calling witnesses. *Id.* at ¶¶ 38, 47; Pl.'s Mem. L. Opp., Doc. 39 at 12–14.

Plaintiff's appeal of the Tier III hearing determination was affirmed by Director ("Dir.") Venettozzi on July 30, 2010. *Id.* at ¶ 40.

### B. Procedural Background

Plaintiff filed an Article 78 petition in state court on November 23, 2010, naming the five Defendants herein as respondents, to review the determination that he had violated Prison Rule 105.13. [4] *See* Doc. 2–1 at 26. On January 5, 2012, the New York Supreme Court for Albany County confirmed the findings of the Tier III hearing. *See Ortiz v. Fischer,* 91 A.D.3d 1006, 935 N.Y.S.2d 914 (2012). The court stated, "[t]he [M]isbehavior [R]eport, together with the documentary evidence and testimony adduced at the hearing, including petitioner's admission to possessing the items in question and the testimony of the correction officials trained in identifying gang-related material, provide substantial evidence supporting the determination of guilt." *Id.* The court also determined that Plaintiff's "claim that he was denied adequate employee assistance because he was not provided copies of the disbursement forms and article [was] unavailing given that he was provided an opportunity to review these documents at the hearing, which he declined, and he

ha[d] not demonstrated any prejudice." *Id.* Moreover, Plaintiff's "assertion that the symbols on the disbursement forms were his personal mark and that the [M]isbehavior [R]eport was retaliatory in nature presented a credibility issue for the Hearing Officer to resolve." *Id.* The court concluded that the Misbehavior Report itself contained "enough detailed and specific information to allow petitioner to prepare an adequate defense." *Id.*

**\*3** Plaintiff filed the instant action on July 30, 2013, followed by an Amended Complaint on February 7, 2014. Docs. 2, 28. Plaintiff alleges violations of his First Amendment rights against all Defendants under 42 U.S.C. § 1983. Am. Compl ¶¶ 43, 48, 54. Plaintiff also brings Fourteenth Amendment claims against Dir. Venettozzi and Cpt. Russo for violations of his due process rights. [5] *Id.* at ¶¶ 43, 47. Lastly, he claims that Sgt. Parkhurst, along with C.O.s Prindle and Gibb, violated his constitutional rights by harassing him. *Id.* at ¶ 54, 935 N.Y.S.2d 914. Plaintiff sues all Defendants in both their official and individual capacities. *Id.* at ¶¶ 4–5.

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction over Plaintiff's claims for monetary damages against Defendants in their official capacities, and pursuant to Rule 12(b)(6) for failure to state a claim.

## II. Legal Standards

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed.R.Civ.P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits, may be considered by the court to resolve the disputed jurisdictional fact issues. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000); see also *Morrison,* 547 F.3d at 170 (citing *Makarova,* 201 F.3d at 113). When evaluating a motion to dismiss for

lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004) (citing *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998)).

Where, as here, a party also seeks dismissal on Rule 12(b)(6) grounds, the court must consider the Rule 12(b)(1) motion first. *Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 820 F.Supp.2d 490, 499 (S.D.N.Y.2011), *aff'd sub nom. Baldessarre ex rel. Baldessarre v. Monroe–Woodbury Cent. Sch. Dist.,* 496 F. App'x 131 (2d Cir.2012).

**B.** **Rule 12(b)(6)**
When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014). The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also id.* at 681 (citing *Twombly,* 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

**\*4** The question in a Rule 12 motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 278 (2d Cir.1995)) (internal quotation marks omitted). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion,

the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of Plaintiff's claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

The same standard applies to motions to dismiss *pro se* complaints. *See Zapolski v. Fed. Republic of Germany,* 425 F. App'x 5, 6 (2d Cir.2011). The Court remains obligated to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor,* 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). "However, even *pro se* plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). A *pro se* plaintiff's pleadings still must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 566 U.S. at 678. A complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted); *see also Triestman,* 470 F.3d at 477 ("[*P*]*ro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' ") (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Additionally, as the Second Circuit recently held, "[a] district court deciding a motion to dismiss *may* consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013) (emphasis added).

A court may also take into account matters of which judicial notice can be taken. Although review is "generally limited to the facts and allegations that are contained in the complaint and in any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits ... we may also look to public records, including complaints filed in state court,

in deciding a motion to dismiss." *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (internal citation and quotation marks omitted). It is routine for courts to take judicial notice of court documents, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see, e.g., Kendall v. Cuomo,* No. 12 CIV. 3438(ALC), 2013 WL 5425780, at *6 (S.D.N.Y. Sept.27, 2013) (taking judicial notice of a valid court order Plaintiff claimed was "false, fake, and nonexistent").

**\*5** Defendants' collateral estoppel argument requires the Court to consider Plaintiff's Article 78 petition and the corresponding New York State Supreme Court decision, in which the court affirmed the outcome of his Tier III hearing. *See Ortiz,* 935 N.Y.S.2d at 914. Where a defendant's issue preclusion argument rests on another court's judgment, it is appropriate for the court to take judicial notice of the plaintiff's complaint filed in the previous action, along with the judgment itself, without converting the motion into one for summary judgment. *See Simpson v. Melton–Simpson,* No. 10 CIV. 6347(NRB), 2011 WL 4056915, at *2 (S.D.N.Y. Aug.29, 2011). Thus, the Court takes judicial notice of Plaintiff's Article 78 petition, along with the state court's subsequent decision. [6]

### III. Discussion

#### A. Subject Matter Jurisdiction

Defendants move to dismiss Plaintiff's claims for monetary damages due to lack of subject matter jurisdiction. Indeed, Defendants are entitled to Eleventh Amendment immunity and any claims brought against them in their official capacities must be dismissed. [7]

"It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This bar "remains in effect when State officials are sued for damages in their official capacity." *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Here, each of the Defendants are employees of DOCCS, a state entity, and

are therefore entitled to Eleventh Amendment immunity from claims against them in their official capacity. *See Inside Connect, Inc. v. Fischer,* No. 13–CV–1138 (CS), 2014 WL 2933221, at *7 (S.D.N.Y. June 30, 2014) (finding the plaintiff's claims against current and former DOCCS employees to be barred the Eleventh Amendment). New York State has neither waived its sovereign immunity, nor has Congress abrogated the state's immunity through § 1983. *See Johnson v. New York,* No. 10 CIV. 9532(DLC), 2012 WL 335683, at *1 (S.D.N.Y. Feb.1, 2012) (citing *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 31 (2d Cir.1991)). Hence, all of Plaintiff's claims against Defendants in their official capacities are barred and must be dismissed. [8]

#### B. Collateral Estoppel

Defendants argue that many of Plaintiff's claims are barred by the doctrine of collateral estoppel because they were already litigated and decided in the underlying Article 78 proceeding in state court. Defs.' Reply Mem., Doc. 42 at 4–7.

A party who had a full and fair opportunity to litigate an issue in a previous proceeding may, under of the doctrine of collateral estoppel, be barred from raising an identical issue in a later proceeding. *Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003). Collateral estoppel, often referred to as issue preclusion, bars the "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *W & D Imports, Inc. v. Lia,* 563 F. App'x 19, 22 (2d Cir.2014) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

**\*6** Under 28 U.S.C. § 1738, federal courts are required to give preclusive effect to state court judgments where the courts of the state would do so. *Ferris v. Cuevas,* 118 F.3d 122, 126 (2d Cir.1997) (citing *Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). Thus, New York law applies when determining what preclusive effect the prior judgment in an Article 78 proceeding has on a § 1983 action in federal court. *Blasi v. New York City Bd. of Educ.,* No. 00–CV–5320 (RRM)(MDG), 2012 WL 3307227, at *7 (E.D.N.Y. Mar. 12, 2012) *report and recommendation adopted,* No. 00–CV–5320, 2012 WL 3307346 (E.D.N.Y. Aug.12, 2012) *aff'd,* 544 F. App'x 10 (2d Cir.2013); *see also Giakoumelos v. Coughlin,* 88 F.3d

56, 59 (2d Cir.1996); *Bussa v. Educ. Alliance, Inc.,* No. 14–CV–449 GBD (JLC), 2014 WL 4744556, at *2 (S.D.N.Y. Sept.24, 2014).

In applying New York collateral estoppel rules, the Second Circuit has identified two essential elements. "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." *Jenkins v. City of New York,* 478 F.3d 76, 85 (2d Cir.2007) (quoting *Juan C. v. Cortines,* 89 N.Y.2d 659, 657 N.Y.S.2d 581, 679 N.E.2d 1061, 1065 (N.Y.1997)). Under New York law, "[t]he party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

Plaintiff's due process claim against Cpt. Russo raises issues identical to those already decided in his Article 78 proceeding.[9] Here, Plaintiff claims that Cpt. Russo violated his due process rights when he "denied him a reasonable amount of time to review the documents" that were the subject of the charges against him and the right to call witnesses. Doc. 39 at 12–14. Plaintiff also asserts that he was denied a fair and impartial hearing officer because Cpt. Russo was biased and unqualified to preside over the hearing. *Id.* at 15–16. Similarly, in his Article 78 petition, Plaintiff argued that Cpt. Russo failed "to afford petitioner adequate employee assistance" because the assistants assigned to Plaintiff told him he was not entitled to many of the documents and witnesses he wanted, and then "failed to meet back" with him to give him the documents he had requested. Compl., Doc. 2–1 at 28, 31–32, ¶¶ 10, 17. He also alleged that Cpt. Russo denied him "ample time to digest or review the documents" and the right to call witnesses. *Id.* at 30–31, ¶¶ 16–17. In addition, Plaintiff's Article 78 petition alleged that he was denied the right to have his "innocence or guilt determined by a fair and impartial hearing officer" in that Cpt. Russo was "arbitrary and capricious[.]" *Id.* at 30, ¶ 15. In sum, it is clear that Plaintiff raised identical issues in his Article 78 petition with respect to Cpt. Russo as he does in the instant litigation.

*7 Plaintiff has also failed to prove that he was not given a full and fair opportunity to litigate the claims in the prior proceeding. *Giakoumelos,* 88 F.3d at 59; *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 491 (1984) ("[T]he burden rests upon the opponent to establish the absence of a full and fair opportunity to litigate the issue in prior action or proceeding."). Nowhere in Plaintiff's papers does he demonstrate that he did not have a full and fair opportunity to litigate all the issues related to the Misbehavior Report and Tier III proceeding in state court. Any assertion to the contrary by Plaintiff would be without merit, given that he submitted a petition supported by exhibits, as well as a reply to the respondents' opposition papers. *See Fortunatus v. Clinton Cnty., N.Y.,* 937 F.Supp.2d 320, 332 (N.D.N.Y.2013) ("[The plaintiff] cannot gainsay that he had a full and fair opportunity to litigate his claims of denial of equal protection and due process. In addition to his lengthy petition, [the Plaintiff] submitted sworn affidavits, exhibits, and a memorandum of law in support of his claims, all of which would substantiate a full opportunity to litigate."). Therefore, Plaintiff's Fourteenth Amendment due process claims against Cpt. Russo are barred by the doctrine of collateral estoppel.

In the instant case, Plaintiff also alleges a retaliation claim against Sgt. Parkhurst. Am. Compl. ¶ 54. Although Plaintiff did not directly state a retaliation claim in his Article 78 petition, he concedes that the state court addressed the issue after Plaintiff "made the attempt" to argue it. Doc. 39 at 11–12. Indeed, the state court held that Plaintiff's assertion "that the [M]isbehavior [R]eport was retaliatory in nature presented a credibility issue for the Hearing Officer to resolve[.]" *Ortiz,* 935 N.Y.S.2d at 916. Thus, because the issue was addressed by the Supreme Court, Plaintiff's retaliation claim against Sgt. Parkhurst is also precluded.

Finally, although the only reference to Dir. Venettozzi in the Article 78 petition is Plaintiff's statement that Dir. Venettozzi affirmed the Tier III hearing findings, Doc. 2–1 at 33, ¶ 20, Plaintiff does not appear to base the instant action on any other separate acts committed by him. *See* Am. Compl. ¶¶ 40, 43, 45. Therefore, to the extent Plaintiff is merely challenging Dir. Venettozzi's decision to uphold the results of the Tier III hearing, his claim is barred.

## C. Adequacy of Pleadings

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.*

### i. Constitutionality of Rule 105.13

**\*8** Liberally construed, Plaintiff's complaint alleges a variety of First Amendment violations related to his possession of the article. Plaintiff alleges that C.O.s Prindle and Gibb violated his First Amendment rights by confiscating the newspaper article from his cell, that Sgt. Parkhurst violated his First Amendment rights by penalizing him for possessing the article, and that Cpt. Russo violated his rights by finding him guilty of the charge in the Tier III Hearing. Am. Compl. ¶¶ 24, 29, 38, 48. He also accuses Dir. Venettozzi of confining him "for exercising his first amendment [sic] right[.]" *Id.* In effect, Plaintiff is either claiming that Defendants violated his First Amendment rights in the manner in which they enforced Prison Rule 105.13 or the regulation itself is unconstitutional.

With respect to the prison regulation itself, although imprisonment does not automatically deprive a prisoner of his First Amendment rights, "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere ." *Beard v. Banks,* 548 U.S. 521, 528, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). In addition, courts owe "substantial deference to the professional judgment of prison administrators." *Id.* (quoting *Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003)) (internal quotation marks omitted). Thus, challenges to prison regulations that allegedly inhibit First Amendment rights "must be analyzed in terms of the legitimate policies and goals of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

Prison regulations impinging on inmates' constitutional rights are valid "if they are reasonably related to legitimate penological interests ... and are not an exaggerated response to such objectives." *Beard,* 548 U.S. at 528 (internal citation and quotation marks omitted). In *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court identified four factors to consider in determining the reasonableness of a prison regulation. First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 482 U.S. at 89 (citing *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Second, courts must assess "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, courts should consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, courts should consider any "ready alternatives" to the regulation in question for furthering the governmental interest. *Id.* "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.*

The first *Turner* factor, requiring a valid and rational connection between the prison regulation and the legitimate government interest, is met in this case. The Supreme Court has recognized the prevalence of dangerous gang activity within prison walls and the importance of preventing it. *Wilkinson v. Austin,* 545 U.S. 209, 227, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ("Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest [in determining placement in a supermax prison] ... gangs seek nothing less than to control prison life and to extend their power outside prison walls."); *Turner,* 482 U.S. at 91–92 ("the Missouri Division of Corrections had a growing problem with prison gangs, and ... restricting communications among gang members ... was an important element in combating this problem."). Here, the regulation seeks to minimize gang activity amongst inmates by limiting the amount of gang-related communication within a prison.

**\*9** As to the second *Turner* factor, the regulation provides for alternative means of exercising First Amendment rights. Specifically, Prison Rule 105.13

presumably allows inmates to possess published gang-related materials that are available through the library or approved through the Media Review process. [10] Regulations which limit, but do not eliminate, the availability of alternatives means of exercising a constitutional right may be permissible. *Beard,* 548 U.S. at 532. While the Court recognizes that Plaintiff alleges that he was issued the article by "the department's correspondence office," Am. Compl. ¶ 32, the transcript of the Tier III hearing indicates that Plaintiff was unable to provide any documentation establishing that Media Review had approved the article. Doc. 2–4 at 105–106. The New York Supreme Court subsequently affirmed the finding that Plaintiff was guilty of violating Rule 105.13. Regardless, the question for purposes of the second *Turner* factor is not whether prison authorities properly interpreted Rule 105.13; it is whether Rule 105.13 provides a reasonable alternative.

The third *Turner* factor evaluates the magnitude and nature of accommodating the asserted constitutional right. Allowing inmates to possess gang-related materials would likely cause a "ripple effect" on other inmates and prison staff; in such circumstances, "courts should be particularly deferential to the informed discretion of corrections officials." *See Turner,* 482 U.S. at 90. Thus, given the threat of gang activity within prisons, accommodating the purported right to possess gang-related materials would likely produce a negative result.

Consideration of the final *Turner* factor also supports the reasonableness of this regulation. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable[.]" *Id.* at 90. Thus, if an inmate can suggest an alternative that accommodates his constitutional rights at a minimal cost to valid penological interests, this may be evidence that a regulation does not satisfy the "reasonable relationship" standard. *Id.* at 91. Here, Plaintiff has not provided any alternatives to the current regulation, nor has he pleaded facts which suggest that obvious alternatives exist. As a result, the Court cannot say the prison regulation fails the "reasonable relationship" standard set forth in the final prong of the *Turner* test.

Finally, the Court notes that substantial deference must be given to prison administrators in matters affecting discipline and safety. *Overton,* 539 U.S. at 132 ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). An analysis of the challenged regulation against the *Turner* factors in conjunction with the deference owed to prison officials compels the conclusion that the regulation in question does not unreasonably restrict Plaintiff's First Amendment rights.

**\*10** Therefore, to the extent that Plaintiff challenges the constitutionality of Prison Rule 105.13 itself, he fails to state a claim under the First Amendment.

### ii. First Amendment Retaliation Claims

Insofar as Plaintiff challenges whether Defendants faithfully enforced Prison Rule 105.13 by penalizing him for possessing the article which he claims was approved through the Media Review process, the Court is required to follow the findings of the state court from Plaintiff's Article 78 proceeding, where it affirmed that Plaintiff was guilty of violating Rule 105.13. *See Ortiz,* 935 N.Y.S.2d at 916. However, the Court also construes the Amended Complaint as alleging First Amendment retaliation claims that were not previously raised against C.O.s Prindle and Gibb. [11] Am. Compl. ¶¶ 28, 54. Plaintiff alleges that C.O.s Gibb and Prindle "retaliated against him" by searching his cell and confiscating a news article containing gang-related material. Am. Compl. ¶ 54. C.O.s Prindle and Gibb were instructed by Sgt. Parkhurst to perform the cell search. *Id.* at ¶ 25.

"[I]t is well settled that a 'prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Williams v. Dubray,* 557 F. App'x 84, 87 (2d Cir.2014) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). Rather, "the inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." *Id.* (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). A First Amendment retaliation claim under § 1983 requires that a prisoner establish three elements; "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a

Case 9:16-cv-01001-MAD-TWD Document 73 Filed 08/27/18 Page 206 of 299
Ortiz v. Russo, Not Reported in F.Supp.3d (2015)
2015 WL 1427247

causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Acknowledging "the ease with which claims of retaliation may be fabricated," courts "examine prisoners' claims of retaliation with skepticism and particular care." *Johnson v. Eggersdorf,* 8 F. App'x 140, 144 (2d Cir.2001) (quoting *Colon,* 58 F.3d at 872); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (retaliation claims by prisoners are "prone to abuse"). Recognizing the possibilities for abuse in retaliation claims, "we have insisted on a higher level of detail in pleading them[.]" *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Thus, a complaint "which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* (citing *Flaherty,* 713 F.2d at 13).

**\*11** At the outset, Plaintiff fails to specifically identify the speech or conduct at issue which he purports to be protected. Plaintiff argues that Sgt. Parkhurst and C.O.s Prindle and Gibb retaliated against him because an earlier misbehavior report, issued against him by Sgt. Parkhurst in 2007, was overturned. Am. Compl. ¶¶ 20–21. In the prison context, free and inhibited access to seek redress of grievances against state officers is a protected right. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Plaintiff has not stated whether he took any constitutionally protected action against Sgt. Parkhurst regarding the 2007 report. Presumably, however, the 2007 report was dismissed after Plaintiff filed a grievance or complaint. Even if the Court accepts this as true, his retaliation claims still fails for the reasons stated below.

Plaintiff does not allege facts which establish that C.O.s Gibb and Prindle took an adverse action against him. Although the Second Circuit has not specifically addressed whether a cell search constitutes "adverse action" as required for a retaliation claim, many district courts in this circuit have held that it does not. *See Williams v. King,* No. 11–CV–1863 (SAS), 2014 WL 3925230, at \*10 (S.D.N.Y. Aug.11, 2014) (collecting cases). Additionally, Plaintiff fails to allege any facts that would support a finding that C.O.s Prindle and Gibb were personally motivated by the dismissal of an earlier grievance they have no apparent connection with.

Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim. *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing a *pro se* prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (the plaintiff "failed to provide any basis to believe that [the defendant] retaliated for a grievance that she was not personally named in"); *Hare v. Hayden,* No. 09 CIV. 3135 RWS, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); *Bryant v. Goord,* No. 99 CIV. 9442, 2002 WL 553556, at \*2 (S.D.N.Y. Apr.12, 2002) ("The grievances that Plaintiff filed prior to the disciplinary proceedings at issue here did not involve any of these Defendants, therefore, there is no basis to assume that these Defendants ... retaliate[d] for his filing grievances against other corrections officers.").

Finally, Plaintiff's retaliation claims lack the necessary causal connection. In evaluating whether a causal connection exists, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a [Tier III] hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Jones v. Marshall,* No. 08 CIV. 0562, 2010 WL 234990, at \*4 (S.D.N.Y. Jan.19, 2010) (quoting *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002)) (internal quotation marks omitted).

**\*12** Here, Plaintiff argues Defendants retaliated against him in 2010 for an overturned misbehavior report issued more than three years earlier. Am. Compl. ¶ 28. Citing an incident which occurred three years prior is generally insufficient to satisfy the causal connection requirement for a retaliation claim. *Spavone v. Fischer,* No. 10 CIV. 9427(RJH)(THK), 2012 WL 360289, at \*5 (S.D .Y. Feb. 3, 2012) (finding fifteen months inadequate to establish a causal connection through temporal proximity); *Crawford v. Braun,* No. 99 CIV 5851(RMB)(JCF), 2001 WL 127306, at \*6 (S.D.N.Y. Feb. 9, 2001) (describing a lapse of seven months as too "attenuated" for purposes of temporal proximity). Plaintiff also asserts that he "can, without a doubt, demonstrate proof of good behavior." Doc. 39 at 19.

However, the attachments to Plaintiff's complaint reveal his disciplinary record is not as pristine as he represents. [12] As to the third factor, he admits that the Misbehavior Report was upheld by a Tier III hearing officer, Dir. Venettozzi, and a New York Supreme Court. *See* Am. Compl. ¶¶ 39, 40; *see also Ortiz,* 935 N.Y.S.2d at 914.

Plaintiff's claims against C.O.s Prindle and Gibb also allege retaliation in "wholly conclusory" terms. *Flaherty,* 713 F.2d at 13. Thus, the First Amendment retaliation claims against them must be dismissed.

### iii. Harassment Claims

Although Plaintiff did not address any harassment claims in his papers opposing Defendants' motion to dismiss, his Amended Complaint alleges that the Defendants "retaliated against him by harassing him." Am. Compl. ¶ 54.

"Prisoners have no constitutional right to be free from harassment." *Greene v. Mazzuca,* 485 F.Supp.2d 447, 451 (S.D.N.Y.2007) (citing *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). In order to qualify for constitutional protection, the alleged harassment "may be so drastic as to violate the Eighth Amendment's right to be free from cruel and usual punishment, but only in the harshest of circumstances." *Id.* It "must be objectively and sufficiently serious," and deny the inmate "the minimal civilized measure of life's necessities." *Id.*

Plaintiff states that, after learning that his 2007 misbehavior report had been dismissed, Sgt. Parkhurst "threatened plaintiff that he would get him at some later point." Doc. 39 at 17. In extremely broad terms, Plaintiff claims that Sgt. Parkhurst "used the disbursement forms and the newspapers articles for his purposes of harassing Plaintiff[.]" Am. Compl. ¶ 33. He also asserts that Sgt. Parkhurst conducted a 72–hour investigation, which Plaintiff alleges is "another form of harassment[,]"during which Plaintiff was "in confinement without charge." *Id.* at ¶ 34. Plaintiff claims that Sgt. Parkhurst, along with C.O.s Prindle and Gibb, used this 72–hour investigation to "finalize their set up [sic] him." *Id.* at ¶¶ 34–35. Based on these allegations, the Court is unable to conclude that Defendants harassed Plaintiff to a level which amounts to an Eighth Amendment violation.

**\*13** Unless accompanied by a physical injury, verbal harassment alone "does not constitute the violation of *any* federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474 (emphasis added). Threats, verbal harassment, and similar behavior are not sufficient for a claim under 42 U.S.C. § 1983. *See Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) ("Insulting or disrespectful comments directed at an inmate generally do not rise to this level [of a constitutional violation]."); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (holding "name calling" by a prison official was not a constitutional violation; *Greene v. Mazzuca,* 485 F.Supp.2d 447, 451 (S.D.N.Y.2007) (being yelled at, spit at, and threatened with time in the SHU did not rise to the level of a § 1983 claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 376 (S.D.N.Y.2001) ("Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983."). Thus, Sgt. Parkhurst's threat to "get him at some later point" does not constitute a constitutional violation.

### D. Failure to Allege Personal Involvement of Dir. Venettozzi

It is the well settled law of this Circuit that a claim brought under § 1983 must allege the personal involvement of each defendant. *See, e.g., Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir.2013) (listing Second Circuit cases). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient ... and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty,* No. 01 Civ. 2123(KMW) (DF), 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted).

Plaintiff alleges that Dir. Venettozzi deprived him of his Fourteenth Amendment rights when he wrongly affirmed the disposition of the hearing, thus penalizing and confining Plaintiff for exercising his First Amendment Rights. Am. Compl. ¶ 43. Courts within this Circuit are split as to whether a prison official who simply denies an inmate's administrative appeal from a disciplinary hearing can be held liable under § 1983. *Compare Jamison v. Fischer,* No. 11 CIV. 4697(RJS), 2012 WL 4767173, at \*4 (S.D.N.Y. Sept.27, 2012) (holding that the administrative official who affirmed the results of the plaintiff's disciplinary hearing was not personally involved because the alleged constitutional violation had

ceased by the time that he was called upon to review the appeal), *with Thomas v. Calero,* 824 F.Supp.2d 488, 509 (S.D.N.Y.2011) (denying motion to dismiss because, by affirming the results of the plaintiff's disciplinary hearing, the defendant's actions were "sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability"). This Court agrees with the line of decisions that hold that "an official reviewing an appeal of a prison disciplinary hearing can be held liable under § 1983 only if the constitutional violation complained of ... is itself ongoing." *Jamison,* WL 4767173, at *5 (citing *Odom v. Calero,* No. 06 CIV 15527(LAK)(GWG), 2008 WL 2735868, at *7 (S.D.N .Y. July 10, 2008)). As one court has noted, "allowing suits to proceed against all of the officers who reviewed an inmate's appeal in such a situation would improperly impose supervisory liability, conflicting with the clear mandate of *Iqbal* and many years of Second Circuit case law." *Id.*

**\*14** Since Dir. Venettozzi's involvement was distinct from the constitutional violations Plaintiff has alleged against the other Defendants, he cannot be held liable under § 1983 for violations that occurred prior to his review and were not ongoing. *See id.* Therefore, Plaintiff cannot sustain a claim against Dir. Venettozzi under § 1983.

### E. Habeas Corpus

In the alternative, Plaintiff asks this Court to "convert this action" to a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 39 at 11. However, a complaint alleging 42 U.S.C. § 1983 claims is not interchangeable with an application for a writ of habeas corpus. *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 202 n. 5 (S.D.N.Y.2004) (refusing to *sua sponte* convert a § 1983 action into a petition to habeas corpus because doing so "may result in a disastrous deprivation of a future opportunity to have a well-justified grievance adjudicated.") (quoting *Adams v. United States,* 155 F.3d 582, 583 (2d Cir.1998)); *Garcia v. Aquavuva,* No. 13–CV–4360 SLT JMA, 2013 WL 6248524, at n. 2 (E.D.N.Y. Dec.3, 2013) (denying plaintiff's motion to convert his § 1983 action to a habeas petition). This Court will not transform Plaintiff's complaint into a petition for habeas corpus.

### F. *Heck v. Humphrey*

Defendants argue that many of Plaintiff's claims are barred by *Heck v. Humphrey.* Doc. 33 at 12. In *Heck v.*

*Humphrey,* the Supreme Court held that if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[,]" the court must dismiss his complaint "unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

The Second Circuit clarified the application of the *Heck* rule to "mixed sanction" cases, where a prisoner is subject to a single disciplinary proceeding that results in sanctions that affect both the duration of his imprisonment and the conditions of his confinement. In "mixed sanction" cases, a prisoner

> can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but that he can only do so if he is willing to forgo once and for all any challenge to any* sanctions that affect the duration of his confinement. In other words, the prisoner must abandon, not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in his current § 1983 suit.

*Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006) (emphasis in original).

Here, Plaintiff was sanctioned with ninety days in the SHU and six months loss of good time credits. Am. Compl. ¶ 39. If Plaintiff indeed lost good time credits, the rule from *Heck* bars Plaintiff from challenging the loss because he has not shown that it was invalidated. [13] *Peralta,* 467 F.3d at 100; *Paulino v. Fischer,* No. 9:12–CV–00076 (TJM), 2013 WL 5230264, at *6 (N.D.N.Y. Sept.16, 2013) ("The rule announced in *Heck* applies whenever a prisoner challenges the fact or length of his conviction or sentence, including being deprived of 'good time' credits in a prison disciplinary proceeding, where the deprivation impacts the duration his confinement."). To the extent Plaintiff challenges his confinement in the SHU as a result of the Misbehavior Report, his claims are barred by *Heck* because he has not indicated that he is willing to forgo

any and all challenges to his loss of good time credits. *See Peralta,* 467 F.3d at 104.

**\*15** "In mixed sanction actions, a *pro se* plaintiff should be given the option of waiving any challenge to conditions affecting the duration of his confinement so that he can proceed with his claims with respect to the conditions of his confinement." *Paulino,* 2013 WL 5230264, at \*7. However, because all of Plaintiff's claims are dismissible on separate grounds, presenting Plaintiff with this option is unnecessary.

### G. Qualified Immunity

Finally, Defendants contend that Plaintiff's claims should be dismissed under the doctrine of qualified immunity. Doc. 33 at 21. A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where the conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *Manganiello v. City of New York,* 612 F.3d 149, 164 (2d Cir.2010) (internal citations omitted).

At the very least, Defendants' qualified immunity argument succeeds on the third prong of the test, because the Defendants' actions were objectively reasonable in light of clearly established legal rules regarding circumstances present here. The substantial deference due to prison officials allows them to use their professional judgment to reach an experience-based conclusion that prison policies, such as Rule 105.13, work to further prison objectives. *Beard,* 548 U.S. at 533. Moreover, there is no authority establishing a First Amendment right to possess gang-related newspaper articles or publications. Taking into account both the objective reasonableness of the Defendants' actions and the absence of a clearly established right, Defendants are entitled to qualified immunity with respect to Plaintiff's First Amendment claims.

### IV. Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 31, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1427247

---

Footnotes

1   Some of the allegations appear in documents attached to the original Complaint, which was partially amended by Plaintiff. "Courts have held that it may be appropriate to consider materials outside of the Complaint in the *pro se* context ... and, in particular, materials that a *pro se* plaintiff attaches to his opposition papers[.]" *Ceara v. Deacon,* No. 13–CV–6023 (KMK), 2014 WL 6674559, at \*8 (S.D.N.Y. Nov.25, 2014) (internal citations omitted) (emphasis added); *see also Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 246–47 (S.D.N.Y.1998) ("Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where, as here, those allegations are consistent with the complaint.").

2   According to the Misbehavior Report, the Jheri Curl gang is a Dominican gang from the New York City area. Am. Compl. at 19.

3   Given the numerous unnumbered attachments to the Complaint, the Court's citations to them refer to the page numbers reflected on ECF.

4   Plaintiff's Article 78 petition names "Correction Officer Pringle" as a respondent, presumably referring to C.O. Prindle, who is a Defendant in the instant action.

5   In his opposition papers, Plaintiff states that he is dropping his conspiracy and failure to protect claims. Doc. 39 at 29. In any event, Plaintiff failed to assert any such claims in any of his pleadings.

6    The Court can also consider the Article 78 petition on the independent basis that it was included as an exhibit to the original complaint. Compl., Doc. 2–1 at 26.

7    Furthermore, "state officials cannot be sued in their official capacity for damages because such officials are not 'persons' under § 1983." *A'Gard v. Perez*, 919 F.Supp.2d 394, 409 n. 13 (S.D.N.Y.2013), *reconsideration denied* (Feb. 11, 2013), *reconsideration denied* (Apr. 9, 2013), *appeal dismissed* (July 8, 2013) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).

8    In his opposition papers, Plaintiff stated that he is "willing to forego all monetary damages in lieu of declaratory relief seeking to simply reverse the underlying decision." Doc. 39 at 12. Regardless, where "the only available declaratory relief would be that Defendants' past policy or practice violated Plaintiff's rights ... such relief is barred under the Eleventh Amendment." *Inside Connect, Inc.*, 2014 WL 2933221, at *7.

9    Defendants also argue that Plaintiff's claims against C.O.s Prindle and Gibb are barred. Doc. 42 at 4–7. However, these claims are not clearly precluded. Although Plaintiff's Article 78 petition asserted that C.O.s Prindle and Gibb searched his cell and recovered the article at issue, Doc. 2–1 at 27, ¶ 8, nowhere in his Article 78 petition did Plaintiff argue that their actions violated his First Amendment rights or were retaliatory in nature. Given these facts, it is not apparent that Plaintiff is raising identical issues to those in his Article 78 petition.

10   The language of Rule 105.13 "excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process." N.Y. Comp.Codes R. & Regs. Tit. 7, § 270.2(B)(6)(iv) (May 28, 2008).

11   Plaintiff also alleges retaliation claims against Sgt. Parkhurst. Am. Compl. ¶ 54. For the reasons set forth in Section III.B, Plaintiff's claim of retaliation against Sgt. Parkhurst must be dismissed because it was adjudicated by the State Supreme Court in its Article 78 proceeding. Even if the Court were to consider it on the merits, however, it would still fail due to the lack of temporal proximity between the dismissal of the 2007 misbehavior report and the conduct at issue here.

12   Plaintiff states that, with the exception of this Misbehavior Report, he has "never been charged with egregious [sic] misconduct to warrant a superintendent's hearing." Doc. 39 at 19. He goes on to state that a "superintendent's hearing" or, Tier III hearing, "is reserved for the most serious alleged disciplinary infractions." *Id.* at n. 9. However, Plaintiff's original complaint attached two misbehavior reports, one from 2010 and another dated 2011, charging Plaintiff with multiple infractions including smuggling and the unauthorized exchange of personal items. Doc. 2–2 at 76, 79.

13   In his papers, Plaintiff claims that he could not lose good time credits because he was ineligible to receive them by virtue of the fact that he is serving an "indeterminate sentence of 25 years to life." Doc. 39 at 9.

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5243925
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick PROCTOR, Plaintiff,

v.

Charles F. KELLY, Jr, Correctional Captain;
George Seyfert, Deputy Inspector General;
Robert T. Murphy, Acting Director, Inmate
Disciplinary Program; Lucien J. Leclaire, Jr., Deputy
Commissioner; Glenn S. Goord, Commissioner;
Gary Greene, Superintendent, Defendants.

No. 9:05-CV-0692 (GTS/GJD).
|
Dec. 16, 2008.

West KeySummary

**1** **Constitutional Law**
👈 Segregation

**Prisons**
👈 Segregation

**Prisons**
👈 Escape

An inmate was not deprived of due process before he was placed in administrative segregation for an extended period of time. The inmate was completing a term of nine years and one month disciplinary confinement in a special housing unit. The inmate was placed in this unit due to a successful escape from another facility that involved an elaborate plan that involved four other people. One of the defendants filed a recommendation report urging that the inmate be placed in administrative segregation. The defendant listed fourteen specific allegations of misbehavior that were attributed to the inmate over a twenty-year period. Based upon these allegations, the defendant stated that the inmate was an extreme risk to the safety and security of any correctional facility. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**Attorneys and Law Firms**

Patrick Proctor, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Bruce J. Boivin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM-DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Plaintiff Patrick Proctor ("Plaintiff"), a New York State prison inmate, filed this *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, against six (6) correctional officials employed by the New York State Department of Correctional Services ("DOCS"). Generally, in his Amended Complaint, Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments (and various state laws, rules and/or regulations). Currently before the Court are Defendants' motion for summary judgment, Plaintiff's cross-motion for summary judgment, a Report-Recommendation that Defendants' motion be granted in its entirety (and that Plaintiff's cross-motion be dismissed), and Plaintiff's Objections thereto. For the reasons set forth below, the Report-Recommendation is accepted, and Plaintiff's Amended Complaint is dismissed.

**I. BACKGROUND**

**A. Plaintiff's Claims**

Generally, Plaintiff's Amended Complaint alleges that six employees of DOCS-(1) Charles F. Kelly, Jr., Correctional Captain, (2) George Seyfert, Deputy Inspector General, (3) Robert T. Murphy, Acting Director, Inmate Disciplinary Program, (4) Lucien J. LeClaire, Jr., Deputy Commissioner, (5) Glenn S. Goord, Commissioner, (6) Gary Greene, Superintendent ("Defendants") violated his rights under the Eighth and Fourteenth Amendments (and various state laws, rules and/or regulations) between approximately December 20, 2003, and July 7, 2004, while he was placed in administrative segregation in the Special Housing

2008 WL 5243925

Unit ("S.H.U.") at Great Meadow Correctional Facility ("Great Meadow C.F."). (*See* Dkt. No. 19, Prelim. Stmt. and ¶¶ 9, 24, 41-46 [Plf.'s Am. Compl.].)

More specifically, Plaintiff alleges that Defendants (1) deprived him of his right to procedural and substantive due process under the Fourteenth Amendment by failing to conduct a fair and impartial hearing during the December 20, 2003, proceeding that resulted in his placement in administrative segregation, and by failing to conduct meaningful periodic reviews of his continued placement in administrative segregation, [1] (2) subjected him to cruel and unusual punishment under the Eighth Amendment by forcing him to live in the S.H.U., where the conditions were inhumane, and (3) deprived him of his liberty interests under New York State law, rules or regulations by conducting an administrative segregation hearing that was not impartial, and by failing to overturn the outcome of the hearing on appeal. (*Id.*)

**B. Magistrate Judge's Report-Recommendation**

On December 18, 2007, Defendants moved for summary judgment, requesting the dismissal of Plaintiff's Amended Complaint in its entirety. (Dkt. No. 93.) The motion was referred to Magistrate Judge DiBianco for a Report-Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). On February 7, 2008, Plaintiff cross-moved for summary judgment. (Dkt. No. 98.) On September 30, 2008, Magistrate Judge DiBianco issued a Report-Recommendation that the Court grant Defendants' motion and deny Plaintiff's cross-motion because of Plaintiff's failure to present an issue of material fact. (Dkt. No. 104, at 27-29, 31-33, 39.)

**\*2** Essentially, Magistrate Judge DiBianco's Report-Recommendation is based on two fundamental conclusions: (1) Plaintiff's due process claims should be dismissed because he has failed to adduce record evidence establishing that Defendants deprived him of any of the process he was due as an inmate facing administrative confinement for safety and security reasons (due to the fact that he had previously escaped from prison, among other reasons); and (2) Plaintiff's inadequate-prison-conditions claim should be dismissed because he has failed to adduce record evidence establishing that the conditions in S.H.U. denied him the minimal civilized measure of life's necessities, and that Defendants caused,

and acted with the requisite state of mind with regard to, those conditions. (*Id.*)

**C. Plaintiff's Objections**

On October 10, 2008, Plaintiff filed Objections to the Report-Recommendation. (Dkt. No. 107.) The Objections, which are contained in twenty-five (25) single-spaced pages, present numerous arguments, some of which were never presented to Magistrate Judge DiBianco (and which are not accompanied by a showing of cause as to why the Court should excuse Plaintiff's failure to raise those arguments before Magistrate Judge DiBianco). (*Compare* Dkt. No. 107 [Plf.'s Obj.] *with* Dkt. No. 98, Part 4 [Plf.'s Memo. of Law] .) [2]

Among Plaintiff's arguments are the following. First, argues Plaintiff, Defendant Kelly conducted Plaintiff's administrative segregation hearing on December 20, 2003, in a biased and arbitrary manner because (a) at the beginning of the hearing Defendant Kelly stated, "I have career goals, I have to go along with the program," (b) in reaching his decision he wrongfully considered certain materials (such as an Unusual Incident Report regarding Plaintiff's possession of a "filed nail clipper"), and (c) after the hearing he tampered with the tape recording of the hearing. (*Id.*) Second, argues Plaintiff, he was wrongfully subjected to double jeopardy when, on December 20, 2003, Defendant Kelly essentially subjected Plaintiff to a second term of administrative segregation based on the same evidence on which Plaintiff's first term of administrative segregation had been based. (*Id.*) Third, argues Plaintiff, he enjoyed a substantive due process right in remaining free from administrative segregation. (*Id.*) Fourth, argues Plaintiff, he was deprived of his procedural due process right to receive periodic reviews of his placement in administrative segregation. (*Id.*) Fifth, argues Plaintiff, Defendant Goord was on constructive notice of the sort of problems that were occurring at the Great Meadow C.F. S.H.U. (due to various lawsuits and grievances that had been filed), and that his failure to correct those conditions constituted a violation of Plaintiff's Eighth Amendment rights. (*Id.*) Sixth, argues Plaintiff, Defendants are liable to him under New York State law, rules and/or regulations (which entitle him to a fair and impartial hearing officer, a recording of his administrative segregation hearing, and the expungement of certain material from his inmate record).

2008 WL 5243925

**\*3** In addition, Plaintiff requests that certain information be redacted from Magistrate Judge DiBianco's Report-Recommendation and/or the record on Defendants' motion for summary judgment. (*Id*. at 9, 16.)

## II. STANDARD OF REVIEW

When specific objections to a magistrate judge's Report-Recommendation are made, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [3] When only general objections are made (or the party merely reiterates his original allegations or arguments), the Court reviews for clear error or manifest injustice. *See Brown v. Peters,* 95-CV1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *af'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [4] Similarly, when a party makes no objection to a portion of a Report-Recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must

come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*4** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Finally, implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that nonmoving party is proceeding *pro se* . [5] This is because even *pro se* plaintiffs must obey the Court's procedural rules. [6] For example, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement, [7] even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

## IV. ANALYSIS

### A. Plaintiff's Procedural Due Process Claim Regarding the Administrative Segregation Hearing

Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his procedural due process claim. As a result, the Court reviews that portion of the Report-Recommendation *de novo*. After carefully reviewing all of the papers regarding Defendants' motion for summary judgment, including Magistrate Judge DiBianco's Report-Recommendation

and Plaintiff's Objections, the Court agrees with Magistrate Judge DiBianco, for the reasons stated in his Report-Recommendation, that Plaintiff has adduced no record evidence that his procedural due process rights were violated during the administrative segregation hearing. The Court would only add four points to Magistrate Judge DiBianco's thorough Report-Recommendation.

First, as Magistrate Judge DiBianco indicated in his Report-Recommendation, New York State law provides an inmate with more procedural protections than are required under the Fourteenth Amendment. (Dkt. No. 104, at 9-11.) *See also* Withrow v. Taylor, 9:05-CV-1129, 2007 WL 3274858, at *13 (N.D.N.Y. Nov.5, 2007) (Hurd, J.). However, as Magistrate Judge DiBianco also recognized, "the fact that New York law provides [an] inmate with a full disciplinary-style hearing does not raise the constitutional requirements for administrative placement." *Withrow,* 2007 WL 3274858, at * 13. For example, "Plaintiff has no federal right to the recording or electronic record of his disciplinary hearing." *Odom v. Kern,* 99-CV-10668, 2008 WL 2463890, at *10 (S.D.N.Y. June 18, 2008) [citations omitted].

Second, with regard to Plaintiff's assertion about the remark made by Defendant Kelly at the start of the hearing (i.e., "I have career goals, I have to go along with the program"), the remark is insufficient to create a genuine issue of material fact as to whether Plaintiff was denied the process he was due at the hearing. For the sake of brevity, the Court will set aside the fact that asserted remark is so ambiguous and lacking in contextual explanation as to diminish its materiality. (*See, e.g.,* Dkt. No. 98, Part 6, ¶¶ 12, 14, 28, 31 [Plf.'s Affid.].) [9] In addition, the Court will set aside the fact that the asserted remark is so self-serving and unsupported by the other record evidence as to give it a conclusory quality. [10] What is more important is that, despite the remark, Defendant Kelly afforded Plaintiff numerous procedural rights, which included, but were not limited to the following: (1) substantial notice of the hearing; (2) the right to choose an assistant before the hearing; (3) the ability to have two witnesses interviewed; (4) notice of his rights during the hearing; (5) the ability to be present for the entire hearing; (6) wide latitude to argue and object during the hearing; (7) the opportunity to question Defendant Seyfert and Deputy Superintendent Carpenter at the hearing; (8) the opportunity to challenge evidence

against him; (9) a deliberately and patiently conducted hearing; and (10) a written hearing determination that was supported by at least "some evidence." (Dkt. No. 104, at 14-28.) [11]

**\*5** Third, with regard to Plaintiff's assertion that Defendant Kelly tampered with the disciplinary hearing tape, as the Southern District found in *Odom v. Kern,* "[t]here is no evidence in the record ... of any tampering with the [disciplinary hearing] tape ." *Odom,* 2008 WL 2463890, at *11 [citations and internal quotations omitted]. At most, Plaintiff has adduced evidence that the portion of a hearing tape was blank. Plaintiff has offered nothing but conclusory allegations, conjecture and/or speculation in support of his claim that it was Defendant Kelly who caused the portion of the tape in question to be blank (or that, even if he did so, he was acting recklessly as opposed to acting merely negligently). [12]

Fourth, Plaintiff's double-jeopardy argument is that (1) he spent more than nine years in administrative segregation as punishment for various offenses, and (2) because he "did his time" for these offenses, they should not be further considered as a reason to keep him in administrative segregation indefinitely. However, as noted in *Wojtkiewicz v. Gunter,* "[t]he Double Jeopardy Clause is limited to criminal prosecutions." *Wojtkiewicz v. Gunter,* 91-CV-2270, 1992 WL 313120, at *2 (D.Colo. Oct. 23, 1992) [citation omitted]. Since "[p]rison disciplinary proceedings are not criminal prosecutions[,] the full panoply of rights due a defendant in criminal proceedings do not apply." *Wojtkiewicz,* 1992 WL 313120, at *2 [citation omitted]. As a result, "a rehearing is not actionable under the Double Jeopardy Clause." *Id.* [citation omitted].

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

### B. Plaintiff's Substantive Due Process Claim Regarding the Administrative Segregation Hearing

Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his substantive due process claim. As a result, the Court reviews that portion of the Report-Recommendation *de*

*novo.* Plaintiff contends that Magistrate Judge DiBianco failed to consider "the substantive level" of his due process claim, which would have entitled him to relief under the Fourteenth Amendment. (Dkt. No. 107, at 4 [Plf.'s Obj.].) Even though the Court finds no error in Magistrate Judge DiBianco's analysis of Plaintiff's substantive due process claim, the Court will further discuss that claim out of special solicitude to Plaintiff.

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.* "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, Memorandum-Decision and Order (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

**\*6** As stated in *Lowrance,* "[t]he first step in substantive due process analysis is to identify the constitutional right at stake." *Lowrance,* 20 F.3d at 537 [citation omitted]. Here, as in *Lowrance,* "the right allegedly violated was [Plaintiff]'s liberty interest in remaining free from administrative confinement unless a correction officer has reasonable grounds to believe that he poses a threat to the order, safety or security of the correctional facility." *Id.* (citing 7 N.Y.C.R.R. § 251-1.6[a] ).

Once "the constitutional interest at stake" is identified, "[the Court] must ... consider whether the state action-administrative confinement-was arbitrary in the constitutional sense and therefore violative of substantive due process." *Id.* Based on the record before Magistrate Judge DiBianco, the Court can find no evidence from which a rational fact finder could conclude that Plaintiff's administrative confinement was arbitrary in the constitutional sense. Rather, as indicated by Magistrate Judge DiBianco, Plaintiff's administrative confinement was based on, among other factors, his violent history both in prison and out of prison. Certainly, a violent history, as well as a history for disobeying orders, creates "at least the potential for disruption of the order and security of the prison." *Id.* With Plaintiff "having thus created a threat to the security of the prison" by his conduct over the years, his subsequent administrative confinement resulting from the December 2003 proceeding "was not arbitrary or conscience-shocking in the constitutional sense." *Id.*[13]

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

### C. Plaintiff's Procedural Due Process Claim Regarding Periodic Reviews

As an initial matter, the Court notes that Plaintiff appears to have asserted his procedural due process claim regarding periodic reviews for the first time in his Memorandum of Law dated February 7, 2008, nearly *two and a half years* after he filed an Amended Complaint on or about September 8, 2005, and nearly *one and a half years* after discovery closed in the action on October 30, 2006. (*Compare* Dkt. No. 98, Part 4, at 10, 27-28 [Plf.'s Memo. of Law] *with* Dkt. No. 19 [Plf.'s Am. Compl.] *and* Dkt. No. 31 [Pretrial Scheduling Order].) As a result, it appears that Defendants have conducted no discovery regarding the claim. For this reason alone, this claim is not properly before the Court, no matter how much special solicitude Plaintiff is afforded.[14] Nonetheless, in the interest of thoroughness, the Court will briefly address the merits of this claim.

As Magistrate Judge DiBianco explained his Report-Recommendation, in addition to being entitled to notice

and the opportunity to be heard before placement in administrative segregation, an inmate is also entitled to periodic reviews of his confinement so that administrative segregation is not used for indefinite confinement of the inmate. (Dkt. No. 104, at 33 [citation omitted].) As this Court has previously recognized, "The periodic review can be informal and non-adversarial. These reviews do not require the presence of the accused and do not require the reviewer to always consider new information, since the original reasons for placing the inmate in [administrative segregation] may continue to be compelling ." *Giano v. Selsky,* 91-CV-0166, 2002 WL 31002803, at *7 (N.D.N.Y. Sept.5, 2002) (Kahn, J.) [internal quotation marks and citation omitted].

**\*7** Of course, "if new relevant evidence becomes available following initial review of the inmate's administrative segregation, the decision-maker is obligated to consider that evidence during the periodic reviews." *Giano,* 2002 WL 31002803, at *7. In other words, if there is a *new* reason why the inmate is being kept in administrative segregation, "[t]he inmate is entitled to notice of the [changed] reason for his confinement and an opportunity to respond to that [changed] reason." *Giano,* 2002 WL 31002803, at *7 [citation omitted]. "If the reasons for his confinement do not change, however, the inmate need not be informed each time his confinement is reviewed." *Id.* Furthermore, an inadvertent denial of a periodic review does not give rise to a due process violation. [15] Nor does the mere violation of a New York State regulation or DOCS Directive requiring reviews with a specific frequency give rise to a due process violation. [16] Here, the Court can find no evidence in the record that Plaintiff continued to remain in administrative segregation as a result of a new reason that arose after the date on which he was originally placed in administrative segregation. Nor can the Court find any record evidence that Plaintiff's confinement is not being reviewed in some manner.

For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

**D. Plaintiff's Eighth Amendment Claim Regarding the Conditions in S.H.U.**

As indicated above, Plaintiff filed an Objection to Magistrate Judge DiBianco's Report-Recommendation with regard to his Eighth Amendment claim. As a result, this Court reviews that portion of the Report-Recommendation *de novo.* After carefully reviewing all of the papers regarding Defendants' motion for summary judgment, including Magistrate Judge DiBianco's Report-Recommendation and Plaintiff's Objections, the Court agrees with Magistrate Judge DiBianco, for the reasons stated in his Report-Recommendation, that Plaintiff has adduced no record evidence that his Eighth Amemdment rights were violated as a result of the conditions in S.H.U. The Court would only add two points to Magistrate Judge DiBianco's thorough Report-Recommendation.

First, even assuming that Plaintiff has adduced record evidence establishing that his prison conditions were (when viewed together) sufficiently serious for purposes of the Eighth Amendment, the Court can find no record evidence that Defendants acted with a sufficiently culpable state of mind with regard to those prison conditions. It must be remembered that "deliberate indifference describes a state of mind more blameworthy than negligence." [17] Rather, deliberate indifference is a state of mind akin to *criminal recklessness.* [18]

Second, Plaintiff's constructive-notice argument is unpersuasive. For example, neither of the two cases cited by Plaintiff (which were settled after the occurrence of the events giving rise to Plaintiff's Eighth Amendment claim in this case) conferred on Defendant Goord notice of the conditions in the S.H.U. at Great Meadow C.F. sufficient to personally involve him in the Eighth Amendment violation alleged by Plaintiff. *See Anderson v. Goord,* 87-CV-0041, Stipulation and Protective Order (N.D.N.Y. filed July 28, 2005) (McCurn, J.); *Disability Advocates, Inc. v. N .Y.S. Office of Mental Health,* 02-CV-4002, Settlement Agreement (S.D.N.Y. filed Apr. 30, 2007) (Lynch, J.). (Dkt. No. 107, at 17 [Plf.'s Obj.].)

**\*8** For all of these reasons, the Court adopts this portion of the Report-Recommendation, granting Defendants' motion for summary judgment with regard to this claim, and denying Plaintiff's cross-motion for summary judgment with regard to this claim.

**E. Plaintiff's State Law Claim**

Plaintiff appears to argue Magistrate Judge DiBianco also erred by failing to consider Plaintiff's separate state law claim. (Dkt. No. 107, at 2, 4, 5, 8 [Plf.'s Obj.].) Specifically, Plaintiff's state law claim appears to contain three related claims: (1) Defendants violated his right to a fair and impartial hearing officer under 7 N.Y.C.R.R. § 301.4(a); (2) Defendants violated his right to have his administrative segregation hearing recorded under 7 N.Y.C.R.R. §§ 254.5, 254.6(b); and (3) Defendants violated his right to have the reference to his possession of a filed nail clipper expunged from his inmate record, which right the Court should enforce pursuant to the doctrine of collateral estoppel.[19] (*Id.*)

To the extent that Plaintiff is arguing that these state law violations give rise to any constitutional violations, the Court has already considered and rejected those claims in this Memorandum-Decision and Order (and Magistrate Judge DiBianco's Report-Recommendation). To the extent that Plaintiff is arguing that these state law violations are themselves actionable in this proceeding, the Court declines to exercise supplemental jurisdiction over those claims under the circumstances. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Verley v. Goord,* 05-CV-1251, 2008 WL 4279498, at *16, n. 35 (N.D.N.Y. Sept.15, 2008) (Kahn, J., adopting Report-Recommendation) [citing cases].[20]

As a result, the Court dismisses Plaintiff's state law claim without prejudice.

### F. Plaintiff's Request for Redaction
The Court denies Plaintiff's request that certain information be redacted from Magistrate Judge DiBianco's Report-Recommendation and/or the record on Defendants' motion for summary judgment, because that request is procedurally improper and unsupported by a showing of cause. (Dkt. No. 107, at 9, 16 [Plf.'s Obj.].)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge DiBianco's Report-Recommendation (Dkt. No. 104) is *ADOPTED* in its *ENTIRETY;* and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 93) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 98) is *DENIED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 19) is *DISMISSED;* and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order upon all parties and Magistrate Judge DiBianco.

PATRICK PROCTOR, Plaintiff,

vs.

CHARLES F. KELLY, JR; GEORGE SEYFERT; ROBERT J. MURPHY; LUCIEN J. LeCLAIRE, JR.; GLENN S. GOORD; GARY GREENE, Defendants.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

**\*9** This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), challenges "the deprivations caused by his placement in [A]dministrative [S]egregation" at Great Meadow Correctional Facility. (Amended Complaint ("AC")[1], ¶ 9 (Dkt. No. 19)). Plaintiff alleges that his due process rights were violated during the proceedings that resulted in his placement in administrative segregation and also claims that the conditions in administrative segregation violated plaintiff's right to be free from cruel and unusual punishment. *Id.* Plaintiff alleges Eighth, Fifth, and Fourteenth Amendment violations. Plaintiff seeks injunctive relief and compensatory and punitive damages. (AC at 17-18).

Presently before the court is defendants' motion for summary judgment in favor of all six defendants, pursuant to FED. R. CIV. P. 56. (Dkt. No. 93). Plaintiff opposes defendants' motion, and makes a cross-motion

for summary judgment. (Dkt. No. 98). For the following reasons, this court will recommend that the defendants' motion for summary judgment be **GRANTED** in favor of all defendants and that plaintiff's cross-motion for summary judgment be **DENIED.**

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### 2. *Facts and Contentions*

Plaintiff states that on December 8, 2003, while incarcerated at Great Meadow, he was completing a term of nine years and one month disciplinary confinement in the Special Housing Unit (SHU). (AC ¶ 10). Plaintiff states that this term of disciplinary confinement was imposed for "various disciplinary infractions, including, but not limited to escape, weapon possession, assault, fighting, etc." *Id.* More specifically, in 1994, plaintiff successfully escaped from Shawangunk Correctional Facility, using an "elaborate" plan that involved three

other inmates and a parolee. Kelly Decl. Ex. C at p. 2; Proctor Deposition Transcript (Pl.Dep.) at 22-23. After plaintiff was captured, he received a disciplinary penalty that included ten years of confinement in SHU. Pl. Dep. at 33.

**\*10** In his complaint, plaintiff alleges that he was scheduled to be released from SHU on December 8, 2003, but was not released "as scheduled." (AC ¶ 11). Instead, plaintiff claims that on December 9, 2003, he was served with an "Administrative Segregation Recommendation," that was written by defendant Seyfert, and dated December 8, 2003. (AC ¶ 12).

Plaintiff states that in the recommendation, defendant Seyfert listed fourteen specific allegations of misbehavior as well as other "general" allegations of misbehavior that were attributed to plaintiff over a twenty year period. (AC ¶ 13). Based upon these allegations, defendant Seyfert stated that plaintiff had proven himself to be an escape risk as well as an "extreme risk to the safety and security of any correctional facility," including inmates as well as staff. (AC ¶ 14). For these reasons, defendant Seyfert recommended that plaintiff be placed in administrative segregation, rather than released into general population at the end of his disciplinary sentence.

Defendant Kelly was assigned to conduct plaintiff's administrative segregation hearing. (AC ¶ 15). Plaintiff states that the hearing began on December 20, 2003. (AC ¶ 15). Plaintiff alleges various defects in the hearing. (AC ¶¶ 15-30). Plaintiff claims that defendant Seyfert testified falsely and relied upon outdated or incorrect information. (AC ¶¶ 17-19). Plaintiff claims that defendant Kelly improperly failed to call certain witnesses requested by plaintiff that would have refuted defendant Seyfert's testimony. (AC ¶¶ 20-22). Plaintiff claims that defendant Kelly failed to review the Unusual Incident (UI) Reports and failed to perform an "independent assessment" of their reliability. (AC ¶ 23). Plaintiff also alleges that defendant Kelly was not impartial, based his final decision on false and inaccurate information, refused to reconstruct part of the audio-taped record that was destroyed, and relied on information that was not in the record. (AC ¶¶ 20-24, 27-31).

Plaintiff states that on December 24, 2003, defendant Kelly affirmed defendant Seyfert's recommendation and ordered plaintiff's placement in administrative

segregation. (AC ¶ 31). Plaintiff appealed this decision and filed grievances regarding the alleged due process violations. (AC ¶¶ 32-40). Plaintiff claims that he has "repeatedly requested" that the allegedly false and inaccurate information relied upon by Seyfert and Kelly be removed from plaintiff's institutional record, but defendants Seyfert, Kelly, Greene, Goord, LeClaire, and Murphy have all refused to do so. (AC ¶ 26). Plaintiff alleges that this false and inaccurate information "will be used in a constitutionally significant way to possibly deny plaintiff's parole release." (AC ¶ 25). Plaintiff also claims that defendants are using administrative segregation as an excuse to further "discipline" plaintiff. (AC ¶ 24).

Separate from plaintiff's claimed due process violations regarding his placement in administrative segregation, plaintiff also claims that the conditions in administrative segregation are cruel and inhuman, violating plaintiff's constitutional rights. (AC ¶¶ 41-46). Plaintiff claims that human waste is left "on the company" for up to a day at a time. (AC ¶¶ 43-46). Plaintiff claims that "these inhuman conditions continued for months." (AC ¶ 46). Plaintiff then compares the conditions in SHU, Protective Custody, and General Population. (AC ¶¶ 47-78). Within these paragraphs, plaintiff describes the differences in privileges, property, and restrictions imposed on all three forms of confinement. *Id.*

 **\*11**  Also within this section of the complaint, plaintiff alleges that in SHU, the plaintiff is subjected to "loud banging and smelling human waste on an almost daily basis" due to an alleged policy of defendants Greene and Goord to house administrative segregation inmates in the same unit as "mentally ill inmates confined to SHU for disciplinary reasons." (AC ¶ 59). Plaintiff alleges that due to the deplorable conditions in SHU, he suffers from severe headaches, physical deterioration, anxiety, stress, depression, paranoia, delusions, and other physical and psychological injuries. (AC ¶ 79).

Although the complaint contains ten causes of action, the first five are related to the alleged due process violations [2] committed by defendants Kelly and Seyfert at the administrative segregation hearing. (AC ¶¶ 80-84). Plaintiff's sixth cause of action alleges that defendants Murphy, LeClaire, Goord, and Greene, all supervisory officials, failed to reverse defendant Kelly's determination and therefore, became liable for the due process violations allegedly committed at the hearing and for the cruel and

unusual punishment allegedly suffered by plaintiff as a result. (AC ¶ 85).

Plaintiff's seventh, eighth, and ninth causes of action are related to the allegedly cruel and unusual conditions in SHU. (AC ¶¶ 86-88). Plaintiff claims that defendants Greene and Goord failed to act upon information regarding the inhumane conditions and that defendant Goord failed to train or supervise his staff and condoned the violations after having received complaints from "prisoners." (AC ¶¶ 86-87). Plaintiff also claims that defendants Greene and Goord authorized a "policy" of housing known severely mentally ill prisoners with "mentally healthy" inmates, knowing that these mentally ill inmates are the ones that cause the "filthy and dangerous" conditions on the unit. (AC ¶ 88).

Finally, plaintiff's tenth cause of action claims that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to properly maintain plaintiff's records, and used them "in an adverse way," causing plaintiff to be improperly placed and kept in administrative segregation. (AC ¶ 89).

### 3. *Due Process*

In order to begin a due process analysis, the court must determine whether Plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the Defendants deprived Plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

 **\*12**  The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.* The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d

2008 WL 5243925

Cir.2000). In *Colon,* the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999)).

In this case, defendants assume for the purposes of this case that plaintiff had a liberty interest in remaining free from the potentially indefinite term of administrative confinement. Thus, the question to be determined is whether plaintiff was afforded the process he was due prior to his placement in administrative segregation.

In *Hewitt v. Helms,* 459 U.S. 460, 469-76, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the principal case discussing due process in relation to the placement in administrative segregation, the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement.[3] Under *Hewitt,* an inmate placed in administrative segregation must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476. The constitutional requirements for placement in administrative segregation are much less strict than those that were articulated for disciplinary determinations set forth in *Wolff v. McDonnell,* 418 U.S. 539, 563-72, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Soto v. Walker,* 44 F.3d 169, 172 n. 3 (2d Cir.1995). In the administrative context, plaintiff would not have a federal constitutional right to have assistance for his defense, to call witnesses, or to have either a hearing or a transcript of that hearing. *See Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 415 (S.D.N.Y.2007) (even in the disciplinary context, no right to a hearing transcript); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006); *Gomez v. Coughlin,* 685 F.Supp. 1291, 1297 (S.D.N.Y.1988) (no right to assistance, witnesses, or even the hearing itself).

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n. 8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id* . at 477. A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto,* 44 F.3d at 173 n. 4 (citing *Hewitt,* 459 U.S. at 477 n. 9). The court understands that generally, "administrative" confinement as contemplated in *Hewitt* is used for temporary confinement of an individual prior to a disciplinary hearing, at which time the individual would have the full due process protections articulated in *Wolff. See Hewitt,* 459 U.S. at 476 (stating that the informal review is sufficient both to determine that the inmate is a security risk and for the decision to confine the inmate "pending the completion of an investigation into misconduct charges against him).

**\*13** The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b) (N.Y.CRR). The regulations also require that administrative segregation inmates receive the ***same type of hearing as those inmates who are transferred to SHU for disciplinary reasons.*** 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

There are several ***state law*** requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must

receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

The constitutional standard for sufficiency of evidence even in the prison disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord,* 487 F.Supp.2d 377 (S.D.N.Y. March 28, 2007) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990). This stricter standard is ***not*** applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton,* 380 F.3d 57, 76 n. 9 (2d Cir.2004).

In this case, on December 9, 2003, plaintiff was served with an administrative segregation recommendation, written by defendant Seyfert. Kelly Decl. ¶ 8 & Ex. A, B, P. The hearing began on December 20, 2003. Defendants Kelly and Seyfert have both submitted declarations regarding the due process issues in support of defendants' motion for summary judgment. With the above due process standards in mind, and also keeping in mind the length of plaintiff's time in restrictive confinement, the court will review plaintiff's claims that defendants did not afford him due process at his administrative segregation hearing.

### A. Seyfert Recommendation

**\*14** Defendant Seyfert states that he is the former Deputy Inspector General for DOCS, and held this position from 1995 until his retirement in October of 2007. Seyfert Decl. ¶ 3. As part of defendant Seyfert's duties, he was in charge of overseeing the DOCS Central Monitoring Case (CMC) Unit. *Id.* ¶ 4. The CMC procedure identifies inmates who by the nature of their crime or status, require special evaluation and tracking of their movements through DOCS. *Id.* ¶ 5. The rules governing the CMC procedure are described in the New York State regulations. N.Y. COMP.CODES R. & REGS., tit. 7, § 1000.1 *et seq.*

Plaintiff has been classified as a CMC inmate, a classification that he does not challenge in this case. Seyfert Decl. ¶ 6. As part of defendant Seyfert's duties regarding CMC inmates, he was required to

track plaintiff's movements through DOCS and evaluate plaintiff's status upon his potential release from the SHU after serving his disciplinary sentence. *Id.* ¶ 8. Defendant Seyfert states that he was required to review the plaintiff's file and determine whether he could be safely released into the general population of Great Meadow or any other facility. *Id.* ¶ 8.

Defendant Seyfert states that plaintiff's CMC file contained all the relevant information necessary to make this determination. *Id* . ¶ 10. These documents include an inmate's criminal history, disciplinary history, involvement in unusual incidents, or any other relevant information. *Id.*

After a review of plaintiff's file, defendant Seyfert wrote the administrative segregation recommendation that was ultimately served on plaintiff. *Id.* ¶ 13. The recommendation is attached to defendant Seyfert's declaration as Ex. A. [4] The recommendation is dated December 8, 2003 and states first, that the reason that plaintiff was initially classified as a CMC inmate was that on February 23, 1984, he absconded from "a job search from the Edgecombe Correctional Facility." Seyfert Decl. Ex. A at 2.

Plaintiff was serving his third term of incarceration with DOCS at the time of the recommendation, and one of his convictions included another "attempted" escape. *Id.* The recommendation then outlined various other incidents in which plaintiff was involved, including an incident in 1990 in which plaintiff slipped out of his restraints. *Id.* Plaintiff subsequently commented to a Sergeant that he wanted to be "more famous than Willie Bosket." *Id.* The recommendation was also based upon the 1994 escape from Shawangunk for which plaintiff was finishing his term of disciplinary confinement and the 1990 stabbing of another inmate.

The court notes that some of the incidents apparently occurred while plaintiff was in SHU. In 1995, in the SHU of Sullivan Correctional Facility, plaintiff removed his handcuffs while confined to his cell. *Id.* at 3. There were several other incidents in 1995, including an incident in which plaintiff set fire to his cell and an incident in which plaintiff was found to have a razor secreted in his rectum. *Id.* In 1997, plaintiff stabbed another inmate in the SHU of Auburn Correctional Facility, and since 1997 had various disciplinary reports for disorderly conduct,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

fighting, harassment, movement violations, refusing direct orders, and violent conduct. *Id.*

**\*15** Defendant Seyfert also stated that plaintiff had accumulated twenty one enemies, located at various correctional facilities. *Id.* Based on all the above information, defendant Seyfert determined that plaintiff was an escape risk as well as a risk to safety and security of ***any*** correctional facility. *Id.* Thus, defendant Seyfert recommended that plaintiff be kept in administrative segregation. *Id.* Defendant Seyfert states, however, that his recommendation is only a "recommendation," and that the final determination of administrative segregation placement is the responsibility of the hearing officer. Seyfert Decl. ¶ 15.

#### B. Preliminary Procedures

The court notes that in accordance with the regulations in New York state, as stated above, plaintiff was afforded all the rights that are afforded to inmates facing disciplinary proceedings. Thus, he was afforded a substantial amount of time for notice. The recommendation was served on him on December 9, 2003, however, the hearing did not begin until December 20, 2003. He was also afforded the right to choose a hearing assistant prior to the hearing. Kelly Decl. ¶ 9 & Exs. B, C. Plaintiff requested and received various documents so that he could prepare a response to the recommendation. [5] *Id.* ¶ 10 & Ex. E at 4-5. Plaintiff also requested that two witnesses be interviewed, which was accomplished by plaintiff's chosen employee assistant Sergeant Nabozny. Kelly Decl. ¶ 11 & Ex. E at 3.

#### C. The Administrative Segregation Hearing

Both plaintiff and defendants have submitted a transcript of the Administrative Segregation Hearing. [6] (Plaintiff's Ex. P-2; Kelly Decl. Ex. P) (HT) [7]. Plaintiff was present for the entire hearing. A review of the hearing transcript shows that plaintiff was given very wide latitude and many opportunities to argue his contentions, argue oral objections to rulings; and submit written objections and summary statements. At the outset, plaintiff was told about his rights with respect to providing oral and documentary evidence [8] and witnesses, and was also told that nothing he said could be used against him in any later criminal proceedings. (HT at 2).

Plaintiff acknowledged that he had been served on December 9, 2003 with the recommendation by George Seyfert, approximately ten days before the hearing. Plaintiff immediately asserted objections to the hearing, and argued that Captain Kelly, the Hearing Officer, was under orders by his superiors to decide against plaintiff. (HT at 7). Plaintiff also argued that the events referred to in the Seyfert Memo of December 2003 were extremely old, some were thirteen years old, and some as old as nineteen years ago. (HT at 8-11). Plaintiff also argued that the events and incidents referred to in the Seyfert Memo should not be used since plaintiff had not been issued any "tickets," and did not have an opportunity to defend those incidents at the time. (HT 8-9, 14, 16, 36, 57, 74, 82, 83).

**\*16** During the hearing, plaintiff was given the opportunity to question George Seyfert, the author of the Administrative Segregation recommendation, and Deputy Superintendent Dave Carpenter, who monitored plaintiff's mail. (T. 54-55, 68-77). Plaintiff's arguments at the hearing and during his written submissions to the Hearing Officer were that several of the events specified in the Seyfert Recommendation never happened, and for the other events, which he admitted, they did not happen as described or there were severe mitigating circumstances.

For example, plaintiff admitted to his escape from Shawangunk Correctional Facility, a maximum security facility, during November 1994. (HT at 10; Pl. Dep. at 25-33). Plaintiff also admitted that he attempted an escape while in the custody of the Suffolk County authorities by kicking a door window, and breaking his handcuffs on a partition in the vehicle. (HT at 8; Pl. Dep. at 86-87). Plaintiff also admitted that during June 1995, he threw feces at a corrections officer and admitted that he made a telephone call to a citizen in which he urged the citizen to tell other individuals to firebomb a house because plaintiff believed that three individuals living in the house had killed his friend. (HT at 13; Pl. Dep. at 98, 99). *See also,* Plaintiff's Response to Defendants' Rule 7.1 Statement of Material Fact.

During the hearing and at his deposition, plaintiff admitted stabbing another inmate in February 1997. (HT at 15; Pl. Dep. at 108), but argued that the Seyfert Recommendation did not include all the facts. Plaintiff argued that he was under attack at the time by another inmate who was attempting to cut plaintiff's face with a piece of glass, and that he was simply defending himself.

(HT at 15). Plaintiff also admitted to setting a fire during May 1997, but claimed that it was a "get warm" fire since the heat in the facility had malfunctioned, all the windows were broken, and it was freezing cold. (HT at 16; Pl. Dep. at 109). With respect to another fire incident, plaintiff admitted that there was a fire in his cell, but argued that he had plexiglass on the front of his cell, and that guards gave him a "light" from the back of his cell, and that some papers caught fire. (Pl. Dep. at 106-107).

Plaintiff denied completely that several of the incidents in the Seyfert Recommendation actually occurred. Plaintiff denied that he ever removed his handcuffs while in his cell in SHU during June 1995. Plaintiff stated at the hearing that he did not recall exactly what happened, but that the staff removed his handcuffs and they were lost by staff. (HT at 12; Pl. Dep. at 93). Plaintiff denies that he removed his handcuffs. (Pl. Dep. at 93). Plaintiff denies that ever secreted a razor blade in his rectum. (HT at 14; Pl. Dep. at 104). Plaintiff's own exhibits, however, contain an Unusual Incident Report which refers to x-rays being taken of plaintiff which showed the location of the razor in his rectum. (Pl.Ex.P-4) (UI dated 9/15/95).

**\*17** A large portion of plaintiff's administrative segregation hearing was spent on plaintiff's challenge to his "enemy" list. The Seyfert Recommendation refers to 21 enemies, and plaintiff argued that the reference to 21 enemies was erroneous. The hearing officer accepted plaintiff's argument. Plaintiff argued on multiple occasions that some of the individuals listed as "enemies" were, in fact, friends, or were no longer in DOCS custody. (HT at 39-43, 63, 77-81; Pl. Dep. at 111-19).

Plaintiff challenged other aspects of the Seyfert Recommendation. Plaintiff challenged two memoranda prepared by separate sergeants on separate dates from two separate facilities. Plaintiff argued that he was never given an opportunity to challenge the allegations in these memos, and was never charged with any type of infraction. (HT at 33). Both sides have submitted copies of each memo, one from Sergeant Greene dated March 16, 1990, the other from Sergeant Sweeney just four days later on March 20, 1990. (Kelly Decl. Exs. M, N).

The first memo by Sergeants Greene and LaBombard to a Deputy Superintendent for Security states that plaintiff has demonstrated certain "characteristics and abilities not apparent in the average inmate." (Kelly Decl. Ex. M

at 2). According to Sergeants Greene and LaBombard, after having shackles applied, plaintiff "shook his wrists a couple of times and stepped out of his wrist chain." *Id* . The sergeants did not know how this occurred and did not rule out error by the corrections officers. The sergeants included various comments made by plaintiff, including that it would not be hard to "get out" of the facility, and "it is like you're asking me to do something." *Id.* The sergeants included comments the plaintiff made about distances, landmarks, and plaintiff's questions about the difference in the route to and from the hospital. *Id.*

The sergeants also stated that plaintiff was constantly flexing his wrists and legs, and was able to cross his legs while keeping one foot on the floor even though plaintiff was in restraints. The sergeants stated that plaintiff made a comment about a supervisor that was outside the facility while plaintiff was being transported back to the facility in the return from a hospital visit. Plaintiff said that he was "memorizing the license plate [of the supervisor's car] and when I see him, I'm going to fuck with him." *Id.* The sergeants concluded that "it is imperative that staff escorting this inmate never lose sight of this inmate's cunning abilities ..." They also stated that officers escorting this inmate must be "constantly on guard ..." *Id.* at 2.

A second memo from Sergeant Sweeney to a First Deputy Superintendent at Clinton Correctional Facility is dated March 20, 1990. (Kelly Decl. Ex. N). In this memo, Sergeant Sweeney stated that he heard Inmate Proctor make comments on the weapons worn by corrections officers, including the number and model of the weapons; that Inmate Proctor was very respectful and well-mannered, which "would cause staff to become complacent," and that Inmate Proctor was asking several questions about where he was going and why there was the amount of security which was present. *Id.* at 1.

**\*18** Sergeant Sweeney also believed that plaintiff was "quite knowledgeable of our radio communications systems, and made numerous remarks pertaining to the system." *Id.* Sergeant Sweeney believed that Inmate Proctor was "very attentive to his surroundings, asking many questions, and appeared to make many mental notes." Sergeant Sweeney believed that Inmate Proctor would utilize any opportunity that might arise to his advantage. *Id.* at 2.

Plaintiff argued that these memoranda were unreliable and simply represented "mind reading" and speculation by the sergeants who wrote them. He argued that no charges were brought and these two memoranda should be given little, if any, weight. (HT at 72-73). At his deposition, plaintiff stated that he had been denied the opportunity to present four witnesses. (Pl. Dep. at 125). Defendant Kelly gave specific reasons for that denial. Defendant Kelly stated that three of the requested witnesses were no longer in DOCS' custody, and the fourth witness did not have any testimony that was material to the issues in the hearing. The fourth witness was an inmate named Colon, and plaintiff wanted Colon to testify that Colon was not plaintiff's enemy.

The Hearing Officer's ruling is supported by the record since the Hearing Officer specifically corrected the "Enemies List," and reduced the number of enemies that plaintiff allegedly had. Plaintiff specifically went through each name on the "new" Enemies List, and argued that most of those names were either not enemies, or were completely unknown to plaintiff. (HT at 79, 80).

Plaintiff has clearly admitted to several very serious crimes, all of which are extremely significant to a correctional facility. *See* Plaintiff's Responses to Defendants' Rule 7.1 Statement; Plaintiff's Deposition (Boivin Decl. Ex. A), and Transcript of Administrative Segregation Hearing Kelly Decl. Ex. P. Plaintiff admitted to a very sophisticated planned and successful escape from Shawangunk Correctional Facility; has admitted that he escaped from Suffolk County authorities by violent behavior; has admitted that he physically assaulted two Nassau County corrections officers; has admitted that he threw feces on a New York State corrections sergeant; and has admitted that he has engaged in other violent behavior such as stabbing or assaulting other inmates.

Plaintiff attempts to minimize his extremely serious criminal and violent record by stating that he has only two escapes. (HT at 18), and that he has been well-behaved while in SHU for nine years, resulting in a reduction of his SHU sentence. Plaintiff claims that he now denounces escape and assaultive behavior, and has told Superintendent Greene of his new outlook. (HT at 19). All of plaintiff's claims do not change the basic facts in this case of plaintiff's absconding from a facility when he was 19 years old, escaping from the Suffolk County authorities five years later, and escaping from

Shawangunk Correctional Facility approximately five years after the Suffolk County escape.

**\*19** By calling Deputy Superintendent Carpenter, an individual who was responsible for monitoring plaintiff's mail, plaintiff attempted to show that his mail contained no suggestions or references to escapes and therefore proves that he has no thoughts of escaping. He also argues that he has personally "denounced" escapes and assaults and therefore everyone should realize that he does not present any risk of escape or violent behavior. (HT at 19).

### D. Defendant Kelly

Plaintiff's first four causes of action alleges that defendant Kelly violated plaintiff's right to due process during the administrative segregation hearing. This court has reviewed the entire hearing transcript, the exhibits attached to the Seyfert Declaration, and plaintiff's deposition. As stated above, all of the due process protections articulated in *Wolff* are not constitutionally required for placement in administrative segregation, however, in this recommendation, this court has carefully reviewed all the process that was afforded to plaintiff and finds that he received as many rights as an inmate would have received in a disciplinary hearing as required by New York State law.

In fact, this court finds that there was substantial evidence, which is more than the modicum of evidence constitutionally necessary, to support the Hearing Officer's finding that plaintiff presents an extreme risk of flight, and a risk of danger to other inmates and DOCS personnel. Plaintiff admitted most of the conduct relied upon by defendant Kelly, and defendant Kelly was justified in using plaintiff's past conduct in making his determination.

Although plaintiff complains that defendant Kelly refused to call a relevant witness, his failure to do so did not violate plaintiff's due process rights. Plaintiff states in the complaint that he wanted to call Inmate Colon "for the reasons stated in paragraph 20 ." (AC ¶ 21). Plaintiff also wished to call Inmate Colon so that Colon could testify that he was supposed to be a witness "several years ago," to state that corrections staff had been placing plaintiff's life in danger and that was the reason that plaintiff attempted to escape from Shawangunk in 1994. (AC ¶ 21).

Proctor v. Kelly, Not Reported in F.Supp.2d (2008)
Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 225 of 299
2008 WL 5243925

By calling Inmate Colon, it appears that plaintiff was trying to justify his 1994 escape and perhaps try to show that he would not have escaped if the corrections staff had not put his "life in danger." Defendant Kelly's written reason for the denial of this witness was that Inmate Colon was listed as a "separatee". (Kelly Decl. Ex. G; HT at 64). Plaintiff claims that the refusal to call Inmate Colon had nothing to do with the reason that plaintiff wanted to call the inmate. (AC ¶ 22). Since plaintiff would not constitutionally have been entitled to witnesses at all, defendant Kelly's denial of Inmate Colon would not have been constitutionally relevant even if the reason was incorrect.

However, the court notes that plaintiff would not have been able to rehash the reasons for his attempted escape in 1994. If his reason for calling Inmate Colon was to justify plaintiff's attempted escape to show that he was no longer an escape risk, such testimony would have been properly denied in any event. The court notes that if calling Inmate Colon was an attempt to prove that plaintiff's enemies list was incorrect, defendant Kelly went over plaintiff's enemies list at the hearing and considered plaintiff's claim that the list was outdated. (HT at 76-80). In fact, defendant Kelly told plaintiff that he would consider some individuals only as "on the separation list" as opposed to being plaintiff's "enemies." (HT at 84-86). It is also clear that defendant Kelly accepted and considered evidence submitted by plaintiff. (HT at 83-84).

 **\*20** Notwithstanding defendant Kelly's failure to call Inmate Colon, it is clear that plaintiff was able to present a defense to the recommendation. Plaintiff claims that defendant Kelly was not "impartial." Compl. ¶ 82. It is true that an inmate is entitled to an "impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An "impartial" hearing officer is one who does not prejudice the evidence, and who could not say how he would assess evidence that he has not seen. *Patterson v. Coughlin,* 905 F.2d 564, 569-70 (2d Cir.1990). The court would point out, however, that disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts based on the "special characteristics" of the prison environment. *Allen,* 100 F.3d at 259; *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) (it is permissible for prison adjudicators to be encumbered by various conflicts of interest).

A careful review of the entire file shows that there is absolutely no evidence that defendant Kelly was not impartial. He conducted an exhaustive hearing, listening to plaintiff's defense, and when plaintiff challenged his enemies list, defendant Kelly did look into the matter, and agreed to consider plaintiff's position. *See generally* Hearing Transcript. *See also* Kelly Decl. ¶¶ 13-17. The record shows that defendant Kelly proceeded very deliberately and patiently, and gave plaintiff great latitude in allowing plaintiff to assert all of plaintiff's arguments and objections. He asked for two or three extensions to complete the hearing because of the issues raised and the time necessary for plaintiff to fully present all of his arguments, claims, theories, and excuses.

With respect to the claim that defendant Kelly was directed to reach a certain result, the declaration of defendant Seyfert clearly shows that this was not the case. Defendant Seyfert states in his declaration that he is not defendant Kelly's superior had no contact with defendant Kelly other than the telephonic testimony that defendant Seyfert provided at the hearing. Seyfert Decl. ¶¶ 39-44. Thus, defendant Kelly's impartiality cannot be questioned through a claim that defendant Seyfert was somehow defendant Kelly's superior, causing an impermissible conflict of interest.

Plaintiff also complains that defendant Kelly's refusal to reconstruct testimony after erasing part of the hearing tape somehow violated plaintiff's due process rights. The court would simply point out, as stated above, that an electronic recording of a hearing is not constitutionally required, and there is no constitutional right to a transcript even in the disciplinary context. *See Sweet,* 514 F.Supp.2d at 415 (even in the disciplinary context, no right to a hearing transcript). Thus, even if defendant Kelly did erase part of the hearing tape and refused to "reconstruct" the testimony, there is no due process violation.

 **\*21** Finally, plaintiff claims that defendant Kelly relied upon false, expunged information in accepting defendant Seyfert's recommendation. Plaintiff also alleges that defendant Kelly failed to make an "independent assessment" of the information. Plaintiff is confusing the law that governs due process claims. The requirement of an "independent assessment" refers to a hearing officer being required to make an independent assessment of "confidential information" that he receives during a disciplinary hearing. *See Sira v. Morton,* 380 F.3d 57,

77 (2d Cir.2004). There was no confidential information relied upon by defendant Kelly in this case, thus, defendant Kelly did not have to make an "independent assessment" of the information utilized. Defendant Kelly did make an "independent assessment" of all the evidence when he considered the plaintiff's testimony and other evidence and defendant Seyfert's evidence and testimony. This was the "independent assessment" required of the hearing officer.

To the extent that plaintiff claims that defendant Kelly relied upon "false and expunged" information, it is unclear to what plaintiff is referring. Plaintiff has argued that he was never given misbehavior reports or "charged" with some of the conduct that was used against him. The fact that plaintiff was not "charged" with misbehavior does not indicate that the conduct did not occur. Plaintiff states that defendant Seyfert testified that UI reports are kept even if the allegations of misconduct were overturned and expunged. Defendant Seyfert did make that statement. (HT at 69). To the extent that UI reports were considered where misbehavior reports were not issued, the court does not find any error in their use.

There is one UI report in plaintiff's case that did result in a misbehavior report and subsequent disciplinary conviction. The incident involved a 1995 charge for contraband in the form of a sharpened nail clipper. Plaintiff later had the charges reversed and expunged. [9] *Proctor v. Coombe,* 233 A.D.2d 648, 649 N.Y.S.2d 832 (3d Dep't 1996). After the UI from this incident was considered in this administrative segregation proceeding, plaintiff brought a proceeding pursuant to 7 N.Y.C.R.R. § 5.51 to expunge *all* references to this incident from his prison record. When the Superintendent denied plaintiff's request, he filed an Article 78 proceeding in Supreme Court of Albany County. *Proctor v. Goord,* 10 Misc.3d 229, 801 N.Y.S.2d 517 (Sup.Ct.2005).

The Supreme Court in Albany County found that because the UI resulted in a misbehavior report and a disciplinary determination that was later expunged, the court found that all references to the UI in plaintiff's record should have been expunged. *Id.* 3 Misc.2d at 232-33, 801 N.Y.S.2d at 519-20. The court held only that references to the UI from the expunged determination should be removed from plaintiff's record. There is no indication, and this court finds none, that the other UI's in which

no misbehavior was charged were false or improperly considered.

**\*22** The Second Circuit has specifically held that prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). To the extent that defendant Kelly considered [10] the one incident involving the nail clipper, the court still finds that no due process violation occurred. Plaintiff had the opportunity to, and did, argue that it should not be considered. If it was error, the error was certainly not "prejudicial" to plaintiff. There were so many other incidents upon which defendant Kelly could base his decision. As stated above, the standard for administrative segregation is "some" or "a modicum" of evidence. Even if the court were to assume that defendant Kelly erred in considering the UI, and even if that error could rise to the level of a constitutional error, [11] the court would find the error harmless.

### E. Defendant Seyfert

Plaintiff has named George Seyfert, who was formerly the Deputy Inspector General of DOCS. Plaintiff claims that defendant Seyfert provided false information and "attested to the veracity of expunged information." Plaintiff claims, in essence, that defendant Seyfert used incomplete and erroneous information when Seyfert compiled the administrative segregation recommendation. Throughout the hearing, plaintiff claimed that Seyfert relied on an erroneous list of plaintiff's "enemies" and also relied on the two memos from correctional sergeants that made statements about plaintiff's actions and state of mind. Plaintiff also argues that Seyfert relied on Unusual Incident Reports, one of which was expunged from plaintiff's records (the nail clipper incident), and others which did not result in Misbehavior Reports. Plaintiff claims, in essence, that he was denied due process since the Unusual Incident Reports did not result in charges, and he was not able to challenge the facts and statements in the Unusual Incident Reports.

The court would point out that inmates are not constitutionally protected from false accusations as long as the hearing comports with due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988). In this case, the court has determined that plaintiff had

more than the constitutionally required due process at his hearing, thus, plaintiff's claims of false accusations against defendant Seyfert cannot stand.

Notwithstanding this finding, the court must note that plaintiff's claims of **false** accusations ring hollow. The plaintiff began the hearing by admitting most of the conduct that was in the recommendation. Plaintiff's claims of "false" evidence are basically his interpretation of how the incidents happened. Even the UI that the Supreme Court in Albany County ordered expunged was not necessarily "false." The court simply ruled that because the misbehavior charge was reversed and ordered to be expunged, the incident could not be considered. No court ruled that the allegations were "false."

**\*23** Plaintiff admitted at the administrative segregation hearing, during his deposition, and in his Response to Defendants' Statement of Material Facts in Support of the Summary Judgment Motion, that he escaped from Shawangunk; escaped from Nassau County authorities; admitted the two assaults, but claimed they were self-defense; admitted one of the "arson" incidents, admitted squirting feces onto a corrections officer; and admitted receiving disciplinary reports for disorderly conduct, fighting, harassment, and a movement violation. Thus, plaintiff's claims against defendant Seyfert may be dismissed.

### F. Defendants Goord, Greene, Murphy, and LeClaire

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were

grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In plaintiff's sixth cause of action he claims that defendants Murphy, LeClaire, Goord, and Greene violated plaintiff's right to due process by failing to reverse defendant Kelly's determination. Compl. ¶ 85. In plaintiff's tenth cause of action, he states that defendants Kelly, Murphy, Seyfert, LeClaire, and Goord failed to maintain plaintiff's disciplinary records accurately and thus, relied upon false and inaccurate unusual incident records. Compl. ¶ 89. As stated above, only one of the unusual incident records was expunged. There is no indication that any of them were "false."

Since there has been no showing of a constitutional violation, to the extent that plaintiff alleges that the supervisory officers, Murphy, LeClaire, and Goord and Greene affirmed plaintiff's administrative segregation placement, there is also no constitutional violation. Additionally, there is **no indication** that defendants Murphy or Goord were personally involved in plaintiff's appeal or in the maintenance of plaintiff's records. Defendant Kelly was only the hearing officer in this case. There is no indication that he was in any way involved in the maintenance of plaintiff's records.

**\*24** In his amended complaint, plaintiff states that defendant Murphy is the Acting Director of the Inmate Disciplinary Program, whose "responsibility" it is to make sure that disciplinary and administrative segregation hearings comply with the law. However, there are no specific claims against this individual. Thus, there is no personal responsibility asserted for defendant Murphy.

Plaintiff has submitted a letter that he received from defendant LeClaire, stating that notwithstanding the questioned UI report, there was other evidence showing that plaintiff's placement in administrative segregation was proper. Pl.Ex. P-15 at 4. Even assuming that this letter would make defendant LeClaire personally responsible in some way for the "affirmance" of plaintiff's administrative segregation status, the letter shows that defendant LeClaire believed that plaintiff's placement in administrative segregation was proper, notwithstanding the allegedly inaccurate or "false" UI outlining the nail clipper incident. *Id.* Thus, as stated above, this UI was not

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

the only basis for plaintiff's placement in administrative segregation, and defendants did not rely on "false" evidence.

This court has examined the Declaration by former DOCS Commissioner Goord in support of defendants' motion for summary judgment. Goord Decl. (Dkt. No. 39). The Declaration is detailed and shows that former Commissioner Goord was required to delegate many separate duties because of the vast number of inmates and the large number of correctional facilities. Goord Decl. ¶¶ 7-10. Commissioner Goord confirms that he was never personally involved in the administrative segregation hearing, the appeals therefrom, or the grievances filed by plaintiff regarding the allegedly inhumane conditions in SHU. Goord Decl. ¶¶ 34-44, 58.

With respect to maintenance of records, defendant Goord states that DOCS tries to maintain inmate records accurately. Goord ¶ 62. If an inmate questions the accuracy of his records, he may file a challenge under 7 N.Y.C.R.R. § 5.50. [12] Defendant Goord states that he did not have any involvement in this procedure. Goord Decl. ¶ 62-64. Plaintiff makes no allegation that defendant Goord had any responsibility for any of the allegations that plaintiff makes. Basically defendant Goord is named in the complaint because he was the Commissioner of DOCS. As stated above, this essentially *respondeat superior* claim cannot survive. This court recommends, therefore, that Commissioner Goord be dismissed from this lawsuit.

The court has examined the Declaration by Superintendent Greene and all of the other records in this case, and finds that Superintendent Greene did not violate any of plaintiff's due process rights with respect to plaintiff's administrative segregation hearing. Superintendent Greene's statement that his only role in the administrative segregation determination was the assignment of Captain Kelly to conduct the hearing is supported by the records in this case.

**\*25** Superintendent Greene was *not* personally involved in the recommendation to put plaintiff into administrative segregation, was not personally involved in the hearing, and was not personally involved in the decision or the appeal. In addition, Superintendent Greene does not maintain inmate records, and has no responsibility for any incomplete or missing records pertaining to the plaintiff.

Greene Decl. ¶ 29. Defendant Greene states that inmate records are kept by the Central Office. *Id.* Thus plaintiff's due process claims may be dismissed as against defendant Greene.

**G. Periodic Reviews**

In plaintiff's cross-motion for summary judgment, he *now* appears to be complaining about the periodic reviews that occur every sixty days when an individual is confined to administrative segregation. Pl. Mem. of Law at 10, 27-28. (Dkt. No. 98). It is true that in addition to the notice and opportunity to be heard prior to placement in administrative segregation, an inmate must be given periodic reviews of his confinement so that administrative segregation is not used for indefinite confinement of the inmate. *Hewitt,* 459 U.S. at 477 n. 9. Those periodic reviews must be meaningful. *See Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000). The question of periodic review is a due process claim that is separate from the claim for the initial placement in administrative segregation. *See Blake v. Coughlin,* 92-CV-1351, 2006 U.S. Dist. LEXIS 55319, \*14-17, 2006 WL 2270383 (N.D.N.Y. Aug. 8, 2006).

Plaintiff's motion for summary judgment, filed in 2008, is the *first time* in this case that plaintiff is complaining about his periodic reviews. There is absolutely *no* mention of periodic reviews in his amended complaint that was initially submitted as a motion to amend on September 8, 2005. Since plaintiff was placed in administrative segregation in 2003, by September of 2005, there would have been many of those periodic reviews to challenge if plaintiff wished to do so. Defendants are correct in arguing that the constitutionality of plaintiff's periodic reviews is not before the court.

**4. *Conditions in SHU***

Plaintiff alleges that the conditions in SHU violated his right to be free from cruel and unusual punishment. Plaintiff's seventh, eighth, and ninth causes of action refer to these allegedly inhumane conditions. The Eighth Amendment does not mandate comfortable prisons, but does guarantee that the conditions in prison will be at least humane. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001). In order to establish an Eighth Amendment violation, plaintiff must show that the deprivation was objectively, sufficiently serious to deprive plaintiff of the minimal civilized measure of life's necessities, and must show a sufficiently culpable state of mind on the part of

2008 WL 5243925

defendant. *Id.* That state of mind component is satisfied if defendant has shown deliberate indifference to plaintiff's health or safety. *Id.* (citations omitted).

**\*26** Plaintiff has submitted many grievances from other inmates that plaintiff believes support his claims that the conditions in SHU violated the Eighth Amendment ban against cruel and unusual punishment. Many of the exhibits show specific investigations and statements by sergeants in response to grievances. In one of plaintiff's exhibits, Sergeant Birrell filed a report stating that no inmates around the grieving inmate were plastering their walls with feces. Pl.Ex. P-21. In another of plaintiff's exhibits, Sergeant Birrell stated that his investigation did not verify flooding of an inmate's cell. Pl.Ex. P-22. In another response, Sergeant Murray stated that the inmate could request that mental health personnel examine him. Pl, Ex. P-24. *See also* Pl. Exs. P-25, P-26, P-28.

In his Eighth Amendment claims, plaintiff has named only supervisory personnel, defendants Greene and Goord. Plaintiff complains about two specific problems in SHU, human waste being left on the gallery, and mentally ill inmates. There is no indication that defendant Goord was involved in any of the grievances submitted by plaintiff or any other inmate. Defendant Goord was not at Great Meadow Correctional Facility. His office was in Albany, and he supervised the entire DOCS system. Goord Decl. ¶ 7.

As defendant Goord states in his declaration, he was ***not*** involved in grievances since they are handled through the Inmate Grievance Program in 7 N.Y.C.R.R. § 701, *et seq.* Goord Decl. ¶¶ 40-43. The court would also point out that even if defendant Goord had ignored letters of protest, this would not have made him personally responsible for the violations outlined in those letters. *Smart v. Goord,* 441 F.Supp.2d 631, 642-643 (S.D.N.Y.2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N. Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007).

Plaintiff's bald assertion that defendant Goord condoned a policy of inhumane conditions in Great Meadow's SHU is completely unsupported by plaintiff's complaint or any of the multitude of exhibits [13] attached to his summary judgment motion.

Defendant Greene is the superintendent of Great Meadow. Defendants claim that there is no policy of condoning such behavior in SHU. Although plaintiff claims that mentally ill inmates are housed in SHU, and ***those mentally ill inmates*** are generally responsible for the human waste and noise problem, plaintiff seems to forget that he admitted placing feces in a toothpaste tube while in he was in SHU and squirting it onto a corrections officer. Plaintiff stated at his administrative segregation hearing that he understood that it was poor judgment, however, other inmates who are not mentally ill could exercise the same "poor judgment."

Defendant Greene states that unfortunately, there are instances in which inmates throw things, [14] flood their cells, start fires, and engage in generally unruly behavior. Greene Decl. ¶ 37. According to defendant Greene, and to the individuals who investigated the grievances cited above, these instances of improper behavior are dealt with "appropriately." Greene Decl. ¶ 38. It is clear from plaintiff's own exhibits that the subjects of these grievances were addressed. Although plaintiff complains that the SHU houses "mentally ill" inmates, plaintiff's opinion of whether an inmate is mentally ill does not raise a question of fact regarding this issue, particularly since plaintiff himself has engaged in some of the "offensive" behavior.

**\*27** Plaintiff has not alleged that he was denied the minimal civilized measure of life's necessities, he has alleged that he has had to suffer some unpleasant conditions caused by other inmates. The court would point out that in some of plaintiff's exhibits, the investigation into the grievance shows that the statements in the grievance were unsubstantiated. In response to a grievance stating that an inmate's jumpsuit was soiled by flooding, Sergeant Birrell reported that the jumpsuit was neither wet, nor soiled. *See* Pl.Ex. P-22 at 5.

Plaintiff has also submitted an SHU log for various dates. Pl.Ex. P-16. [15] A review of the log entries shows that generally the officers handled issues very quickly. The court also notes that there are notations that MHU (mental health unit) personnel made rounds frequently. *See e.g.* Pl.Ex. P-16 at 6, 9, 11, 14. The court would also point out that there is no indication that an individual who needs a mental health professional is "mentally ill." There are incidents of "banging" on the cells, [16] however, these appear to occur on an occasional basis.

Plaintiff filed a grievance, alleging that on May 31, 2004, an inmate flooded his toilet. Plaintiff himself states that a porter was mopping up the area at 2:00 p.m., but also states that at 11:30 p.m., the inmate in question had not been given the opportunity to clean his cell. Pl.Ex. P-23. A review of the log book entries shows that an inmate was throwing toilet water and feces on the floor at 12:55 p.m. and at 1:35 p.m. Pl.Ex. P-16 at 24. If plaintiff claims that the porter was cleaning the area at 2:00 p.m., this does not support his claims that this condition was allowed to exist for the entire day. Additionally, the court notes that the log book also shows that by 2:18 p.m., an inmate plumber was trying to unclog the toilet, and by 2:35 p.m., the toilet was "flushable." *Id.* at p. 24.

The court also notes that between May 9, 2004 and May 13, 2004, there was a plumber on the unit at least twice. Pl.Ex. P-16 at 14-16. On May 27, 2004, another inmate was on the unit to fix and clean an inmate's toilet. *Id.* at 22. Shortly thereafter, a porter was "out to clean." *Id.* On one day, at 11:03, an inmate was observed throwing feces and water out of his cell and covering the plexiglass on the front of his cell with an unknown substance. Pl.Ex. P-16 at 26. The log book notes that a supervisor was "notified" immediately, and at 11:52, maintenance was called. At 11:55, the MHU was on the unit to attempt to "extract" the inmate. *Id.* On another day, the log book indicates that at 9:17 a.m. someone was "out cleaning the mess on odd side of F-Block." *Id.* at 34. At 10:15 a.m. C.O. Depalo came to take an inmate out of his cell "to clean cell," and the "cell extraction protocol" was in progress. *Id.*

On July 11, 2004, an inmate kept his food tray and was yelling and banging for approximately one hour. *Id.* at 68. The reason for the banging, however, was that his eye was bothering him, and the officer called the nurse, who informed him that the physician's assistant would check the inmate's eye on evening rounds. *Id.* There was some more "banging and hollering" noted for approximately one half hour on July 14, 2004. *Id.* at 73. On July 14, 2004, at 7:40 a.m., the officer noted that an inmate had smeared feces on the plexiglass covering the door of his cell and covered the door with paper. *Id.* at 72. At approximately

12:46 p.m., the plexiglass was being removed from a cell to clean the door and the bars. *Id.* at 75. At 2:00 p.m., the cell [17] was "completely clean" and the plexiglass was placed back on the cell. *Id.*

**\*28** The court will not discuss every entry in the log book and what it states, and the court does note that there are other instances of improper behavior noted in the log book. [18] In the entries cited, however, the hygiene issues were all addressed quickly, and the area cleaned within a short period of time. When there were plumbing issues on the unit, these too were addressed. These examples are only to indicate that plaintiff's conclusory assertions that there is some kind of "policy" to allow unhygienic conditions, caused by mentally ill or other inmates to exist on the SHU, or that defendants Greene and Goord condoned such behavior are meritless.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 93) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is

**RECOMMENDED,** that plaintiff's cross-motion for summary judgment (Dkt. No. 98) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5243925

---

Footnotes

1    The Court notes that Plaintiff's claim regarding periodic reviews was raised for the first time in his February 7, 2008 Memorandum of Law, more than two years after Plaintiff filed his Amended Complaint. (Dkt. No. 98, Plf.'s Mem. of Law, at 10, 27-28)

2008 WL 5243925

**2**   *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F.3d 847, 862 (5th Cir.2003) [citation omitted].

**3**   On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g .,* Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

**4**   *See also* Vargas v. Keane, 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**5**   *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

**6**   *See* McNeil v. U.S., 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

**7**   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

**8**   *See, e.g.,* DeMar v. Car-Freshner Corp., 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.) (*pro se* civil rights case); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 1 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.) (*pro se* civil rights case); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.) (*pro se* civil rights case); *see also* Monahan v. N.Y. City Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1[a][3], in *pro se* civil rights case).

**9**   *See* Alicea v. Howell, 387 F.Supp.2d 227, 235 (W.D.N.Y.2005) (deeming immaterial the fact that, at start of disciplinary hearing, hearing officer admitted to having had previous conversation with plaintiff's hearing assistant, which caused hearing assistant to communicate veiled threat to plaintiff about filing complaints about the assistance provided to him); *see also Alicea v. Howell,* 03-CV-0650, Ex. N to Declaration of Wade Howell, Submitted in Support of Defendants' Motion for Summary Judgment, at 2-5 (W.D.N.Y. filed Dec. 31, 2004).

**10**   *See* Bunting v. Nagy, 452 F.Supp.2d 447, 460-61 (S.D.N.Y.2006) (deeming "conclusory" plaintiff's affidavit testimony that hearing officer began hearing by stating, "You look familiar," giving plaintiff a "knowing glare," and then stating, off the record, that "he was going to find plaintiff guilty and going to impose a stiff penalty because he had the previous one modified.").

**11**   *Bunting,* 452 F.Supp.2d at 460-61 (finding no due process violation, despite assertedly biased remark by hearing officer, because "defendant made a substantial effort to locate [a witness] on plaintiff's behalf ... [and] plaintiff received notice of the charges against him and was allowed to present evidence and call witnesses in his defense. Defendant's finding of guilt is fully supported by 'some evidence' ....").

12    *See Daniels v. Williams,* 474 U.S. 327, 331-33 (1986) (stating that "injuries inflicted by governmental negligence are not addressed by the United States Constitution" and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.").

13    The Court notes that, even if it found record evidence of a substantive due process violation having occurred, it could not find any record evidence that Defendants had committed such a violation recklessly. *See Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property ...."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.... [N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.") [internal quotation marks and citations omitted].

14    In addition, the Court notes that Plaintiff has not alleged (in his Memorandum of Law) any specific deprivation of his right to periodic reviews (much less a deprivation caused by Defendants); rather, he has alleged only an entitlement to receive periodic reviews.

15    As indicated above, negligence does not give rise to a procedural due process violation. *See, supra,* note 9 of this Memorandum-Decision and Order [citing cases].

16    This is because "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) [citation omitted]. "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of [a] New York State law or regulation (much less a violation of 42 U.S.C. § 1983)." *Cabassa,* 2008 WL 4416411, at *6, n. 24 [internal quotation marks and citations omitted]. "This is because [the use of] a DOCS Directive is merely a system the DOCS Commissioner has established to assist him in exercising his discretion, which he retains despite any violation of that Directive ." *Id.* [internal quotation marks and citation omitted].

17    *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence.").

18    *Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

19    *See Proctor v. Goord,* 10 Misc.3d 229, 801 N.Y.S.2d, 517 (N.Y.S. Sup.Ct., Albany County 2005) (holding that the DOCS Commissioner's decision not to expunge Unusual Incident Report regarding filed nail clipper and all references to the matter was arbitrary and capricious).

20    The Court would only note that the doctrine of collateral estoppel does not appear to apply under the circumstances. Among other things, Plaintiff sued Defendant Goord is his official capacity in his Article 78 proceeding, and he now sues Defendant Goord in his individual or personal capacity. *See Fletcher v. Goord,* 07-CV-707, 2008 WL 4426763, at *10 (N.D.N.Y. Sept.25, 2008) (Sharpe, J.).

1     The amended complaint is Docket Number 19. The court will cite the amended complaint as "AC." Plaintiff's motion to amend was filed in September 2005. (Dkt. No. 19). Plaintiff's motion was granted in February 2006, and rather than requiring plaintiff to submit a new amended complaint, the court allowed the filing of the proposed amended complaint that was originally attached to the motion. (Dkt. No. 26). Where the portion of the amended complaint is easily identified by numbered paragraphs, the court will refer to the paragraph number. Otherwise, the court will refer to the page.

2     The court notes that within these five causes of action, plaintiff also claims that the due process violations also resulted in Eighth Amendment violations. Plaintiff is confusing the "atypical and significant hardship" used to determine whether

a liberty interest exists for due process purposes, with cruel and unusual punishment for Eighth Amendment purposes. The court will discuss the difference below.

3    Although the standard for determining whether a liberty interest is created is now governed by *Sandin,* rather than by *Hewitt,* the standard for determining the process that is due after a liberty interest has been created remains the same. *See* *Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

4    The court must point out that there are many duplicate exhibits in this file. The same exhibit has often been submitted by both defendants and plaintiff. The court will be mindful to cite to the appropriate exhibit.

5    Kelly Decl. Ex. E at 4-5 is the list of plaintiff's requested documents. Plaintiff appears to have been denied some of his requested documents as evidenced by the notation "no" next to the request.

6    The hearing was conducted on several different days, but is numbered consecutively. Pages 61-66 are chronologically the final date of the hearing, but are included in the transcript out of chronological order.

7    The court is citing to the Hearing Transcript attached to defendant Kelly's declaration.

8    The court notes that it appears that the name of plaintiff's employee assistant was misspelled in the hearing transcript. The document showing plaintiff's choice of assistant states that he chose Sergeant Nobozny, however the hearing transcript states that plaintiff's assistant was Deblaise. (HT at 3). This fact is irrelevant to the decision, since it is clear that plaintiff did have an assistant assigned to him.

9    The court does note that the charges were "administratively reversed," causing the Appellate Division to dismiss the Article 78 proceeding as moot. *Proctor v. Coombe, supra.*

10    The court notes that at the hearing, when plaintiff was responding to each of the allegations in the report, he merely stated that this incident "never happened.... that's all I am going to say about that." (HT at 13). He later argued that he was found "innocent" of the charges and the records were expunged. (HT at 36-37). Plaintiff questioned why the information was being used against him. *Id.* Plaintiff did have the opportunity to argue that defendant Kelly should not consider the information. Plaintiff and the hearing officer had a lengthy discussion about incidents that did not result in misbehavior reports. (HT at 52-54). The hearing occurred in 2003, and the Supreme Court's decision stating that the information should have been expunged occurred in 2005.

11    The court makes no such finding in this case.

12    As stated above, plaintiff did challenge the **one** expunged misbehavior report and UI record and won in the Supreme Court. Plaintiff did not later challenge his "enemies" list.

13    Plaintiff has submitted 45 exhibits in support of his summary judgment motion. Pl. Exs. 1-45 (Dkt. No. 98). Some of them are duplicates of the defendants exhibits, such as the administrative hearing transcript and the two sergeants' memoranda. Pl. Exs. 1-3, 8. However, plaintiff's exhibits contain letters written by plaintiff to various officials. Pl. Exs. P-11-11-12, 14-15, 22-23. Some of the exhibits are grievances by other inmates regarding the conditions in SHU. Pl. Exs. 24-36. Other exhibits consist of newspaper articles discussing the confinement of mentally ill inmates as well as excerpts from other writings regarding correctional facilities. Pl. Exs. 39-41, 42-44. Plaintiff also submits a handwritten affidavit from an individual, stating that he believes plaintiff's statements to be accurate. Pl.Ex. 45. The court has reviewed and considered all of plaintiff's exhibits in conjunction with defendants' motion and plaintiff's cross-motion for summary judgment.

14    At one time, plaintiff also had a plexiglass shield placed over his cell. These shields are generally used when an inmate throws materials (feces or otherwise) out of his cell. Thus, it appears that "mentally ill" inmates are not only those that cause problems in the SHU.

15    The pages of plaintiff's Ex. P-16 are numbered in various places, but it appears that plaintiff has numbered the pages consecutively at the bottom right, and the court will cite to those page numbers.

16    *See e.g.* Pl.Ex. P-16 at 78, 88.

17    The court is assuming that this is the same cell, although the names of the inmates have been "blacked-out" from the log entries.

18    Plaintiff did not include all the pages from each day in this exhibit. The pages appear to also be stamped with numbers at the top right hand corner of the page. These numbers are not always consecutive, indicating that there are pages missing.

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5441503
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No.
2; and M. Soto, Defendants.

No. 9:11–CV–0250.
|
Sept. 27, 2013.

**DECISION & ORDER**

**Attorneys and Law Firms**

Benji D. Reed, Pine City, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant Soto.

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).

In his Report and Recommendation [dkt. # 33], Magistrate Judge Peebles:

RECOMMENDED that plaintiff's amended complaint (Dkt. No. 30) be REJECTED as failing to cure the deficiencies detected in the court's earlier order as it relates to all claims asserted against defendant Soto, and that this action be DISMISSED, with prejudice, as it relates to defendant Soto; and it is further

RECOMMENDED that plaintiff's amended complaint be REJECTED as precluded by New York Correction Law § 24 as it relates to all claims asserted against defendant John Doe # 2; and it is further

RECOMMENDED that plaintiff's amended complaint be ACCEPTED as it relates to the claims asserted against defendant John Doe # 1; and it is further

RECOMMENDED that, upon the district judge accepting the recommendations regarding the claims asserted against defendant John Doe # 1, the superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery;

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, the clerk of the court issue a summons and forward it, along with a copy of plaintiff's amended complaint, to the United States Marshal for service upon the superintendent of Eastern Correctional Facility. The clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this report and recommendation, and any decision and order issued accepting or rejecting it; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, a response to the plaintiff's amended complaint be filed by a defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and it is further,

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, plaintiff continue to take reasonable steps to ascertain the identity of defendant John Doe # 1, and, if appropriate, file a motion with the court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building,

100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**\*2** Dkt. # 33 at 18–21.

Plaintiff has filed objections to Magistrate Judge Peebles' report (dkt.# 36).

## II. STANDARD OF REVIEW

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole,* 2011 WL 3809920, at \* 2 (S.D.N.Y., Aug. 25, 2011) (citations and interior quotation marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb. 25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

Plaintiff's first objection contends that Judge Peebles' recommendation to dismiss the retaliation claim against Defendant Soto is the result of Plaintiff's Complaint "being inartfully drawn or composed." Dtk. # 36 at 1. Plaintiff correctly articulates the lenient standard that is to be afforded to *pro se* litigants in civil actions. The Supreme Court has stated that "[a] document filed *pro se* is 'to be liberally construed' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). However, even applying this lenient standard, the Court agrees with Magistrate Judge Peebles that "careful review of plaintiff's proposed amended complaint reveals that it lacks sufficient factual allegations to demonstrate a plausible retaliation claim, including a basis to find a causal connection between a protected activity engaged in by plaintiff, and an adverse action taken by the defendants against him as a result." Dkt. # 33 at 10. This conclusion is reinforced by the fact that the misbehavior report that serves as the basis of Plaintiff's claim against Defendant Soto was dismissed when the hearing officer "learned that [Plaintiff], in fact, had missed the programming for medical reasons." *Id.* at 7. Thus, it is clear that the misbehavior report was filed because of a mistaken belief as to Plaintiff's location, not in retaliation for Plaintiff using medical services at the correctional facility, and that Plaintiff suffered no adverse consequences from the misbehavior report. Because the Court has already given Plaintiff an opportunity to amend his Complaint, dkt. # 28 at 6, it now finds that Plaintiff's failure to make a claim under Section 1983 is not a product of the quality of the pleadings. Rather, the facts of this case are simply insufficient to implicate a retaliation claim. Therefore, the Court finds on *de novo* review that Plaintiff's claim against Soto is properly dismissed.

**\*3** In all other respects, Plaintiff fails to make specific objections to Magistrate Judge Peebles' report. Instead, he states generally that "the magistrate alleges that my

amended complaint lack [sic] sufficient allegations which could be reasonably concluded that a nexus exist [sic] linking the protected activity and adverse action." Dtk. # 36 at 1. Plaintiff then proceeds by merely rearguing the same claims presented to Magistrate Judge Peebles in an attempt to demonstrate that there is a causal connection between Defendant Soto's actions and Plaintiff's protected behavior. *See generally* dkt. # 36. As a consequence, the Court reviews the Report and Recommendation for clear error and finds none. Moreover, upon *de novo* review, the Court reaches the same conclusion as did Magistrate Judge Peebles. Accordingly, the Court accepts and adopts Magistrate Judge Peebles recommendations for the reasons stated in his report.

**IV. CONCLUSION**

For the reasons discussed above, the Court accepts and adopts Magistrate Judge Peebles' recommendations for the reasons stated in his report. Accordingly,

(1) Plaintiff's amended complaint (Dkt. No. 30) is **REJECTED** and this action is **DISMISSED,** with prejudice, as it relates to Defendant Soto; and

(2) Plaintiff's amended complaint is **REJECTED** and this action is **DISMISSED,** with prejudice, as it relates to Defendant John Doe # 2; and

(3) Plaintiff's amended complaint is **ACCEPTED** as it relates to the claims asserted against Defendant John Doe # 1; and

(4) It is **ORDERED** that the Superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery; and

(5) It is **ORDERED** that the Clerk of the Court issue a summons and forward it, along with a copy of Plaintiff's Amended Complaint, to the United States Marshal for service upon the Superintendent of Eastern Correctional Facility. The Clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of the Report and Recommendation, and this Decision and Order; and

(6) It is **ORDERED** that upon the superintendent of Eastern Correctional Facility being added as a defendant in this action and Defendant John Doe # 1 being

identified, a response to the plaintiff's amended complaint be filed by Defendant John Doe # 1, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and

(7) It is **ORDERED** that Plaintiff continue to take reasonable steps to ascertain the identity of Defendant John Doe # 1, and, if appropriate, file a motion with the Court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit. Plaintiff's failure to ascertain the identity of Defendant John Doe # 1 will result in the dismissal of this action; and

**\*4** (8) It is **ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**IT IS SO ORDERED.**

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Benji D. Reed, a New York prison inmate, has commenced this suit pursuant to 42 U.S.C. § 1983 against various prison officials alleging deprivation of his civil rights. As a result of prior court determinations, plaintiff's claims against M. Soto, the only defendant named and served in the action, have all been dismissed,

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.   3

although plaintiff was granted leave to amend his complaint in order to allege facts demonstrating the existence of a plausible retaliation claim against that defendant.

Currently pending before the court for review is an amended complaint proffered by plaintiff in an attempt to cure the deficiencies discerned by the court in connection with his retaliation claim, as originally stated. Having reviewed that proposed amended complaint, I conclude that, like its predecessor, the new pleading fails to include sufficient factual allegations to support a cognizable retaliation claim, and therefore recommend that it be rejected. In addition, because I find that the negligence claim asserted against one of the unidentified defendants, defendant John Doe # 2, is precluded by New York Correction Law § 24, I recommend that claim be dismissed. Finally, because I conclude that plaintiff's amended complaint sets forth facts plausibly alleging an Eighth Amendment claim against the other unidentified defendant, defendant John Doe # 1, who, to date, has not been identified and therefore cannot be served, I recommend that the superintendent of Eastern Correctional Facility be added to the action for the sole purpose of aiding plaintiff in ascertaining the identity of that defendant.

## I. BACKGROUND

Plaintiff commenced this action on March 8, 2011, asserting a variety of claims against two unnamed defendants John Doe # 1 and John Doe # 2, and defendant M. Soto, a corrections counselor at Eastern Correctional Facility ("Eastern"), where plaintiff was housed at the relevant times.[1] On October 17, 2011, defendant M. Soto, the sole remaining named-defendant in the action, moved for dismissal of the balance of plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In a report issued on July 26, 2012, I recommended dismissal of plaintiff's claims against defendant Soto, with leave to amend with respect to plaintiff's cause of action for retaliation arising out of the alleged filing of false misbehavior reports by defendant Soto. See Report and Recommendation Dated July 26, 2012 (Dkt. No. 22). That recommendation was based upon a finding that plaintiff's complaint failed to allege facts sufficient to establish the requisite nexus between his visit to the prison infirmary, which plaintiff alleged constituted protected activity, and

defendant Soto's issuance of misbehavior reports against him, representing an alleged adverse action motivated by retaliatory animus. Id. at pp. 15–16.

**\*5** My recommendation was adopted by Senior District Judge McAvoy on September 26, 2012, with leave to the plaintiff to replead within thirty days. Dkt. No. 28. Plaintiff has since availed himself of the opportunity to amend, submitting a proposed amended complaint on October 12, 2012. Dkt. No. 30. That amended complaint has been referred to me for review.

## II. DISCUSSION

### A. Unlawful Retaliation

It is well-established that the issuance, by correctional officers, of a false misbehavior report to against an inmate, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise. Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986), cert. denied, 485 U.S. 982, 108 S.Ct. 1273 (1988)). In such a case, "[t]he prisoner's due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them." Jones v. Coughlin, 45 F.3d 677, 679 (2d Cir.1995) (citations omitted).

When an allegedly false misbehavior report is issued, motivated by an inmate's exercise of a protected right under the Constitution, however, a cognizable retaliation claim lies under 42 U.S.C. § 1983. See Franco v. Kelly, 854 F.2d 584, 590 (2d Cir.2008) ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper.") (alterations and internal quotation marks omitted). In order to state a prima facie claim of retaliation under section 1983, a plaintiff must advance non-conclusory allegations establishing that (1) the he engaged in protected conduct; (2) the defendants took adverse action against him; and (3) a causal connection exists between the protected activity and the adverse action. Dillon v. Morano, 497 F.3d 247, 251 (2d Cir.2007); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir.2001), overruled on other grounds by Phelps v. Kapnolas, 308 F.3d 180, 187 n. 6 (2d Cir.2002). In other words, plaintiff must allege facts plausibly suggesting that the protected conduct was a "substantial or motivating

factor" in the prison officials' decision to take action against the plaintiff.

In my earlier report, I interpreted plaintiff's complaint as alleging unlawful retaliation, predicated upon his contention that two misbehavior reports issued against him by defendant Soto in September 2010 were motivated by the fact that Reed sought medical treatment for a stomach illness. Assuming that plaintiff's resort to seeking medical treatment within the correctional facility could be regarded as protected activity sufficient to trigger the First Amendment's protection against retaliation, and that the issuance of a false misbehavior report could represent constitutionally significant adverse action, I nonetheless found that plaintiff's complaint lacked sufficient factual allegations from which it could be reasonably concluded that a nexus existed linking the protected activity and adverse action alleged. [2] For reasons similar to those set forth in my original report, I conclude that plaintiff's most recent amended complaint is similarly lacking in the necessary factual allegations to establish the missing link.

**\*6** The facts alleged in plaintiff's amended complaint show that on September 16, 2010, he visited the medical clinic at Eastern to receive treatment for a food related illness. Amended Complaint. (Dkt. No. 30) at 3. Plaintiff alleges that on that same date, he was issued a misbehavior report by defendant Soto for missing assigned programming, accusing him of being out of place and lying concerning his whereabouts. *Id.* at 4. The misbehavior report was later dismissed when it was learned that he, in fact, had missed the programming for medical reasons. *Id.* at 5. As a result, it appears that the misbehavior report was issued not *because of* plaintiff's trip to the infirmary, but instead out of a mistaken belief that he was elsewhere than in the infirmary at the time of the scheduled programming. *See id.* ("However, after it was ascertained and found by the hearing officer that ... I was infact [sic] at the medical clinic being treated for an illness ... and thereafter confined to my cell ... [,] the misbehavior report ... was dismissed."). In simple terms, plaintiff's own allegations contradict his theory that defendant Soto issued a misbehavior report in retaliation for plaintiff seeking medical care. His complaint therefore lacks facts demonstrating the existence of a plausible retaliation claim, including, significantly, a causal link between the protected activity and first misbehavior report at issue.

Plaintiff's retaliation claim also potentially implicates a second misbehavior report that, according to plaintiff's amended complaint, was issued against him on September 25, 2010, again alleging his refusal to participate in prison programming. Amended Complaint. (Dkt. No. 30) at 6. The charges were ultimately dismissed after plaintiff explained the circumstances surrounding his refusal, which included an allegation by plaintiff that defendant Soto forced him to sign the refusal-to-participate form. *Id.* at 7. Once again, conspicuously lacking in plaintiff's complaint is any allegation linking a protected activity to the issuance of this second misbehavior report.

I note that in his amended complaint, plaintiff also alleges that defendant Soto directed various derogatory statements toward him, alleging "upon information and belief" that they were motivated by favorable disciplinary decisions in connection with the two misbehavior reports previously issued by that defendant. Amended Complaint (Dkt. No. 30) at 8. It is well-established, however, that verbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation cause of action. *See Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations."). [3] Section 1983 is not intended to represent a code of professional conduct for federal, state and local prison officials. *Cf. Alnutt,* 913 F.Supp. at 166, *accord, Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (Peebles, M.J.); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (Sotomayor, J.). Standing alone, allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (finding that allegations that corrections officers laughed at and insulted the plaintiff do not give rise to a claim under section 1983); *Carpio v. Walker,* No. Civ. 95–CV–1502, 1997 WL 642543, at \*6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J., adopting report-recommendation by DiBianco, M.J.) ("[V]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation.").

**\*7** In sum, careful review of plaintiff's proposed amended complaint reveals that it lacks sufficient factual allegations to demonstrate a plausible retaliation claim, including a basis to find a causal connection between a protected activity engaged in by plaintiff, and an adverse action taken by the defendants against him as a result. Plaintiff's claims against defendant Soto should therefore be dismissed, without leave to replead.

B. John Doe Defendants

In the event that my recommendation is accepted and plaintiff's claims against defendant Soto are dismissed, the question remains as to whether he should be permitted to pursue his claims against the two unnamed, "John Doe," defendants.

1. Merits of Claims Asserted Against John Doe Defendants

In order to decide whether the unnamed John Doe defendants survive plaintiff's amended complaint, as a threshold matter, I must briefly address the merits of the claims asserted against them. As it relates to defendant John Doe # 1, plaintiff's amended complaint alleges that, notwithstanding the fact that defendant John Doe # 1 knew that the "[M]exican corn and rice diablo," which was served to plaintiff and other inmates as the evening meal on September 14, 2010, and which allegedly caused plaintiff to become ill, smelled badly and "could be contaminated," defendant John Doe # 1 nonetheless served it to plaintiff. Amended Complaint (Dkt. No. 30) at 4. These allegations, liberally construed, could support a plausible cruel-and-unusual-punishment claim in violation of the Eighth Amendment. *Id.* at 8. Indeed, the Eighth Amendment protects inmates against being served contaminated food in prison. *See, e.g., Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) ("[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."). For this reason, I recommend a finding that, although the identity of defendant John Doe # 1 is unknown at this juncture, plaintiff's amended complaint alleges facts plausibly suggesting that defendant John Doe # 1 violated plaintiff's Eighth Amendment right.

As it relates to defendant John Doe # 2, plaintiff's amended complaint alleges that defendant John Doe # 2, who is allegedly in charge of inspecting "all food products served" in Eastern, failed to identify the Mexican corn and rice diablo as contaminated. Amended Complaint (Dkt. No. 30) at 4. As a result of this allegation, liberally construed, plaintiff's amended complaint asserts a state-law negligence claim against that defendant. *Id.* at 9.

This claim fails, however, because New York Correction Law § 24 precludes civil actions from being filed against "any officer or employee of [the Department of Corrections and Community Supervision] ... in his ... personal capacity, for damages arising out of any act done or failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee[,]" except for civil actions brought by the New York State Attorney General. N.Y. Corr. Law § 24(1). Here, although plaintiff has failed to specifically identify defendant John Doe # 2, plaintiff's amended complaint alleges that "Defendant, John Doe # 2[,] is an employee employed at Eastern." Amended Complaint (Dkt. No. 30) at 2. Because defendant John Doe # 2 is an employee of the Department of Corrections and Community Supervision ("DOCCS"), New York Correctional Law § 24 is triggered, precluding plaintiff from maintaining a negligence action against him. *Dallio v. Hebert,* 678 F.Supp.2d 35, 57 (N.D.N.Y.2009) (Suddaby, J., adopting report and recommendation by Lowe, J.) (dismissing the plaintiff's state-law claims of assault, battery, and negligence against a defendant correctional officer because "[a]lthough New York Correction Law section 24 explicitly bars only cases filed in state court, it is equally applicable to state law claims filed in federal court[.]"). For these reasons, I recommend that the negligence claim against defendant John Doe # 2 be dismissed with prejudice.

2. Identification of Defendant John Doe # 1

**\*8** Because I find that plaintiff's amended complaint states a claim against defendant John Doe # 1, the question remains whether plaintiff may pursue his claims against that defendant because that defendant remains unidentified, despite the fact that this case has been pending against him since March of 2011.[4] Complaint (Dkt. No. 1). More specifically, although Senior District Judge McAvoy's Decision and Order dated September 27, 2012, granted defendant Soto's motion to dismiss, the

claim against defendants John Doe # 1 survived because defendant Soto's motion moved to dismiss only the claims against him. Dkt. Nos. 22, 28. For this reason, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, the court has the authority to *sua sponte* dismiss all claims against defendant John Doe # 1 upon notice to plaintiff. Fed.R.Civ.P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice ... or order that service be made within a specified time."); *see also* N.Y.N.D. L.R. § 4.1(b) (restricting Rule 4(m)'s time period to 60 days). However, as discussed more fully below, despite the fact that the court is unaware of any efforts made by plaintiff to identify defendant John Doe # 1, and mindful of the Second Circuit's instruction that the district courts are to assist *pro se* inmate litigants, I reject this option at this stage.

Generally, when a *pro se* plaintiff includes a "Doe" defendant along with named defendants, the complaint is served upon the named defendants, and the upon plaintiff pursues discovery to identify the Doe defendant. *Peralta v. Doe,* No. 04–CV–6559–P, 2005 WL 357358, at *2 (W.D.N.Y. Jan. 24, 2005). In this case, however, in the event my recommendation to dismiss defendant Soto is adopted, no nameddefendant will remain in this case. Mindful of plaintiff's status as a *pro se* inmate litigant, and of the court's obligation to assist *pro se* inmate litigants identify unknown defendants, I recommend that the superintendent of Eastern be added as a defendant in this action only so that service and joinder may occur. Once issue is joined, plaintiff may, through discovery, seek the identity of defendant John Doe # 1. *See Peralta,* 2005 WL 357358, at * 2 (permitting the addition of the superintendent of Eastern to facilitate service and discovery to uncover the identities of the unknown defendants) (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997) (holding that the district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *see also Dorsey v. Fischer,* No. 9:09–CV–1011 (GLS/DEP), Decision and Order (N.D.N.Y. filed Jan. 23, 2012) (*sua sponte* adding the superintendent of the correctional facility where the alleged wrongdoing occurred in order to facilitate the identification of Doe defendants). [5]

**\*9** Accordingly, I recommend that the clerk of the court be directed to add the superintendent of Eastern as a defendant for service and discovery purposes only. By doing so, I do not suggest in any way that the superintendent of Eastern was personally involved in the events allegedly giving rise to the Eighth Amendment claim asserted against defendant John Doe # 1. In addition, because the court finds that the superintendent of Eastern is likely to be represented by the New York State Attorney General, I recommend that the clerk send a copy of the plaintiff's amended complaint, this report and recommendation, and any decision and order adopting or rejecting it, to the Attorney General's Office to facilitate the identification of defendant John Doe # 1.

Plaintiff is advised, however, that the United States Marshals Service cannot effect service on a "John Doe" defendant. Therefore, if plaintiff wishes to pursue his claims against defendant John Doe # 1, he must take reasonable steps to ascertain his identity. Upon learning the identity of defendant John Doe # 1, plaintiff must seek permission from the court to file a second amended complaint to properly name him as a defendant. If plaintiff fails to ascertain the identity of defendant John Doe # 1, so as to permit the timely service of process, this action will be dismissed as against that individual.

### III. SUMMARY AND RECOMMENDATION

Because plaintiff, though granted leave to amend, has failed to cure the deficiencies discussed in my earlier report and recommendation by alleging facts demonstrating the existence of a plausible retaliation claim against defendant Soto, I recommend that that claim be dismissed with prejudice. In addition, I recommend that plaintiff's negligence claim against defendant John Doe # 2 be dismissed because New York Correction Law § 24 precludes plaintiff from suing that defendant, a DOCCS employee, for any state-law claim. Finally, because I recommend a finding that plaintiff's amended complaint sets forth allegations plausibly suggesting a cause of action against defendant John Doe # 1, I recommend that the superintendent of Eastern be added as a defendant to this action for the sole purpose of permitting service and discovery.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that plaintiff's amended complaint (Dkt. No. 30) be REJECTED as failing to cure the

deficiencies detected in the court's earlier order as it relates to all claims asserted against defendant Soto, and that this action be DISMISSED, with prejudice, as it relates to defendant Soto; and it is further

RECOMMENDED that plaintiff's amended complaint be REJECTED as precluded by New York Correction Law § 24 as it relates to all claims asserted against defendant John Doe # 2; and it is further

RECOMMENDED that plaintiff's amended complaint be ACCEPTED as it relates to the claims asserted against defendant John Doe # 1; and it is further

RECOMMENDED that, upon the district judge accepting the recommendations regarding the claims asserted against defendant John Doe # 1, the superintendent of Eastern Correctional Facility be added as a defendant to this action for the sole purpose of permitting service and discovery;

*10 RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, the clerk of the court issue a summons and forward it, along with a copy of plaintiff's amended complaint, to the United States Marshal for service upon the superintendent of Eastern Correctional Facility. The clerk shall forward a copy of the summons and complaint by mail to the Office of the New York State Attorney General, together with a copy of this report and recommendation, and any decision and order issued accepting or rejecting it; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, a response to the plaintiff's amended complaint be filed by a defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure after service of process on a defendant; and it is further,

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, plaintiff continue to take reasonable steps to ascertain the identity of defendant John Doe # 1,

and, if appropriate, file a motion with the court seeking permission to file a second amended complaint so that he may add such individual, by name, as a defendant to this lawsuit; and it is further

RECOMMENDED that, upon the district judge accepting the recommendation that the superintendent of Eastern Correctional Facility be added as a defendant in this action, all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roland v. Racette, 984 F.2d 85 (2d Cir.1993).

*11 It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5441503

Footnotes

1    Plaintiff's complaint also named seven corrections employees assigned to Southport Correctional Facility ("Southport") as defendants. All claims stemming from events occurring at Southport were severed from those arising out of Eastern, however, and were transferred to the Western District of New York by order issued by Senior District Judge Thomas J. McAvoy on August 2, 2011. *See* Dkt. No. 4.

2    When examining whether such a nexus exists, courts generally look to several factors, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

4    Although the following analysis is applicable to defendant John Doe # 2, as well, in light of the fact that I recommend dismissal of the only claim pending against him due to New York Correction Law § 24, I do not address defendant John Doe # 2 in this section of the report and recommendation.

5    *Cf. Davis v. Kelly,* 160 F.3d 917, 921–22 (2d Cir.1998) (holding that when a prisoner does not know the identities of any of the individuals who allegedly violated his constitutional rights, it is appropriate to maintain "supervisory personnel as defendants ... until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability.... After an opportunity for discovery, undisputed allegations that the supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case, but such dismissal is premature where the opportunity to identify those involved has not yet been accorded"); *Murphy v. Goord,* 445 F.Supp.2d 261 (W.D.N.Y.2006) (denying superintendent's motion for judgment on the pleadings on personal involvement grounds and allowing plaintiff to proceed with discovery to identify the Doe defendants; *Brown v. Doe,* No. 96–CV–1222, 1999 WL 893070, at *2 (S.D.N.Y. October 18, 1999) (deferring defendants' motion to dismiss until they have provided the requisite discovery information and materials to the pro se prisoner litigant on the grounds that "[p]laintiffs, especially *pro se* incarcerated plaintiffs should be given an opportunity to identify ... unknown defendants through discovery").

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3636138
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,

v.

Dale ARTUS, Superintendent; Thomas Lavalle,
Deputy Superintendent; Steven Racette, Deputy
Superintendent of Security; Tara Brousseau, I .G.P.
Supervisor; D. Holdridge, Captain; Uhler, Captain;
Lamora, Lieutenant; Lynch, Lieutenant; Hicks,
Sergeant; Menard, Sergeant; Baker, Sergeant;
Matott, Sergeant; Marcil, Sergeant; Gregory Savage,
Mental Health Counselor; J. Sprenger, Chaplain;
Ronald Durmont, Registered Nurse and Examiner;
Moller, Correctional Officer; Tucker, Correctional
Officer; Martin, Correctional Officer; Shutts,
C.O.; Grom, C.O.; Poupore, Correctional Officer;
Boulrice, C.O.; Moseley, C.O.; Trudeau, Correctional
Officer; R. Trudeau, Correctional Officer; Allen,
Correctional Officer; Miner, Correctional Officer;
Gittens, Correctional Officer; Besaw, Correctional
Officer; Tetreault, C.O.; John Doe, C.O.;[1] Bodet,
Correctional Officer; Richard Roy, Inspector
General; Nunez, Inspector General; James Morgan,
Associate Director of Quality Management;
Joanne Waldron, Unit Chief; and Maureen Bosco,
Forensic Program Administrator, Defendants.

No. 09–CV–575 (DNH/DRH).
|
July 27, 2010.

**Attorneys and Law Firms**

Raszell Reeder, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Justin C. Levin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## REPORT–RECOMMENDATION AND ORDER [2]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Raszell Reeder ("Reeder"), an
inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, thirty-eight DOCS employees, violated
his constitutional rights under the First, Eighth, and
Fourteenth Amendments. Compl. (Dkt. No. 1). Presently
pending are the moving defendants'[3] motion for
judgment on the pleadings pursuant to Fed.R.Civ.P.
12(c). Dkt. No. 65. Reeder opposes the motion. Dkt. No.
69. For the following reasons it is recommended that
defendants' motion be granted in part and denied in part.

### I. Background

The facts are related herein in the light most favorable
to Reeder as the non-moving party. *See* subsection II(A)
*infra.*

### A. Excessive Force

On April 22, 2009, Reeder assaulted defendant Poupore,
a corrections officer. by throwing feces on him during
the breakfast hour. Compl. ¶ 17; Dkt. No. 69, ¶ 14.
Defendant Hicks, a Sergeant, was notified to respond
to the assault, but defendant Menard, also a Sergeant,
reported to Reeder's cell instead. Compl. ¶ 17. At Reeder's
cell, Menard observed that the lights in the back of the
cell were off, a safety hazard which also precluded video
recording. *Id.* ¶¶ 4, 11, 22; Dkt. No. 69, ¶ 2.

After the assault on Poupore occurred, Reeder informed
defendants Matott, a sergeant, and Sprenger, a chaplain,
as well as mental health staff, and Menard that he
would comply with their orders and exit his cell without
resistance. Compl ¶¶ 10, 21. Nevertheless, Menard
deployed chemical weapons and an extraction team into
Reeder's cell because Reeder allegedly failed to comply
with Menard's direct orders to release his food tray and
a carton of milk in which the feces were believed to have
been stored. *Id.* ¶¶ 3, 8, 18; Dkt. No. 69, ¶ 7. Reeder
contends that there was never a container of milk with
feces in his possession and this was solely a ploy to allow
Menard to dispense chemical agents into his cell. Compl.
¶ 18; Dkt. No. 69, ¶¶ 2, 7. Menard responded to the call
instead of Hicks to retaliating against Reeder and to cause
Reeder serious injury. Compl. ¶ 19.

After Menard deployed the chemical agents, an extraction team composed of defendants Martin, Shutts, Tucker, Grom, and Moller, all corrections officers, entered the cell. Compl. ¶¶ 4, 8–9, 20, 22, 25–26. When the team entered the cell behind a plexi-glass shield, Reeder pushed the shield from his cell in self-defense and then lay on the floor without further resistance. *Id.* ¶ 11. The incident report indicated that Martin pushed Reeder to the floor and took control of his upper torso and head area; Shutts assisted with the restraints; Tucker took control of Reeder's arms and placed them behind his back; and Moller videotaped the entire extraction. *Id.* ¶¶ 8–9. Reeder alleges that Martin punched him in the face, slammed his head on the ground, kneed him in the head, and continued to ==assault== him as he lie on the ground; Shutts attempted to pull his left knee out of his socket; Tucker squeezed his left hands with great force, attempting to break them; Grom used his body to block the camera's view of the attack; and Moller stood in the dark portion at the back of his cell, purposefully omitting the recording or certain events during the extraction. *Id.* ¶¶ 4, 8, 9, 22, 24–26. Reeder contends the ==assault== was in retaliation for his ==assault== on Poupore. Dkt. No. 69, ¶ 2.

### B. Medical Care

**\*2** After the incident, Reeder was examined by defendant Durmont, a nurse. Compl. ¶¶ 5, 12. Durmont's report indicated that he examined Reeder, his eyes were reddened from exposure to the chemical agents, and Reeder was sweating. *Id.* ¶ 12. Durmont found nothing wrong with Reeder during the examination. *Id.* ¶ 5. However, Reeder alleges this examination was cursory as Durmont failed to note the blood coming out of his ear, his swollen fingers, knee and face, his scars, his blackened eyes, or the pain in his fingers, face and neck. *Id.* ¶ 5; Dkt. No. 69, ¶ 6. Additionally, Durmont never reexamined Reeder after April 22 to ensure that there were no new injuries and that the pre-existing ones had not worsened. Compl. ¶ 12.

### C. Conditions of Confinement

After the examination, Reeder was given a cell depravation order and was placed into a cell with no hygiene supplies, no state clothing, and no grievance forms, pens, paper, or regular diet for six days. Dkt.

No. 69, ¶ 14. Additionally, from April 22 until May 12, 2009, Reeder's food was inadequate in that it either was not delivered or was completely frozen, very hot, or contaminated with dirt. Compl. ¶ 2. Defendant Boulrice, a corrections officer, dropped Reeder's milk on the floor, refused to replace it, and refused to feed him breakfast on April 18 as well as refusing to feed him breakfast, lunch, and dinner on April 23 and dinner on April 24. *Id.* ¶¶ 13, 28, 30, 31; Dkt. No. 69, ¶ 8); (2. Defendant Moseley, a corrections officer, did not give Reeder a new tray after Reeder fought with Boulrice on April 18, denied him breakfast on April 18 and 23, and denied him lunch on April 22 and 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Defendants Holdridge, a Captain, and Baker, a Sergeant, failed to act after Reeder complained about not receiving food on April 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Defendant Gittens, a corrections officer, denied him dinner on April 23. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8); (5. Defendant Trudeau, a corrections officer, denied him dinner on both April 24 and 29. Compl. ¶¶ 13, 30; Dkt. No. 69, ¶ 8. Poupore denied him dinner on April 29. Compl ¶ 13; Dkt. No. 69, ¶ 8); (7. Allen denied him breakfast and lunch on May 1. Compl. ¶¶ 13, 31; Dkt. No. 69, ¶ 8); (8. Defendants Tetreault and Besaw, corrections officers, denied him breakfast and lunch, serving him the wrong meals on May 3 and falsifying the feed up sheet to indicate he was properly fed. Compl. ¶¶ 13, 31; Dkt. No. 69, ¶ 8); (9. Defendants R. Trudeau and Miner, corrections officers, denied Reeder food meals. Compl. ¶¶ 13, 31; Dkt. No. 69 ¶ 8. Defendants ==Artus==, Lavalle, and Racette, the Superintendent and Deputy Superintendents, failed to act after being notified specifically about the food situation. Compl. ¶ 13.[4] ==Reeder== also contends that on April 25 through 28, April 30, and May 2, the food that he received was scarce and also tainted. Compl. ¶ 13.

### D. Property

**\*3** Reeder also alleges that Hicks and an unknown officer stole his personal property, lying about the fact that it was allegedly contaminated and required disposal in the garbage. Compl. ¶ 32; Dkt. No. 69, ¶ 13. Hicks' actions were approved by Menard. Dkt. No. 69, ¶ 13. These actions were in retaliation for the ==assault== on defendant Poupore. *Id.*

## E. Grievances

Reeder contends that "Clinton Prison Administration is a facility that hid evidence and agree with inmates being assaulted, harass [sic], never showing concern, accepting captains, Lts., Sgts., Correction Officers falsifying investigation reports. They always doing incomplete investigations, it is a facility administration and with corrections personnel thats committed to retaliation conspiracy." Compl. ¶ 14. Reeder alleges that Artus, Lavalle, and Racette received constant complaints and took no action, refused to approve the initiation of investigations which were essential for inmates filing grievances, and failed to intervene in any way when the other named defendants denied Reeder food for almost a month. Dkt. No. 69, ¶¶ 3, 10. Additionally, Uhler, Holdridge, Lynch, Hicks, Marcil, Baker, Menard, and Matott also allegedly knew about Reeder's deprivation of meals and failed to remedy the situation. *Id.* ¶ 3. Lastly, defendant Brousseau failed in her duties as IGP Supervisor to act on grievances in a timely and appropriate manner and provide inmates with investigations when they filed grievances, as defendants Artus and Racette were notorious for unanimously rejecting any request for an investigation. *Id.;* Compl. ¶ 7.

## F. Other Claims

Reeder also contends that while incarcerated, defendants tampered with his mail. Compl. ¶ 14. Additionally, as the administration was aware of the many investigations Reeder was seeking, their summary denials and their refusal to intervene in the alleged retaliation deprived Reeder of his Equal Protection rights. *Id.* ¶ 16. Moreover, the administration failed in their duties to file criminal charges against employees on behalf of inmates, like Reeder, who were subjected to retaliation. *Id.* ¶ 1. Lastly, Reeder contends that he was constantly harassed by R. Trudeau, Poupore, and Martin because they would loudly bang on his cell in retaliation for his assault on Poupore. Dkt. No. 69, ¶ 4.

## II. Discussion

Reeder contends that his First Amendment rights were violated when defendants retaliated against him by subjecting him to excessive force, denying him food, and refusing to provide him with investigations and tampered with his mail. Reeder contends his Eighth Amendment rights were violated when various defendants subjected him to excessive force, when Durmont was deliberately indifferent to his serious medical needs, and denied him to acceptable conditions of confinement. Reeder finally claims that his Fourteenth Amendment rights were violated when defendants confiscated his property without due process and denied him equal protection. Defendants contend that Reeder has failed to state any constitutional claims; Reeder has failed to allege the personal involvement of Waldron, Roy, Morgan, and Bosco; and they are entitled to qualified immunity.

## A. Legal Standard

**\*4** "The standard for granting a Rule 12(c) motion ... is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills,* 259 F .3d 123, 126 (2d Cir.2001) (citations omitted). Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that

is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

**\*5** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Roy

Reeder claims that defendant Roy, the DOCS Inspector Generally, was personally involved in his constitutional violations by failing to respond, or investigate, any of the <mark>assault</mark> claims which Reeder provided to him. Compl. ¶¶ 16, 33; Dkt. No. 12. Receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that the proposed defendants took any action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that *§ 1983* does not impose *respondeat superior* liability.") (citations omitted). Accordingly, this contention is insufficient to establish personal involvement. As no other bases for involvement were advanced, and the record does not indicate that any other exist, defendants' motion should be granted on this ground.

### 2. Waldron, Morgon, and Bosco

In his response, Reeder alleges that these three defendants denied him mental health treatment for his mental health condition which subsequently worsened. Dkt. No. 69, ¶ 11. The complaint fails to indicate or establish any theory of personal involvement. The gravamen of Reeder's

complaints are that these defendants "knew" about the things that were occurring within the correctional facility and failed to act. Compl. ¶ 34. This essentially attempts to establish personal involvement based upon the supervisory role these defendants occupied, which is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement). The complaint does not contend that they were personally involved in the alleged violations, created unconstitutional policies, or were grossly negligent in supervising subordinates. As such, Reeder has failed to establish their personal involvement and defendants' motion on this ground should be granted.

### C. First Amendment

#### 1. Retaliation [5]

**\*6** Reeder claims that he was assaulted, denied proper medical treatment and food, and had his property stolen and mail tampered with in retaliation for his assault on Poupore. Compl. ¶ 2, 13, 19; Dkt. No. 69, ¶¶ 2, 13–14. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Reeder has failed to allege facts sufficient to support a retaliation claim. First, his actions in assaulting another corrections officer are not the sort of thing protected by the constitution. Thus, for any subsequent incident for which Reeder asserts the assault was the basis of the retaliation, such claims are without merit.

Second, even if can be said that Reeder filed grievances in the form of requests for investigations, such actions are still inadequate to establish an actionable cause. While filing grievances and lawsuits are actions protected by the First Amendment, Reeder has failed specifically to alleged who he filed grievances against and when they were filed. Third, Reeder has also failed to allege any facts to establish that any of defendants' alleged adverse actions were motivated by, or temporally related to, any constitutionally protected conduct. Thus, all Reeder has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct. These conclusory allegations, without more, are insufficient to maintain the present claims. *Jackson,* 549 F.Supp.2d at 214.

Accordingly, defendants' motion should be granted as to these claims.

#### 2. Mail Tampering

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citations omitted). While legal mail is afforded the greatest protection, [6] "greater protection [is afforded] to outgoing mail than to incoming mail." *Id.* (citations omitted). "Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved." *Id.* (citations omitted). However, in this case Reeder has failed to plead with any sort of particularity with what mail defendants tampered. Accordingly, defendants cannot reasonably specify the reasons, if any, why Reeder's mail was impeded or opened. As there are only conclusory allegations without reference to time, place, person, or manner of tampering, such allegations are insufficient to establish a constitutional violation.

**\*7** Accordingly, defendants' motion should be granted as to this claim.

#### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir.2003) (citing Chance, 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment,

or the need for specialists ... are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, defendants do not challenge that Reeder was suffering from a serious medical condition. Instead, they assert that Reeder has failed to allege deliberate indifference by defendant Durmont. Reeder contends that Durmont's examination was intentionally quick and cursory, that he did not follow up, and Durmont did not note or acknowledge his complaints of swelling on his face and blackness around his eyes. Compl. ¶ 12. Additionally, Reeder contends that the photographs taken immediately after the incident document these injuries, in addition to the swelling he sustained in his hand and knee. Dkt. No. 69, ¶ 6. Construing these facts in the light most favorable to Reeder, he has advanced a claim that Durmont's actions rose past a level of mere disagreement to one of intentional disregard.

**\*8** Accordingly, defendants' motion on this ground should be denied.

### 2. Excessive Force

Menard seeks judgment on Reeder's claim that Menard's use of mace during the extraction constituted the use of excessive force. [7] Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186

F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 2010 WL 596513 (2010) ("The core judicial inquiry ... was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*9** Liberally construing Reeder's complaint, he has satisfied the objective component of the excessive force inquiry. Reeder alleges that he suffered from excruciating pain in his fingers, face and neck; a swollen face, knee and fingers; black eyes; and a bloody ear. Compl. ¶¶ 5, 12; Dkt. No. 69, ¶ 6. While these injuries are not attributable to Menard spraying mace in Reeder's face, the deployment of chemical weapons solely for the purposes of harming an inmate who had planned to cooperate and voiced such intentions to multiple parties represents a malicious use of force which would constitute a *per se* Eighth Amendment violation. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513. Therefore, construing the facts in the light most favorable to Reeder, he has alleged an Eighth Amendment claim against Menard for

his malicious and intentional use of chemicals solely for the purpose of causing Reeder harm. Compl. ¶¶ 9, 10, 18, 19, 21; Dkt. No. 69, ¶¶ 2, 7.

Accordingly, defendants' motion as to Menard on this claim should be denied.

### 3. Failure to Intervene

Liberally construing Reeder's complaint, he has alleged that defendants Grom and Moller were at the scene when he was assaulted and failed to intervene. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

Viewing the facts in the light most favorable to Reeder, he has stated facts sufficient to contend that Grom and Moller failed to intervene. While the two defendants may not have had advanced warning that Reeder would be assaulted during the extraction, it became clear when Reeder was saying he was going to be cooperative, laying on the ground, and not resisting, that Grom and Moller should intercede to prevent additional harm when they observed three officers punching and kicking a defenseless inmate. Additionally, as discussed *infra,* a reasonable person in the officer's position would be well aware that such a use of force was contrary to an individual's constitutional rights. Thus, crediting Reeder's contentions, by standing idly by, Grom and Moller failed to take reasonable steps to intervene and terminate the violation of Reeder's constitutional rights.

Therefore, defendants' motion on this ground should be denied.

### 4. Failure to Protect

Eighth Amendment obligations also include the duty to protect prisoners from known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834 (*citing Helling v. McKinney,* 509 U.S. 25, 31–32 (1993)).

 **\*10**  As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). To state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison office must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Matthews v. Armitage,* 36 F.Supp.2d 121, 124–25 (N.D.N.Y.1999) (internal citations and quotations omitted).

Reeder claims that defendant Nunez failed to protect him because Reeder contact Nunez about the assault by staff, Nunez indicated that he would be transferring Reeder to a different facility, the transfer never occurred, and Reeder continued to be assaulted. Compl. ¶¶ 16, 33; Dkt. No. 69, ¶ 9. These allegations suffice to state the elements of a constitutional claim. Reeder was assaulted once by the corrections staff and the animosity continued. Reeder alerted Nunez to this problem and Nunez indicated he would resolve it by having Reeder transferred from the facility. Therefore, Nunez was aware that Reeder was in danger. Nunez failed to timely act and Reeder was allegedly subjected to more assaults. Liberally construing these allegations, Reeder has pleaded a claim for Nunez's failure to protect. Accordingly, defendants' motion as to Nunez should be denied.

Reeder also claims that Artus, Lavalle, and Racette had an executive "duty to protect inmates" with which they too failed to comply. Compl. ¶ 1. Such contentions are insufficient to allege an Eighth Amendment claim. Reeder fails to identify how these three individuals knew of any

serious risk specific to his health and safety. As such, Reeder has failed to allege facts sufficient to establish the objective prong of the analysis as to these defendants. Accordingly, defendants' motion as to Artus, Lavalle, and Racette on this claim should be granted.

### 5. Conditions of Confinement [8]

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane prisons and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly,* 76 F.3d at 480 (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind ...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (internal quotation marks and citations omitted).

 **\*11**  The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

The Eighth Amendment "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). "While no court has held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation ... may well be recognized as being of constitutional dimension." *Id.* (citations omitted). In this case, Reeder specifically alleged that he failed to receive food on April 18, 22, 23, 24, 29, and May 1 and 3. Compl. ¶¶ 13, 28, 30, 31. Construing all allegations in the light most favorable to Reeder, seven days without meals in a twelve day period suffices to allege a constitutional deprivation.

Reeder names ten defendants who specifically participated in the denial of, or ignored his complaints regarding the failure to provide, his meals. With respect to Moseley, Boulrice, Holdridge, Gittens, Baker, C. Trudeau, Poupore, Allen, Tetreault, and Besaw, Reeder has sufficiently alleged facts to establish deliberate indifference and a culpable state of mind. Compl. ¶¶ 13, 28, 30, 31. Accordingly, the motion as to those defendants should be denied.

However, **Reeder** also contends that **Artus**, Lavalle, Racette, Uhler, Lynch, Hicks, Marcil, Menard, and Matott, were generally and summarily informed of the deprivation of food but failed to intervene or correct it. Compl. ¶ 13; Dkt. No. 69, ¶ 3. Additionally, Reeder contends that R. Trudeau and Miner denied him food meals, but fails to allege with specificity any dates or times of such meal denials. Compl. ¶¶ 13, 31. This is in stark contrast to the previously identified defendants as to whom Reeder alleged date and meals. Accordingly, with respect to these remaining eleven defendants, Reeder has failed to allege facts which would constitute deliberate indifference and defendants' motion as to these defendants should be granted.

### E. Fourteenth Amendment

#### 1. Equal Protection [9]

**\*12** The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted).

In this case, Reeder has only offered one statement mentioning equal protection, though it fails to establish how he was treated differently than other inmates. There are no contentions, and the record does not show, that Reeder was treated differently by staff than other inmates. All Reeder offers is a single, vague, conclusory allegation. This allegation, without more, is insufficient. *See, e.g., John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d 345, 353 (S.D.N.Y.2000) ("[A]ssertions of selective enforcement and racial animus [that] are wholly conclusory and unaccompanied by any supporting factual allegations ... are insufficient to state a claim under either the Equal Protection Clause or 42 U.S.C. § 1983.") (citations omitted).

Accordingly, defendants' motion should be granted on this ground.

#### 2. Confiscation of Property

Reeder contends that Hicks and Menard were involved in the unlawful confiscation and destruction of his personal property. Compl. ¶ 32; Dkt. No. 69, ¶ 13. An inmate has a

right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer, 468 U.S. 517, 533 (1984).* "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

**\*13** In this case, Reeder contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 [10] procedure exists and affords an adequate state court remedy. Second, because Reeder is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.

### F. Failure to State a Claim [11]

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

### 1. Right to an Investigation

*Reeder* contends that *Artus* and Racette summarily denied requests for investigations. Even viewing the facts in the light most favorable to *Reeder,* he has failed to state a claim upon which relief can be granted because he has no constitutional right to an investigation. *See Carrasquillo v. City of N.Y.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered"). Accordingly, defendants' motion as to this claim should be granted. [12]

### 2. Faulty Grievance Procedures

"Prisoners, including pretrial detainees, have a constitutional right of access to the courts ...." *Bourden v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (internal quotation marks omitted) (citing *Bounds v. Smith,* 430 U.S. 817, 821–22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts). "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) (citations omitted); *see also Cancel v. Goord,* No. 00–CV–2042 (LMM), 2001 WL 303713, at \*3 (S.D.N.Y. Mar. 29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted). However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell,* 365 F.Supp.2d at 370 (citations omitted).

In this case, Reeder cannot establish that he had a liberty interest which required constitutional protection. Reeder has only alleged complaints about the grievance process as a whole, stating specifically that defendant Brousseau did not act upon grievances quickly enough or advocate strenuously enough for the inmates. Compl. ¶ 7; Dkt. No. 69, ¶ 3. Accordingly, defendants' motion on this ground should be granted.

### 3. Right to Criminal Investigations on Correctional Officers

**\*14** Additionally, there exists no constitutionally protected right to file criminal charges against another. *See Langworthy v. Dean,* 37 F.Supp.2d 417, 422 (D.Md.1999) ("[A] right to compel the prosecution of criminal activity does not exist."). Thus, to the extent that Reeder claims administrative defendants should have been acting upon any of his requests to compel criminal prosecution of any of the other named defendants, such claims are not cognizable on federal review. Defendants' motion on this ground should be granted.

### G. Qualified Immunity

Defendants claim that even if Reeder's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Reeder's Eighth Amendment excessive force, medical indifference, failure to intervene, failure to protect, and conditions of confinement claims. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Reeder's constitutional rights.

There is no question that it was well settled on May 18, 2009 that the Eighth Amendment (1) prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate (*Hudson,* 503 U.S. at 9–10), and (2) required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting all of Reeders' allegations as true, qualified immunity cannot be granted to (1) DuMont for his involvement with Reeder's medical care; (2) Menard, Martin, Shutts, and Tucker for their alleged assertion of excessive force during the extraction; (3) Grom and Moller for their alleged failure to intervene to assist Reeder during the extraction; (4) Nunez for his alleged failure to protect Reeder from further assaults; and (5) Moseley, Boulrice, Holdridge, Gittens, Baker, Trudeau, Poupore, Allen, Tetreault and Besaw for their alleged failure to provide Reeder with adequate nutrition or respond to his complaints that he was being denied food. However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III. Conclusion

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for judgment on the pleadings (Dkt. No. 65) be:

1. **DENIED** as to Reeder's claims of:

   A. Medical indifference against defendant Durmont;

   B. Excessive force against defendants Menard, Martin, Shutts, and Tucker;

   C. Failure to intervene against defendants Grom and Moller;

   D. Failure to protect against defendant Nunez;

   E. Deprivation of food against defendants Moseley, Boulrice, Holdridge, Gittens, Baker, C. Trudeau, Poupore, Allen, Tetreault and Besaw; and

2. **GRANTED** as to all other claims and all other moving defendants; and

IT IS FURTHER RECOMMENDED that the complaint be **DISMISSED** without prejudice as to defendant John Doe.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3636138

## Footnotes

1    Defendant John Doe has neither appeared nor been served. Fed.R.Civ.P. 4(m) requires that a complaint be served upon a defendant within 120 days after the complaint is filed or the complaint may be dismissed as to any unserved defendant without prejudice. *See also* N.D.N.Y.L.R. 4.1(b). The complaint here was filed on May 18, 2009. Compl. No summons was executed upon the defendant. More than 120 days have passed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed as to John Doe without prejudice pursuant to Rule 4(m) and Local Rule 4.1(b).

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    *See* note 1 *supra.*

4    Reeder also asserts that defendants Uhler, Lynch, Hicks, Marcil, Allen, and Bodet were involved in his denial of meals; however no specific dates or meals were alleged.

5    Defendants also contend that the intracorporate doctrine shields them from liability. Defs. Mem. of Law (Dkt. No. 65–1) at 9–10. It is recommended herein that this claim be denied on the merits and, therefore, this contention will not be further addressed.

6    "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 (1996)). "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation.... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge). In this case, there are no contentions, and the record does not support a finding, that the mail in question was legal mail. Accordingly, while increased protections would apply had the mail been legal in nature, there is no reason to presume this is the case. Even if the mail was legal, there have been no allegations, nor would the record support, the conclusion that defendants caused Reeder any actual injury as he has successfully communicated with the court and participated in discovery and motion practice. Accordingly, defendants' motion should be granted as to any claim that the mail in question was legal mail.

7    Other defendants do not seek judgment on this claim which alleges that Martin, Shutts, and Tucker used excessive force against him. To the extent that Reeder claims that any other defendants were involved in the excessive force, such claims are meritless because he has failed to identify which defendants were involved, or how they were involved. Therefore, he has failed to establish the subjective prong of the Eighth Amendment analysis. Accordingly, Reeder's failure to plead any such occurrences with any specificity is fatal to his claim.

8    To the extent that Reeder's claims surrounding his cell deprivation could be construed as a conditions of confinement claim, such contentions are meritless. Dkt. No. 69, ¶ 14. First, such contentions were not advanced in his complaint and

even a liberal reading of the complaint fails to indicate the allegation of any such claim. Moreover, even if such a claim was advanced, Reeder's temporary loss of his personal effects fails to allege that Reeder was deprived of any single, identifiable human need.

9    In his response, Reeder contends that defendants R. Trudeau, Poupore, and Martin constantly harassed him by banging on his cell. Such actions, without more, are similar to those cases alleging only verbal harassment. These claims are insufficient to allege a constitutional violation. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ( "The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Reeder did not assert, nor does the record support, any allegations of physical injury. Therefore, even viewing the facts in the light most favorable to Reeder, these alleged statements, without more, are insufficient to state a constitutional claim.

10    N.Y. C.P.L.R. art. 78 (McKinney 1994 & Supp.2007) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

11    To the extent that Reeder has alleged "negligent action" by the named defendants, such allegations are meritless as they are not a cognizable basis for relief under § 1983. *See e.g., Davidson v. Williams,* 474 U.S. 327, 328 (1986) (holding that negligent acts are insufficient to trigger liability in constitutional claims).

12    To the extent that such contentions can be construed to allege that Reeder should be compensated for defendants' failure to comply with DOCS policies and protocols for investigating grievances, such contentions are also meritless. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights. At most, any violation of state procedural requirements would create liability under state law ....").

---

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.    13

2007 WL 737485

2007 WL 737485
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kenny TAYLOR (a/k/a Reggie Brown), Plaintiff,
v.
Captain George SANTANA (Captain of V.C.B.C.),
D. Malone (C.O. of O .B.C.C.), Richard Wolf
(Executive Director), Wayne A. Lamont (Warden),
Captain Ortiz (Captain of O.B.C.C.), Captain
Brown (Captain of O.B.C.C.), Martin F. Horn
(Commissioner), Richard Pagan (Chief of Security),
Willie J. Taylor (Dep of Security), Captain
Westbrook (Captain of O.B.C.C.) Defendants.

No. 05 Civ. 1860(AKH).
|
March 6, 2007.

*MEMORANDUM AND ORDER GRANTING
MOTION FOR SUMMARY JUDGMENT
AND DISMISSING COMPLAINT*

HELLERSTEIN, J.

**\*1** Plaintiff Kenny Taylor (a/k/a Reggie Brown), currently an inmate at the Cape Vincent Correctional Facility, brings this action under 42 U.S.C. § 1983, alleging that defendants violated his constitutional rights by confining him in a Central Punitive Segregation Unit ("C.P.S.U.") of the Otis Bantum Correctional Center ("O.B.C.C.") at Rikers Island without due process, denying him access to the courts and his attorney. Plaintiff initially also complained he was subjected to false arrest and malicious prosecution, but he abandoned that claim. Plaintiff requests relief in the form of "compensatory and monetary damages of the amount of 2.5 million dollars" for each day he was in the segregation unit.

Defendants, pursuant to Fed.R.Civ.P. 56, move for summary judgment, arguing that plaintiff's due process rights are not implicated because defendants had a legitimate government interest in housing plaintiff in C.P.S.U.; that, even assuming that plaintiff's due process rights were implicated and violated, he is entitled only to nominal damages; that plaintiff's claim of denial of access to the courts fails as a matter of law; that plaintiff cannot establish the personal involvement of certain defendants in the purported violations; that defendants are entitled to qualified immunity; and that, to the extent that plaintiff's complaint can be construed to include state law claims, they must be dismissed for failure to follow the "notice of claim" requirements in New York General Municipal Law §§ 50-e, 50-i. For the following reasons, defendants' motion for summary judgment is granted, and the complaint is dismissed.

I. Background

Plaintiff Taylor was arrested on September 15, 2004 for menacing, and pled guilty in Bronx Criminal Court on October 19, 2004. On October 12, 2004, while waiting in the Court Holding Pens for a court appearance, plaintiff became involved in a violent fistfight with another detainee, Ronald Fesce. Fesce sustained severe injuries, and died several days later. Defendant George Santana, Captain of the Vernan C. Baine Prison Barge ("V.C.B.P." or "V.C.B .C."), was assigned to investigate the incident.

Plaintiff denied that he was involved in a fight. When questioned on October 15, 2004 by Santana about Fesce's beating and death, plaintiff denied that he had been fighting. He said that Fesce had slipped on water coming from a toilet in the holding pen, and that plaintiff had tried to help him up. However, Santana found that plaintiff was responsible for the fight.

Plaintiff promptly was arrested at Rikers and charged with assault in the second and third degrees, and harassment in the second degree. Plaintiff was indicted in Bronx Supreme Court on November 10, 2004 on the counts of assault in the second and third degrees. After a jury trial, plaintiff was found guilty of assault in the second degree on November 20, 2006.

Plaintiff alleges that, on October 17, 2004, two days after his arrest for the assault on Fesce, he was sent to solitary confinement at Rikers Island, with no hearing or notice of the charges against him. On October 19, 2004, the Department of Correction ("DOC," or the "Department") requested a variance pursuant to § 1-16(b)(1) of the Board of Correction Minimum Standards, in order to keep plaintiff "locked in" for more than two hours per day. N.Y. Comp.Codes R. & Regs. tit. 40 §§ 1-16, 1-06. The request stated that the variance was necessary due to plaintiff's alleged involvement in Fesce's

2007 WL 737485

homicide and that the variance was required to secure the safety of the inmate from the inmate population at large. Under § 1-16, the Board of Correction may grant a variance to exempt the Department from a given rule when full compliance is impractical or impossible. N.Y. Comp.Codes R. & Regs. tit. 40 § 1-16. When the Board of Correction grants a variance, the Board must specify whether it is an emergency variance (up to twenty-four hours) a limited variance (for a specific period of time up to six months), or a continuing variance (for an indefinite period of time). *Id.* Defendant Richard Wolf, Executive Director of the Board of Correction, approved a continuing variance the same day and requested that the Department inform the Board when due process procedures were completed and the variance was no longer needed. Wolf's approval of the variance also specified that plaintiff was to be provided minimal services, including access to the law library, access to individual booths to meet with his attorney, recreational services, linen, laundry, and haircuts.

**\*2** A Directive on Inmate Disciplinary Due Process ("Directive 6500") provides that a prisoner charged with a Department of Correction infraction shall receive a Notice of Infraction within seventy-two hours of the incident and shall receive a hearing within roughly seventy-two hours of the notice. N.Y. City Dep't of Corr., Directive No. 6500 §§ III.A.3, III.B.6. If an inmate is charged with a serious offense, he may be transferred to C.P.S.U., and he is to receive a Notice of Infraction immediately after the transfer. *Id.* III.A.10.

Plaintiff asserts that he did not know the reason for his confinement because he did not receive notice, a hearing, or a copy of the variance related to the decision to confine him in C.P.S.U. Upon his complaint, on November 9, 2004, a grievance officer filled out an Inmate Grievance Form for plaintiff, alleging that plaintiff had been denied due process when he was placed in C.P.S.U. The grievance officer informed plaintiff that a variance had authorized his confinement for his own safety. The next day, defendant Nancy Ortiz, Captain of O.B.C.C., brought plaintiff a Notice of Pre-Hearing Detention pending an investigation, based on the belief that he had committed an infraction. Plaintiff claims that he did not sign or accept the Notice because defendant Ortiz would not it under the door to allow him to read it. Plaintiff alleges that he did not receive a copy until November 22, 2004.

On December 13, 2004, plaintiff received a Report of Infraction, describing the Department of Correction' charges against him. Defendant Renee Westbrook completed this report, basing her conclusions on defendant Santana's investigation. Defendant Darlene Malone's signature also appears on the report. The Department of Correction held a hearing on December 14, 2004 over which defendant Joyce Brown presided. Plaintiff pled not guilty to all charges, denied that he had fought with Fesce and testified that Fesce had fallen on the floor in the holding pen. Plaintiff was found guilty of "fighting resulting in injury" and sentenced to ninety days of punitive segregation, retroactive to October 17, 2004, the date on which he was originally confined to C.P.S.U.

Meanwhile, plaintiff had filed a number of petitions pursuant to New York Criminal Procedure Law § 7800 ("Article 78 petition"), challenging the lawfulness of his confinement in C.P.S.U. On December 15, 2004, the Bronx Supreme Court dismissed his Article 78 petition. Plaintiff served his 90-day term in C.P.S.U., and then was returned to the general prison population.

Plaintiff contends that he was not afforded any of the basic services provided by the variance. Specifically, plaintiff states that he was not allowed to contact his attorney while he was in C.P.S.U. because the facility's phones blocked calls to and from the area code where his attorney was located. Plaintiff also alleges that, because he was in C.P.S.U., he was consistently taken to court late and missed his attorney. As a result, plaintiff alleges that he was unprepared for his Grand Jury appearance on October 28 because he had no interaction with his attorney after counsel was appointed on October 16. In addition, plaintiff claims that he was denied recreational time for the time he was in C.P.S.U. Plaintiff also states that he was denied showers and was sometimes denied food. Finally, he asserts that he was not permitted access to the law library and his mail.

**\*3** Plaintiff filed a state law tort claim against New York City pursuant to the New York General Municipal Law on March 22, 2005. The City of New York denied the claim on June 7, 2005 for failure to comply with the notice of claim requirement set forth in General Municipal Law § 50-e.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    2

Plaintiff timely filed the instant suit under 42 U.S.C. § 1983, alleging that Correction officers denied him due process, interfered with his access to the courts and his attorney, and subjected him to unconstitutional conditions of confinement. Specifically, plaintiff claims that defendant Captain Santana arrested him without a full investigation, withheld evidence, and transferred plaintiff to C.P.S .U. In an affidavit, defendant Santana responds that his involvement with plaintiff terminated with his investigation and that Santana did not have the authority to transfer plaintiff to C.P.S.U. Plaintiff alleges that defendants Richard Wolf (Executive Director of the Board of Correction) and Martin Horn (Commissioner of the Board of Correction) ordered plaintiff's segregation. Plaintiff alleges also that defendants Richard Pagan (Chief of Security), Willie Taylor (Deputy Warden), and Wayne Lamont (Warden), carried out the orders of defendants Wolf and Horn, and placed plaintiff in C.P.S.U. Plaintiff alleges that Captain Ortiz refused to allow plaintiff to see the pre-hearing notice and did not give him a copy in a timely manner. Plaintiff alleges that Correction Officer Malone and Captain Westbrook gave him an allegedly false Report of Infraction on December 13, 2004. Lastly, plaintiff alleges that Captain Brown, who presided at plaintiff disciplinary hearing on December 14, 2004, upheld his infraction and withheld documents at the hearing.

Chief Judge Mukasey directed plaintiff to file an amended complaint on February 4, 2005 and plaintiff did so on March 8, 2005. Plaintiff subsequently submitted a second amended complaint on May 3, 2005. Defendants deposed plaintiff on March 17, 2006 and defendants moved for summary judgment on all claims on August 7, 2006.

## II. Standard of Review

Summary judgment may be granted if there are "no genuine issues as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to come forward with competent evidence:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**\*4** Fed.R.Civ.P. 56(e). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *Harlen Assocs. v. Village of Mineola,* 273 F.3d 494, 498 (2d Cir.2001), that party must raise more than just a "metaphysical doubt" as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen,* 273 F.3d at 499. Accordingly, if the "evidence favoring the nonmoving party" "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

## III. Discussion

A. *Plaintiff's Due Process Rights Were Not Violated*
The due process clause is implicated where a person has a federally or state-created liberty interest arising from statute or regulation. *See Meachum v. Fano,* 427 U.S. 215, 223-227 (1976); *Hewitt v. Helms,* 459 U.S. 460, 470 (1982). The statute or regulation must be mandatory and require certain official conduct in order to create a protected liberty interest. *Hewitt,* at 471-472.

In *Hewitt v. Helms,* the Supreme Court held that prison regulations for imposing solitary confinement created a protected liberty interest because the language was mandatory. The Department of Correction regulations use such mandatory language. For example, Directive 6500 provides that, if the Department transfers a dangerous inmate to administrative segregation pending an investigation of an infraction, then the inmate "must

be served with this Notice [of an infraction] immediately after the transfer." N.Y. City Dep't of Corr., Directive No. 6500 § III.A.10. Similarly, Section 1-06(b) of the Board of Correction Minimum Standards states, "No prisoner shall be required to remain confined to his or her cell [for more than two hours per day] except ..." in limited circumstances, such as a temporary inmate head-count. N.Y. Comp.Codes R. & Regs. tit. 40 § 1-06. As a result, the New York City Department of Correction has used sufficiently mandatory language to create a liberty interest, protected by the due process clause of the fourteenth amendment, in being free from solitary confinement.

The analysis then shifts to whether defendants' actions amounted to a violation of plaintiff's due process rights. The process required to protect a liberty interest is determined by balancing the individual's interest against the state's interests. *See Matthews v. Eldridge,* 424 U.S. 319 (1976). Generally, a prison authority's strong governmental interest in maintaining order, when balanced against an inmate's narrow range of liberty interests, requires that prison officials have broad administrative and discretionary authority to make disciplinary decisions. *See Hewitt,* 459 U.S. at 467.

With regard to convicted prisoners, the Supreme Court, in *Sandin v. Conner,* held that the violation of a state created liberty interest will rise to the level of a constitutional violation if the conditions of a prisoner's confinement "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472 (1995). A pretrial detainee, however, is entitled to a different due process analysis than a convicted prisoner, depending on the purpose and need for the restraint on liberty. *Benjamin v. Fraser,* 264 F.3d 175, 188-190 (2d Cir.2001). If the purpose is punitive, it is governed by the standard in *Wolff v. McDonnell,* which requires written notice of the charges at least twenty-four hours before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence. *Benjamin,* 264 F.3d at 190 (citing *Wolff v. McDonnell,* 418 U.S. 539 (1974)). If the restraint on liberty is administrative-meaning that it is employed to achieve a legitimate government interest, such as protecting the safety of the individual or the general prison population-then it is analyzed under the less protective standard established by the Supreme Court in *Hewitt v. Helms:* an inmate must "merely receive some

notice of the charges against him and an opportunity to present his views" to the prison official charged with deciding whether to impose the restraint. *Benjamin,* 264 F.3d at 190 (citing *Hewitt,* 459 U.S. at 476)). Under *Hewitt,* officials may afford process after the imposition of the restraint-as long as the process occurs within a reasonable time. 459 U.S. at 476 n. 8. However, the determination of whether a restraint is administrative or punitive is not formalistic; a purportedly administrative restraint may be punitive if it is found to be "tantamount to punishment." *Benjamin,* 264 F.3d at 188 (affirming the District Court's finding that a formally administrative restraint amounted to punishment).

**\*5** Since plaintiff at the time of his transfer to C.P.S.U. was a pretrial detainee, *Hewitt* and *Wolff* govern his due process claim. The Department of Correction's argument, that plaintiff's confinement was administrative and not punitive, is the issue to be decided by the Court. The Court must decide if the purpose of plaintiff's restraint was punitive, or administrative (non-punitive), and whether the restraint was excessive in the circumstance. *Benjamin,* 264 F.3d at 188 (citing *Bell v. Wolfish,* 441 U.S. at 538).

There is nothing in the record showing that defendants intended to punish plaintiff. Clearly, defendants had a legitimate non-punitive purpose in placing plaintiff in C.P.S.U. Plaintiff Taylor's fight with Fesce showed him to have uncontrolled rage and fighting prowess that could be imminently dangerous to himself and to others in close proximity, and to the overall welfare of the prison. It was entirely reasonable for the Department to confine plaintiff for his own protection and for the protection of the general prison population.

I find also that the restraint that defendants used to maintain safety was not excessive. Given that plaintiff had caused the death of another inmate, the prison authorities reasonably could be concerned about the danger of further violent behavior or retaliation, by and against plaintiff, and it was not excessive to confine him to C.P.S.U. In other words, plaintiff has not shown that the measure was so severe as to be "tantamount to punishment." In *Benjamin,* the Second Circuit upheld a finding by the District Court that a method of handcuffing was "tantamount to punishment" because it caused "severe injury to the wrists and cuts and bleeding." 254 U.S. at 182. Although being placed in C.P.S.U. is not an insignificant restraint on liberty, it did not inflict physical

injury and it was not excessive in relation to its purpose. *Cf. Id.* I hold that plaintiff's detention was administrative and is therefore subject to review under *Hewitt.*

The notice and hearing standards in *Hewitt* are not exacting or rigid, and weigh the inmate's private interest with the public interests of the prison as a whole. 459 U.S. at 473 (citing *Matthews v. Eldridge,* 424 U.S. at 335). Like plaintiff's case, *Hewitt* concerned an inmate who was transferred to administrative segregation. The Supreme Court held that the inmate's private interest was minor because he "was merely transferred from one extremely restricted environment to an even more confined situation." *Hewitt,* 459 U.S. at 473. In contrast, the prison officials' interest in maintaining the safety of the prison was considerable as "perhaps the most fundamental responsibility of the prison administration." *Id.* The Supreme Court balanced these two interests and upheld the constitutionality of relatively flexible notice and hearing requirements. *Id.* at 474-476.

According to *Hewitt,* prison officials are obligated to provide an inmate with "some kind of notice" of the charges against him. 459 U.S. at 476. Although plaintiff, in the case before me, did not receive a formal written notice until November 22, 2004, plaintiff had previously received sufficient notice of the reason for his confinement. On October 15, 2004, defendant Santana questioned plaintiff about the fight with Fesce. Plaintiff was immediately arrested and two days later was sent to C.P.S.U. Under these circumstances, plaintiff's contention that he did not know the reason for his confinement is not credible. Moreover, on November 1, 2004, a grievance officer informed plaintiff that a variance authorized the Department to confine him for his own safety pending an investigation. The following day, defendant Ortiz informed plaintiff that he was in pre-hearing detention based on the belief that he committed an infraction. Even if plaintiff did not receive a formal Notice of Infraction immediately after his transfer to C.P.S.U., plaintiff's interactions with Department officials adequately notified him of the reason for his confinement. Plaintiff's treatment thus satisfied *Hewitt'* s requirement that a detainee receive "some kind of notice" of the charges against him. 459 U.S. at 476.

**\*6** Also consistent with *Hewitt,* plaintiff had an adequate opportunity to be heard by a prison official prior to his confinement. Plaintiff presented denials and explanations

to defendant Santana during his investigation, and thus had an opportunity to present his views to the prison official with the authority to impose a restraint. 459 U.S. at 476. The purpose underlying the hearing requirement in *Hewitt* is to "permit a reasonably accurate assessment of probable cause to believe that misconduct occurred." 459 U.S. at 475. Plaintiff's interaction with defendant Santana was sufficient for this purpose. Although Santana was not the prison official with the authority to decide whether to confine plaintiff, the hearing requirement of *Hewitt* was satisfied because the decision to confine plaintiff was based on Santana's findings.

I recognize that plaintiff did not receive the process required by the Department of Correction rules and regulations. It was not until November 10, 2005, more than three weeks after his C.P.S.U. confinement began, that plaintiff was served with a Notice of Pre-Hearing Detention, and not until December 13, 2005, five more weeks later, that a Report of Infraction, describing the charges against him, was served. Plaintiff was given his hearing December 14, 2005, almost eight weeks after he was confined to C.P.S.U. In light of his 90-day term of confinement in C.P.S.U., this was too long a period. However, defendants' failure to follow state regulations does not amount to a constitutional violation. *Hewitt* does not elevate state regulations to the level of constitutional requirements; it demands that state actions comport with a minimal due process standard for prison inmates. In this case, the Otis Bantum Correctional Center at Rikers Island acted consistently with the notice and hearing requirements of *Hewitt v. Helms* and *Benjamin v. Fraser.* Therefore, summary judgment for the defendants is appropriate.

### B. *Plaintiff Has Not Offered Evidence Demonstrating that Correction Officers Deprived Him of Other Rights Secured by Constitution*

In addition to claiming a due process violation, plaintiff alleges that defendants violated his right of access to the courts, his right to counsel, and subjected him to unconstitutional conditions of confinement. Defendants are entitled to summary judgment on these claims because plaintiff has failed to establish the personal involvement of any of the defendants in depriving him of these rights if, indeed, plaintiff was actually deprived of these rights. In order to prevail on a § 1983 claim against a defendant, a plaintiff must establish that that defendant was personally involved in depriving the plaintiff of a federal right.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). In addition, the Second Circuit has held that:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*7** *Colon v. Coughlin,* 58 F.3d 865, 934 (2d Cir.1995) (citations omitted). Plaintiff asserts that he was denied the right of access to the courts, the right to counsel, and his right to constitutionally adequate conditions of confinement, but plaintiff does not specify the role of any of the defendants in any alleged violation. Plaintiff claims repeatedly that he was denied access to the phones and was taken late to court, but he never states which defendant, if any, denied him these rights. Similarly, plaintiff alleges that he was denied recreation, showers, and other services, but he does not indicate which defendants actively denied him these services or was indifferent to supervisory knowledge that such deprivations were occurring. Plaintiff does not allege or show that any defendant was grossly negligent, created an unconstitutional policy or custom, or showed deliberate indifference to his rights. In short, plaintiff has failed to allege or establish the personal involvement of any of the defendants in any alleged violation.

Defendants' personal involvement is an essential element of a § 1983 claim, which plaintiff would bear the burden of proving at trial. *See* 42 U.S.C. § 1983. Because plaintiff has failed to make the requisite showing, summary judgment in favor of defendants is appropriate. *See Celotex,* 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Therefore, defendants are granted summary judgment on plaintiff's remaining constitutional claims.

### C. The Court Declines to Exercise Supplemental Jurisdiction

Defendants contend that, to the extent that plaintiff's complaint can be construed to include state law tort claims against New York City or the Department of Correction, such claims must be dismissed for failure to comply with the statutory period filing a notice of claim under the General Municipal Law. N.Y. Gen. Mun. Law §§ 50-e, 50-i. I do not pass on these claims. The federal claims having been dismissed, I exercise my discretion not to consider the claims under state law. 28 U.S.C. § 1367.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice as to his federal constitutional claims and without prejudice as to his state claims. The clerk shall enter judgment and close the file.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 737485

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3913018
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William D. THOMAS, Plaintiff,

v.

L. PINGOTTI; et al., Defendants.

William D. Thomas, Plaintiff,

v.

Polizzi; et al., Defendants.

9:17-CV-0300 (GTS/DEP)
|
9:17-CV-0377 (GTS/ATB)
|
Signed 09/06/2017

**Attorneys and Law Firms**

WILLIAM D. THOMAS, Plaintiff, pro se, 13-A-2123, Downstate Correctional Facility, Box F, Fishkill, NY 12524.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

## I. INTRODUCTION

**\*1** The Clerk of the Court has sent to the Court for review two complaints filed pro se by plaintiff William D. Thomas in the above-captioned actions. [1] Plaintiff, who is confined at Downstate Correctional Facility, asserts claims arising out of his confinement at Shawangunk Correctional Facility ("Shawangunk C.F.") in 2016. Plaintiff has not paid the filing fee in either action, and seeks leave to proceed in forma pauperis ("IFP").

## II. Duplicative Actions

A court reviewing a complaint pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A may properly consider whether the claims asserted by the plaintiff are duplicative of claims asserted in another action. [2] As the Second Circuit has recognized, "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." Curtis v. Citibank, N.A., 226 F.3d 133, 138-39 (2d

Cir. 2000). The principles which guide courts addressing duplicative and repetitive claims rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952). The doctrine is also meant to protect parties from "the vexation of concurrent litigation over the same subject matter." Adam v. Jacob, 950 F.2d 89, 93 (2d Cir. 1991). Thus, "[c]ourts generally look to the identity of the parties, legal claims, factual allegations including temporal circumstances, and the relief sought to determine if the complaint is repetitive or malicious." Hahn v. Tarnow, No. 06-CV-12814, 2006 WL 2160934, at *3 (E.D. Mich. July 31, 2006).

In managing the litigation in its court, there are several approaches to the proper disposition of duplicative actions, including dismissal without prejudice, and consolidation. Curtis, 226 F.3d at 138. The district court has broad discretion in making this determination, and the exercise of its power is reviewed by the Court of Appeals for abuse of discretion. Id.; see also Lopez v. Ferguson, 361 Fed.Appx. 225, 226 (2d Cir. 2010) ("We review a district court's dismissal of claims as duplicative for abuse of discretion."); Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990) ("The trial court has broad discretion to determine whether consolidation is appropriate.").

**\*2** The pleading submitted by plaintiff in *Thomas* I is styled as a "Complaint under [New York] Civil Service Law Section 75." *See* Dkt. No. 1 at 5. [3] While nominally directed towards Shawangunk C.F. Acting Supt. Pingotti, the pleading identifies sixteen additional corrections and medical staff as "respondents" and alleges numerous claims of misconduct by those individuals during plaintiff's confinement at Shawangunk C.F. in 2016. *Id.* at 5-9. Liberally construed, plaintiff claims that he has been subjected to adverse actions in retaliation for his having filed grievances and complaints (related primarily to his participation in the Sex Offender Treatment Program ("SOTP")), disciplined without due process, denied proper and adequate mental health care, and denied proper investigation of and redress for the misconduct complained of his grievances.

In *Thomas* II, plaintiff submitted a twenty-five page complaint utilizing the form civil rights complaint available to litigants in the Northern District of New

York. *See* Dkt. No. 1 ("Compl."). All seventeen of the defendants named in *Thomas* I are defendants in this complaint. *Id.* at 1-7. The complaint in *Thomas* II sets forth, with some additional factual support, the instances of misconduct complained of in *Thomas* I, as well as additional claims and three additional defendants. *Id.* at 9-23. [4] Plaintiff seeks an award of compensatory and punitive damages as well as declaratory and injunctive relief. *Id.* at 24-25.

Upon review of the two pleadings, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist. To the extent that these actions differ in any significant way, the differences arise only from the additional claims and defendants in *Thomas* II. The Court also finds that the pleading in *Thomas* II sets forth plaintiff's claims in a more comprehensive and well-organized manner than does the pleading in *Thomas* I which, as noted, purports to be a state court petition under Civil Service Law Section 75.

Based upon the foregoing, and in order to conserve judicial resources and avoid duplicative litigation, the Court hereby dismisses *Thomas* I without prejudice in favor of *Thomas* II. [5]

## III. IFP STATUS

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). [6] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

**\*3** Upon review, the Court finds that plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility, *see* Dkt. No. 10, and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. Dkt. No. 3.

Accordingly, plaintiff's application to proceed with this action IFP is granted.

## IV. SUFFICIENCY OF THE COMPLAINT

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from officers and employees of a governmental entity, the Court must consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [7] Similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both Sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a complaint, the Court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that

2017 WL 3913018

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**\*4** Plaintiff seeks relief in this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that Section 1983 "is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). To be held liable for damages in a Section 1983 action, a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). Thus, to set forth a cognizable claim under Section 1983, a "plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

Plaintiff asserts numerous claims for the violation of his rights protected under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. The sufficiency of those claims, as set forth in the complaint in seven causes of action, is addressed below.

### A. First Cause of Action—Retaliation
To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.

*Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has long instructed that because virtually any adverse action taken against a prisoner by a prison official can be characterized as a constitutionally proscribed retaliatory act, courts must examine claims of retaliation with "skepticism and particular care." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 491). Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the factual allegations tending to link the two. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, plaintiff alleges that he was retaliated against "for filing grievances and voicing opinion. And filing the 42 U.S.C. 1983 lawsuit." Compl. at 10. [8] Plaintiff identifies the following instances in which defendants took allegedly adverse action against him: C.O. Bertone threatened plaintiff with physical harm if he "continue[d] to make complaints;" C.O. Cutler and C.O. Stefanik wrote false reports against plaintiff "due to plaintiff voicing his opinion, and views;" and C.O. Clayburn issued a false misbehavior report to plaintiff after learning that plaintiff had written several inmate grievances against "fellow employees." *Id.* at 12.

It is well-settled that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall*, 677 F. Supp.2d 643, 648 (W.D.N.Y. 2010) (citing *Cabassa v. Smith*, No. 08 Civ. 480 (LEK/DEP), 2009 WL 1212495, at \*7 (N.D.N.Y. Apr. 30, 2009)); *see Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Kemp v. LeClaire*, No. 03 Civ. 844, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are indistinguishable from those that have been found insufficient to establish a constitutional violation).

**\*5** Upon review, the Court finds that C.O. Bertone's statement that he would "make something happen" to plaintiff if he continued to make complaints, without more, does not suffice to state a cognizable First Amendment retaliation claim against this defendant.

Plaintiff does not enjoy a protected constitutional right "to be free from false and inaccurate information" in his prison records. The creation of a false report in a prisoner's file is not, on its own, a due process violation. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Hollman v. Bartlett*, No. 08-CV-1417, 2011 WL 4382191, at \*12 (E.D.N.Y. Aug. 26, 2011) (the placement of a false report in an inmate's file, without more, is not a due process violation). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Here, while plaintiff alleges that C.O. Cutler and C.O. Stefanik created false reports about plaintiff which were retaliatory in nature, plaintiff has not provided any facts regarding the type of records or reports that were created, the manner in which these records were falsified, or how such falsity harmed plaintiff. Upon review, the Court finds that plaintiff has not alleged facts sufficient to plausibly suggest that these defendants took actions against him which were sufficiently "adverse" for purposes of the First Amendment. As a result, plaintiff's claims against C.O. Cutler and C.O. Stefanik do not survive initial review and are dismissed without prejudice. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009) (summary order) (allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.).

The Court also considered the sufficiency of plaintiff's claim that C.O. Clayburn issued a false misbehavior report in retaliation for grievances plaintiff had filed against other corrections officers. *See* Compl. at 12.[9] "Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim." *Ortiz v. Russo*, No. 13 CIV. 5317, 2015 WL 1427247, at \*11 (S.D.N.Y. Mar. 27, 2015) (citing *Wright v. Goord*, 554

F.3d 255, 274 (2d Cir. 2009) (dismissing a pro se prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant)); *see also Guillory v. Ellis*, No. 9:11-CV-0600 (MAD/ATB), 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff "failed to provide any basis to believe that [defendant] retaliated for a grievance that she was not personally named in"). Here, because plaintiff has not alleged facts sufficient to plausibly suggest that grievances he wrote against other officers were a "substantial or motivating factor" in C.O. Clayburn's decision to issue the challenged misbehavior report, this claim does not survive initial review.

**\*6** Based upon the foregoing, plaintiff's retaliation claims against C.O. Bertone, C.O. Cutler, C.O. Stefanik, and C.O. Clayburn set forth in the First Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

### B. Second Cause of Action—Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable Equal Protection claim, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Here, plaintiff states that he is an "African American Muslim," and claims that defendants treat him differently from the Caucasian inmates in the SOTP "without a [reason] of doing so." Compl. at 13. More specifically, plaintiff alleges that defendants Piliero-Kinderman, Bode-Cutler, and Snyder (identified as Caucasian female employees assigned to the SOTP) spoke disparagingly to him in an attempt to "dehumanize" him and "strip [him] of his self-esteem;" plaintiff contends that these remarks were racially motivated. *Id.* Plaintiff further claims that he was improperly disciplined by defendant Scaringi (identified as a "Caucasian female American"), who ignored substantial evidence of plaintiff's innocence and found him guilty due to her discriminatory motive. *Id.* at 13, 15 (Scaringi went "against her better judgment, due to the fact that plaintiff is a African American male in a sex-offender program. And Defendant is a Caucasian woman."). With respect to a disciplinary hearing conducted by defendant Polizzi (identified as a Caucasian American male), plaintiff claims that he was improperly found guilty without regard to the evidence "because [he] is an African-American Muslim." *Id.* at 15.[10] As against defendant Acting Supt. Pingotti, plaintiff complains that he improperly reviewed and approved misbehavior reports written against plaintiff by C.O. Cutler, C.O. Clayburn, and C.O. Figuero (not a defendant) and designated Polizzi to conduct the hearings, actions that Acting Supt. Pingotti would not have taken in the case of a "Caucasian prisoner who had a false misbehavior report written against him." *Id.* at 18. Plaintiff further alleges that Acting Supt. Pingotti improperly affirmed the disciplinary findings by defendant Polizzi. *Id.*

**\*7** Plaintiff's complaint does not include any facts plausibly suggesting that similarly situated prisoners were treated differently than he was. Rather, plaintiff merely makes the conclusory assertion that inmates of other races, religions, and gender were treated differently by defendants (or would be treated differently if they found themselves in similar circumstances). Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause. *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008); *see also Coleman v. Rice*, No. 8:14-CV-1469 (MAD/CFH), 2015 WL 401194, at \*7 (N.D.N.Y. Jan. 28, 2015); *Hughes v. Butt*, No. 9:06-CV-1462 (TJM/GHL), 2009 WL 3122952, at \*12 (N.D.N.Y. Sept. 28, 2009).

As a result, plaintiff's Equal Protection claims set forth in the Second Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### C. Third Cause of Action—Free Exercise

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). This includes the "right to participate in congregate religious services ... Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (internal citations omitted); *see also Ford*, 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock.").[11] However, an inmate's freedom of religion is not absolute, and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (citation omitted). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safley,* 482 U.S. 78, 84 (1987).[12]

As alleged in the complaint, defendants Piliero-Kinderman, Bode-Cutler, and Snyder deliberately undertook to deny plaintiff the ability to practice his religion "when they went out of their way to discretely get plaintiff remove[d] from sex-offender treatment program by having false misbehavior reports written on plaintiff." Compl. at 19.[13] Plaintiff also contends that defendant Lt. Gardner made disparaging remarks about plaintiff's religion during the disciplinary hearing he conducted to address these reports. *Id.* At the conclusion of the hearing, Lt. Gardner found plaintiff guilty of misbehavior and sanctioned him with thirty (30) days of keeplock confinement. *Id.* During plaintiff's period of "restrictive confinement," Acting Deputy Supt. of Security ("Acting DSS") Bertone ignored plaintiff's written requests to attend Jum'mah services, and "to attend to break of Ramadan prayer and festival" with his "fellow Muslim[s]." *Id.* at 20-21.[14] Plaintiff identifies these observances as "religious tenets" of his faith. *Id.* at 20.

**\*8** Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court finds that a response to plaintiff's claim that he was denied free exercise of his religion is required from Acting DSS Bertone. This is not a ruling on the merits and the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court reaches a different conclusion, however, with respect to the sufficiency of plaintiff's claims against defendants Piliero-Kinderman, Bode-Cutler, Snyder, and Gardner. As to these defendants, because plaintiff has not alleged facts which plausibly suggest that they were personally involved in the determinations made regarding plaintiff's ability to participate in congregate religious services during his period of keeplock confinement, his First Amendment free exercise claims against them set forth in the Third Cause of Action do not survive the Court's initial review and are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### D. Fourth Cause of Action—Privacy and Failure to Address Grievances

The Supreme Court has recognized that the right to privacy protects against disclosure of personal matters, such as one's medical conditions. *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994). "The privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.' " *Shuler v. Brown*, No. 07-CV-0937 (TJM/GHL), 2009 WL 790973, at \* 5 (N.D.N.Y. Mar. 23, 2009) (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). However, courts have held that the right of confidentiality does not prohibit the disclosure of an individual's criminal history, including arrest records. *See Paul v. Davis*, 424 U.S. 693, 713 (1976) (finding no constitutional right of confidentiality affected by the publication of the fact that an individual was arrested of shoplifting); *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (rejecting claim that reporting and notification requirements of New York's Sex Offender Reporting Act violate plaintiff's right to privacy of personal information); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (holding that "there is no constitutional right to privacy in one's criminal record"

because "arrest and conviction information are matters of public record").

Here, plaintiff alleges that defendant C.O. Cunningham improperly told other inmates in the SHU that plaintiff "is a rapist in the sex-offender program." Compl. at 21. According to plaintiff, C.O. Cunningham intended to "encourage" other inmates to antagonize plaintiff "to see if they could get him to hang himself." *Id.*

Because the constitutional right to privacy does not protect the type of information allegedly disclosed by C.O. Cunningham, this claim does not survive initial review. [15]

**\*9** The Fourth Cause of Action also includes claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna which arise, if at all, from their alleged failure to properly investigate and address plaintiff's complaints and grievances. Compl. at 22. As alleged, Deputy Supt. Taylor-Stewart ignored plaintiff's constant complaints about defendants Piliero-Kinderman, Bode-Cutler, and Snyder. *Id.* Plaintiff also alleges that Supt. Lamanna ignored plaintiff's complaints and improperly denied his grievance. *Id.*

Despite the fact that New York prison inmates are required to exhaust administrative remedies prior to commencing an action complaining of prison conditions, and resort to that grievance process is regarded as protected activity under the First Amendment which insulates inmates against retaliation for engaging in such activity, *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996), there is no constitutional right of access to the established inmate grievance program. *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at \*9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *see also Shell v. Brzezniak*, 365 F. Supp. 2d362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim").

Based upon the foregoing, plaintiff's allegations that his complaints and grievances were not properly processed, investigated, and responded to does not give rise to

cognizable claims for the violation of his Fourteenth Amendment due process rights. As a result, these claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna set forth in the Fourth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

**E. Fifth Cause of Action—Unlawful SHU Confinement**
Although it is clear that the Constitution "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)." "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

In his Fifth Cause of Action, plaintiff claims that he was "unlawfully confined in the SHU" due to the actions of defendants Piliero-Kinderman, Bode-Cutler, Snyder, Cutler, Stefanik, Clayburn, Cunningham, Gardner, Taylor-Stewart, Pingotti, Scaringi, Polizzi, Denniston, North, and Koba. Compl. at 22. No other facts are alleged.

Generally speaking, the "normal" or "ordinary" restraints imposed on inmates confined in SHU are not unconstitutional. *See Sostre v. McGinnis*, 442 F.2d 178, 192 (2d Cir. 1971) (en banc) ("It is undisputed on this appeal that segregated confinement does not itself violate the Constitution."). [16] Moreover, such confinement is not "abnormal" unless it is "totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (internal quotation marks and citations omitted). In limited circumstances, the length of the disciplinary detention may itself constitute disproportionate punishment in light of the gravity of the offense. *See Sostre v. McGinnis*,

442 F.2d 178, 190–94 & n.28 (2d Cir. 1971) (length of disciplinary detention [12 months] did not constitute disproportionate punishment considering the gravity of the offense; *Peoples v. Fischer*, No. 11-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 3, 2012) (denying motion to dismiss claim that disciplinary sentence of thirty-six months SHU confinement for a non-violent rule infraction constituted cruel and unusual punishment), *motion for reconsideration granted in part and denied in part on other grounds*, 898 F. Supp.2d 618, 626 (S.D.N.Y. 2012).

**\*10**  Significantly, plaintiff does not allege that the conditions of his SHU confinement were unduly harsh or in any way "abnormal" or "unusual." Plaintiff has also not disclosed the duration of his confinement. Moreover, plaintiff has failed to allege facts in support of his claim that these fifteen defendants were personally involved in creating the conditions of his SHU confinement that he seeks to complain of.

As a result, the unlawful confinement claim set forth in the Fifth Cause of Action is dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**F. Sixth Cause of Action—Due Process**
In the Sixth Cause of Action, plaintiff sets forth claims against defendants North, Hines, Pearson, and Koba which, liberally construed, assert violations of plaintiff's due process rights. *See* Compl. at 22-23.

As against defendant C.O. North, plaintiff alleges that he tampered with hearing tapes that plaintiff requested, and improperly "coached" Scaringi to find plaintiff guilty at a Tier III hearing held in November 2015. Compl. at 22.

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life.' " *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). [17] Thus, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231.

Here, insofar as plaintiff alleges that C.O. North engaged in conduct which resulted in his being denied due process at his disciplinary hearing, this claim does not survive initial review. Even assuming that plaintiff enjoyed a protected liberty interest in the disciplinary hearing conducted by Scaringi (and the Court makes no such finding), there is no basis in the complaint upon which the Court could conclude that C.O. North was personally involved in that wrongdoing for purposes of personal liability under Section 1983.

**\*11** Plaintiff alleges that defendant Hines improperly denied plaintiff's request for documents under the New York Freedom of Information Law ("FOIL"). Compl. at 23. [18] While the exact contours of plaintiff's claim are far from clear, to the extent that he claims that the denial of his FOIL request violated his constitutional rights, that claim is not cognizable in this Section 1983 action. *See Ladeairous v. Attorney Gen. of N.Y.*, 592 Fed.Appx. 47, 48 (2d Cir.), cert. denied sub nom. *Ladeairous v. Schneiderman*, 136 S. Ct. 220 (2015), reh'g denied, 136 S. Ct. 579 (2015) ( " '[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.' ") (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)).

As alleged in the complaint, defendant C.O. Pearson confiscated legal materials and grievance records from plaintiff's cell. Compl. at 23. Following this incident, plaintiff "started to have problems obtaining legal research and materials." *Id.*

The Supreme Court has held that even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)). [19] As a result, plaintiff's claims against C.O. Pearson arising from the confiscation of his legal papers are not cognizable in this action.

In his complaint, plaintiff alleges that defendant Koba, identified as the Grievance Supervisor, falsely reported that plaintiff never filed any grievances, and "prevented plaintiff from exhausting his grievances against fellow employees." Compl. at 23. In addition, plaintiff alleges that Koba provided false testimony at plaintiff's disciplinary hearing "to make plaintiff look like a gang member." *Id.*

Upon review, the Court finds that plaintiff's claims against defendant Koba do not survive initial review. As discussed above in Part III(D), an inmate does not enjoy a protected due process interest in accessing the inmate grievance system. As a result, plaintiff's claim that defendant Koba did not properly perform his duties as "Grievance Supervisor" at Shawangunk C.F. is not cognizable in this Section 1983 action. In addition, it is well-settled that "provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Mitchell v. Senkowski*, 158 Fed.Appx. 346, 349 (2d Cir. 2005) (summary order) (citing *Boddie*, 105 F.3d at 862). Thus, the mere allegation that a defendant has given false testimony at a disciplinary hearing fails to support a section 1983 claim for damages against the witness providing such testimony. *Green v. Greene*, No. 9:07–CV–0351 (GTS/DEP), 2009 WL 5874308, at \*23 (N.D.N.Y. Mar. 30, 2009); *see also Cole v. Fischer*, No. 07 Civ. 11096, 2009 WL 130186, at \*3 (S.D.N.Y. Jan. 15, 2009).

**\*12** Based upon the foregoing, plaintiff's claims against defendants North, Hines, Pearson, and Koba set forth in the Sixth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be

2017 WL 3913018

granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**G. Seventh Cause of Action—Inadequate Medical Care**
There are two elements to a claim that officials violated a plaintiff's Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). [20]

In his complaint, plaintiff claims that Dr. Parks acted with deliberate indifference to plaintiff's "health and safety when he deny plaintiff proper and helpful medications." Compl. at 23. Plaintiff does not set forth any facts regarding the nature and extent of his medical and/or mental conditions, his efforts to obtain evaluation and treatment, or the basis for his belief that the treatment provided was not "proper and helpful."

Upon review, the Court concludes that the facts alleged in the complaint do not plausibly suggest that Dr. Parks acted with deliberate indifference, was reckless in his treatment of plaintiff, or provided him with treatment that was "inadequate" in a constitutional sense. It is well-settled that an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

As a result, plaintiff's medical indifference claim set forth in the Seventh Cause of Action does not survive initial review and is dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**V. CONCLUSION**
**\*13 WHEREFORE**, it is hereby

**ORDERED** that upon review of the pleadings filed in *Thomas* I and *Thomas* II, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist; because the pleading in *Thomas* II is more complete and because plaintiff has asserted additional claims and named additional defendants in that action, *Thomas* I is hereby **DISMISSED without prejudice** in favor of *Thomas* II; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* I (Dkt. No. 11) is **DENIED as moot**; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* II (Dkt. No. 10) is **GRANTED**; [21] and it is further

**ORDERED** that the Clerk provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's inmate authorization (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that plaintiff's claim that he was denied free exercise of his religion by Acting DSS Bertone set forth in the Third Cause of Action survives initial review and requires a response from this defendant; and it is further

**ORDERED** that plaintiff's remaining claims are **DISMISSED without prejudice** in accordance with 28 U.S.C. § 1915(e)(2)(ii) and 28 U.S.C. § 1915A(b)(1); [22] and it is further

**ORDERED** that the Clerk shall terminate Polizzi, Pingotti, Lamanna, Taylor-Stewart, Parks, Piliero-Kinderman, Denniston, Koba, Bode-Cutler, Snyder, Pearson, Gardner, Hines, Cunningham, Clayburn, Scaringi, Cutler, Stefanik, and North as defendants in this action; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service of process, the Clerk shall issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service on defendant Bertone. The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**\*14 ORDERED** that a response to plaintiff's complaint be filed by defendant Bertone or his counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number (No. 9:17-CV-0377), and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 3913018

---

**Footnotes**

1    Since March 2017, plaintiff has filed five civil rights actions in this District.

2    The dismissal of an action as duplicative has been found on several occasions to fall within the ambit of the court's power to dismiss a complaint which is frivolous or malicious pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). *See, e.g., Abreu v. Travers,* No. 9:15-CV-0540 (MAD/ATB), 2015 WL 10741194, at \*4 (N.D.N.Y. Sept. 14, 2015) (citing cases), reconsideration denied, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 1717204 (N.D.N.Y. Apr. 28, 2016); *see also Denton v. Hernandez,* 504 U.S. 25, 30 (1992) (recognizing Congress's concern that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits") (citation omitted).

3    Section 75 provides for the availability of a hearing upon stated charges prior to dismissal of certain government employees in New York. *See Russell v. Hodges,* 470 F.2d 212, 215 (2d Cir. 1972). Civil Service Law Section 75 does not afford plaintiff any basis for relief in this action; in light of plaintiff's pro se status the Court has liberally construed the pleading as seeking redress pursuant to 42 U.S.C. § 1983 ("Section 1983").

4    The additional defendants are Shawangunk C.F. Supt. Lamanna, Shawangunk C.F. C.O. Cunningham, and Shawangunk C.F. C.O. North. *Thomas* II, Compl. at 2, 6-7.

5    In light of the dismissal of *Thomas* I, plaintiff's IFP application in that case, *see* Dkt. No. 11, is denied as moot. Except as specifically noted, all further references in this Decision and Order to the docket shall be to *Thomas* II.

6    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. Based upon that review, it does not appear that plaintiff has accumulated three "strikes" for purposes of 28 U.S.C. § 1915(g).

7    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

8    No other facts are alleged regarding the timing or subject matter of plaintiff's complaints and grievances.

9    Plaintiff's claim is asserted in wholly conclusory terms; no facts are provided regarding the date(s) of these grievances, the officers against whom the grievances were filed, or the nature of plaintiff's complaints.

10   The hearing was convened to consider an inmate misbehavior report written by C.O. Clayburn. Compl. at 16.

11   As the Second Circuit noted in *Ford*, DOCCS Directive 4202 "sets out prison officials' obligations in accommodating prisoners' religious practices." *Ford*, 352 F.3d at 586. Part X of Directive 4202 provides that "[u]pon commencement of keeplock or confinement status, an inmate may submit a written request to attend regularly scheduled congregate religious services;" such requests are to be directed to (and decided by) the Deputy Superintendent for Security.

12   This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). At this early stage of the action, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest. *See Holland*, 758 F.3d at 221; *Salahuddin*, 467 F.3d at 274-75.

13   As noted, plaintiff states that he is an "African American Muslim." Compl. at 13.

14   Plaintiff does not contend that he was prohibited or prevented from praying or otherwise practicing his religion in his cell during the period of keeplock confinement.

15   In light of plaintiff's pro se status, the Court also considered whether plaintiff has plausibly alleged that C.O. Cunningham intentionally exposed plaintiff to "a substantial risk to his safety" in violation of his Eighth Amendment rights when he made comments to other inmates about plaintiff's criminal history, and concludes that he has not. Plaintiff may pursue such a claim in a properly filed amended complaint.

16   "Under the 'normal conditions of SHU confinement in New York [state prison],' the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citation omitted).

17   For example, segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *Sandin*, 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

18   As alleged, plaintiff's request was denied on the ground that it was not timely. Compl. at 23.

19   The confiscation of an inmate's legal papers related to a legitimate, non-frivolous legal proceeding can give rise to a claim under the First Amendment for interference with access to the courts, provided that the inmate can establish that he or she has suffered prejudice as a result of the actions of corrections officials in the pursuit of his or her legal claims. *See Pacheco v. Pataki*, No. 9:07-CV-850 (FJS/GHL), 2010 WL 3635673, at *3 (N.D.N.Y. Sept. 9, 2010) ("A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents.... [f]or the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury."). Here, because plaintiff does not claim and there are no facts alleged in the complaint which even suggest, that the problems he experienced with the law library resulted in "actual injury," the complaint does not state a cognizable access to the courts claim.

20   "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)).

21   Although his in forma pauperis application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

22   Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must be a complete pleading and must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**Thomas v. Pingotti, Slip Copy (2017)**

2017 WL 3913018

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2080517
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,
v.
George SEYFERT, et al., Defendants.

No. 9:03-CV-1389 (TJM).
|
July 19, 2007.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Jeffrey M. Dvorin, Office of Attorney General, Department of Law, The Capitol, Albany, NY, for Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** In this amended civil rights complaint,[1] Plaintiff alleges a variety of Due Process; First Amendment; and Eighth Amendment claims allegedly committed by the Defendants, and resulting from an incident in which Plaintiff was being investigated for an escape attempt at Sing Sing Correctional Facility (Sing Sing). (Dkt. No. 36). Presently before the Court is Plaintiff's motion for partial summary judgment and Defendants' cross motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt.Nos.105, 121). Plaintiff has responded in opposition to Defendants' cross-motion. (Dkt. No. 128).

**DISCUSSION**

**1. *Summary Judgment***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

**2. *Facts***

**A. Due Process**

Although Plaintiff begins his complaint with a discussion of his May 15, 2003 transfer from Sing Sing to Shawangunk Correctional Facility (Shawangunk) and his subsequent placement in Administrative Segregation (Ad Seg) at Shawangunk, there is additional background necessary for an understanding of the facts surrounding Plaintiff's claims. A great deal of material has been submitted by both Plaintiff and Defendants in support of their motions, and the court will attempt to summarize these submissions. Plaintiff's deposition was taken on April 8, 2006,[2] and many of the Defendants have submitted affidavits. Plaintiff has filed transcripts of portions of the criminal trial at which he as convicted of attempted escape based upon many of the facts that underlie the claims in this case. (Dkt. No. 128, Plaintiff's Exhibits, Pt. 1).

On May 7, 2003, a corrections officer at Sing Sing advised Defendant Darren Daughtry, an Investigator with the New York State Police, that an unknown individual had entered Sing Sing, dressed in a correction uniform and had presented false identification, indicating that he was Corrections Officer Anthony White. Daughtry Aff. ¶ 2. Defendant Daughtry traveled to Sing Sing to obtain more information about the incident. *Id.*

**\*2** Defendant Daughtry learned that the officers had questioned the man's credentials and had escorted him to the executive offices for further investigation. *Id.* The man was carrying a bag containing additional corrections uniforms. *Id.* After being escorted to the executive offices, the man asked to use the bathroom and managed to leave the prison without being detected. *Id.* As a result of this incident, the New York State Police, with the assistance of other agencies, began a search for this individual. *Id.*

Defendant Daughtry states that the next day, he learned that the Ossining Police Department had interviewed people who were in the area of the prison following the incident. *Id.* ¶ 3. Defendant Daughtry reviewed the names and descriptions of those interviewed, and one person, Tony Dubose, matched the description of the individual who had entered the facility with false credentials. *Id.* The New York State Police located Mr. Dubose, arrested him on May 12, 2003, and questioned him about the incident.

Mr. Dubose told Defendant Daughtry that a woman named Jatanya offered to pay Dubose $15,000.00 to help a man, known as "Puzz," escape from Sing Sing. *Id.* ¶ 4. The plan was that Mr. Dubose would dress as a corrections officer, enter the prison with the false credentials, and arrange for the escape. *Id.* Mr. Dubose stated that he attempted to carry out the plan, but failed and left the prison after he asked to use the bathroom. *Id.* Mr. Dubose told Defendant Daughtry that Jatanya and another woman, named Tamara, were waiting for him in a rental car. *Id.*

Defendant Daughtry states that he contacted an officer at Sing Sing who informed him that Plaintiff's nickname was "Puzz" and regularly received visits from Jatanya Belnavis and Tamara Johnson. *Id.* ¶ 5. The New York State Police located the two women. *Id.* When questioned, Jatanya Belnavis identified Corrections Officer Quangtrice Wilson as having been involved in the plan. *Id* . ¶ 6. Officer Wilson was also interviewed and admitted that she agreed to provide Plaintiff with information about the daily operation and lay-out of the facility and allowed a digital picture to be taken of her shield and identification card. *Id.* Defendant Daughtry believed that Plaintiff's friend, Latrina Boyd, also assisted in obtaining the false credentials. *Id.* ¶ 7.

During his investigation, Defendant Daughtry communicated with Department of Correctional Services (DOCS) Deputy Inspector General (IG), Defendant George Seyfert. *Id.* ¶ 8. Defendant Daughtry states that his investigation of this incident began on May 7, 2003 and "in view of the number of people involved in the conspiracy," the investigation remained open until the end of January 2004, when the matter was submitted to a Grand Jury. *Id.* ¶ 9. Plaintiff was indicted, and on April 8, 2005, a jury found him guilty of various offenses connected with the escape attempt. [3] *Id.* at ¶ 10. Plaintiff was sentenced on June 7, 2005. *Id.* Plaintiff, however, claims that Defendant Daughtry supplied false information to the officials at Shawangunk regarding the incident and then, on February 10, 2004, violated Plaintiff's due process rights by arresting him without probable cause to believe that Plaintiff had attempted to escape. AC ¶¶ 46-47.

**\*3** Defendants have also submitted the affidavit of Deputy IG Seyfert. Seyfert Aff. The affidavit includes a description of the Office of the IG and its functions. Seyfert Aff. ¶¶ 1-4. Defendant Seyfert states that among other functions, the IG is responsible for investigating allegations of violations of DOCS rules and regulations, and the New York State Penal Law by both staff and inmates. *Id.* at ¶ 3. The IG is also responsible for assisting other law enforcement agencies outside of DOCS and making sure that substantiated incidents are referred to the appropriate agency for review, possible disciplinary action, and/or criminal prosecution. *Id.* ¶¶ 3-4.

In his affidavit, Defendant Seyfert states that his office was notified a short time after the May 7, 2003 incident. *Id.* ¶ 7. The case was referred to Defendant Seyfert in his capacity as a Deputy IG for one of the Internal Affairs Units of the office. *Id* . Defendant Seyfert assigned two senior investigators to the case and immediately sent them to Sing Sing. *Id.* The New York State Police and the local police were notified. *Id.* Defendant Seyfert states that on May 14, 2003, he and one of his senior investigators met with investigators of the New York State Police, and during that meeting, Plaintiff was identified by the New York State Police as a suspect in the May 7, 2003 escape attempt. *Id.* ¶ 9.

On May 15, 2003, Plaintiff was transferred to Shawangunk. In an affidavit, Defendant Joseph Smith, Superintendent of Shawangunk, states that prior to Plaintiff's arrival at Shawangunk, Smith spoke with Defendant Seyfert. Smith Aff. ¶ 5. During that conversation, he and Defendant Seyfert discussed various

Zimmerman v. Seyfert, Not Reported in F.Supp.2d (2007)

2007 WL 2080517

issues regarding Plaintiff, including the potential security risk that he posed in light of the attempted escape from Sing Sing. *Id.* Defendant Smith states that, during that conversation, he learned the information surrounding the escape attempt and Plaintiff's potential involvement. *Id.* ¶ 6.

It was based on the information provided by Defendant Seyfert that Defendant Smith decided that Plaintiff should be placed in administrative segregation upon his arrival at Shawangunk, and to then be given a hearing regarding the administrative segregation placement. *Id.* Defendant Smith states that he based his decision on the information that the escape attempt involved "accomplices outside the facility, who breached Sing Sing's security by concealing their identities using fake DOCS officials uniforms and credentials." *Id.* Defendant Smith also stated that he took into account the information that Plaintiff had developed a personal relationship with a corrections officer who provided Plaintiff with information regarding the daily operation and lay-out of the facility. *Id.*

Defendant Smith states that it was because of this "sophisticated scenario" that he believed Plaintiff posed a threat to the safety and security of the facility, warranting administrative segregation. *Id.* ¶ 7. Administrative segregation involves restricted privileges [4] and close monitoring of inmates. *Id.* Defendant Smith states that if Plaintiff had been given all of the privileges in general population, he could have potentially abused those privileges by smuggling contraband or by contacting potential witnesses and interfering with the criminal investigation. *Id.* ¶ 8. Defendant Smith states that he was also concerned that Plaintiff could attempt to plan another escape, and the additional restrictions were necessary to prevent Plaintiff from contacting any potential accomplices. *Id.*

**\*4** Defendant Smith states that based on all the above information, he ordered Plaintiff's placement in administrative segregation, pending a hearing. *Id.* ¶ 9. Defendant Smith specifically states that Defendant Seyfert did not order Defendant Smith to place Plaintiff in Ad Seg. *Id.* Defendant Sergeant Lutz prepared Plaintiff's Ad Seg report based on Defendant Smith's order, and Defendant Deputy Superintendent for Security (DSS) Maly authorized the Ad Seg report. Smith Aff. ¶ 9 & Ex. A. However, it was ultimately Defendant Smith's decision

to place Plaintiff in segregation. *Id.* Plaintiff received the Ad Seg report on May 17, 2003. *Id.*

The Amended Complaint alleges that Defendant Seyfert "directed" Defendant Smith to place Plaintiff in administrative segregation without due process. AC ¶ 30. Plaintiff further alleges that Defendant Lutz prepared an insufficient Ad Seg report, which failed to inform Plaintiff of the date, time, and place of the "incident." AC ¶ 31. Plaintiff states that Defendant Maly authorized the report and "failed to cure" the violations.

On May 22, 2003, Plaintiff was afforded his first hearing on the administrative segregation recommendation. The documents associated with this hearing have been submitted as Dvorin Declaration, Ex. B. The hearing ended on May 25, 2003. The hearing officer was Defendant Squillace, and Plaintiff's chosen employee assistant was Defendant Wilkins. *Id.* Ex. B at 9, 11. Plaintiff has included as an exhibit the list of documents and witnesses that he requested from Defendant Wilkins, together with Defendant Wilkins's responses to those requests. Plaintiff's Ex. B (Attached to Dkt. No. 105). Plaintiff alleges that Defendant Wilkins violated Plaintiff's due process rights by failing to obtain the documents and witnesses requested by Plaintiff.

Plaintiff also alleges that Defendant Squillace violated Plaintiff's due process rights at the May 22-25, 2003 Ad Seg hearing by failing to call requested witnesses, failing to order the production of documents, and making a decision that was not supported by sufficient evidence. AC ¶¶ 34-36. A transcript of the hearing has been included as Dvorin Declaration, Ex. E. Defendant Maly was the only witness at the hearing. (5/25/03 Hearing Transcript at 10-14).

Defendant Squillace upheld Plaintiff's placement in Ad Seg, and Plaintiff appealed the decision. On August 25, 2003, Defendant Selsky reversed the administrative determination based on insufficiency of evidence and sent the matter back to the facility for a new hearing. Plaintiff argues that Defendant Selsky violated Plaintiff's due process rights by allowing a second hearing rather than simply reversing the determination and expunging the records. AC ¶ 38.

After Selsky's administrative reversal for insufficient evidence, another hearing was scheduled, and Defendant

Chapperino was assigned as Plaintiff's employee assistant. Dvorin Declaration Ex. C at 16. Once again, Plaintiff requested a series of documents and witnesses, some of which were refused due to the "ongoing investigation." *Id.* at 19-22. Plaintiff's second hearing began on August 29, 2003 and ended on September 4, 2003. *Id.* at 7. Defendant Pico was the hearing officer, and a transcript of the hearing has been filed as Dvorin Declaration Ex. F.

 **\*5** At the second hearing, Plaintiff maintained that he did not attempt to escape on May 7, 2003 because he was in the visiting room with 17 corrections officers and 65 visitors when the "code blue" was announced in the jail. (8/29/03 Hearing Transcript at 13). Plaintiff told the hearing officer that although he did not receive the requested documents from his assistant, he had already seen the documents because his attorney and his private investigator had obtained these documents, so Plaintiff already knew what the facts of the alleged escape were. *Id.* at 12-13, 19. Plaintiff's focus was to convince Defendant Pico that Plaintiff did not "go to the door ... intend to open the door [or] ... try to run out the door." *Id.* at 20.

Defendant Lutz testified at Plaintiff's second hearing. *Id.* at 23-26. Defendant Lutz testified that he wrote the administrative segregation recommendation because he was told to do so by Defendant Maly, and that Defendant Lutz had not personally reviewed any of the paperwork in the case. *Id.* at 23, 25. Defendant Chiapperino also testified at the hearing and stated that he did not provide many of the requested documents because there was an investigation pending and the "information was not available." *Id.* at 26. At the hearing, Plaintiff produced a newspaper clipping that outlined a great deal of the facts of the investigation which Defendant Pico read into the record. *Id.* at 39. Defendant Pico stated at Plaintiff's hearing that Pico would obtain the UI (Unusual Incident) package from Sing Sing Correctional Facility and would review it, share the information that could be shared with Plaintiff, and maintain the confidentiality of the rest. *Id.* at 42.

Later during the hearing, Defendant Pico asked Plaintiff why he wished to call witnesses to prove that Plaintiff was in the visiting room on May 7, 2003, and Plaintiff stated that he believed that corrections officials were trying to accuse Plaintiff of attempting to escape from the visiting room. *Id.* at 43. Defendant Pico allowed Plaintiff to call another inmate to testify that he and Plaintiff were in

the visiting room together on May 7, 2003 when the "code blue" was announced. *Id.* at 48-50. Defendant Pico eventually obtained the UI report and stated on the record that he reviewed the information contained in the report. *Id.* at 53. Defendant Pico also discussed parts of the report with Plaintiff. *Id.* at 54-55.

Defendant Seyfert also testified at Plaintiff's second hearing, however, Plaintiff did not hear that testimony, and the tape recording of that testimony has been maintained as confidential. [5] Plaintiff objected to Defendant Pico's refusal to allow Plaintiff to hear the "confidential" tape, arguing that nothing on the tape was confidential, and that "most of the stuff is already in the newspapers." *Id.* at 62. Plaintiff also stated that he had already spoken to Defendant Seyfert and that "he explained everything to me that's going on in the case." *Id.* Plaintiff stated that he only wished to hear the tape so that if Defendant Seyfert were stating something that was not true regarding the investigation, Plaintiff could controvert the statement with documents in Plaintiff's possession. *Id.* at 62-63.

 **\*6** Plaintiff requested that his attorney and his private investigator be called as witnesses, but Defendant Pico denied those requests because the individuals did not have any connection to the incident. *Id.* at 56-58, 62. After Defendant Pico denied Plaintiff his attorney and private investigator as witnesses, Plaintiff made a very lengthy statement regarding the incidents of May 7, 2003. Plaintiff cited federal case law to the hearing officer, arguing that Plaintiff should not be found "guilty" of the attempted escape. *Id.* at 64-65, 66.

Defendant Pico found, based upon the evidence, including the confidential tape, that Plaintiff should be kept in administrative segregation, but specifically told Plaintiff that he was not finding him "guilty" of committing any particular misbehavior in the visiting room on May 7, 2007. *Id.* at 85-86. Defendant Pico stated that Plaintiff was still under investigation for the alleged escape attempt from Sing Sing. *Id.* at 86. Defendant Selsky affirmed the continuation of administrative segregation. Dvorin Decl. Ex. D at 1.

Defendants have also submitted the periodic administrative review documents. Maly Decl. Ex. B. The initial reviews indicated that administrative segregation was being continued because Plaintiff was under

investigation for an escape attempt at Sing Sing. *Id.* at 9-11.[6] The review dated March 5, 2004 states that the Plaintiff was "criminally charged" for an escape attempt at Sing Sing Correctional Facility. *Id.* at 8. All these review documents also state that Plaintiff was exhibiting a positive attitude and good behavior while in Ad Seg. *Id.* at 8-11.

The next review, dated May 3, 2004 stated that although Plaintiff was following staff directions in Ad Seg and showed an "overall positive attitude," he was also caught attempting to smuggle a personal communication concealed in legal work. *Id.* at 6, 7. The review document stated that Plaintiff had a hearing regarding this conduct and received a thirty day Special Housing Unit ("SHU") sanction as a result of the guilty finding. *Id.* It was also stated, as had been stated in the previous reports, that his presence in general population could jeopardize the security of the facility. *Id.*

The periodic review report dated July 1, 2004 stated exactly the same reasons for maintaining Plaintiff in administrative segregation. *Id.* at 5. The December 25, 2004 review was identical to the previous report. *Id.* at 4. The February 22, 2005 periodic review document stated that Plaintiff had been "criminally charged" for the escape attempt, and that he was "currently standing trial" for those charges. *Id.* at 3. The recommendation was to continue Plaintiff in Ad Seg. *Id.* On April 22, 2005, the review document states that Plaintiff was found guilty after trial in Westchester County for attempted escape, first degree, among other charges. *Id.* at 2. Again, the recommendation was to continue Ad Seg. *Id.*

**\*7** In addition to Plaintiff's placement in administrative segregation, a "mail watch" was requested by Defendant Maly and approved by Defendant Smith for all of Plaintiff's mail between May 16, 2003 until June 22, 2005, with a review every two months. All the mail watch orders have been submitted as an exhibit to the Defendants' cross-motion. Smith Decl. Ex. F. The mail watch request states that Plaintiff was under investigation by DOCS and by the New York State Police for attempting to escape from Sing Sing. *Id.* at 3.

Incoming mail was to be reviewed for any plans for criminal activity and information which, if communicated, would create a security threat. *Id.* Outgoing mail was going to be reviewed because there

was reason to believe that DOCS rules or regulations had been violated. *Id.* Defendant DSS Maly was chosen to monitor the mail, and the mail watch form indicates that legal mail was included. *Id.* Finally, there is a "note" at the bottom of the page stating that as the mail is received, it should be "immediately" distributed to the inmate unless it contained contraband. *Id.*

Plaintiff also claims that the Defendants responsible for the misbehavior report and disciplinary hearing held against Plaintiff on April 7, 2004[7] violated his due process rights. On March 27, 2004, Defendant Stokes issued a misbehavior report against Plaintiff for having "authorized articles in an unauthorized area" and "smuggling." Kimler Decl. Ex. A (misbehavior report). Defendant Stokes stated that he was working in the SHU on March 27, 2004 and was helping to escort Plaintiff to the second floor infirmary for a visit. *Id.* While going through the legal mail that Plaintiff was taking to the visit, Defendant Stokes found three pages of a personal letter, hidden in a "law firm envelope." *Id* . The letter was confiscated, and a contraband receipt was issued. *Id.* Defendant Kimler was chosen by Plaintiff as his employee assistant. Dvorin Decl. Ex. D at 12, 15. Plaintiff was charged with attempting to smuggle a personal letter into the visiting area inside a legal envelope. The three page letter was an exhibit at the disciplinary hearing and has been submitted as part of the April 7, 2004 hearing packet in this case. *Id.* at 8-10, 22-24 (duplicate).

At the disciplinary hearing, Plaintiff complained that the hearing was not held within seven days of the incident, and was therefore, untimely. Dvorin Decl. Ex. G at 4. The hearing officer, Defendant Gardner, explained to Plaintiff that because he was not "confined" based on the misbehavior report,[8] prison officials had fourteen days to commence the hearing, and the hearing was timely. *Id.* Plaintiff's defense to the charge was that he gave the legal envelope in which the letter was found, to Defendant Stokes when Plaintiff was in his cell, but that Defendant Stokes did not look in the envelope until they got to the visiting room.[9] Thus, Plaintiff contends that Defendant Stokes was responsible for bringing the letter into an unauthorized area. *Id.* Plaintiff claimed that if Defendant Stokes had looked inside the legal envelope when they were still in Plaintiff's cell, he would never have been charged with this misbehavior. *Id.* Plaintiff later claimed that he did not even know that the letter to his mother

was in the envelope, and that this was a copy of a letter that Plaintiff had already mailed to his mother, using the regular procedures. *Id .* at 8-9.

**\*8** Defendant Stokes testified at Plaintiff's disciplinary hearing. *Id.* at 6-10. Defendant Stokes testified that when he found the letter, he initially told Plaintiff that he would just put the pages back in Plaintiff's cell, but "then I thought better of it and I said well, I'll let the Sergeant review it. Let her make the call." *Id.* at 10. Defendant Kimler was the sergeant involved, and she also testified at Plaintiff's disciplinary hearing. *Id.* at 11-13. Sergeant Kimler admitted that when she went over the incident with Plaintiff, she stated that he "forgot it was in there." *Id.* at 13. Defendant Gardner found Plaintiff guilty of the misbehavior and imposed a penalty of thirty days SHU confinement and loss of various privileges. *Id.* at 17. Plaintiff appealed the decision, and Defendant Selsky affirmed this disciplinary determination on July 15, 2004.

### B. Cruel and Unusual Punishment

Plaintiff claims that between September 26, 2003 and October 10, 2004, Defendant Karamanos harassed Plaintiff by kicking Plaintiff's cell door every half hour while Plaintiff was trying to sleep. AC ¶ 55. Plaintiff claims that at unspecified times during this period, Defendant Karamanos also refused to give Plaintiff soap, writing paper, and tissue. *Id.* Plaintiff also claims that Defendant Karamanos spit in Plaintiff's food and threatened to kill Plaintiff. *Id.* Plaintiff alleges that Defendant Smith violated Plaintiff's right to be free of cruel and unusual punishment by failing to protect Plaintiff against Defendant Karamanos's conduct. AC ¶ 62.

Plaintiff claims that Defendant Smith further violated Plaintiff's Eighth Amendment rights by refusing to return Plaintiff's typewriter and reading lamp after learning of "excessive pains" in Plaintiff's hands due to the great deal of writing that Plaintiff had to do "because of his confinement" and after learning of Plaintiff's "eye pains." AC ¶¶ 63-64. Defendant Smith is also alleged to have forced Plaintiff to shave with a razor instead of an electric shaver; denied Plaintiff adequate laundry services and refused to provide Plaintiff with a "reasonable alternative" to the prison laundry. AC ¶¶ 65-66. Plaintiff blames Defendant Smith for causing Plaintiff's mild stroke on November 4, 2003. AC ¶ 53. Plaintiff claims that Defendant Smith caused a "stressful situation" when he

prevented Plaintiff from proving his innocence at his "disciplinary hearing" and by directing Defendant Maly to conduct "sham" reviews of Plaintiff's placement in administrative confinement.

Plaintiff alleges that on March 2, 2004, Defendant Koemm violated Plaintiff's Eighth Amendment rights by forcing Plaintiff to come out of his cell at 7:00 a.m. and demanding that Plaintiff walk more than 100 feet in the cold while wearing only underwear in front of other inmates and female officers. AC ¶ 57. Plaintiff claims that Defendant Koemm also violated Plaintiff's Eighth Amendment rights on July 27, 2004 by refusing to feed Plaintiff for more than eleven hours and keeping Plaintiff in shackles for more than eleven hours. AC ¶ 58.

**\*9** Plaintiff claims that prior to August 23, 2003, he asked Defendant Smith several times to transfer Plaintiff from the SHU area due to threats he had received from other inmates. AC ¶ 51. Plaintiff states that Defendant Smith refused to move Plaintiff, and because of Defendant Smith's failure to protect Plaintiff, he was assaulted by another inmate who threw urine and feces at Plaintiff on August 23, 2003. AC ¶ 51. Plaintiff also claims that Defendant Lutz subjected Plaintiff to cruel and unusual punishment after this incident because Defendant Lutz did not allow Plaintiff to shower for forty five minutes after the assault. AC ¶ 52.

### C. Visitation and Access to Courts/Counsel

Plaintiff alleges that on May 25, 2003, Defendant Smith violated Plaintiff's right to "visitation of choice" by denying a visit with his clergyman, Minister James Willis. [10] AC ¶ 47. Plaintiff also alleges that Defendant Smith denied Plaintiff a visit with his attorney on June 18, 2003. AC ¶ 48. Plaintiff claims that Defendant Smith violated Plaintiff's attorney-client privilege by initiating the mail watch and opening all of Plaintiff's legal mail. AC ¶ 49. Plaintiff claims that Defendant Smith denied Plaintiff a legal telephone call on an unspecified date. AC ¶ 50. Plaintiff also alleges that Defendant Koemm violated Plaintiff's rights by "not allowing Plaintiff to speak with his attorney in private." AC ¶ 74.

### D. Retaliation

Plaintiff claims that Defendant Kimler retaliated against Plaintiff for filing legal claims against her peers by taking

Plaintiff's legal books and refusing to return them to him. AC ¶ 67. Defendant Kimler has filed an affidavit in which she states that on August 3, 2004, Corrections Officer Cusack [11] performed a routine cell search of Plaintiff's SHU cell. Kimler Aff. ¶ 5. As a result of that search, Officer Cusack confiscated, among other things, books and magazines that were "in excess of the number of items allotted SHU inmates." *Id.*

Defendant Kimler states that the excess books and magazines were placed in Plaintiff's personal property box according to DOCS Directives. *Id.* ¶ 5 & Ex. B. One of the books, entitled Prisoner Self-Help Litigation Manual, was returned to the facility Law Library, and a bible was returned to Plaintiff. *Id.* Officer Cusack did not issue a misbehavior report, but Plaintiff complained about the confiscation of materials, so Defendant Kimler investigated the matter. *Id.* Defendant Kimler states that she asked the Law Library Officer what books were signed out to Plaintiff. *Id.* The Law Library Officer sent Defendant Kimler a memorandum listing two books signed out by Plaintiff, neither of which was the Self-Help Manual. *Id.*

Although Plaintiff claims that the Self-Help Manual was sent to him by his mother, Defendant Kimler states that the book was clearly stamped "SHU" in large letters on the front and on the binding of the book. *Id.* ¶ 6. Defendant Kimler asserts that the items were not confiscated because they posed a threat to security or because Plaintiff sued other officers in the facility, but rather because the items were in excess of the amount allowed in an SHU cell. *Id.* ¶¶ 6, 7.

### E. Grievances

**\*10** Plaintiff's amended complaint also names Thomas Eagen, Director of the Inmate Grievance Program. Plaintiff filed grievances regarding Defendant Smith's alleged refusal of the telephone call to Plaintiff's lawyer, and the denial of Minister Willis's visit. Plaintiff also filed a grievance regarding Defendant Karamanos's alleged behavior, although in Plaintiff's claims against Defendant Eagen, he does not mention Eagen's affirmance of the denial of the Karamanos grievance.

Defendant Eagen has submitted an affidavit in support of the Defendants' cross-motion for summary judgment. In the affidavit, Defendant Eagen states that although he

is the Director of the Inmate Grievance Program (IGP), he has no vote in the Central Office Review Committee's (CORC) determination of specific grievances. Eagen Aff. ¶ 6. Defendant Eagen is responsible "solely for the administrative functions of the IGP and CORC." *Id.*

### 3. *Due Process*

Plaintiff in this case has five distinct due process claims. First, Plaintiff alleges that his placement in administrative segregation violated due process. Second, Plaintiff alleges that the periodic reviews conducted while he was in administrative segregation were "shams" and violated due process. Third, Plaintiff alleges that the Defendants involved in his disciplinary hearing for smuggling violated his due process rights in connection with that hearing. Fourth, Plaintiff alleges that Defendant Eagen violated due process when affirming the denial of Plaintiff's grievances regarding his legal call, legal visit, and his visit from Minister Willis. Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's due process rights by falsely reporting to Defendant Smith that Plaintiff was under investigation for escape, and later by arresting Plaintiff without probable cause.

#### A. Administrative Segregation Placement

In order to begin a due process analysis, the court must determine whether Plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the Defendants deprived Plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHU claim by the standard of *Sandin*

); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding). The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

**\*11** The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). In *Colon,* the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999)).

In this case, there appears to be no question that Plaintiff had a liberty interest in remaining free of the confinement to which he was subjected. Plaintiff states in his motion for summary judgment that he was in Ad Seg in SHU from May 15, 2003 until July 20, 2005, over two years. Plaintiff's Declaration ¶ 25 (Dkt. No. 105). Thus, the question to be determined is whether Plaintiff was afforded the process he was due prior to, and during the continued imposition of this confinement. Plaintiff argues that he was not afforded due process.

In *Hewitt v. Helms,* 459 U.S. 460, 469-76, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement. [12] Under *Hewitt,* an inmate placed in administrative segregation must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n. 8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id* . at 477. A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto v. Walker,* 44 F.3d 169, 173 n. 4 (2d Cir.1995) (citing *Hewitt,* 459 U.S. at 477 n. 9).

The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b) (N.Y.CRR). The regulations also require that administrative segregation inmates receive the same type of hearing as those inmates who are transferred to SHU for disciplinary reasons. 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

**\*12** There are several state law requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

In this case, Plaintiff claims that Defendant Seyfert violated Plaintiff's due process rights by ordering Defendant Smith to place Plaintiff in administrative segregation. As stated above, Defendant Smith takes full responsibility for Plaintiff's placement, and Defendant Seyfert was only involved to the extent that he informed Defendant Smith of the facts of the case and the pending investigation. Although Plaintiff continues to maintain

that this was false information, it is clear that the information regarding the investigation was correct.

Plaintiff makes the same claim against Defendant Daughtry. The "false" information allegedly conveyed by Defendant Daughtry was the fact that an escape was being investigated and it was believed that Plaintiff may have been involved in the plan. Clearly, the information was not "false" since Plaintiff was ultimately convicted of participation in the escape plan. It was based on this information that Defendant Smith instructed Defendant Lutz to prepare an "Administrative Segregation Recommendation," approved by Defendant Maly, and served on Plaintiff on May 17.2003. Smith Decl.¶ 9 & Ex. A.

Defendant Smith outlines the basis for his decision to transfer Plaintiff to Ad Seg pending a hearing. Smith Decl. ¶¶ 6-8. Because the escape attempt involved a visitor, smuggling of uniforms, falsifying credentials, and the development of a relationship with a corrections officer in furtherance of the escape attempt, Defendant Smith believed that it would be important to be able to supervise Plaintiff more closely and to restrict his access to potential accomplices, visitors, and other forms of communication. *Id.* These concerns are valid bases for imposing administrative segregation pending a formal hearing.

Plaintiff was served with the Ad Seg report, clearly indicating that he was under investigation for an escape attempt at Sing Sing. Smith Decl. Ex. A. Thus, Plaintiff was informed of the basis for his confinement, and the Ad Seg Recommendation specifically informed Plaintiff that he would have a full hearing with the due process rights afforded to inmates facing disciplinary proceedings within 14 days of the Ad Seg recommendation. *Id.* The recommendation further states that "[i]f restricted pending a hearing on this recommendation, you may write the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement." *Id.*

 **\*13** Thus, in accordance with *Hewitt,* Plaintiff received notice of the administrative segregation placement, together with the reason for the placement and was afforded the opportunity to be heard even prior to the hearing if he chose to avail himself of the opportunity. Thus, Plaintiff's due process rights were not violated in

conjunction with his initial placement in administrative segregation. Plaintiff was afforded a hearing which commenced on May 22, 2003, well within the 14 days from the service of the Ad Seg Recommendation on Plaintiff. Any due process claims relating to Plaintiff's initial placement in SHU pending his hearing must be dismissed.

Plaintiff also argues that he was denied due process at both administrative segregation hearings. AC ¶¶ 68. With respect to the first hearing, (May 22-25, 2003), Plaintiff alleges that Defendant Wilkins failed to properly assist Plaintiff by refusing to provide him with requested documents. Plaintiff also alleges that Defendant Squillace denied Plaintiff the right to call witnesses, denied him the right to view documentary evidence, denied Plaintiff a fair hearing, and upheld the administrative segregation recommendation without sufficient evidence. Plaintiff also alleges that Defendant Selsky denied Plaintiff due process when he allowed a second hearing to take place after reversing the first one.

A review of the May 22-25, 2003 hearing transcript shows that Plaintiff was attempting to present evidence that would show his "innocence" of the escape charge, and Defendant Squillace was trying to explain that he was not determining whether Plaintiff was innocent or guilty of the attempted escape, but rather whether Plaintiff should be confined to administrative segregation because of a security threat. May 22-25, 2003 Hearing Transcript at 16, 18. The fact that the investigation was still pending was Defendant Squillace's basis for upholding the recommendation. *Id.* at 17. At the continuation of his hearing on May 25, 2003, Plaintiff stated that his family and his attorney were doing their own investigation into the allegations, and Plaintiff stated that his name was not listed anywhere in the "reports." *Id.* at 20. Plaintiff appeared to be aware of a great deal more information than the hearing officer. *Id.* at 21.

Plaintiff was clearly afforded the ability to respond to the Ad Seg recommendation at the hearing. Plaintiff argued that he had not "done anything wrong" or broken any departmental rules, so he should not be placed in administrative segregation. *Id.* at 23. Plaintiff attempted to argue that he was not an escape risk and that it would be impossible to escape from the facility, whether he were in general population or in SHU. *Id.* at 24. He also argued that he could be placed in Involuntary Protective Custody

(IPC), and that if so, he could get additional visitation rights and could conduct his own investigation into the escape attempt. *Id.* at 25.

**\*14** For the May 22-25, 2003 hearing, Plaintiff had requested various documents from Defendant Wilkins. Plaintiff's Ex. B at 1 (attached to Dkt. No. 105). Plaintiff requested copies of, among other things, the Unusual Incident Report; all "To and From" reports; the name of the individual who authorized Plaintiff's cell search; copies of his own records; copies of DOCS Directives; the investigative reports of the attempted escape; any "confidential reports" from staff and inmates; statements of anyone arrested as a result of the incident; "[a]ll log book entries;" copies of Plaintiff's visiting, clothing, sneaker, and commissary lists; and Plaintiff wished to know whether he was on a "mail watch" and why his visitors were being denied access to the facility. *Id.*

Defendant Wilkins responded by providing some documents, such as Plaintiff's own disciplinary history, the DOCS Directives, and Plaintiff's visiting list. *Id.* at 2. The documents relating to the investigation of the escape attempt were denied to Plaintiff because they were "confidential" to the on-going investigation. *Id.* Although there were witnesses listed on this exhibit, Defendant Wilkins stated that the witness requests would be handled by the hearing officer. *Id.* at 1-2. The hearing officer, Defendant Squillace, did not call any of Plaintiff's proposed witnesses which included his criminal attorney and various other individuals. *Compare* Plaintiff's Ex. B at 1 *with* Dvorin Decl. Ex. E (May 22-25, 2003 Hearing Transcript) at 14-15.

Defendant Squillace found that Plaintiff should remain in administrative segregation because his presence in general population would present a risk to the facility order and security based upon the fact that Plaintiff was under investigation for an escape attempt at Sing Sing. May 22-25, 2003 Hearing Transcript at 29. Plaintiff was clearly told of his right to appeal. *Id.*

On Appeal, Defendant Selsky reversed this determination based on insufficiency of evidence, but remanded the case for a new hearing. Plaintiff alleges that the reversal shows that he was subjected to constitutional violations by Squillace and Wilkins, and also argues that Defendant Selsky violated Plaintiff's due process rights by remanding

the case for a new hearing rather than reversing the matter outright.

The standard for sufficiency of evidence in the prison administrative or disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord,* 04 Civ. 5919, 2007 U.S. Dist. LEXIS 22992, \*10 (S.D.N.Y. March 28, 2007) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990). This stricter standard is not applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton,* 380 F.3d 57, 76 n. 9 (2d Cir.2004).

**\*15** In this case, while it is true that the evidence before Defendant Squillace was minimal, there certainly was evidence that Plaintiff was under investigation for an escape attempt at Sing Sing. Thus, the fact that Defendant Selsky sent the case back for a second hearing does not show that Plaintiff's due process rights were violated by Defendant Squillace, and it does not show that Defendant Selsky's remand for a second hearing in any way violated Plaintiff's due process rights.

With respect to the denial of documentary evidence and witnesses, the Court notes that Plaintiff was attempting to call witnesses who would testify that Plaintiff had a pending challenge to his criminal case [13] and, therefore, he would not try to escape and "ruin" his life. These witnesses were not relevant to the issue of whether Plaintiff was a danger to the security of the institution, and, therefore, were properly denied by Defendant Squillace. Additionally, it is clear that the documentary evidence was part of a continuing criminal investigation, and thus, was not available for Plaintiff to examine.

Although Plaintiff claims that Defendant Maly testified "falsely" that Plaintiff was under investigation, there is no basis for this claim. Plaintiff might be attempting to claim that Maly, and in the second hearing, Defendant Lutz, had no "personal" knowledge of the investigation and had only signed the administrative segregation recommendation because they were told to do so by

Defendant Smith. However, it is clear that Plaintiff was under investigation for his involvement in the attempted escape at all times relevant to the incidents in this case. In any event, as argued by Defendants, Plaintiff has no due process right to be free from false accusations as long as the hearing comports with due process. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

At the second hearing, additional evidence was presented to support the administrative segregation determination. Defendant Seyfert testified outside of Plaintiff's presence. A transcript of Defendant Seyfert's testimony has been submitted as a confidential exhibit to Defendants' motion for summary judgment. (Dkt. No. 125). A review of the exhibit shows that there was substantial evidence of Plaintiff's connection to the escape that was never completed because the individual who entered the prison to assist in the escape left before completing his task.

The additional confidential materials alone would have justified Plaintiff's placement in administrative segregation. Once again, Plaintiff claims that the hearing officer, Defendant Pico, and Plaintiff's employee assistant, Defendant Chiapparino, violated Plaintiff's due process rights. Defendants have submitted both the transcript of the August 29, 2003 rehearing and the Hearing Packet containing all the documents associated with the re-hearing and Plaintiff's appeal of the determination made at the re-hearing. Dvorin Decl. Exs. C (hearing packet) & F (hearing transcript).

***16** Although Plaintiff claims that Defendant Chiapparino violated Plaintiff's rights by refusing to obtain documentary evidence for him, Defendant Chiapparino would have been unable to obtain confidential investigation documents from either the New York State Police, any other law enforcement agency, or from the District Attorney's Office that was handling the criminal investigation and prosecution.

The Court also notes that the purpose of the employee assistant is to obtain documents for an inmate who would otherwise be unable to obtain the documents himself. *See Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Plaintiff was afforded a substantial second hearing in this case. The transcript is ninety pages long. At the beginning of the hearing, Defendant Pico carefully reviewed Plaintiff's request for documents and witnesses from Defendant Chiapparino. August 29, 2003 Hearing Transcript at 4-5. Defendant Pico also indicated which requests were refused. A review of these requests shows that Plaintiff was completely aware of what was alleged to have happened on May 7, 2003 since Plaintiff requested the name of the man who allegedly attempted to enter Sing Sing. *Id.* at 4.

Plaintiff complained at the hearing that he was denied documents. *Id.* at 11. Defendant Pico then asked Plaintiff to state why the documents would be relevant. Plaintiff told Defendant Pico that he had a lawyer who was investigating the case and that he had a private investigator also investigating the case. *Id.* at 12. Plaintiff stated that his lawyer and private investigator already had all the documents that Plaintiff requested from his employee assistant. *Id.* Plaintiff also stated at the hearing that his attorney came to the facility and showed Plaintiff the documents. *Id.*

Defendant Pico pointed out to Plaintiff that if Plaintiff had already seen the documents in question, the only thing missing was for the hearing officer to see them, because if the documents had been produced by Defendant Chiapparino, Plaintiff would simply be presenting the documents to Defendant Pico to "prove [his] point." *Id.* Defendant Pico sent Plaintiff back to his cell to obtain documents that he had been given. *Id.* at 15-16. Plaintiff argued that the documents showed that on the day of the attempted escape, he was in the visiting room in front of 17 corrections officers, and that Plaintiff did not try to escape. *Id.* at 17. Plaintiff then stated that he wished to call the corrections officers that were working on that date to testify that Plaintiff did not attempt to escape, and thus, there was no need to put Plaintiff in administrative segregation. *Id.* Later, however, Plaintiff implied that as long as Defendant Pico saw the documents, Plaintiff did not need the witnesses. *Id.*

Based on the testimony at the second hearing, it is clear that Plaintiff was well aware of the information that he needed to respond to the administrative segregation recommendation. Regardless of whether Defendant Chiapperino was able to obtain the documents requested, Plaintiff had the opportunity to defend himself because he had access to the documents himself. [14] Thus, Defendant Chiapperino did not deny Plaintiff due process prior to the second hearing in failing to produce confidential documents at Plaintiff's request.

**\*17** Defendant Chiapperino was called as a witness at the hearing. *Id.* at 26-28. Plaintiff argued that during a conversation with Plaintiff, Defendant Chiapperino implied that the outcome of the hearing was prejudged against Plaintiff. *Id.* at 26. However, Defendant Chiapperino testified that he and the Plaintiff did not have "a conversation to that effect." *Id.* Defendant Chiapperino also testified that he could not obtain the documents that Plaintiff requested because they were part of an ongoing investigation. *Id.* Plaintiff was allowed to call other witnesses to testify at the hearing, *id.* at 36-38, including another inmate who allegedly heard a conversation between Defendant Chiapperino and Plaintiff. The Court also notes that Defendant Pico agreed to get the Unusual Incident Report from Sing Sing and review it himself, even if Plaintiff was not allowed to see it. *Id.* at 42-43. Defendant Pico also agreed to share any non-confidential portions with Plaintiff. *Id.* Plaintiff continued to be confused that Defendant Pico was going to find Plaintiff "guilty" of the attempted escape, and continued to argue that he was innocent of the attempted escape because he did not commit any misbehavior in the visiting room on the day in question. *Id.* at 65-67.

Defendant Pico initially denied two witnesses who would have allegedly testified that Plaintiff did not commit any misbehavior in the visiting room on May 7, 2003. There was no reason to call these witnesses because Defendant Pico agreed that Plaintiff did not commit any misbehavior in the visiting room, although he did eventually call one of the officers because he was available, and "it didn't hurt." *Id.* at 82-85. Defendant Pico later read his findings into the record. *Id.* at 85-86. Defendant Pico repeated his reasons for refusing to call Plaintiff's attorney and private investigator based on lack of relevance, and found that Plaintiff's presence in general population would be a threat to the safety and security of the facility. *Id.* at 86.

Plaintiff was informed of his right to appeal. *Id.* at 89. Defendant Pico also informed Plaintiff that his status in Administrative Segregation would be reviewed every sixty days. *Id* . at 88. The hearing concluded on September 4, 2003. *Id.* at 89. Plaintiff appealed Defendant Pico's determination, and on November 13, 2003, the determination was affirmed by Defendant Selsky. Dvorin Decl. Ex. C (8/29/03 Hearing Packet) at 1.

Based on all the evidence presented, this Court finds that no due process violations occurred at the re-hearing of Plaintiff's administrative segregation status. Plaintiff was given notice of the reason for the hearing, and during the several day hearing, he was given the opportunity to call witnesses and to present evidence on his behalf. The fact that Defendant Chiapperino could not obtain some of the documents because they were confidential investigative documents did not deny Plaintiff due process, particularly in view of the fact that Plaintiff stated himself that he had an attorney and an investigator who had obtained documents for him.

**\*18** Defendant Pico was justified in denying some of Plaintiff's witnesses as irrelevant. Plaintiff requested that his criminal defense attorney and his private investigator be called to testify. Plaintiff was confused, however, regarding the purpose of the hearing. The issue was not whether Plaintiff was guilty or innocent of the escape attempt, but rather whether he was a risk to the safety and the security of the facility. Thus, there was no purpose in calling these witnesses. [15] In any event, as stated above, the required constitutional due process for administrative segregation is only that Plaintiff be given some notice and opportunity to be heard. *Hewitt, supra.* Although New York State law affords an individual who is admitted to administrative segregation the same rights as an individual who is being charged with a disciplinary infraction, the Court need only consider whether the minimum constitutional due process was provided. A review of the evidence in this case shows that the minimum due process was provided by Defendants Chiapperino, Pico, and Selsky in connection with Plaintiff's second administrative segregation hearing.

Finally, Plaintiff alleges that his hearings were not "impartial ." An inmate is entitled to a hearing officer who does not "prejudge the evidence and who cannot say ... how he would assess evidence he has not seen yet." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *inter alia Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990)). Prison hearing officers, however, "are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *inter alia Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994)).

Plaintiff attempted to show that the outcome of the hearing had been prejudged. Dvorin Decl. Ex. F at 26-32. Defendant Chiapperino was called as a witness and asked

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

whether he had ever had a conversation with Plaintiff, stating that the officials would "probably ... keep reversing this," and implying that the decision had already been made regarding Plaintiff's status. *Id.* at 27. Defendant Chiapperino denied that the conversation took place as Plaintiff stated. *Id.* at 29. Corrections Officer Stokes was called as a witness and asked whether he heard such a conversation between Defendant Chiapperino and Plaintiff. *Id.* at 29. Officer Stokes was present at the meeting between Defendant Chiapperino and Plaintiff but testified that he did not hear any such conversation between the two. *Id.*

There is no evidence from which a fact finder could reasonably conclude that the hearing officers in this case were not impartial or had in some way prejudged the evidence. It was clear at the first hearing that Defendant Squillace did not know very much about the case at all, and at the second hearing Defendant Pico went out of his way to obtain evidence in order to make an informed decision. Thus, Plaintiff's claims that he did not have impartial hearing officers or impartial hearings are dismissed.

**\*19** The Court finds that Plaintiff's initial placement in administrative segregation was proper and any due process claims against any Defendants in connection with Plaintiff's initial placement in administrative segregation, whether in relation to the first hearing or to the rehearing are dismissed. This includes claims against Defendants Seyfert, Daugherty, Lutz, Maly, Wilkins, Squillace, Chiapperino, Pico, Selsky, and Goord.

### B. Periodic Review of Ad Seg

In addition to the requirement that the inmate be given notice and an opportunity to be heard prior to being placed in administrative segregation, prisoners confined to administrative segregation must be given periodic reviews of their confinement so that administrative segregation is not used as a pretext for indefinite confinement of the inmate. *Hewitt,* 459 U.S. at 477 n .9. Those periodic reviews must be "meaningful." *See Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000) (a fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner) (citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1979)). The question of periodic review is a due process claim, separate from the claim for the initial placement in administrative segregation. *See e.g. Blake v. Coughlin,* 92-CV-1351, 2006

U.S. Dist. LEXIS 55319, *14-17 (N.D.N.Y. Aug. 8, 2006) (although it had been determined that Plaintiff's initial placement in administrative segregation was lawful, the constitutionality of the periodic reviews was an issue at trial).

Plaintiff in this case claims that the periodic reviews of his administrative confinement conducted by Defendant Maly were a "sham ." AC ¶ 70. Defendant Maly's declaration states that an inmate's periodic review in administrative segregation is now governed by a formal procedure, conducted every sixty days. Maly Decl. ¶ 4 (citing DOCS Directive 4933). This procedure was established in November of 2002, and was made part of the regulations appearing at 7 N.Y.C.R.R. § 301.4(d).

According to the regulations, the periodic reviews are made by a three-member panel, consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. *Id.* § 304.1(d)(1). The panel examines the inmate's institutional record and submits a recommendation to the Superintendent, who makes the final determination. *Id.* § 301.4(d)(2).

In making the recommendation, the panel considers the reasons why the inmate was initially determined to be appropriate for administrative segregation; information on the inmate's subsequent behavior and attitude; and any other factors that the panel believes would weigh either in favor of or against keeping the inmate in administrative segregation. *Id.* § 301.4(d)(1)(i)-(d)(1) (iii).

In this case, the periodic reviews of Plaintiff's administrative segregation status have been submitted as Exhibit B to the Maly Declaration. As stated above, the reviews initially state that Plaintiff was under investigation for the escape attempt, then they state that Plaintiff had been charged criminally for the escape attempt, that he was later on trial, and finally that he was convicted of the criminal charges. In the May 3, 2003 review, the panel included the information regarding Plaintiff's disciplinary charge for smuggling. Regardless of Plaintiff's good behavior in administrative segregation/ SHU, the reviewers continued to find that Plaintiff was a threat to security.

**\*20** The fact that the reports contain similar language does not necessarily mean that the reviews were a

"sham." In any event, Defendant Maly was only one of three individuals who considered Plaintiff's case at each review, in addition to the Superintendent making the final determination. The initial reason for Plaintiff's placement in administrative segregation was that he was suspected of being involved in the attempted escape. As time passed, the investigation continued to the point where Plaintiff was criminally charged with the attempted escape. His security risk did not change. If anything, as more information surfaced, the security risk may have increased, and the fact that he was found guilty after a trial indicates that the risk was real. Thus, the fact that the initial reason for Plaintiff's placement in administrative segregation was used later as a reason to keep Plaintiff in administrative segregation did not make the panel's review a "sham."

In his response, Plaintiff submits a decision by state trial court Justice Robert DiBella. Plaintiff's Ex. Y. Prior to his criminal trial on the escape charges, Plaintiff moved to suppress a recorded statement that he gave to Defendant Daughtry in which Plaintiff admitted his involvement in the escape attempt. Justice DiBella suppressed the statement, finding that the continuation of Plaintiff's administrative segregation could have been coercive, and that the People had not met their burden of proof beyond a reasonable doubt that the statement was voluntary. *Id.* at 4-7.

Justice DiBella also found that evidence was "lacking" with respect to the decisions made to continue Plaintiff in administrative segregation. *Id.* at 6. Judge DiBella did state that it was "clear that in the days and weeks following the attempted escape, prison authorities had a clear and legitimate need to segregate Defendant from the general inmate population for investigative and security purposes.... However, the People failed to establish the continued institutional need for Defendant's Ad Seg status in the months after the attempted escape." *Id.* Justice DiBella also found that although courts generally defer all matters of internal security to prison authorities, the evidence of extended confinement was relevant to show that Plaintiff's confession was coerced through undue deprivation and promises to release Plaintiff from that deprivation. *Id.* at 7.

In making these findings, Judge DiBella also found that "on balance" the prosecutor's witnesses were "more credible" than the Plaintiff's witnesses, however, there were gaps in the testimony and gaps in the recording of Plaintiff's statement. *Id.* Thus, the prosecution had not shown that Plaintiff's statement was voluntary beyond a reasonable doubt. *Id.*

Although Plaintiff may be attempting to argue that Judge DiBella's decision shows that the Plaintiff's reviews were merely a "sham" to keep Plaintiff in administrative segregation until he confessed to the attempted escape, the Court does not agree. The standard of proof for determining whether Plaintiff's statement was voluntary is completely different than the standard of proof to determine whether Plaintiff was afforded due process relating to his administrative segregation review. Judge DiBella had to find that the Plaintiff's statement was voluntary beyond a reasonable doubt, whereas the standard to uphold a continuing administrative segregation is merely whether the review was "meaningful," including whether the reviewers were unbiased.

**\*21** In *Tellier v. Scott,* the court stated that if the reason for Plaintiff's placement in administrative segregation was his escape risk at the time of his placement, then the periodic review must consider any information relating to a change in petitioner's risk of escape. *Tellier v. Scott,* 94 Civ. 3459, 2004 U.S. Dist. LEXIS 1493, \*28-29 (S.D.N.Y. Feb. 5, 2004). The court stated that officials are not permitted to ignore relevant information as it becomes available. *Id.* at \*29.

Defendant Maly's affidavit notes that the periodic reviews are performed by a panel, and the panel in this case relied upon the "changing circumstances" of the investigation as it progressed until Plaintiff was charged, and later, convicted of his involvement in the attempted escape. Maly Decl. ¶ 10. The panel also considered Plaintiff's disciplinary conviction for the attempted "smuggling" of the personal letter in his legal mail. *Id.* While Plaintiff argues that the charge was unnecessary, that he had placed the personal letter in the legal envelope by mistake, and that the officer should have searched the envelope prior to arriving at the visiting room, it must be remembered that Plaintiff was being investigated for a sophisticated scheme to escape from the facility. The scheme involved smuggling information and contraband in and out of the facility. The fact that Plaintiff could have been attempting to smuggle a personal letter, whether harmless or not, would impact

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

upon a determination of whether the inmate was still a threat to security.

The Court finds that Defendants have shown that there is no question of fact regarding whether they conducted a "meaningful" review of Plaintiff's administrative segregation status, and Plaintiff's due process claims regarding the periodic administrative segregation review must be dismissed as against Defendant Maly.

### C. Contraband Smuggling Charge

Plaintiff also alleges due process violations in connection with the charge that he attempted to smuggle a personal letter in a legal envelope. Plaintiff claims that Defendant Stokes filed a false misbehavior report, Defendant Kimler violated Plaintiff's due process rights by "directing" Defendant Stokes to file the false report, and Defendant Gardner violated Plaintiff's due process rights by finding Plaintiff guilty of the allegedly false charge based upon insufficient evidence. Plaintiff received a thirty-day SHU disciplinary sentence for the violation.

Based on *Sandin, supra,* Plaintiff's thirty-day disciplinary sentence in SHU does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest. Nevertheless, Plaintiff was afforded all the process he was due. Kimler Decl. Exs. A, B, Dvorin Decl. Ex. G (4/8/04 Hearing Transcript); *see Bedoya,* 91 F.3d at 352. Although Plaintiff alleges that the misbehavior report was "false," [16] a review of the testimony at Plaintiff's hearing shows that Plaintiff claimed that "there's really no intent here to smuggle." 4/8/04 Hearing Transcript at 4. Plaintiff does not claim that there was no letter or that the personal letter was not found in his legal envelope, but rather claims that he had a defense to the charge of smuggling because he did not mean to have the personal letter in the legal envelope. Plaintiff also argues that he would have gotten as far as the visiting room with the letter if Defendant Stokes had done "his job," seen the letter sooner, and simply told Plaintiff that he could not take it to the visiting room. *Id.* Plaintiff also argues that there was nothing "bad" in the letter, and that there was nothing "threatening the facility in this letter." *Id.* at 9. Plaintiff later explained to the hearing officer that it would not make sense for Plaintiff to try to smuggle a letter because he was well aware that his papers would be searched, and that it was just an honest mistake. *Id.* at 13-15. Thus, Plaintiff's claim appears not that the misbehavior report

was "false," but rather merely that he had a justifiable defense to the allegation, namely, that he did not intend to smuggle the letter that was, in fact, in his legal envelope.

**\*22** It is not for the court to re-weigh the evidence or the witnesses' credibility at prison disciplinary hearings. *Johnson v. Goord,* 2007 U.S. Dist. LEXIS 22992 at \*21 (citing *Superintendent v. Hill,* 472 U.S. at 455. Because the standard for sufficiency of evidence in a prison disciplinary hearing is "some" or "a modicum" of evidence, [17] it is clear that in this case, the evidence before the hearing officer, Defendant Gardner, met the constitutional standard. Thus, the due process claims against Defendants Stokes, Kimler, and Gardner relating to the April 8, 2004 disciplinary hearing and prior misbehavior report are dismissed.

### D. Grievances

Plaintiff alleges that Defendant Eagen violated Plaintiff's due process rights when he upheld the Superintendent's decision "not to grant Plaintiff a legal call" and to deny Plaintiff's visitation without a hearing.

Prison grievance procedures do not confer any substantive rights that would require due process protection. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (citing *inter alia Mahotep v. Deluca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998)). Thus, to the extent that Plaintiff alleges that his "due process" rights were violated because Defendant Eagen affirmed the denial of his grievances, the claim must be dismissed.

### E. False Arrest

Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's "due process rights" when he arrested Plaintiff without probable cause to believe that he was involved in an escape. AC ¶ 46B. A claim of false arrest is not properly brought under the general due process protection, rather it is brought under the Fourth Amendment right to be free from unreasonable searches and seizures. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *inter alia Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995)). A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Id.* (citing *inter alia Singer v. Fulton County Sheriff,* 63 F.3d 110. 118 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996)).

Zimmerman v. Seyfert, Not Reported in F.Supp.2d (2007)
Case 9:16-cv-01001-MAD-TWD    Document 73    Filed 08/27/18    Page 289 of 299
2007 WL 2080517

Under New York law, the action for false imprisonment was derived from the common-law action of trespass and "protects the personal interest of freedom from restraint of movement." *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 335 N.E.2d 310, 314 (1975), *cert. denied sub nom. Schenbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). A Plaintiff asserting a false arrest claim must show that the Defendant intended to confine Plaintiff; that Plaintiff was conscious of the confinement and did not consent; and finally, that the confinement was not otherwise privileged. *Martinez v. Schenectady,* 97 N.Y.2d 78, 85, 735 N.Y.S.2d 868, 872-73 761 N.E.2d 560, 564-65 (2001) (citing *Boughton,* 37 N.Y.2d at 458, 373 N.Y.S.2d 87, 335 N.E.2d 310).

In this case, Plaintiff alleges that Defendant Daughtry "arrested" Plaintiff on February 10, 2004, without probable cause to believe that Plaintiff attempted to escape. AC ¶ 46B. Since the concept of false arrest deals with "restraint" of movement, Plaintiff cannot under any circumstances present in this case, make a claim for false arrest. Plaintiff was already in prison pursuant to a criminal conviction. Regardless of his "arrest" on additional charges on February 10, 2004, Plaintiff would still have been incarcerated. There was no additional restraint on his liberty, other than the administrative segregation that the court has determined was properly imposed.

**\*23** Additionally, there is no indication that probable cause for Plaintiff's arrest on charges of attempted escape was lacking. If an individual is convicted of the crime for which he was arrested, the conviction is a defense to an action asserting that the arrest was made without probable cause. *Cameron v. Fogarty,* 806 F.2d 380, 388-89 (2d Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). Because Plaintiff was convicted of the charges, there can be no cause of action for false arrest against Defendant Daugherty.

### 4. *Cruel and Unusual Punishment*

Plaintiff claims that conduct by various Defendants rose to the level of cruel and unusual punishment. The Eighth Amendment protects inmates against cruel and unusual punishment. *U.S. CONST . amend. 8.* Cruel and unusual punishment takes the form of "unnecessary and wanton infliction of pain" by prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976). Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmates health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The Eighth Amendment places "restraints" on prison officials, including prohibiting the use of excessive force against inmates. *Id.* at 832. The Eighth Amendment also imposes affirmative duties on prison officials to provide humane conditions of confinement in terms of shelter, adequate food, clothing, and medical care, *id.,* and, in certain circumstances, protect inmates from violence by other inmates. *Id.* at 833.

There is an objective and a subjective prong to the Eighth Amendment analysis. *Wilson v. Seiter,* 501 U.S. at 297. Under the objective prong, the Plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* at 297. In order to be sufficiently serious, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

An inmate's claim that a defendant was deliberately indifferent in protecting him from the violence of other inmates states a claim under section 1983. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). To state an Eighth Amendment claim for failure to protect an inmate, the Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The Defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the Defendant must also draw that inference. *Id.*

**\*24** In this case, Plaintiff alleges Eighth Amendment violations against Defendants Smith, Koemm,

2007 WL 2080517

Karamanos, and Lutz. The Court will consider each Defendant separately.

**A. Smith**

Plaintiff alleges that Defendant Smith violated Plaintiff's Eighth Amendment rights when he failed to protect Plaintiff from another inmate's attack; when he failed to protect Plaintiff against Defendant Karamanos's harassment; when he created a "stressful situation" for Plaintiff; when Smith refused to provide Plaintiff with an alternative to the facility laundry; when Defendant Smith refused to return Plaintiff's typewriter after learning that Plaintiff had pain in his hands from having to write a great deal; when he refused to return Plaintiff's reading lamp after Smith learned that Plaintiff had eye pain, and when he "forced" Plaintiff to shave with a regular razor rather than allowing him to use "electronic clippers."

With respect to the failure to protect, Plaintiff alleges that on August 25, 2003, another inmate assaulted Plaintiff by throwing a cup of urine and feces on him. AC ¶ 51. Plaintiff claims that Plaintiff asked Defendant Smith "several" times to be transferred "from the SHU area" because of threats that Plaintiff had received from other inmates. Id. Plaintiff claims that he was assaulted due to Defendant Smith's failure to act on those requests. Id.

In Defendant's Smith's declaration, he states that he does not recall Plaintiff ever informing him of any threat by a specific inmate, however, Defendant Smith states that he does recall Plaintiff having an "altercation" with another inmate in the SHU recreation yard, at which time Plaintiff was moved to a separate SHU area. Smith Decl. ¶ 10. Plaintiff was deposed in this action on April 18, 2006. A transcript of the deposition has been included in Defendants' submissions in support of summary judgment. During the deposition, Plaintiff was asked what he told Defendant Smith about the threats, and Plaintiff stated that he specifically told Defendant Smith that the way that the visiting room was set up was dangerous. Deposition Transcript (DT) at 74. Plaintiff stated that although he told Defendant Smith that he was receiving threats, he did not tell Defendant Smith which inmates were threatening him or the nature of those threats. Id. at 74-75.

Plaintiff also claims that he told Defendant Smith that he would like to be moved to the hospital or moved to the "other side" of SHU because "certain inmates" were

stating that if they "landed in the visiting room" with Plaintiff, they would "cut him" or beat him up. Id. at 76. Plaintiff then explained that the August 25, 2003 assault took place in the SHU recreation yard (not in the visiting room). Id. Plaintiff states that an inmate began a conversation with Plaintiff, but Plaintiff did not respond. Plaintiff states that the inmate then kicked the gate that separated him from Plaintiff, [18] and when Plaintiff looked up, the inmate threw the cup of urine and feces through the gate at Plaintiff. Id. at 77.

**\*25** When Plaintiff was asked who the inmate was that threw the urine and feces, Plaintiff stated that he had "[n]ever seen him before," and that he never saw him again because he was "moved to the other side after the incident." Id. (emphasis added). From Plaintiff's own description of the incident, it cannot reasonably be concluded that Defendant Smith was deliberately indifferent to a serious risk of harm to Plaintiff. Plaintiff states that he told Defendant Smith about a risk to him in the visiting room generally. Additionally, he never told Defendant Smith about any danger from specific inmates, and Plaintiff admitted at the deposition that he had never before seen the inmate who assaulted him. Finally, Plaintiff also admits that as soon as the assault occurred, he was "moved to the other side." This statement is consistent with Defendant Smith's declaration. Thus, this court finds that Plaintiff has not raised an issue of fact regarding Defendant Smith's alleged failure to protect Plaintiff from the assault.

Plaintiff also claims that Defendant Smith violated Plaintiff's Eighth Amendment rights by denying him a typewriter, a lamp, and his electric clippers. Defendant Smith states that these items were denied Plaintiff due to administrative segregation regulations and not due to any desire to deprive Plaintiff of any constitutional rights. Smith Decl. ¶¶ 19-21. Defendant Smith states that Plaintiff's typewriter, reading lamp, and electric clippers were not among the "standard issue" items or otherwise permissible property in SHU, and they were confiscated and stored upon Plaintiff's admission to SHU. Id. ¶ 20.

Defendant Smith does, however, state that Plaintiff was "provided with reasonable alternatives" to his requests. Id. ¶ 21. He was provided unlimited writing materials, his cell was adequately lighted to permit reading and writing, and he was issued a razor at each shower upon request. Id. ¶ 21. Finally, Defendant Smith states that no inmates

are given the privilege of laundering their clothing "in their own fashion." *Id.* ¶ 22. Defendant Smith states that he told Plaintiff that any concerns regarding his laundry had to be addressed to the area supervisor and not to the Superintendent's office. *Id.*

None of the "deprivations" alleged by Plaintiff rise to the level of constitutional violations. There is no constitutional right to a typewriter, [19] a particular lamp, to electric clippers, or to an "alternative" to the facility laundry. Although Plaintiff makes conclusory allegations of "hand pain" from excessive writing and "eye pain" from the lack of his personal lamp, he does not allege deprivations of the "minimal necessities" of life or serious injury. He does not indicate that he suffered any particular damage from these alleged denials. He does not even explain why he needed an alternative to the facility laundry. Although he complains about razor "bumps," there is no claim of a serious medical need relating to these bumps.

**\*26** Plaintiff also alleges that Defendant Smith caused a "stressful situation," resulting in Plaintiff suffering a stroke. Plaintiff claims that this "stressful" condition violated Plaintiff's Eighth Amendment rights. Since this court has found that Plaintiff's placement and retention in administrative segregation comported with due process, and Plaintiff does not allege any other reason for his "stress," there is no merit to the claim that Defendant Smith "caused" Plaintiff's alleged stroke. Moreover, there is no evidence of causation linking Plaintiff's Ad. Seg. placement with his stroke. Plaintiff does not claim that he was denied proper medical care.

During Plaintiff's deposition, he stated that the doctor [20] told Plaintiff that he was "faking" the stroke. DT at 87. However, Plaintiff stated that the next morning, the nurse told the doctor that Plaintiff's blood pressure was "way over," and that the doctor "agreed with the nurse" and put Plaintiff on Procardia for "high blood pressure." DT at 87-89. There is no indication that Defendant Smith caused Plaintiff's medical condition.

### B. Koemm

In addition to other claims, Plaintiff alleges that Defendant Koemm violated Plaintiff's right to be free from cruel and unusual punishment on March 2, 2004 when Plaintiff was transported to court. Plaintiff alleges

that Defendant Koemm forced Plaintiff out of his cell at 7:00 a.m., demanded that he only wear his underwear, and forced him to walk more than 100 feet in the cold in front of other inmates and female officers. Plaintiff also claims that on July 27, 2004, during another trip to court, Defendant Koemm refused to feed Plaintiff and kept him in shackles for more than eleven hours.

Defendant Koemm states in his declaration that he did arrive at Plaintiff's cell early in the morning without advance notice that Plaintiff was being transported to court. Koemm Decl. ¶ 13. The purpose of this procedure is so that the inmate would not be able to smuggle items out of his cell and would not have the opportunity to contact other inmates, friends, or family regarding the logistics of his transportation. Due to the fact that Plaintiff was under investigation for attempted escape, he was considered a "high risk" inmate. *Id.* ¶ 11.

Defendant Koemm further states that Plaintiff was wearing boxer shorts and a t-shirt and was given shower shoes to walk to the frisk area. *Id.* ¶ 13. Plaintiff was escorted by Defendant Koemm and other officers to a separate part of the facility where Plaintiff was strip frisked and issued clothing to wear to court. *Id.* Again, the purpose of this procedure was to prevent the inmate from concealing items in clothing that was kept in his cell. *Id.* Finally, Defendant Koemm states that the area from Plaintiff's cell to the frisk area is completely enclosed, and Plaintiff did not have to leave the building to enter the transportation van until he was fully clothed. *Id.* ¶ 14.

**\*27** Plaintiff's claim that he was not given notice of his transportation to court or that he had to walk 100 feet in the cold does not rise to the level of cruel and unusual punishment. Plaintiff was given shower shoes, and he was wearing boxer shorts and a t-shirt. There is no indication that Plaintiff suffered any "unnecessary or wanton infliction of pain" in violation of the Eighth Amendment. It has been held that using restraints during transportation of an inmate is necessary to protect staff, other inmates, and the public. *See Richardson v. Castro,* 97-CV-3772, 1998 U.S. Dist. LEXIS 7457, \*16-17 (E.D.N.Y. April 24, 1998). In *Richardson,* the court held that there was no due process violation as a result of the use of shackles, and that there was no evidence that the prison officials caused the "unnecessary or wanton infliction of pain" in violation of the Eighth Amendment in using the shackles. *Id.* at \*17.

Defendant Koemm also states that all high risk inmates are shackled during transportation, and upon arrival at the courthouse, the presiding judge makes the determination of whether the shackles should be removed, and in this case, the judge did not order that Plaintiff's shackles be removed. [21] Koemm Decl. ¶ 16. The Court will assume that Plaintiff was shackled for the eleven hours that he claims, but Plaintiff does not allege that he suffered "unnecessary or wanton infliction of pain" or any damage whatsoever from the extended restraint.

Finally, it is true that the Eighth Amendment prevents prison officials from depriving inmates of their "basic human needs" such as food, clothing, shelter, medical care, and reasonable safety. *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quotation omitted). With respect to nutrition, the Eighth Amendment requires that inmates be served nutritionally adequate food that is prepared under conditions that do not present an "immediate danger to the health and well being of the inmates who consume it." *Id.* (citing *Robles v. Coughlin,* 725 F.2d 12, 14 (2d Cir.1983) (per curiam) (internal quotation marks omitted)). The court in *Robles* stated that under certain circumstances, a substantial deprivation of food may rise to the level of a constitutional violation. 725 F.2d at 15 (citation omitted).

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious and the Defendant must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennen,* 511 U.S. at 834. In this case, even assuming that Plaintiff was delayed in appearing before the Grand Jury, and that as Defendant Koemm states, Plaintiff was not given an evening meal, the fact that Plaintiff did not eat until he returned to the facility and may have gone eleven hours without eating does not rise to the level of a constitutional claim against Defendant Koemm. Thus, the Eighth Amendment claim of denial of food is dismissed.

### C. Karamonos

**\*28** Plaintiff alleges that between September 26, 2003 through October 10, 2003, Defendant Karamonos violated Plaintiff's right to be free from cruel and unusual punishment by kicking Plaintiff's cell door every half hour while Plaintiff slept, by refusing to give Plaintiff toilet tissue, writing paper, soap, and toothpaste, by spitting in Plaintiff's food, and by threatening Plaintiff. AC ¶¶ 55, 79.

Inmates have no constitutional right to be free from harassment. *Greene v. Mazzuca,* 2007 U.S. Dist. LEXIS 30923, \*5-6 (S.D.N.Y. April 26, 2007(citing *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). [22] It is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

As in other Eighth Amendment claims, in order for harassment to rise to the level of a constitutional violation, the alleged harassment must be "objectively and sufficiently serious," denying the Plaintiff the "minimal civilized measure of life's necessities." *Greene v. Mazzuca,* 2007 U.S. Dist. LEXIS 30923 at \*6. Additionally, the Defendant must have exhibited deliberate indifference to the inmate's health or safety. *Id.* Finally, the Plaintiff must show that the alleged harassment resulted in some injury or damage. *Id.* (citations omitted).

In this case, Plaintiff filed grievances regarding Defendant Karamonos's alleged behavior. The grievance documents have been submitted as Exhibits B and C to Defendant Smith's declaration. Plaintiff's main complaint appeared to be the denial of his magazines. Although the federal complaint alleges that Defendant Karamonos kicked Plaintiff's cell door "every half an hour while he slept," the grievances state that most of Defendant Karamonos's alleged kicking occurred at 3:00 p.m. in the afternoon, and at the latest by 11:00 p.m. [23] At his deposition, Plaintiff stated that if Plaintiff wanted to sleep during Defendant Karamonos's shift, this Defendant would kick the bottom of the gate and wake Plaintiff up. DT at 96-97.

While it is true that Plaintiff alleged in his grievances that Defendant Karamonos denied Plaintiff tissue, pens, and other items in order to harass Plaintiff, Plaintiff does not allege that he did not receive these necessities from other officers at other times or that he was unable to maintain his hygiene for any length of time. In fact, at his deposition, he stated that Defendant Karamonos worked only the 3-11 shift on Monday through Friday, and Plaintiff was able to get "tissue" and he was able to get writing paper on the weekends. DT at 99-100. It has been held that a temporary denial of toiletries, while

2007 WL 2080517

perhaps uncomfortable, does not create such an "obvious risk to an inmate's health and safety" to show deliberate indifference by Defendant. *Chavis v. Kienert,* 2005 U.S. Dist. LEXIS 41920, 66-67 (N.D.N.Y. Sept. 30, 2005).

**\*29** With regard to Plaintiff's claim that Defendant Karamonos tampered with or "spit" in his food, there is insufficient evidence of such before to the Court to sustain the claim. *Chavis,* 2005 U.S. Dist. LEXIS 41920, *65-66. While claims of unsanitary, spoiled or contaminated food may be sufficient to raise an Eighth Amendment claim, the allegations in the Amended Complaint that Defendant Karamonos "spit" in Plaintiff's food and poked his finger in Plaintiff's food are conclusory and unsubstantiated. *See* AC ¶ 55.[24] Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal. *See Chavis,* 2005 U.S. Dist. LEXIS 41920, *65-66. Plaintiff's Eighth Amendment claims against Defendant Karamonos are dismissed.

### D. Lutz

Plaintiff's last Eighth Amendment claim states that Defendant Lutz would not allow Plaintiff to shower for forty five minutes after another inmate attacked Plaintiff with feces and urine. AC ¶ 52. In his declaration, Defendant Lutz states that on August 25, 2003, he was a Sergeant, and the SHU Supervisor at Shawangunk. Lutz Decl. ¶ 4. Defendant Lutz was apparently not present in the SHU at the specific time that this incident occurred. Defendant Lutz states that he was told that Plaintiff had been involved in a disturbance in the yard, and on the way to the yard, Defendant Lutz stopped at Plaintiff's cell "for about a minute" to inquire what had happened, but that Plaintiff would not tell him. *Id.* ¶ 5.

Defendant Lutz then went to the yard. *Id.* Defendant Lutz arrived at the yard thirty minutes after the incident. *Id.* ¶ 6. When Defendant Lutz arrived at the yard, he was told that the incident involved another inmate throwing feces and urine on Plaintiff. *Id.* ¶ 7. Defendant Lutz states that he requested that an officer photograph the area where the incident took place. *Id.*

Defendant Lutz also stated that following the incident, there was considerable commotion in the SHU unit, which could have caused a threat to security, and that after remaining in the yard for a few minutes, Defendant Lutz returned to Plaintiff's cell to again ask what had occurred.

*Id.* ¶¶ 9-10. However, Plaintiff declined to respond and refused any medical treatment. *Id.* ¶ 10. Plaintiff was then moved to the protective custody side of SHU for his own safety. *Id.* ¶ 11. Defendant Lutz states that he brought Plaintiff to the shower "within approximately 10 minutes of arriving at his cell for the second time." *Id.* ¶ 13. Although Plaintiff alleges that Defendant Lutz threatened that he would not take Plaintiff to shower until Plaintiff told Defendant Lutz what happened, Defendant Lutz states that any delay in bringing Plaintiff to the shower was to ascertain what had happened, assess the situation and the resulting commotion in SHU, and move Plaintiff for his own protection. *Id.* ¶ 14.

Plaintiff alleges that he was not allowed to shower "until forty-five minutes after the assault in the SHU recreation yard." AC ¶ 52 (emphasis added). While this fact may be accurate, there is no dispute that Defendant Lutz did not arrive at the SHU yard until thirty minutes after the incident, so any delay caused by Defendant Lutz could only have been approximately fifteen minutes, which is completely consistent with Defendant Lutz's statement. Based on the undisputed facts, no reasonbale fact finder could conclude that the deprivation imposed on Plaintiff by this Defendant[25] was "sufficiently serious," or that Defendant Lutz was deliberately indifferent to a serious risk of harm to Plaintiff. Thus, all of Plaintiff's Eighth Amendment claims are dismissed.

### 5. *First Amendment*

**\*30** Plaintiff alleges various other claims. These claims relate to his ability to receive mail, his visitation, and his right to confer privately with counsel. Interference with mail, in general, implicates an inmate's First Amendment right to free speech, and interference with an inmate's legal mail also implicates the Plaintiff's First Amendment right to access to courts.

An inmate has the First Amendment right to the free flow of incoming and outgoing mail. *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006). Regulations limiting the right to send and receive mail are valid if "reasonably related to legitimate penological interests." *Id.* (citing *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). When courts consider competing interests, they have consistently afforded greater protection to an inmate's legal mail in comparison to an inmate's personal

mail. *Id.* (citation omitted). Claims regarding legal mail are often tied to claims of the denial of access to courts. *Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002).

In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Turner v. Safely,* 482 U.S. at 89. Finally, the court must determine whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

With respect to visitation, it has been generally held that there is no First Amendment right to visitation in prison,[26] however, the Supreme Court has analyzed restrictions on visitation under the *Turner* standard. *See Overton v. Bazzetta,* 539 U.S. 126, 137, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Finally, inmates have no "per se" constitutional right to use a telephone. *Charles v. Maleh,* 02-CV-1341, 2006 U.S. Dist. LEXIS 9878, *26-27 (D.Conn. Mar. 8, 2006) (citing *inter alia Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) (holding that inmates have no right to unrestricted telephone use)).

### A. Smith

Plaintiff alleges that Defendant Smith improperly instituted a mail watch in violation of Plaintiff's First Amendment rights. Plaintiff also claims that Defendant Smith denied Plaintiff telephone calls to his attorney and a visit with his attorney, as well as a visit with his clergyman.

Defendant Smith concedes that he placed a mail watch on Plaintiff's mail. Smith Decl. ¶ 16. Defendant states that the order was based upon DOCS Directive No. 4421, § 721.3(c)(1)-(4)[27] and a request from the Inspector General's Office. The mail watch order, the reasoning for that order, and the extensions of that order have been submitted as an exhibit to Defendant Smith's declaration.[28] Smith Decl. Ex. F. Defendant Smith states in his declaration that the basis for the order was the determination that because of the ongoing criminal investigation of Plaintiff for the attempted escape, his mail, including his legal mail, posed a threat to facility security. Smith Decl. ¶ 16.

**\*31** Directive No. 4421 which governs privileged correspondence provides that even privileged or legal mail may be opened outside the presence of the inmate if the Superintendent makes a written determination that the mail poses a threat to the security or order of the facility. Smith Decl. Ex. E, DOCS Directive 4421, § 721.3(c) (1)-(4). The directive does provide that if the Superintendent authorizes an inmate's privileged mail to be read, it may only be read by the Superintendent, a deputy Superintendent (DSS), or Central Office Staff. *Id.* § 721.3(c)(2). The orders in this case properly provided that the mail was to be "detained" (not opened) and sent to the DSS Office. *See* Smith Decl. Ex. F at p. 2. The mail would only be read by the DSS or the Superintendent. The mail watch was initiated on May 16, 2003 and was extended every 60 days until June 22, 2005. *Id.* at p. 1.

Although Plaintiff complains about the procedures that were used when he was in administrative segregation, he must remember that he was being investigated for his involvement in an attempted escape, and this involvement included communications with individuals both inside and outside of the prison. The reasonableness of the mail watch is clear. Although Plaintiff attempts to justify his arguments by bitterly maintaining that he never did anything and did not attempt to escape, this is true only because the attempt was thwarted before Plaintiff had the opportunity to participate. The fact that he did not actually do anything does not mean that he was not involved in planning the escape that never occurred. Thus, Plaintiff's First Amendment claim regarding his mail watch are dismissed.

To the extent that Plaintiff is attempting to raise a First Amendment denial of access to courts claim based upon the interference with his legal mail, he must show actual injury as a result of the deficient access to courts. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The cause of the injury must be inadequacy of the access. *Id.* at 351. Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

In this case, Plaintiff has not made the requisite showing. The fact that he was convicted of the criminal charges does not indicate that the "cause" of the injury was Plaintiff's mail watch. Plaintiff has made an inadequate showing

that the mail watch somehow caused or contributed to his conviction. Plaintiff cites no other case that was hindered or lost because of the mail watch. Thus, any First Amendment claim of denial of access to courts based upon the mail watch must be dismissed.

Plaintiff alleges that Defendant Smith denied Plaintiff a visit from Minister James Willis on May 25, 2003 and a visit from Plaintiff's attorney on June 18, 2003. Defendant Smith states in his declaration that he did not personally deny Plaintiff a visit from Minister Willis, [29] but rather handled the grievance that Plaintiff filed as a result of that denial. [30] Smith Decl. ¶ 14. Plaintiff filed a grievance regarding the denial of the Minister's visit. (Dkt. No. 105, Plaintiff's Ex. J). In the grievance, Plaintiff alleged that the Minister Willis was not allowed to visit Plaintiff because he did not have "official I.D.," and that his identification was confiscated so that the facility could verify that he was a "real chaplain."

 **\*32** Again, there is no question that Minister Willis was not initially allowed to visit Plaintiff. However, during Plaintiff's deposition, he admitted that Minister Willis was allowed to visit Plaintiff a few weeks later, and was allowed to visit Plaintiff various times after the only time that he was questioned about his identity. [31] DT at 49-51. Given the facts surrounding the investigation of Plaintiff, and the fact that the individual who entered the facility to assist Plaintiff in escaping was impersonating a corrections officer and had false identification, it is quite reasonably related to the safety and the security of the facility that anyone visiting Plaintiff thereafter would be subject to a verification procedure.

The same is true for the one denial of Plaintiff's visit with Attorney Robert Horne. Defendant Smith states that Plaintiff was denied a visit with Attorney Horne on June 3, 2003. [32] Smith Decl. ¶ 15. Defendant Smith states that the reason for this denial was that Attorney Horne was not properly listed for visiting purposes, but that upon further review, a visit with Attorney Horne was authorized. *Id.* During his deposition, Plaintiff testified that Attorney Horne was coming to visit Plaintiff to discuss representing him on the potential criminal case against him relating to the escape attempt. (DT at 52).

When he first attempted to visit Plaintiff, Attorney Horne was not actually representing Plaintiff. *Id.* However,

Plaintiff conceded during his deposition that Attorney Horne was allowed to visit Plaintiff a month later. (DT at 52-53). Plaintiff stated at his deposition that the attorney told Plaintiff that he was not allowed to visit Plaintiff the first time because "they" did not want Plaintiff to know what was "going on." (DT at 53). However, apparently this was not a problem the following month when Attorney Horne was allowed his visit. Plaintiff stated that Attorney Horne did not ultimately represent Plaintiff at the criminal trial, thus, no harm to Plaintiff's criminal case could have been caused by the denial of one visit. (DT at 53). The failure to allow Attorney Horne to visit Plaintiff on one occasion did not violate any of Plaintiff's First Amendment rights.

Plaintiff claims that Defendant Smith denied Plaintiff the opportunity to call another attorney on the telephone. On June 1, 2003, Plaintiff filed a grievance regarding this denial. (Dkt. No. 105, Plaintiff's Ex. L). Plaintiff's rationale for requesting the telephone call was that he was under investigation, and could have "future" charges brought against him. *Id.* Plaintiff also stated that he could not write to his attorney because "all of [his] legal and personal mail [was] being held by the Inspector General and DSS Maly, so there is no other way for me to contact my lawyer." *Id.*

Contrary to Plaintiff's claims, he was under a "mail watch." His mail was not being "held." The grievance was denied because telephone calls in administrative segregation were prohibited, "except for emergency calls and legal telephone calls as approved by the superintendent." (Dkt. No. 105, Plaintiff's Ex. N). The Central Office Review Committee upheld Defendant Smith's determination that allowing Plaintiff to make telephone calls would compromise security, and advised Plaintiff that he could write to his attorney. *Id.*

 **\*33** Notwithstanding this denial, Plaintiff was later allowed to make the emergency telephone call at the request of his attorney. Defendants have submitted a letter from Plaintiff's attorney dated September 2, 2003 thanking the facility for arranging an emergency telephone conference regarding Plaintiff's appeal. Smith Decl. ¶ 18 & Defendants' Ex. G (letter from Ronald L. Kuby). Attorney Kuby's letter requested that another telephone call be scheduled for the following week, prior to oral argument on Plaintiff's appeal. *Id.* Plaintiff does

not indicate that he suffered any injury as the result of the inability to telephone his attorney from the facility.

### B. Eagen

Plaintiff also names Defendant Eagen as being responsible for the First Amendment violations because Defendant Eagen affirmed the denial of Plaintiff's grievances. As stated above, Defendant Eagen states in his declaration that he actually has no vote in the resolution of the grievance appeals, and in any event, this court has found that there were no First Amendment violations in the first instance. Thus, Plaintiff's First Amendment claims regarding visitation and legal mail may be dismissed as to Defendant Eagen.

### C. Koemm

Plaintiff alleges that he was denied the right to confer in private with his attorney on February 10, 2004 and on March 2, 2004. AC ¶ 56. Plaintiff alleges that he was effectively prevented from speaking with his attorney prior to his appearance in court. *Id.* During Plaintiff's deposition, he stated that he was not prevented from conferring with counsel, but that there was a corrections officer present during the conversations. (DT at 105-107). Plaintiff also conceded at the deposition that he was able to speak with his attorney in court at counsel table, and that his attorney visited him at Shawangunk. (DT at 105-106).

In his declaration, Defendant Koemm states that because Plaintiff was "high risk" status, the security threat required that there be at least one officer standing "at a reasonably close distance" to Plaintiff while he conferred with counsel. Koemm Decl. ¶¶ 6-7. Defendant Koemm states, however, that the officer remained at an "optimal distance" in order to "balance the competing interests of security and privacy." *Id.* ¶ 7.

Plaintiff only alleges these two instances in which he was allegedly prevented from conferring "privately" with counsel. Clearly, because Plaintiff was being charged with escape, it was reasonable to consider him a "high risk" inmate. The restriction on Plaintiff's privacy on these two occasions, particularly since Plaintiff was able to confer with his attorney at counsel table, was rationally related to legitimate security interests. Thus, even assuming that Defendant Koemm or one of his officers needed to stand in close proximity to Plaintiff, doing so did not violate any

of his constitutional rights. Plaintiff does not claim that he was harmed in any way by this alleged invasion of his privacy on these two isolated occasions. Thus, Plaintiff's constitutional claims against Defendant Koemm may be dismissed.

### 6. *Retaliation*

**\*34** In order to establish a claim of retaliation for the exercise of a constitutional right, Plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by Defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, Plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). [33]

The court in *Dawes* stated that in order to survive summary dismissal, the Plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the Defendant took adverse action against the Plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted). Although it is sometimes argued that in order to establish that an act was sufficiently "adverse," a Plaintiff must allege an actual chill of his or her First Amendment rights, the Second Circuit has held that in a prison context, all that is required is that the adverse conduct by Defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). In *Gill,* the court held that this objective test applied, even where a particular Plaintiff was not subjectively deterred and continued to file grievances and lawsuits. *Id.*

In this case, Plaintiff's final argument is that Defendant Kimler retaliated against Plaintiff for filing a lawsuit

2007 WL 2080517

against "her peers." AC ¶ 67. Plaintiff claims that Defendant Kimler took Plaintiff's legal books and refused to return them. *Id.* Defendant Kimler states in her declaration that on August 3, 2004, Corrections Officer Cusack performed a routine cell search of Plaintiff's SHU cell and confiscated "among other things, books and magazines that were in excess of the number of items allotted SHU inmates." Kimler Decl. ¶ 5. Defendant Kimler states that the excess books and magazines were simply placed in Plaintiff's personal property box according to DOCS Directive 4933. *Id.* Defendant Kimler states that one book, entitled "Prisoner Self-Help Litigation Manual" was returned to the Law Library, and a bible was returned to Plaintiff. *Id.* Defendant Kimler also states that Officer Cusack did not issue a misbehavior report, but that Plaintiff complained so much that Defendant Kimler investigated the situation further. *Id.*

Defendant Kimler contacted the law library staff and determined that although two books had been signed out by Plaintiff, they were both Federal Reporters, and not the Prisoner Self-Help Litigation Manual. *Id.* Defendant Kimler states that although Plaintiff may argue that his mother sent him the manual in question, Defendant Kimler noted that the book was "clearly stamped 'SHU' in large letters on the front and on the binding of the book." *Id.* ¶ 6. Defendant Kimler concedes that the books were not taken because they were a "threat" to facility security, rather they were simply confiscated because Plaintiff had too many books in his SHU cell. *Id.*

**\*35** In the amended complaint, Plaintiff's claim against Defendant Kimler is mentioned in two paragraphs, both stating in a conclusory fashion that Defendant Kimler took Plaintiff's legal books in retaliation for his filing "a" lawsuit. AC ¶¶ 67, 84. There is absolutely no explanation of why Plaintiff believes this to be true, and this is the type of conclusory allegation that cannot withstand a motion for summary judgment.

It is unclear to which lawsuit Plaintiff is referring. The original complaint in this case was filed on November 17, 2003. The original complaint did not name Defendant Kimler as a Defendant. (Dkt. No. 1). The amended complaint was filed on October 15, 2004. (Dkt. No. 36). The books mentioned in Defendant Kimler's declaration were confiscated on August 3, 2004, and they were not confiscated by Defendant Kimler. The search was conducted by Officer Cusak, and he decided not to issue a misbehavior report for the unauthorized number of books. Kimler Decl. ¶ 5. Plaintiff does not respond to Defendant Kimler's assertions of fact.

Without more, Plaintiff's conclusory allegations of retaliation cannot survive. There is no relationship between the confiscation of books in 2004 by Officer Cusak and Defendant Kimler's refusal to return a book that did not belong to Plaintiff and Plaintiff's lawsuit. Defendant Kimler has asserted a valid reason for the confiscation of the books, and Plaintiff does not challenge this assertion of fact. Thus, Plaintiff's final claim is dismissed.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that Plaintiff's motion for partial summary judgment (Dkt. No. 105) is **DENIED,** and it is

**ORDERED,** that Defendants' cross-motion for summary judgment (Dkt. No. 121) is **GRANTED** and the amended complaint is **DISMISSED IN ITS ENTIRETY.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2080517

Footnotes

1   This is Plaintiff's third amended complaint. The original complaint was filed on November 17, 2003. (Dkt. No. 1). The Court ordered Plaintiff to file an amended complaint because the original did not comply with FED. R. CIV. P. 8 & 10. (Dkt. No. 9). Plaintiff's first amended complaint also did not comply with the Federal Rules, so the Court ordered the first amended complaint stricken and ordered Plaintiff to file another amendment. (Dkt.Nos.8, 9). Plaintiff filed a second amended complaint that was accepted by the Court. However, Plaintiff was later granted a motion to amend, and filed his third amended complaint which is now under consideration. (Dkt.Nos.26, 35, 36).

2   Dvorin Declaration, Exs. A(1) & A(2).

2007 WL 2080517

3    Defendant Daughtry states that Plaintiff was convicted of bribery, promoting prison contraband, attempted escape, and conspiracy. Daughtry Aff. ¶ 10.

4    These restrictions include restricted movement around the facility, access to telephones, visitation, and packages. Smith Aff. ¶ 7.

5    A transcript of Defendant Seyfert's testimony has been filed under seal for the Court's review. (Dkt. No. 125).

6    These reviews were dated July 9, 2003; October 31, 2003; and January 5, 2004.

7    Although the Defendants Exhibits refer to an April 8, 2004 disciplinary hearing, the transcript of the hearing indicates that the hearing took place on April 7, 2004. Dvorin Decl. Ex. G.

8    Plaintiff was already "confined" to the SHU under administrative segregation, thus, he was not "confined" pursuant to the misbehavior report.

9    The court notes that "visiting room" in this particular situation was the second floor infirmary, where Plaintiff was being taken "for his SHU visit." 4/8/04 Hearing Transcript at p. 11.

10    Plaintiff also claims that Defendants John Doe 1 and John Doe 2 harassed Minister Willis when he attempted to visit Plaintiff. AC ¶ 47. Although the claim that Plaintiff's rights may have been violated by denial of his visitor may be actionable, to the extent the amended complaint could be read as alleging the harassment of his visitor, Plaintiff cannot raise or recover for the rights of others in this action. *See Nguyen Thang Loi v. Dow Chem. Co.,* 373 F.Supp.2d 7, 50 (E.D.N.Y.2005) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc. .,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). In any event, Plaintiff has neither identified nor served either John Doe.

11    Officer Cusack is not a Defendant in this case.

12    Although the standard for determining whether a liberty interest is created is now governed by *Sandin,* rather than by *Hewitt,* the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

13    The criminal case to which Plaintiff is referring is the conviction for which he was incarcerated at the time of the escape attempt, not the prosecution for the escape attempt.

14    Plaintiff also had a newspaper clipping relating the facts of the incident at Sing Sing. *Id.* at 22.

15    Defendant Pico did call some of the witnesses requested by Plaintiff who were corrections officers in the visiting room. Dvorin Decl. Ex F at 83. Lieutenant Seward did not remember whether Plaintiff was in the visiting room on May 7, 2003, although Lt. Seward did know who the Plaintiff was. *Id.*

16    A false misbehavior report, in itself, does not rise to the level of a due process violation. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

17    *Superintendent v. Hill,* 472 U.S. at 455.

18    Plaintiff stated that the two inmates were separated by wire fencing. DT at 77.

19    *See Taylor v. Coughlin,* 29 F.3d 39 (2d Cir.1994) (there is no constitutional right to a typewriter as incident to the right of access to courts). A typewriter is not considered one of the minimal necessities of life and thus would not be related to the Eighth Amendment in any event.

20    Dr. Forte was initially named as a Defendant, but is now deceased and there has been no substitution. (DT at 87).

21    The court also notes that in Plaintiff's response to the cross-motion for summary judgment he has included portions of the memorandum in his state court motion to set aside the verdict. (Dkt. No. 128, Exhibits Pt. 2). In this memorandum, Plaintiff argues that DOCS had nothing to do with Plaintiff remaining in shackles during his Grand Jury testimony, that it was the prosecutor's decision, and that the prosecutor "managed to manipulate Judge Walker in an exparte [sic] hearing...." Exhibits, Pt. 2 at p. 1. This is completely consistent with Defendant Koemm's statement that it was the presiding judge's decision to maintain the restraints on Plaintiff. Plaintiff cannot make one argument in his state court papers and make the opposite argument in this case.

22    *Shabazz v. Pico* was vacated in part on other grounds unrelated to the harassment issue. *See Shabazz v. Pico,* 205 F.3d 1324 (2d Cir.2000), *reported in full,* 2000 U.S.App. LEXIS 3404 (2d Cir. Feb. 24, 2000).

23    Plaintiff states in his grievance that Defendant Karamonos worked the 3:00-11:00 p.m.

24    Plaintiff's claim does not appear to be based upon an allegation of daily food tampering, but rather upon isolated incidents during the 2 week period. *See* Smith Decl. Ex. B & C.

25    This Defendant cannot be responsible for a delay prior to the time that he arrived and was in a position to remedy the situation.

26   *See Calderon v. Dzurenda,* 2006 U.S. Dist. LEXIS 55831, *8-10 (D.Conn. July 24, 2006).

27   Although Defendant Smith refers to this provision as a section of the DOCS Directive, the regulation is also contained in Title 7 of the New York Code of Rules and Regulations. N.Y. COMP.CODES R. & REGS., tit. 7, § 721.3. (7 NYCRR).

28   The court does note that the mail watch orders themselves reference DOCS Directive 4422 which governs general, rather than privileged correspondence. The Superintendent's handwritten order, however, states that the order includes legal mail. Smith Decl. Ex. F at p. 3.

29   Plaintiff claims that the "John Doe" Defendants harassed Minister Willis when he attempted to visit Plaintiff. These John Doe Defendants were never identified or served. Because the court is finding that there was no First Amendment violation in the initial denial of visitation, this court would have dismissed the action as against these John Doe Defendants in any event.

30   There is no question that Plaintiff was initially denied the opportunity to visit with Minister Willis.

31   It was during that later visit that Minister Willis told Plaintiff that the minister had been "harassed" at the front gate and had his identification confiscated. (DT at 50).

32   Defendant Smith states that although Plaintiff alleges that the denial took place on June 18, 2003, the facility records indicate that the denial occurred on June 3, 2003.

33   The court would note that *Dawes* did not create a "heightened pleading standard", and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See Phelps v. Capnolas,* 308 F.3d 180, 187 (2d Cir.2002). The decision in *Phelps* resulted from a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6), and the court was considering only the face of the complaint. This case comes before the court upon a motion for summary judgment, thus, this case is distinguishable from a situation in which only the complaint is being examined.

---

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.